UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
THE CITY OF NEW YORK,

         Plaintiff,

-against-

GOLDEN FEATHER SMOKE SHOP, INC., KIMO
SMOKE SHOP, INC., SMOKE AND ROLLS INC.,
SHAWN MORRISON, KIANA MORRISON, in her
individual capacity, MONIQUE'S SMOKE SHOP,
ERNESTINE WATKINS, in her individual capacity,
JESSEY WATKINS, WAYNE HARRIS, PEACE PIPE
SMOKE SHOP, RODNEY MORRISON, Sr.,
CHARLOTTE MORRISON, in her individual capacity,
RED DOT & FEATHERS SMOKE SHOP, INC.,
RAYMOND HART, in his individual capacity,
SMOKING ARROW SMOKE SHOP, DENISE
PASCHALL, in her individual capacity, TONY D.
PHILLIPS, TDM DISCOUNT CIGARETTES, and
THOMASINA MACK, in her individual capacity,

         Defendants.

--------------------------------------------------------------------x

**MEMORANDUM & ORDER**
08-CV-3966 (CBA)

AMON, United States District Judge.

      The City of New York brought this action against the above-captioned defendants,

seeking injunctive relief, penalties and damages under the Contraband Cigarette Trafficking Act,

18 U.S.C. § 2341 et seq. (the "CCTA"), and the Cigarette Marketing Standards Act, N.Y. Tax L.

§ 483 et seq. (the "CMSA"). Defendants are individuals and businesses engaged in the sale of

cigarettes from the Poospatuck Indian Reservation in Mastic, New York (the "Poospatuck

Reservation" or the "Reservation"). According to the City, defendants purchase large quantities

of cigarettes on which State and City taxes have not been paid and sell them in bulk to

bootleggers, who transport the cigarettes off the Reservation and sell them in the City and

elsewhere. The City seeks a preliminary injunction pursuant to Rule 65(a) of the Federal Rules

of Civil Procedure, enjoining defendants' violations of the CCTA and CMSA. Defendants have

moved to dismiss this action pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction on the grounds of tribal sovereign immunity.[1]

For the following reasons, defendants' motion to dismiss is denied.  At oral argument held on February 26, 2009, the Court scheduled an evidentiary hearing on the City's motion for a preliminary injunction.  The Court defers decision on the City's motion until after that hearing is held but resolves certain issues associated with it here.

I.    **Background**

A.    **Taxation of Indian Cigarette Sales**

Article 20 of the New York Tax Law imposes a tax on all cigarettes possessed for sale or use in New York State, except for those cigarettes that New York is "without power" to tax.  See N.Y. Tax L. § 471 ("There is hereby imposed and shall be paid a tax on all cigarettes possessed in the state by any person for sale, except that no tax shall be imposed on cigarettes sold under such circumstances that this state is without power to impose such tax . . . ."); Dep't of Taxation & Fin. of N.Y. v. Milhelm Attea & Bros., Inc., 512 U.S. 61, 64, 114 S.Ct. 2028, 2031 (1994) (citing N.Y. Tax L. § 471(1)).  Under New York law, cigarette taxes are normally pre-paid by State-licensed "stamping agents," usually wholesale cigarette dealers who purchase tax stamps from the State and affix them to cigarette packages as evidence of payment.  The tax burden is built into the cost of the cigarettes and passed along the distribution chain to each subsequent

---

[1] The following defendants join in the motion to dismiss:  Golden Feather Smoke Shop, Inc., Kimo Smoke Shop, Inc., Smoke and Rolls Inc., Shawn Morrison, Kiana Morrison, Monique's Smoke Shop, Ernestine Watkins, Wayne Harris, Red Dot & Feathers Smoke Shop, Inc., Raymond Hart, Smoking Arrow Smoke Shop, Denise Paschall, TDM Discount Cigarettes, and Thomasina Mack.  Of these, defendant Shawn Morrison is not a Native American, and therefore admits he cannot invoke the sovereign immunity defense that forms the basis for defendants' motion to dismiss, joining only in defendants' objections to the City's motion for a preliminary injunction.  (See Oral Argument Tr., Feb. 26, 2009, at 11-12.)  For the sake of convenience, the Court uses the term "defendants" to refer to the defendants participating in these motions.

purchaser, ultimately falling on the consumer.  See N.Y. Tax L. § 471(2); New York Assoc. of Convenience Stores v. Urbach, 669 N.E.2d 904, 906 (N.Y. 1988).

Federal and state governments lack authority to tax cigarettes sold to members of Native American tribes for their own consumption.  Thus, cigarettes to be consumed on the reservation by enrolled tribal members are tax-exempt and need not bear stamps ("unstamped cigarettes"). Milhem Attea & Bros., Inc., 512 U.S. at 64, 114 S.Ct. at 2031 (citing Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation, 425 U.S. 463, 475-81, 96 S.Ct. 1634, 1642-45 (1976)).  "On-reservation cigarette sales to persons other than reservation Indians, however, are legitimately subject to state taxation."  Id. (citing Washington v. Confederated Tribes of Colville Reservation, 447 U.S. 134, 160-61, 100 S.Ct. 2069, 2084-85 (1980)).  In a related case involving cigarette wholesalers, this Court held that § 471 constitutes an "applicable" tax for the purposes of the CCTA and may serve as the basis for claims under both the CCTA and the CMSA.  City of New York v. Milhem Attea & Bros., Inc., 550 F. Supp. 2d 332, 346-49 (E.D.N.Y. 2008) ("Milhem Attea").

**B.    The City's Allegations**

According to the allegations in the Complaint, each defendant purchases "unlimited quantities" of unstamped cigarettes on the pretext that they are intended for sales to enrolled tribe members on the Poospatuck Reservation.  In fact, each defendant sells virtually all of the unstamped cigarettes off the Reservation to members of the broader public.  The City claims that these transactions involve quantities of cigarettes that could not possibly be consumed by tribe members on the Reservation.  In 2007, for example, defendants purchased approximately 9.7 million cartons of unstamped cigarettes.  According to the City, the total population on the Poospatuck Reservation is 279, which means that consumption of all 9.7 million cartons on the

Reservation would require every person residing there in 2007 to have consumed approximately 960 packs of cigarettes per day.

The City claims to suffer damages and irreparable injury as a result of defendants' unlawful cigarette sales. By selling cigarettes without paying applicable taxes, defendants are able to pass along an illegal discount to customers, which reduces the price of cigarettes at times to less than half of the normal retail price for tax-paid cigarettes. According to the Complaint, these illegal sales replace sales that would otherwise generate tax revenue, at a cost to the City and State of hundreds of millions of dollars in yearly tax revenue. The City further claims that the illegal sales irreparably impair the City's smoking cessation programs, citing the "well-established correlation between smoking cessation and the prevailing price of cigarettes." (Compl. ¶ 44.)

### C.     The Unkechauge Indian Nation

Defendants claim they are entitled to sovereign immunity by virtue of their membership in, or relationship with, the Unkechauge Indian Nation (the "Unkechauge Nation" or the "Tribe"), which is not a party to this litigation. The Unkechauge Nation is a recognized Indian tribe under New York State law. See N.Y. Indian L. § 150 (referring to "the Poospatuck (Unkechauge) Indian Nation" and setting forth the Tribe's system of government); N.Y. Tax L. § 470(14) (defining "Indian nation or tribe" to include the "Poospatuck or Unkechauge Nation"). The Tribe is not formally recognized by the United States government.

## II.     Motion to Dismiss on Grounds of Sovereign Immunity

### A.     Standard of Review

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a case may be dismissed for lack of subject matter jurisdiction if the court "lacks the statutory or constitutional power to

adjudicate it."  <u>Makarova v. United States</u>, 201 F.3d 110, 113 (2d Cir. 2000).  When a defendant moves to dismiss a cause of action pursuant to Rule 12(b)(1), the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  <u>Raila v. United States</u>, 355 F.3d 118, 119 (2d Cir. 2004).

Because sovereign immunity "is a limitation on federal court jurisdiction, a motion to dismiss based on tribal immunity is appropriately examined under Fed.R.Civ.P. 12(b)(1)." <u>Bassett v. Mashantucket Pequot Museum & Research Ctr. Inc.</u>, 221 F. Supp. 2d 271, 276 (D. Conn. 2002) ("<u>Bassett II</u>").  In evaluating a Rule 12(b)(1) motion, "the court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing."  <u>Zappia Middle E. Constr. Co. Ltd. v. Emirate of Abu Dhabi</u>, 215 F.3d 247, 253 (2d Cir. 2000).

## B.    Sovereignty of the Unkechauge Nation

Absent unequivocal congressional authorization or a clear waiver of sovereign immunity, an Indian tribe, or an agency thereof, is not subject to civil suit in any state or federal court.  <u>C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe</u>, 532 U.S. 411, 418, 121 S.Ct. 1589, 1594 (2001); <u>Kiowa Tribe v. Mfg. Techs., Inc.</u>, 523 U.S. 751, 754, 118 S.Ct. 1700, 1702 (1998) ("As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity.").  Defendants, as individuals and businesses, argue that their membership in the Unkechauge Nation and their status as Tribal businesses entitle them to the defense of sovereign immunity.  The issue of whether the Unkechauge Nation itself is entitled to sovereign immunity is the subject of a separate lawsuit, which is currently before Judge Kiyo A. Matsumoto in this District.  <u>See</u> <u>Gristede's Foods, Inc. v. Unkechauge Nation</u>, 06-CV-1260 (KAM).  The Tribe itself, however, is not a party in this case.  For the purposes of the

instant motion, this Court assumes without deciding that the Unkechauge Nation is entitled to sovereign immunity.[2]  The question on this motion, then, is whether defendants—individuals and businesses—share in the Tribe's immunity.  The Court concludes that they do not.

### C.  Burden of Proof

As an initial matter, the parties disagree as to who bears the burden of proof on the issue of sovereign immunity.  The City cites <u>New York v. Shinnecock Indian Nation</u>, 523 F. Supp. 2d 185 (E.D.N.Y. 2007), for the proposition that a party asserting sovereign immunity as a defense has the burden of proving it.  <u>See id.</u> at 297 n.72.  That case, however, dealt with the burden of proof on a claim of sovereign immunity asserted at trial, not on a motion to dismiss for lack of subject matter jurisdiction.  In the latter context, the Second Circuit has stated that "[o]n a motion invoking sovereign immunity to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of proving by a preponderance of evidence that jurisdiction exists."  <u>Garcia v. Akwesana Hous. Auth.</u>, 268 F.3d 76, 84 (2d Cir. 2001).  This principle is consistent with the general rule that "the plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  <u>Luckett v. Bure</u>, 290 F.3d 493, 496-97 (2d Cir. 2002); <u>see also</u> <u>Milhelm Attea</u>, 550 F. Supp. 2d at 340.  In <u>Garcia</u>, however, the parties agreed that the defendant was an arm of the tribe and shared in its tribal sovereign immunity.  268 F.3d at 84 ("Garcia concedes that the AHA, as an agency of the St. Regis Tribe, enjoys the same presumption of immunity.").  The Second Circuit placed the burden on the plaintiff to show either that Congress had abrogated tribal immunity or that the tribe had waived it.  <u>Id.</u> at 85-87.

This case raises an issue that was not in dispute in <u>Garcia</u>: whether defendants can claim sovereign immunity in the first instance.  Here, the Court is guided by the Second Circuit's

---

[2] Of course, if the Tribe does not prevail in its argument that it is entitled to sovereign immunity, these defendants would necessarily lose that argument as well.

decision in <u>Woods v. Rondout Valley Central School District Board of Education</u>, 466 F.3d 232 (2d Cir. 2006), which dealt with a party claiming to be an "arm of the state" entitled to Eleventh Amendment sovereign immunity. The <u>Woods</u> court framed the issue as follows:

> To the extent the Eleventh Amendment is construed as a specific limitation on the Article III powers of the federal courts that deprives them of subject matter jurisdiction to hear claims against the states, the burden might appear to fall on Woods because it is generally a plaintiff's burden to demonstrate subject matter jurisdiction. To the extent, however, that Eleventh Amendment immunity is viewed as akin to an affirmative defense that a state may assert or waive at its discretion, the burden would appear to fall on the defendant Board of Education.

<u>Id.</u> at 237 (citations omitted). The Second Circuit joined the unanimous opinion of other circuits in holding that "the governmental entity invoking the Eleventh Amendment bears the burden of demonstrating that it qualifies as an arm of the state entitled to share in its immunity." <u>Id.</u> (citing <u>Gragg v. Ky. Cabinet for Workforce Dev.</u>, 289 F.3d 958, 963 (6th Cir. 2002); <u>Skelton v. Camp</u>, 234 F.3d 292, 297 (5th Cir. 2000); <u>Christy v. Pa. Tpk. Comm'n</u>, 54 F.3d 1140, 1144 (3d Cir. 1995); <u>Baxter v. Vigo County Sch. Corp.</u>, 26 F.3d 728, 734 n.5 (7th Cir. 1994); <u>ITSI TV Prods., Inc. v. Agric. Ass'ns</u>, 3 F.3d 1289, 1292 (9th Cir. 1993)); <u>see also</u> <u>Gorton v. Gettel</u>, 554 F.3d 60, 62 (2d Cir. 2009) ("The burden is on the party seeking immunity to demonstrate that it is an arm of the state."). Several reasons justified this conclusion. First, a state's ability to waive sovereign immunity, and the fact that district courts are not required to raise the issue <u>sua sponte</u>, make sovereign immunity more like an affirmative defense than a jurisdictional bar. <u>Woods</u>, 466 F.3d at 238. Second, the court found that placing the burden on the state would be consistent with the Second Circuit's treatment of immunity claims by foreign entities under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602-11. <u>Woods</u>, 466 F.3d at 238. Finally, "the allocation of the burden to the governmental entity comports with the traditional principle that a party in possession of facts tending to support its claim should be required to come forward with

that information." Id. (citing Drexel Burnham Lambert Group, Inc. v. Galadari, 777 F.2d 877, 880 (2d Cir. 1985)).

This reasoning applies with equal force in the case of a party claiming tribal sovereign immunity as an "arm of the tribe." See Shinnecock Indian Nation, 523 F. Supp. 2d at 297 n.72 (stating that "Eleventh Amendment jurisprudence on the burden of proof applies with equal force to assertions of tribal immunity"). As described in more detail below, the issue of whether an entity is an arm of the tribe may rest on nuances in the entity's ownership and control structure, corporate purpose, and relationship with the tribal government. Cf. ITSI TV Prods., 3 F.3d at 1292 (observing that "a claim of Eleventh Amendment immunity will occasion serious dispute only where a relatively complex institutional arrangement makes it unclear whether a given entity ought to be treated as an arm of the state"). Knowledge of these facts is much more likely to reside with the party asserting immunity. Accordingly, this Court concludes that defendants have the burden of establishing that they are entitled to sovereign immunity.[3]

### D.    Tribal Businesses

Sovereign immunity applies to both the commercial and governmental activities of an Indian tribe, whether they take place on or off a reservation. Kiowa, 523 U.S. at 760, 118 S.Ct. at 1705 (declining to restrict tribal sovereign immunity for commercial or off-reservation activities); Bassett v. Mashantucket Pequot Tribe, 204 F.3d 343, 357 (2d Cir. 2000) ("Basset I") (explaining that "a tribe's immunity extends to its off-reservation commercial activities"). Official tribal enterprises that act as a division or arm of the tribe are immune from suit as an extension of the tribe's sovereign immunity. See, e.g., Native Am. Distrib. v. Seneca-Cayuga Tobacco Co., 546 F.3d 1288, 1292-96 (10th Cir. 2008) (holding that tobacco manufacturer had

---

[3] As described more fully below, the Court concludes that even if the City bore the burden of proving that defendants are not arms of the Tribe, it has met that burden.

sovereign immunity as an enterprise of the tribe, which deprived district court of subject matter jurisdiction); Allen v. Gold Country Casino, 464 F.3d 1044, 1047 (9th Cir. 2006) (holding that casino was entitled to tribal sovereign immunity as an arm of the tribe); accord Bassett I, 204 F.3d at 358 ("It may be that the district court will conclude, upon further analysis, that the museum is an agency of the Tribe and, as such, is entitled to benefit from the Tribe's immunity.").  In evaluating whether the defendant companies are entitled to sovereign immunity, "[t]he question is not whether the activity may be characterized as a business, which is irrelevant under Kiowa, but whether the entity acts as an arm of the tribe so that its activities are properly deemed to be those of the tribe."  Allen, 464 F.3d at 1046; see, e.g., Hagen v. Sisseton-Wahpeton Cmty. College, 205 F.3d 1040, 1043 (8th Cir. 2000) ("[T]he College serves as an arm of the tribe and not as a mere business and is thus entitled to tribal sovereign immunity."); Ramey Constr. Co. v. Apache Tribe, 673 F.2d 315, 320 (10th Cir. 1982) (affirming district court's determination that an inn was "a sub-entity of the Tribe rather than a separate corporate entity, and is thus clothed with the sovereign immunity of the Tribe").

In Gristede's, this Court outlined a series of factors courts have used to determine whether an organization is an arm of tribal government:[4]

- The entity is organized under tribal constitution or laws (rather than federal law).
- The organization's purpose(s) are similar to a tribal government's (e.g., promoting tribal welfare, alleviating unemployment, providing money for tribal programs).
- The organization's managing body is necessarily composed primarily of tribal officials (e.g., organization's board is, by law, controlled by tribal council members).
- The tribe's governing body has the unrestricted power to dismiss members of the organization's governing body.

_____

[4] The Gristede's litigation was originally assigned to this Court.  In August 2008, the case was reassigned to Judge Matsumoto.

> • The organization (and/or its governing body) "acts for the tribe" in managing organization's activities.
> • The tribe is the legal owner of property used by the organization, with title held in tribe's name.
> • The organization's administrative and/or accounting activities are controlled or exercised by tribal officials.
> • The organization's activities take place primarily on the reservation.

Gristede's, No. 06-CV-1260, slip op. at 15 (E.D.N.Y. Dec. 22, 2006) (citing In re Greene, 980 F.2d 590 (9th Cir. 1992); Ramey Constr. Co., 673 F.2d 315; William V. Vetter, Doing Business with Indians and the Three "S"es: Secretarial Approval, Sovereign Immunity, and Subject Matter Jurisdiction, 36 Ariz. L. Rev. 169, 176-77 (Spring 1994)); accord Ransom v. St. Regis Mohawk Educ. & Cmty. Fund, Inc., 658 N.E.2d 989, 992-93 (N.Y. 1995) (setting forth same factors). The common element running through these factors is that an arm of the tribe operates "not as a mere business," Hagen, 205 F.3d at 1043, but rather as an extension of the tribe's own economic activity, "so that its activities are properly deemed to be those of the tribe" itself. Allen, 464 F.3d at 1046.

The defendant businesses do not satisfy these criteria. The only evidence defendants submit in support of their status as arms of the Tribe is a barebones declaration of Gilbert Davis, an officer of the Unkechauge Tribal Council. (Decl. of Gilbert Davis, Nov. 23, 2008 ("Davis Decl.").) This declaration does not even identify any defendant by name, let alone attempt to explain defendants' relationship to the Tribe. Instead, Davis merely describes the general procedure for opening businesses on the Reservation, from which this Court presumably is to infer that defendants must satisfy the necessary criteria or else they could not do business on the Reservation. The individual defendants' very status as Native Americans is also left to inference, because Davis does not even affirm that any individual defendant is a member of the Tribe. Even if these deficiencies could be remedied, which counsel represented at oral argument

they could, the Court still would be compelled to conclude that defendants operate independently from the Tribe and not as subordinate tribal entities.

According to Davis, the Council issues licenses to Tribe members to open businesses, including smoke shops, on the Reservation.  (Id. ¶¶ 1, 4.)  Only "blood right members" of the Tribe can obtain a license to do business on the Reservation.  (Id. ¶ 3.)  The licensed businesses pay fees to the Tribe for the right to operate on Reservation lands.  (Id. ¶ 4.)  According to Davis, the fees paid by licensed Reservation smoke shops make up the "major Source of Tribal Funds," which are used to perform essential Tribal functions.  (Id. ¶¶ 8-9.)  The Tribe itself does not own or manage the smoke shops, however, and defendants do not assert that the Tribe has any supervisory control over the management of the shops or that the shops "act for the Tribe" in their business endeavors.

At oral argument, defendants' counsel made further representations concerning defendants' relationship with the Tribe.  According to defendants, opening a Reservation business requires a license from the Tribal Council, which is reduced to a Tribal resolution.  (See Oral Argument Tr., Feb. 26, 2009, at 14.)  The Tribal Council limits the number of cigarettes that can be purchased, subjects the shops to inspection, and issues regulations concerning the shops' entryways and parking lots.  (Id. at 15-16.)  Following the initiation of this lawsuit, the Tribe has taken additional steps, including imposing a Tribal tariff on all cigarettes sold, instituting a moratorium on new smoke shops, working with New York State to resolve cigarette trafficking issues, and retaining its own police enforcement for cigarette trafficking.  (Id. at 17, 19.)  Defendants conceded at oral argument, however, that the Tribe does not own or control the smoke shops and that the profits from their business operations go to the smoke shops' owners, not to the Tribe itself.  (See id. at 18-19.)

Defendants offer no evidence to support these assertions, which are not properly before the Court. Nevertheless, even assuming defendants' representations regarding the nature of the businesses to be true, the record indicates that they are "mere businesses," which pay licensing fees to the Tribe for the right to operate on Reservation land. This relationship—as licensor and licensed business entity—stands in sharp contrast to cases involving economic entities established by the tribe and managed by the tribe for the benefit of the tribe. See, e.g., Seneca-Cayuga Tobacco Co., 546 F.3d at 1292-96 (finding tobacco manufacturer to be arm of the tribe where it was created by tribal resolution for the express purpose of serving as "an economic development project" for the tribe to carry out "essential governmental functions"); Allen, 464 F.3d at 1046-47 (finding casino to be arm of the tribe where the casino was "no ordinary business," but was "owned and operated by the Tribe" and created to perform gaming activities "under the auspices of the Tribe," for which the tribe was the "primary beneficiary"). Here, defendants' relationship with the Tribe appears to be no different from that of the State and State-licensed businesses: the Tribe issues licenses to the businesses, collects taxes and fees, and promulgates regulations governing their activity. Defendants' activities are not properly considered those of the Tribe itself, but are instead those of separate business entities, which confer incidental benefits on the Tribe in exchange for the right to operate on Reservation land. See Dixon v. Picopa Constr. Co., 772 P.2d 1104 (Ariz. 1989) (holding that corporation formed under tribal law was not a tribal "subordinate economic organization" because management and control was vested in a corporate board of directors, not the tribal council); see also Johnson v. Harrah's Kan. Casino Corp., No. 04-4142, 2006 WL 463138 (D. Kan. Feb. 23, 2006) (concluding that non-tribal management company contracted to run Tribe's casino was not a

"tribal enterprise"). Accordingly, they are not entitled to sovereign immunity as arms of the Tribe.[5]

## E.    Individual Defendants

It is "well-settled that tribal sovereign immunity does not extend to individual members of a tribe." Catskill Dev., L.L.C. v. Park Place Entm't Corp., 206 F.R.D. 78, 86 (S.D.N.Y. 2002) (citing Puyallup Tribe, Inc. v. Dep't of Game, 433 U.S. 165, 97 S.Ct. 2616 (1977)); see also Narragansett Indian Tribe v. Rhode Island, 449 F.3d 16, 42 (1st Cir. 2006) (en banc) ("The general rule is that tribal sovereign immunity does not protect individual members of an Indian tribe."). Tribal government officials share an Indian tribe's immunity from suit if they are sued in their official capacity and are acting within the scope of their authority. Chayoon v. Chao, 355 F.3d 141, 143 (2d Cir. 2004); Bassett II, 221 F. Supp. 2d at 278 ("[T]ribal immunity extends to all tribal employees acting within their representative capacity and within the scope of their official authority."). In this case, the City has sued the individual defendants as individuals in their capacity as business owners. Furthermore, there is no indication that the individual defendants are Tribal officials. Finally, the individual defendants are not entitled to sovereign immunity as officers of Tribal businesses in light of this Court's conclusion that the defendant businesses are not arms of the Tribe. Compare Romaniella v. Hayward, 933 F. Supp. 163, 167

---

[5] Even if the City had the burden of proving by a preponderance of the evidence that defendants are not arms of the Tribe, it has met that burden. The City has presented documentation from the New York Department of State web site indicating that at least three of the smoke shops are New York corporations, which tends to support the conclusion that they are not arms of the Tribe. (See Decl. of Eric Proshansky, Oct. 27, 2008 ("Proshansky Decl."), Exs. 24, 29, 33.) See also Dixon, 772 P.2d at 1111 (stating that a party's "status as a corporation . . . weighs heavily against a finding that [it] is a subordinate economic organization" of an Indian tribe). More importantly, defendants undertook to present evidence on this issue even while maintaining that the City bears the burden, and the City points to Gilbert Davis's own assertions as evidence that defendants operate as independent businesses rather than tribal entities. With regard to one defendant, the City further has presented tax documents showing that only a small fraction of the smoke shop's revenues was allocated to tribal fees. (Proshansky Decl. Ex. 21A.)

(D. Conn. 1996) (extending tribal immunity to tribe members responsible for maintenance of parking lot owned and operated by tribe), aff'd on other grounds, 114 F.3d 15 (2d Cir. 1997).

Accordingly, the Court concludes that defendants are not entitled to dismissal on the grounds of sovereign immunity. Defendants' motion to dismiss for lack of subject matter jurisdiction is denied.[6]

## III.    Motion for Preliminary Injunction

A party seeking a preliminary injunction has the burden of establishing irreparable harm and "either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships decidedly tipped in the movant's favor." Green Party v. N.Y. State Bd. of Elections, 389 F.3d 411, 418 (2d Cir. 2004).

### A.    Irreparable Harm

As a general matter, a showing that irreparable harm would result if an injunction is not granted is "the single most important prerequisite for the issuance of a preliminary injunction." Citibank N.A. v. Citytrust, 756 F.2d 273, 275 (2d Cir. 1985). Irreparable harm is defined as an injury for which a monetary award cannot be adequate compensation. JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 79 (2d Cir. 1990).

The City argues that the showing of irreparable harm is excused in this case because the CCTA and CMSA explicitly authorize a municipal government to seek and obtain injunctive relief. It further contends that irreparable harm to City health programs would result from the continuation of defendants' unlawful conduct while this action is pending. The Court addresses these issues in turn.

_____

[6] To the extent that defendants raise issues of standing, this Court addressed those issues in Milhelm Attea, 550 F. Supp. 2d at 340-41, and found that the City has standing. The Court finds that the City has standing in this action for the same reasons.

### 1.      Statutory Conditions for Injunctive Relief

The City argues that it need not demonstrate irreparable harm based upon the principles announced in SEC v. Management Dynamics, Inc., 515 F.2d 801 (2d Cir. 1975).  In Management Dynamics, the Second Circuit held that in an enforcement action pursuant to § 20(b) of the Securities Act of 1933, the Securities Exchange Commission did not need to show irreparable harm in order to obtain a preliminary injunction.  Id. at 807-08.  Section 20(b) provides, in part:

> Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this subchapter . . . the Commission may, in its discretion, bring an action in any district court . . . to enjoin such acts or practices, and upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

15 U.S.C. § 77t(b).  The court seized on the words "is engaged or about to engage," holding that "the 'critical question' in issuing an injunction" under this statute was not whether the traditional equity test was satisfied, but "whether 'there is a reasonable likelihood that the wrong will be repeated.'"  Mgmt. Dynamics, 515 F.2d at 807 (quoting SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1100 (2d Cir. 1972)).  The Second Circuit rejected the appellants' contention that irreparable harm was required, explaining that, unlike private actions "rooted wholly in the equity jurisdiction of the federal courts, SEC suits for injunctions are 'creatures of statute.'"  Id. at 808.  Because "'the issuance of an injunction in cases of this nature has statutory sanction, it is of no moment that the plaintiff has failed to show threatened irreparable injury or the like, for it would be enough if the statutory conditions for injunctive relief were made to appear.'"  Id. (emphasis added) (quoting SEC v. Torr, 87 F.2d 449, 450 (2d Cir. 1937)).

Following Management Dynamics, courts in the Second Circuit have distinguished between statutes that merely authorize injunctions to be issued and those approving the issuance

of injunctions upon the satisfaction of express "statutory conditions." <u>See</u> <u>United States v.</u> <u>Buddhu</u>, No. 3:08 Civ. 74, 2008 WL 2355930, at *3 (D. Conn. June 5, 2008) (explaining that "the traditional equitable considerations must be applied" when a statute "authorizes injunctive relief, but does not provide 'statutory conditions'"); <u>United States v. Webb</u>, No. 06-CV-5317, 2007 WL 397041, at *5 (E.D.N.Y. Feb. 1, 2007) (concluding that 26 U.S.C. § 7402(a) "is essentially 'a catch-all provision' which grants district courts jurisdiction to issue injunctive relief" but "does not itself authorize specific injunctive relief" such that the traditional equity test applies); <u>Pres. Coal. of Erie County v. Fed. Transit Admin.</u>, 129 F. Supp. 2d 551, 572 (W.D.N.Y. 2000) ("Unless a statute specifically requires that an injunction issue upon a finding of a violation, the district court should employ traditional equitable principles, including an assessment of the likelihood of irreparable harm to the moving party, in deciding whether to issue a preliminary injunction."). The City urges this Court not to follow those decisions, arguing that whenever a government entity is authorized to bring an enforcement action to obtain equitable relief, a preliminary injunction may be issued without a showing of irreparable harm. (<u>See</u> Oral Argument Tr., Feb. 26, 2009, at 40-41.) Indeed, in <u>Management Dynamics</u> the Second Circuit noted that "the SEC appears in these proceedings not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," such that "the standards of the public interest not the requirements of private litigation measure the propriety and need for injunctive relief." 515 F.2d at 808 (internal quotation marks omitted). Where an injunction is given "statutory imprimatur," the "finding that future violations are likely to occur implies that a significant injury to the public has been shown to the judge's satisfaction." <u>Id.</u> at 808-09; <u>see also</u> <u>Gov't of Virgin Islands v. Virgin Islands Paving, Inc.</u>, 714 F.2d 283, 286 (3d Cir. 1983) ("[W]hen a statute contains, either explicitly or implicitly, a finding

that violations will harm the public, the courts may grant preliminary equitable relief on a showing of a statutory violation without requiring any additional showing of irreparable harm.").

Even if <u>Management Dynamics</u> should be read to impose a requirement for express statutory conditions, no showing of irreparable harm would be required for the issuance of a preliminary injunction under the CMSA. The CMSA sets forth express statutory conditions for the issuance of an injunction. It provides, in relevant part:

> An action may be maintained in the supreme court to prevent, restrain or enjoin a violation, or threatened violation, of any of the provisions of this article. Such an action may be instituted by any person injured by any violation or threatened violation of this article, or by the tax commission. <u>If in such action a violation or threatened violation of this article shall be established, the court shall enjoin and restrain, or otherwise prohibit, such violation or threatened violation</u>.

N.Y. Tax L. § 484(b)(1) (emphasis added). This statute, by its terms, provides that an injunction shall issue if "a violation or threatened violation of this article shall be established." <u>Id.</u> This requirement takes the place of the traditional equity test for the issuance of a preliminary injunction.[7] <u>See, e.g.</u>, <u>United States v. Broccolo</u>, No. 06 Civ. 2812, 2006 WL 3690648, *2 (S.D.N.Y. Dec. 13, 2006) (finding irreparable harm unnecessary for issuance of preliminary injunction where statutes "contain express provisions authorizing district courts to enter injunctions upon the showing of a violation of the law"). Therefore, to obtain an injunction under the CMSA, the City need not demonstrate irreparable harm, but it must "establish" "a violation or threatened violation."

Whether a preliminary injunction may issue under the CCTA without a showing of irreparable harm is a closer question. The CCTA provides, in relevant part, that "a local government, through its chief law enforcement officer (or a designee thereof), . . . , may bring an

---

[7] Indeed, defendants have conceded this point. (<u>See</u> Defs.' Opp'n Br. at 24 ("While this provision [N.Y. Tax L. § 484(b)(1)] may be mandatory, it is only so upon the establishment of a violation or threatened violation.").)

action in the United States district courts to prevent and restrain violations of this chapter by any person (or by any person controlling such person) . . . ." 18 U.S.C. § 2346(b)(1). It further provides that, in such an action, a local government may "obtain any other appropriate relief for violations of this chapter from any person (or by any person controlling such person), including civil penalties, money damages, and injunctive or other equitable relief." Id. § 2346(b)(2). Defendants argue that these provisions merely authorize injunctive relief without setting forth express conditions for issuing an injunction. See, e.g., Webb, 2007 WL 397041, at *5 (applying traditional equity considerations under "catch-all provision" granting district courts "jurisdiction to make and issue in civil actions, writs and orders of injunctions . . . and to render such judgments and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws"). The City urges that it need only establish a "violation" and show that further violations are likely to occur in the future. See United States v. Odessa Union Warehouse Co-op, 833 F.2d 172, 174-76 & n.2 (9th Cir. 1987) (holding that the Government was not required to show irreparable harm under a statute granting district courts "jurisdiction, for good cause shown . . . to restrain violations"). Because the City's evidence on irreparable harm may render it unnecessary to resolve this question, the Court defers decision on this issue until after the evidentiary hearing.

## 2.    The City's Claim of Irreparable Injury

In support of its claim that irreparable harm will ensue if the Court does not grant a preliminary injunction, the City presents the affidavit of Thomas R. Frieden, M.D., M.P.H., the Commissioner of the New York City Department of Health and Mental Hygiene. (See Aff. of Thomas R. Frieden, M.D., M.P.H., Oct. 28, 2008 ("Frieden Aff.").) According to Mr. Frieden, there is a "well-documented price-elasticity associated with cigarette purchasing in which an

increase in cigarette prices is associated with a decline in consumption." (Id. ¶ 6.) He cites survey data indicating that 59,000 City residents purchased unstamped cigarettes "directly from Indian reservations or on the street," at an average price $3.00 lower than a standard legal pack of cigarettes. (Id. ¶ 7.) He estimates from this data that, if the 59,000 smokers were forced to purchase cigarettes at the legal price, "over 7,000 New Yorkers would quit smoking, preventing over 2,000 premature deaths due to smoking-related illness in the future." (Id.) The City also submits a 2006 study documenting the correlation between increased cigarette prices and smoking cessation. (See Proshansky Decl., Ex. 43.)

The Court lacks sufficient information to determine whether the City would suffer irreparable harm if an injunction is not issued restraining violations of the CCTA. Accordingly, an evidentiary hearing is necessary to explore this issue.

**B.      The Merits**

**1.      Likelihood of Success on CCTA Claim**

The CCTA makes it "unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute or purchase contraband cigarettes." 18 U.S.C. § 2342(a). Contraband cigarettes are defined as "a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found, if the State or local government requires a stamp, impression, or other indication to be placed on packages or other containers of cigarettes to evidence payment of cigarette taxes." Id. § 2341(2). Together, these provisions establish four elements for a CCTA violation: that a party (1) knowingly "ship, transport, receive, possess, sell, distribute or purchase" (2) more than 10,000 cigarettes (3) that do not bear tax stamps, (4) under circumstances where state or local

cigarette tax law requires the cigarettes to bear such stamps.  See Milhelm Attea, 550 F. Supp. 2d at 345-46.

At the evidentiary hearing scheduled in this case, the City will have the opportunity to prove that defendants have sold the requisite number of unstamped cigarettes.  In anticipation of that hearing, the Court addresses two preliminary issues here.

First, the Court concludes that state law "requires" cigarettes sold by defendants to members of the broader public to bear tax stamps for the reasons expressed in Milhelm Attea, 550 F. Supp. 2d at 345-48.  New York Tax Law § 471(1) imposes a "tax on all cigarettes possessed in the state" except those cigarettes the State lacks the power to tax.  It is well settled that "on-reservation cigarette sales to persons other than reservation Indians . . . are legitimately subject to state taxation."  Milhelm Attea & Bros., Inc., 512 U.S. at 64, 114 S.Ct. at 2031. Because the State has the power to tax such sales, a tax is imposed.  Therefore, defendants' sales and shipments of cigarettes off the Reservation to the broader public are subject to an applicable state tax.  See Milhelm Attea, 550 F. Supp. 2d at 345-48.

Second, defendants argue that they are exempt from CCTA liability under 18 U.S.C. § 2346(b)(1), which provides, in relevant part, that "[n]o civil action may be commenced under [the CCTA] against an Indian tribe or an Indian in Indian country (as defined in section 1151)." Although defendants appear to conflate this question with that of sovereign immunity, the issue of whether defendants qualify as "Indian[s] in Indian country" is distinct.  With regard to sovereign immunity, the question is whether defendants, as tribe members or tribal businesses, can raise the defense of sovereign immunity as an extension of the Tribe's immunity from suit. The Court has already answered this question in the negative.  Here, the question is whether

defendants satisfy the statutory definition of an "Indian in Indian country" as defined by the CCTA, regardless of whether they are entitled to raise the defense of sovereign immunity.

Not all land on which Native Americans reside is "Indian country." Section 1151 defines "Indian country" as encompassing three categories of land:

> (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation,

> (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and

> (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151.[8] The common element running through these three categories is that in each case the land has been designated as Indian country by the federal government. An "Indian reservation" refers to "federally-protected Indian tribal lands, meaning those lands which Congress has set apart for tribal and federal jurisdiction." Indian Country, U.S.A., Inc. v. Oklahoma, 829 F.2d 967, 973 (10th Cir. 1987) (citation omitted); see also 18 U.S.C. § 1151(a) (referring to "any Indian reservation under the jurisdiction of the United States Government"); United States v. John, 437 U.S. 634, 648-49, 98 S.Ct. 2541, 2549 (1978) (stating that the test for whether land is an "Indian reservation under the jurisdiction of the United States Government" is "whether the land in question had been validly set apart for the use of the Indians as such, under the superintendence of the Government" (internal quotation marks omitted)). To be a "dependent Indian community," lands must satisfy "two requirements—first, they must have been set aside by the Federal Government for the use of the Indians as Indian land; second, they

---

[8] Although 18 U.S.C. § 1151 is a criminal jurisdiction statute, the Supreme Court has held that it applies to questions of civil jurisdiction as well. See Alaska v. Native Village of Venetie Tribal Gov't, 552 U.S. 520, 527, 118 S.Ct. 948, 952 (1998).

must be under federal superintendence." Alaska v. Native Village of Venetie Tribal Gov't, 522 U.S. 520, 527, 118 S.Ct. 948, 953 (1998). Finally, "Indian allotments" are "parcels of land created out of a diminished Indian reservation and held in trust by the Federal Government for the benefit of individual Indians." Id. at 529, 118 S.Ct. at 953 (citing United States v. Pelican, 232 U.S. 442, 449, 34 S.Ct. 396, 399 (1914)).

Although the State of New York formally recognizes the Unkechauge Nation, the Tribe has no relationship with the federal government. See Carruthers v. Flaum, 365 F. Supp. 2d 448, 451 (S.D.N.Y. 2005) ("[T]he [Unkechauge] tribe has not been federally recognized and, as far as this court knows, has never even applied for federal recognition."). Defendants do not claim that the Tribe has any official federal status but instead assert the principle that formal federal recognition is not a prerequisite to a tribe's entitlement to sovereign immunity. See, e.g., Okla. Tax Comm'n v. Citizen Band of Potawatomi Indian Tribe, 498 U.S. 505, 509, 111 S.Ct. 905, 909 (1991) (referring to Indian tribes' "inherent sovereign authority"); Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 694 (1st Cir. 1994) (explaining that federal recognition is "recognition of a previously existing status" and that a "Tribe's retained sovereignty predates federal recognition—indeed, it predates the birth of the Republic"); Gristede's, No. 06-CV-1260, slip op. at 4-9 (concluding that federal recognition is not a prerequisite for sovereign immunity). This argument fails because it improperly conflates the question of sovereign immunity with the statutory definition of "Indian country" under the CCTA. Whether the Unkechauge Nation, a nonparty to this litigation, may validly assert sovereign immunity has no bearing on whether these defendants fall within the statutory exemption applicable to "Indian[s] in Indian country." Accordingly, the CCTA exemption for "Indian[s] in Indian country" is not a bar to the City's CCTA claims.

## 2.    The CMSA

The CMSA, N.Y. Tax L. §§ 483-89, "prohibits the sale of cigarettes below cost when the seller intends thereby to harm competition or evade taxes." Lorillard Tobacco Co. v. Roth, 786 N.E.2d 7, 8 (N.Y. 2003). The statute makes it unlawful for

> any agent, wholesale dealer or retail dealer, with intent to injure competitors or destroy or substantially lessen competition, or with intent to avoid the collection or paying over of such taxes as may be required by law, to advertise, offer to sell, or sell cigarettes at less than the cost of such agent wholesale dealer or retail dealer, as the case may be.

N.Y. Tax L. § 484(a)(1). For retail dealers, it is also unlawful "to induce or attempt to induce, or to procure or attempt to procure the purchase of cigarettes at a price less than the cost of the agent for sales to retail dealers, if purchased from an agent, or at a price less than the cost of the wholesale dealer." Id. § 484(a)(4)(A).

The statute defines the "cost of the retail dealer" as "the basic cost of cigarettes plus the cost of doing business by the retail dealer" including operational costs and taxes. Id. § 483(b)(3)(A). The "basic cost of cigarettes," in turn, is defined as "the invoice cost of cigarettes to the agent who purchases from the manufacturer, or the replacement cost of cigarettes to the agent . . . to which shall be added the full face value of any stamps which may be required by law." Id. § 483(a)(1). The CMSA further provides that advertising, offering to sell, or selling cigarettes at less than cost "shall be prima facie evidence . . . of intent to avoid the collection or paying over of such taxes as may be required by law." Id. § 484(a)(6).

Defendants argue that they are exempt from coverage of the CMSA because they do not qualify as wholesale dealers, chain stores, or retail dealers. Instead, defendants argue that they fall into a separate category of "reservation cigarette sellers," defined in Article 20 of the New York Tax Law. Section 470 of Article 20 defines "reservation cigarette seller" as a "seller of

cigarettes which is an Indian nation or tribe, one or more members of such tribe, or an entity

wholly owned by either or both, which sells cigarettes within the boundaries of a qualified

reservation." N.Y. Tax L. § 470(17). The terms "wholesale dealer" and "retail dealer" are

defined separately.[9] <u>See</u> N.Y. Tax L. § 470(8), (9). Defendants conclude from these definitions

that they are not subject to the CMSA because it applies only to "any agent, wholesale dealer or

retail dealer," and not to reservation cigarette sellers.

Defendants' argument fails for two reasons. First, the category of "reservation cigarette

seller" does not exist within the CMSA. The term is defined only in § 470, which is part of

Article 20 of the New York Tax Law, whereas the CMSA is contained in a separate article,

Article 20-A. The CMSA incorporates some definitions from § 470, but not all of them,

providing:

> Any term which is defined by section four hundred seventy of this chapter shall
> have the same meaning <u>when used in this article</u>, except that for purposes of this
> article the following terms shall have the meanings herein indicated:
>
> . . .
>
> 4. "Retail dealer" means any person engaged in selling cigarettes at retail, and
> shall include a chain store, a wholesale dealer or an agent for purposes of its sales
> of cigarettes to consumers.

N.Y. Tax L. § 483(a) (emphasis added). The definitions in § 470, therefore, only apply to the

CMSA "when used" in Article 20-A, and Article 20-A never employs the term "reservation

cigarette seller." The definition of "retail dealer" in § 483, by its terms, applies to "<u>any person</u>

---

[9] Section 470 defines "Wholesale dealer" as "[a]ny person who (a) sells cigarettes or tobacco
products to retail dealers or other persons for purposes of resale, or (b) owns, operates or
maintains one or more cigarette or tobacco product vending machines in, at or upon premises
owned or occupied by any other person, or (c) sells cigarettes or tobacco products to an Indian
nation or tribe or to a reservation cigarette seller on a qualified reservation." N.Y. Tax L. §
470(8). "Retail dealer" is defined as "[a]ny person other than a wholesale dealer engaged in
selling cigarettes or tobacco products." <u>Id.</u> § 470(9).

engaged in selling cigarettes at retail," which accurately describes the defendant businesses.  Id. § 483(a)(4) (emphasis added).  In addition, New York Tax Law § 486 sets forth explicit exemptions to the CMSA and does not carve out reservation cigarette sellers.  Id. § 486(a) (providing exemptions for "isolated" transactions and for cigarettes sold by "any fiduciary or other officer acting under the order or direction of any court").  In light of the special treatment often afforded Indian tribes, their members, and their businesses under New York law, the Court presumes that if the legislature wished to exclude such businesses from the scope of the CMSA, it would have done so explicitly.  Cf. United States v. Smith, 499 U.S. 160, 167, 111 S.Ct. 1180, 1185 (1991) ("'Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.'" (quoting Andrus v. Glover Constr. Co., 446 U.S. 608, 616-17, 100 S.Ct. 1905, 1910-11 (1980))).

Second, even if all of the definitions in § 470 were included within the CMSA, there is nothing to suggest that a reservation cigarette seller cannot also be a retail dealer.  Section 470 defines the term "retail dealer" as "[a]ny person other than a wholesale dealer engaged in selling cigarettes or tobacco products."  N.Y. Tax L. § 470(9) (emphasis added).  The legislature could have defined this term to exclude reservation cigarette sellers in addition to wholesale dealers, but it did not.  Indeed, the definitions in § 470 necessarily overlap with each other in some circumstances.  The defendants in Milhelm Attea, cigarette wholesalers who are State-licensed stamping agents, likely fall into three definitions simultaneously: those for "dealer," "wholesale dealer," and "agent."[10]  See N.Y. Tax L. § 470(7), (8), (11).  It is apparent to this Court that the

_____

[10] Section 470 defines "dealer" as "[a]ny wholesale dealer and retail dealer as hereinafter defined."  N.Y. Tax L. § 470(7).  "Agent" is defined as "[a]ny person licensed by the

purpose of defining "reservation cigarette seller" as a separate term is not to set it apart as an exclusive category from "retail dealer," but to establish a vocabulary for the remedial scheme in § 471-e, which is the only section, other than the definition section, that employs the term. The Court concludes, therefore, that defendants are "retail dealers" within the meaning of the CMSA.

Turning to the elements of a CMSA violation, the Court lacks sufficient evidence to determine whether each defendant has sold cigarettes below cost with the intent to evade taxes. The parties shall address this issue at the evidentiary hearing.

### C.    Laches

Defendants argue that the doctrine of laches prohibits the City from obtaining equitable relief. "Laches is an equitable defense which bars injunctive relief where a plaintiff unreasonably delays in commencing an action." Tri-Star Pictures, Inc. v. Leisure Time Productions, B.V., 17 F.3d 38, 44 (2d Cir. 1994); see also Merrill Lynch Inv. Managers v. Optibase, Ltd., 337 F.3d 125, 132 (2d Cir. 2003) ("A party asserting a laches defense must show that the plaintiff has inexcusably slept on [its] rights so as to make a decree against the defendant unfair." (internal quotation marks omitted)). "A party asserting the defense of laches must establish that: (1) the plaintiff knew of the defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay." Ikelionwu v. United States, 150 F.3d 233, 237 (2d Cir. 1998) (citing Tri-Star Pictures, 17 F.3d at 44).

Although defendants assert that the City is seeking to enjoin "a practice which has occurred for decades," they present no evidence as to how long the City has known of defendants' conduct. (Defs' Opp'n Br. at 34.) The City claims that it only received crucial evidence—Form CG-6 filings made to the New York State Department of Taxation and Finance

---

commissioner of taxation and finance to purchase and affix adhesive or meter stamps on packages of cigarettes under this article." Id. § 470(11).

("DTF") by cigarette wholesalers Gutlove & Shirvint, Inc. and Mauro Pennisi, Inc.—from DTF in June 2008. (See Supplementary Decl. of Eric Proshansky, Dec. 1, 2008, ¶ 2.) Just as importantly, defendants do not even attempt to show how they have been prejudiced by the City's alleged delay. In the absence of prejudice, laches is no bar to equitable relief. See Majorica, S.A. v. R.H. Macy & Co., 762 F.2d 7, 8 (2d Cir. 1985) ("Lack of diligence, standing alone, is insufficient to support a claim of laches; the party asserting the claim also must establish that it was prejudiced by the delay.").

Defendants argue that Bray v. City of New York, 346 F. Supp. 2d 480 (S.D.N.Y. 2004), supports their defense of laches. In Bray, the City sued to enjoin mass bike rides, of which it had been aware "for a number of years," seeking a preliminary injunction two days before the demonstration was supposed to take place. Id. at 491-92. The court found that, "[w]ith only two days to respond to the City's application, the Plaintiffs are prejudiced, and the Court is short-changed." Id. at 492. Unlike in Bray, defendants here are given the full amount of time normally afforded to litigants to respond to the City's arguments. Thus, there is no prejudice of the kind the plaintiffs suffered in Bray.

Defendants appear to conflate their laches argument with an assertion that the City's delay undercuts its contention that irreparable harm would ensue if a preliminary injunction is not issued. This argument is more properly analyzed as part of the question of whether the prerequisites for a preliminary injunction have been satisfied. The Court will take up this issue after the evidentiary hearing.

## IV.    Conclusion

For the foregoing reasons, defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction is denied. The Court has

scheduled an evidentiary hearing on the City's motion for a preliminary injunction and defers

decision on the City's motion until after that hearing.

       SO ORDERED.


Dated: Brooklyn, New York
       March 16, 2009

                                        Carol Bagley Amon
                                        United States District Judge