UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
THE CITY OF NEW YORK,

        Plaintiff,

-against-

GOLDEN FEATHER SMOKE SHOP, INC., KIMO
SMOKE SHOP, INC., SMOKE AND ROLLS INC.,
SHAWN MORRISON, KIANA MORRISON, in her
individual capacity, MONIQUE'S SMOKE SHOP,
ERNESTINE WATKINS, in her individual capacity,
JESSEY WATKINS, WAYNE HARRIS, PEACE PIPE
SMOKE SHOP, RODNEY MORRISON, Sr.,
CHARLOTTE MORRISON, in her individual capacity,
RED DOT & FEATHERS SMOKE SHOP, INC.,
RAYMOND HART, in his individual capacity,
SMOKING ARROW SMOKE SHOP, DENISE
PASCHALL, in her individual capacity, TONY D.
PHILLIPS, TDM DISCOUNT CIGARETTES, and
THOMASINA MACK, in her individual capacity,

        Defendants.

-------------------------------------------------------------------x

**FINDINGS OF FACT**
**CONCLUSIONS OF LAW**
08-CV-3966 (CBA)

AMON, United States District Judge:


## TABLE OF CONTENTS

I.  Introduction ........................................................................................................... 3

II.  Procedural History ................................................................................................ 4

III.  Motion for Reconsideration ................................................................................. 6

IV.  Background and Findings of Fact ........................................................................ 9

  A.  New York State's Cigarette Tax Scheme ......................................................... 9

    1.  Taxation of Indian Cigarette Sales ................................................................ 9

    2.  The Cost of Cigarettes .................................................................................... 10

      a.  Legal Framework ...................................................................................... 10

      b.  Historical Minimum CMSA Prices .......................................................... 12

  B.  Poospatuck Smoke Shops ................................................................................. 13

    1.  Mari A. .......................................................................................................... 14

    2.  Ahman Aldabeshes ........................................................................................ 16

C.   Specific Defendants ................................................................................................. 17

   1.   Monique's Smoke Shop ................................................................................. 17

      a.   Background ............................................................................................. 17

      b.   Bulk Sales of Unstamped Cigarettes .................................................... 18

      c.   Continuing Sales of Unstamped Cigarettes ........................................... 19

      d.   Continuing Sales at Prices Below CMSA Minimum ............................. 20

   2.   Peace Pipe Smoke Shop ................................................................................ 21

      a.   Background ............................................................................................. 21

      b.   Bulk Sales of Unstamped Cigarettes .................................................... 21

      c.   Continuing Sales of Unstamped Cigarettes ........................................... 24

      d.   Continuing Sales at Prices Below CMSA Minimum ............................. 24

   3.   Red Dot and Feather Smoke Shop ................................................................. 25

      a.   Background ............................................................................................. 25

      b.   Bulk Sales of Unstamped Cigarettes .................................................... 26

      c.   Continuing Sales of Unstamped Cigarettes ........................................... 28

      d.   Continuing Sales at Prices Below CMSA Minimum ............................. 29

   4.   Smoking Arrow Smoke Shop ........................................................................ 29

      a.   Background ............................................................................................. 29

      b.   Bulk Sales of Unstamped Cigarettes .................................................... 30

      c.   Continuing Sales of Unstamped Cigarettes ........................................... 33

      d.   Continuing Sales at Prices Below CMSA Minimum ............................. 34

   5.   TDM Discount Cigarettes .............................................................................. 34

      a.   Background ............................................................................................. 34

      b.   Bulk Sales of Unstamped Cigarettes .................................................... 35

      c.   Continuing Sales of Unstamped Cigarettes ........................................... 37

      d.   Continuing Sales at Prices Below CMSA Minimum ............................. 39

D.   Injury to the City ...................................................................................................... 39

E.   Irreparable Harm ...................................................................................................... 41

   1.   New York City's Tobacco Control Program .................................................. 42

   2.   Dr. Frieden's Study ....................................................................................... 42

   3.   Relationship Between Cigarette Cost and Consumption ................................ 43

   4.   Relationship Between Cost of Cigarettes and Smoking Cessation ................ 44

V.   Motion for Preliminary Injunction:  Conclusions of Law ............................................ 45

 A.   Standard of Review .................................................................................................. 45

B. Likelihood of Success on the Merits.................................................................47

   1. The CCTA .................................................................................................47

     a. Applicable Tax ....................................................................................47

     b. Defendants' Violation of the CCTA ....................................................61

   2. The CMSA .................................................................................................64

     a. Applicable Tax ....................................................................................64

     b. Standing under the CMSA....................................................................64

     c. Defendants' Violation of the CMSA ...................................................66

C. Additional Required Showing..........................................................................66

   1. Irreparable Harm .......................................................................................66

     a. Not Required to be Shown....................................................................66

     b. Irreparable Harm in any event Established...........................................72

   2. Violations Will Likely Be Repeated .........................................................73

VI. Defendants' Application for a Stay Pending Appeal .....................................75

VII. Conclusion and Preliminary Injunction ..........................................................76

## I. Introduction

The City of New York brought this action against the above-captioned defendants,

seeking injunctive relief, penalties and damages under the Contraband Cigarette Trafficking Act,

18 U.S.C. § 2341 et seq. (the "CCTA"), and the Cigarette Marketing Standards Act, N.Y. TAX L.

§ 483 et seq. (the "CMSA").  Defendants are individuals and businesses engaged in the sale of

cigarettes from the Poospatuck Indian Reservation in Mastic, New York (the "Poospatuck

Reservation" or the "Reservation").  The City seeks a preliminary injunction pursuant to Rule

65(a) of the Federal Rules of Civil Procedure, enjoining certain defendants from selling untaxed

cigarettes to nonmembers of the Unkechauge Indian Nation (the "Unkechauge Nation" or the

"Tribe").[1]  Certain defendants have moved for reconsideration of this Court's March 16, 2009

order denying their motion to dismiss for lack of subject matter jurisdiction.  For the reasons set

forth below, defendants' motion for reconsideration is denied.  The City's motion for a

preliminary injunction is granted.  The preliminary injunction is stayed for thirty days to permit

defendants to file a Notice of Appeal and to request a further stay from the Court of Appeals.

## II.    Procedural History

The City commenced this action against the above-captioned defendants on September

29, 2008 and moved for a preliminary injunction against all defendants on October 28, 2008.  By

motion dated November 24, 2008, defendants Monique's Smoke Shop, Ernestine Watkins,

Wayne Harris, Red Dot & Feather Smoke Shop, Inc., Raymond Hart, Smoking Arrow Smoke

Shop, Denise Paschall, TDM Discount Cigarettes, Thomasina Mack, Kimo Smoke Shop, Golden

Feather Smoke Shop, Smoke and Rolls, and Kiana Morrison (the "Moving Defendants") moved

to dismiss all claims against them pursuant to Rule 12(b)(1) of the Federal Rules of Civil

Procedure for lack of subject matter jurisdiction on the grounds of Tribal sovereign immunity.

On March 16, 2009, this Court issued an order denying the Moving Defendants' motion

to dismiss, finding that defendants could not assert the defense of sovereign immunity because

they are private businesses, not arms of the Tribe.[2]  See City of New York v. Golden Feather

Smoke Shop, No. 08-CV-3966, 2009 WL 705815, at *7 (E.D.N.Y. Mar. 16, 2009).  The Court

further concluded that the CCTA exemption for "Indian[s] in Indian country," 18 U.S.C. §

---

[1] Defendants have indicated that since prehistoric times the Unkechauge Indians have inhabited the land known as the Poospatuck Reservation. (Defs. Joint Memo. Opp'n Pl. Prelim. Inj., Nov. 24, 2008, at 8.)

[2] This Court assumed without deciding that the Unkechauge Nation, a non-party to this action, may raise the defense of sovereign immunity. See Golden Feather, 2009 WL 705815, at *3.  The issue of whether the Unkechauge Nation itself is entitled to sovereign immunity is the subject of a separate lawsuit, which is currently before Judge Kiyo A. Matsumoto in this District.  See Gristede's Foods, Inc. v. Unkechauge Nation, 06-CV-1260 (KAM).

2346(b)(1), is not a bar to the City's CCTA claims.  Id. at *12.  Although the Court reiterates some aspects of its prior order here for the sake of context, familiarity with this Court's March 16, 2009 order is assumed.

On or about May 14, 2009, defendants Golden Feather Smoke Shop, Inc., Kimo Smoke Shop, Inc., Shawn Morrison, and Kiana Morrison agreed to a consent injunction, which this Court entered on May 21, 2009.  (DE # 138.)  Pursuant to the consent injunction, these defendants were "enjoined from purchasing, receiving, possessing, distributing and selling unstamped cigarettes."  (Id.)  Separately, the City agreed not to seek injunctive relief against defendant Smoke and Rolls, Inc. because Smoke and Rolls is not currently operational.  (See Tr. of Oral Argument, July 30, 2009, at 3.)  Defendants Tony D. Phillips and Jessey Watkins are currently in default.  By motion dated March 30, 2009, the City moved for default judgments against Phillips and Watkins.  This motion is currently before the Court.  Watkins has since made an informal application to set aside the entry of default against him.

The Court held a four day hearing on the City's motion for a preliminary injunction. Defendants Monique's Smoke Shop, Ernestine Watkins, Wayne Harris, Peace Pipe Smoke Shop, Rodney Morrison, Sr., Charlotte Morrison, Red Dot & Feather Smoke Shop, Inc., Raymond Hart, Smoking Arrow Smoke Shop, Inc., Denise Paschall, TDM Discount Cigarettes, and Thomasina Mack participated in the hearing.  Both the City and defendants presented evidence.

By motion dated July 15, 2009, defendants Monique's Smoke Shop, Ernestine Watkins, Wayne Harris, Red Dot & Feather Smoke Shop, Inc., Raymond Hart, Smoking Arrow Smoke Shop, Inc., Denise Paschall, TDM Discount Cigarettes, and Thomasina Mack moved for reconsideration of this Court's March 16, 2009 order denying their motion to dismiss this case

for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil

Procedure.  The Court first addresses this reconsideration motion.

### III.    Motion for Reconsideration

The defendants challenge this Court's determination that defendants cannot assert the

defense of tribal sovereign immunity because they are privately owned businesses, and not "arms

of the tribe."  See Golden Feather, 2009 WL 705815, at *7.  They further challenge this Court's

conclusion that the CCTA exemption for "Indian[s] in Indian country" is not a bar to the City's

CCTA claim.  See id. at *12.

The decision whether to grant or deny a motion for reconsideration falls within the

discretion of the district court.  See Devlin v. Transp. Commc'ns Int'l Union, 175 F.3d 121, 132

(2d Cir. 1999).  "The standard for granting such a motion is strict, and reconsideration will

generally be denied unless the moving party can point to controlling decisions or data that the

court overlooked—matters, in other words, that might reasonably be expected to alter the

conclusion reached by the court."  Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir.

1995).  A motion for reconsideration may be granted based upon "an intervening change of

controlling law, the availability of new evidence, the need to correct a clear error, or to prevent

manifest injustice."  T.Z. v. City of New York, No. 05-CV-5111, 2009 WL 1794702, at *3

(citing Doe v. New York City Dept. of Social Servs., 709 F.2d 782, 789 (2d Cir. 1983)).  A

motion for reconsideration, however, "is neither an occasion for repeating old arguments

previously rejected nor an opportunity for making new arguments that could have been

previously advanced."  Associated Press v. U.S. Dep't of Def., 395 F. Supp. 2d 17, 19 (S.D.N.Y.

2005) (internal citations omitted); see also E.E.O.C. v. Fed. Express Corp., 268 F. Supp. 2d 192,

195 (E.D.N.Y. 2003) (stating that a party seeking reconsideration "must demonstrate that the

Court overlooked controlling decisions or factual matters that were put before it on the underlying motion" (internal quotation marks omitted)).

Defendants do not point to any intervening change of controlling law. Defendants argue unsuccessfully that the New York State Appellate Division's decision in Cayuga Indian Nation of New York v. Gould, ___ N.Y.S.2d ____, 2009 WL 1981848 (N.Y. App. Div. July 10, 2009), constitutes a change in substantive law with respect to the issue of whether defendants are Indians in Indian country. Cayuga, however, is a state case, and did not involve application of the federal CCTA. The Appellate Division's determination that the definition of "qualified reservation" under New York tax law should reflect existing federal common law at the time the legislation was passed has no relevance to the definition of "Indian country" under the CCTA.

Nor do defendants present any evidence that the Court has overlooked, which might reasonably be expected to alter this Court's decision. Although defendants assert that the Tribe has increasingly exerted more control over the defendant smoke shops during the pendency of this litigation, this evidence does not in any way undermine this Court's conclusion that the shops are subject to regulation by Tribal government, but not extensions of the Tribe itself.

Defendants' principal complaint is that in determining that the defendant businesses are not arms of the Tribe, the Court has overlooked the unique cultural history of the Unkechauge Nation. In support of this argument, defendants present the affidavit of history professor John A. Strong, which briefly traces the development of business activity among members of the Unkechauge Nation since the Seventeenth Century. (See Affidavit of John A. Strong, July 15, 2009 ("Strong Aff.") and additional affidavit of Gilbert Davis, a member and officer of the Unkechauge Tribal Council, Apr. 3, 2009.) As an initial matter, the Court notes that it is difficult to understand the claim that the Court "overlooked" this information since it was not presented to

the Court until the motion for reconsideration. There is no indication that this evidence was unavailable to defendants on the underlying motion. This deficiency alone is sufficient grounds for denying defendants' motion. In any event, the history presented by defendants does not undermine the fact that the Tribe has allowed its members to operate businesses constrained only by certain regulation by Tribal authorities. <u>Compare</u> Strong Aff. ¶ 6 (explaining that traditional law was codified into "a system of regulation and community participation" including licensing procedures and the requirement of Tribal referendum to authorize business activity); <u>with</u> <u>Golden Feather</u>, 2009 WL 705815, at *7 ("[D]efendants' relationship with the Tribe appears to be no different from that of the State and State-licensed businesses: the Tribe issues licenses to the businesses, collects taxes and fees, and promulgates regulations governing their activity."). As the Court concluded in its March 16, 2009 order, "[d]efendants' activities are not properly considered those of the Tribe itself, but are instead those of separate business entities, which confer incidental benefits on the Tribe in exchange for the right to operate on Reservation land." <u>Golden Feather</u>, 2009 WL 705815, at *7; <u>compare</u> Strong Aff. ¶ 7 ("In order to meet the challenges of reservation enterprises which bring important economic resources into the reservation community, the Tribal Council has introduced as system which includes licensing, regulation, and a requirement which distributes a percentage of tobacco profits to benefit the reservation as a whole."). Nor is the Court persuaded to alter its conclusion by the belated and conclusory assertions contained in the post-decision affidavit of Gilbert Davis. In fact, the Court's decision on this issue was further reinforced by the testimony introduced at the hearing, which confirmed that the defendant smoke shops are owned and controlled by individuals, for private benefit, even if they are subject to regulation by and pay fees to the Tribe. (<u>See, e.g.</u>, Ex. 95 at 14:1-15:19 (Mack testifying that she is the sole owner of TDM Discount Cigarettes); Ex.

94 at 14:23-15:1 (Paschall testifying that she is the owner of Smoking Arrow Smokes, although her daughter runs the store); Ex. 92 at 10:4-5 (Jessey Watkins testifying that Anitra Monique Watkins is the owner of Monique's Smoke Shop); Ex. 93 at 6:3-4, 12:15-17, 20:4-6 (Hart testifying that he is the owner of Red Dot Smokes and that nobody other than Hart and his employees receives payments from the money made at the store); see also Ex. 89 ¶¶ 1, 4 (stipulating that Peace Pipe is a sole proprietorship owned by defendant Charlotte Morrison).)

Accordingly, defendants' motion for reconsideration is denied.

## IV. Background and Findings of Fact

### A. New York State's Cigarette Tax Scheme

#### 1. Taxation of Indian Cigarette Sales

Article 20 of the New York Tax Law imposes a tax on all cigarettes possessed for sale or use in New York State, except for those cigarettes that New York is "without power" to tax. See N.Y. TAX L. § 471 ("There is hereby imposed and shall be paid a tax on all cigarettes possessed in the state by any person for sale, except that no tax shall be imposed on cigarettes sold under such circumstances that this state is without power to impose such tax . . . ."); Dep't of Taxation & Fin. of N.Y. v. Milhelm Attea & Bros., Inc., 512 U.S. 61, 64, 114 S.Ct. 2028, 2031 (1994) ("Milhelm Attea & Bros.") (citing N.Y. TAX L. § 471(1)). Under New York law, cigarette taxes are normally pre-paid by State-licensed "stamping agents," usually wholesale cigarette dealers, who purchase tax stamps from the State and affix them to cigarette packages as evidence of payment. The tax burden is built into the cost of the cigarettes and passed along the distribution chain to each subsequent purchaser, ultimately falling on the consumer. See N.Y. TAX L. § 471(2); New York Assoc. of Convenience Stores v. Urbach, 699 N.E.2d 904, 906 (N.Y. 1988).

The purpose of this system is to prevent the widespread evasion of New York cigarette taxes. See Milhelm Attea & Bros., 512 U.S. at 75, 114 S.Ct. at 2036.

Federal and state governments lack authority to tax cigarettes sold to members of Native American tribes for their own consumption. Thus, cigarettes to be consumed on the reservation by enrolled tribal members are tax-exempt and need not bear stamps ("unstamped cigarettes"). Milhelm Attea & Bros., 512 U.S. at 64, 114 S.Ct. at 2031 (citing Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation, 425 U.S. 463, 475-81, 96 S.Ct. 1634, 1642-45 (1976)). "On-reservation cigarette sales to persons other than reservation Indians, however, are legitimately subject to state taxation." Id. (citing Washington v. Confederated Tribes of Colville Reservation, 447 U.S. 134, 160-61, 100 S.Ct. 2069, 2084-85 (1980)). This Court has held that § 471 constitutes an "applicable" tax for the purposes of the CCTA and may serve as the basis for claims under both the CCTA and the CMSA. See Golden Feather, 2009 WL 705815, at *1; City of New York v. Milhelm Attea & Bros., Inc., 550 F. Supp. 2d 332, 346-49 (E.D.N.Y. 2008) ("Milhelm Attea").

### 2. The Cost of Cigarettes

#### a. Legal Framework

New York's cigarette tax is incorporated into a set of minimum price requirements for the sale of cigarettes within the state. The CMSA, N.Y. Tax L. §§ 483-89, "prohibits the sale of cigarettes below cost when the seller intends thereby to harm competition or evade taxes." Lorillard Tobacco Co. v. Roth, 786 N.E.2d 7, 8 (N.Y. 2003). The statute makes it unlawful for

> any agent, wholesale dealer or retail dealer, with intent to injure competitors or destroy or substantially lessen competition, or with intent to avoid the collection or paying over of such taxes as may be required by law, to advertise, offer to sell, or sell cigarettes at less than the cost of such agent wholesale dealer or retail dealer, as the case may be.

N.Y. Tax L. § 484(a)(1).  "Cost" is defined to include several components, incorporating the added costs at each step in the supply chain.  For the purposes of the present motion, the most significant cost requirement is the "cost of the retail dealer," which is the minimum price at which a retail dealer may sell cigarettes to a customer.

The baseline for cost calculations under the CMSA is the "basic cost of cigarettes."  The statute defines the "basic cost of cigarettes" as "the invoice cost of cigarettes to the agent who purchases from the manufacturer . . . less all trade discounts, except discounts for cash, to which shall be added the full face value of any stamps which may be required by law."  Id. § 483(a)(1).  The statute defines the "cost of the retail dealer," in turn, as (1) the "basic cost of cigarettes," plus (2) "the cost of doing business by the retail dealer," plus (3) "the cost of doing business by the agent with respect to the sales of cigarettes to retail dealers."  Id. § 483(b)(3)(A).  Thus, the minimum price at which a retail dealer may sell cigarettes to a customer is the sum of the "basic cost of cigarettes" and two markups, one for each step in the supply chain.

Although this cost "consists of overhead and operational expenses theoretically unique to a given agent or dealer, . . . in practice [it is] determined using statutory default rates."  Lorillard Tobacco, 786 N.E.2d at 9 n.2; see also Tr. 541:6-542:14.  Under the CMSA, the "cost of doing business by the retail dealer" is "presumed to be seven per centum of the sum of the basic cost of cigarettes plus the cost of doing business by the agent with respect to the sales of cigarettes sold to retail dealers."  N.Y. Tax L. § 483(b)(3)(B).  The "cost of doing business by the agent" with respect to sales to retail dealers is presumed to be 3.875% of the "basic cost of cigarettes" plus twenty cents per carton.  Id. § 483(b)(1)(B).  These statutory markups have not changed since 1989.  (Tr. 541:6-542:4.)  The New York State Department of Taxation and Finance ("DTF") publishes a guide to this pricing framework, known as Publication 508, which lists the

appropriate sale prices depending on the manufacturer's list price for a particular brand of cigarettes.  (See Ex. 39.)

**b.  Historical Minimum CMSA Prices**

Andrew DeFrancesco, Chief Financial Officer of Harold Levinson Associates ("HLA") (Tr. 254:15-23), testified regarding these minimum price requirements imposed by the CMSA. As a licensed stamping agent and dealer, HLA is bound to follow these requirements.  (Tr. 258:16-19.)  DeFrancesco testified consistently with the legal requirements of the CMSA.  The Court finds his testimony to be credible and adequately supported by the governing legal framework and by documentary evidence in the record.

Specifically, DeFrancesco explained how to determine the minimum price at which a retail dealer is permitted to sell a carton of a particular brand of cigarettes to a consumer in New York State, under the legal framework described above.  First, the retail dealer calculates the "basic cost of cigarettes" by adding the cost of applicable tax stamps to the list price supplied by the manufacturer for the particular brand.  In December 2006, New York City and New York State each imposed a cigarette tax of $15 per carton, making the total cigarette tax $15 for each carton sold outside New York City or $30 for each carton sold within New York City.  (Ex. 72A; Tr. 537:23-538:1.)  On June 3, 2008, the New York State cigarette tax increased to $27.50 per carton.  (Tr. 554:18-23.)  To calculate the "cost of the retail dealer," the retail dealer would start with the "basic cost of cigarettes" and add the two statutory markups.  Finally, the retail dealer would subtract any manufacturer's discount that may apply to the brand at that particular time.

For example, DeFrancesco explained that the minimum price at which a retail dealer was permitted to sell a carton of Newport cigarettes in December 2006 to a consumer in New York State, outside New York City, was $42.72.  To arrive at this price, one would start with the

manufacturer's list price of $28.64 and add the cost of New York State tax stamps ($15.00), which would yield the basic cost of $43.64. Adding the two statutory markups results in a retail minimum price per carton of $48.72. This minimum retail price is reflected in Publication 508. (Ex. 39 at 31.) From the minimum retail price listed in Publication 508, the retail dealer would subtract the Newport discount in effect in December 2006, which was $6.00 per carton. The resulting price of $42.72 was the minimum price at which a retail dealer was permitted to sell a carton of Newport cigarettes in New York State, outside New York City, in December 2006.

The evidence presented at the hearing established that the minimum prices per carton for sales by retail dealers to consumers in New York State, outside New York City, are reflected in the following chart:

| Date | Brand | Manufacturer's Discount | Minimum Price |
|------|-------|------------------------|---------------|
| Dec. 18, 2006 | Newport | $6.00 | $42.72 |
| Dec. 18, 2006 | Marlboro | $4.00 | $43.61 |
| Dec. 12, 2007 | Newport | $6.00 | $43.28 |
| Dec. 12, 2007 | Marlboro | $3.50 | $44.11 |
| June 3, 2008 | Newport | $6.00 | $58.28 |
| June 3, 2008 | Marlboro | $2.60 | $58.91 |
| Dec. 12, 2008 | Newport | None | $65.40 |
| Dec. 12, 2008 | Marlboro | $2.10 | $59.41 |
| Feb. 12, 2009 | Newport | None | $66.51 |
| Feb. 12, 2009 | Marlboro | $2.10 | $60.41 |
| Mar. 9, 2009 | Newport | None | $74.40 |
| Mar. 9, 2009 | Marlboro | $2.10 | $68.30 |

(See Exs. 39, 72A-72F; Tr. 547:9-566:16.)

### B. Poospatuck Smoke Shops

Defendants and other smoke shops on the Poospatuck Reservation sell cigarettes outside of this pricing framework. Their principal business model, and the reason customers visit them from throughout the New York Metropolitan Area, is to provide customers with the opportunity to purchase cigarettes at significantly reduced prices, without paying tax. Among other business

activity, defendants sell these reduced price cigarettes to bootleggers who transport the cigarettes off the reservation and into New York City where they resell them for a profit to other consumers who do not wish to pay the full price.

### 1. Mari A.

The City presented the testimony of Mari A., a confidential witness who operated a cigarette business in New York City from around 2001 until 2008. (Tr. 9:23-10:1.) Mari A.'s business involved purchasing large quantities of unstamped cigarettes on the Poospatuck Reservation and transporting them into New York City, where she sold them for a profit. (Tr. 10:5-9.) The Court finds Mari A.'s testimony to be credible regarding her businesses and the cigarette purchases she made on the Poospatuck Reservation.

During the years she was in business, Mari A. generally traveled from New York City to the Poospatuck Reservation every day, at least five days per week, to purchase cigarettes. (Tr. 10:25-11:4.) Upon arriving at the Reservation, Mari A. would try to purchase approximately 900 cartons of cigarettes. (Tr. 10:14-18.) She would transport the cigarettes back to the City and re-sell them, usually in the Bronx, with the intention of selling all of them the same day. (Id.) On the days that Mari A. was able to sell all of the cigarettes right away, she would return to the Reservation to purchase more cigarettes the same day. (Tr. 11:7-15.) When business was strong, Mari A. would work as often as six or seven days a week. (Id.)

Mari A. carried out her deliveries using either minivans or trucks. (Tr. 14:3-5.) When she drove a minivan, she would remove the back passenger seats. (Tr. 14:6-11.) Smoke shop employees would package boxes of cigarettes in black bags, load them into her minivan, and cover them with a blanket. (Id.) Sometimes Mari A. would visit more than one smoke shop on a

given visit to purchase the number of cigarettes she required.  (Tr. 12:10-17)  All of the cigarettes Mari A. purchased on the Reservation were unstamped.  (Tr. 18:23-19:1.)

Some smoke shops assisted Mari A. in avoiding detection by the police.  Mari A. would try to go to the Reservation early in the morning when she believed the police would soon change their shift.  (Tr. 11:19-12:1.)  During the police shift, employees of certain smoke shops would "ride her out," meaning that they would escort her off the Reservation past police patrols. (Tr. 12:2-9.)  When asked how this procedure worked, Mari A. testified:

> Well, there's police that be there.  They know what you're doing.  So the objective is to avoid the police and get off the reservation without being detected, especially if you were in a van.
> So what most stores would do, they hired people and they would ride around the reservation up to like Eleanor [Avenue], and they would look to see if they seen any strange cars or the police.  And if the police were there, they would come back and tell you to wait.  If they didn't see any police, or they seen police sitting on one side, they would ride you out a different way, a back way, so you can get off the reservation safely.

(Tr. 22:21-9.)

Mari A. purchased predominantly Newport and Marlboro brand cigarettes.  (Tr. 13:6-9.) Although the price she paid for them varied, in 2007 she generally paid between $27 and $30 for each carton of Newports.  (Tr. 13:10-16.)  As discussed above, the CMSA minimum price for Newports was $42.72 per carton in December 2006 and $43.28 per carton in December 2007.

Upon returning to the Bronx, Mari A. would resell the cigarettes either to stores, to people who sold "five dollar packs" on the streets, or "to anybody that didn't want to pay the whole price at the store."  (Tr. 13:17-24, 17:2-18:11.)  Mari A. had personal knowledge that many of her customers were themselves reselling the cigarettes for a profit.  Stores would sometimes ask Mari A. for New York State tax stamps to affix so that they could sell them safely and pass inspection.  (Tr. 16:10-17:9.)  Mari A. witnessed her individual customers reselling

cigarettes on the street, at first at three packs for $10, and later on for $5 per pack. (Tr. 17:2-18:11.) Sometimes her customers would run out of cigarettes to sell, and "they would call me and say, 'I don't have any anything [sic] to sell. Could you please hurry up? Because I got a line down the street. And I need you to hurry up and bring me my cigarettes.'" (Tr. 18:13-17.)

Mari A. was not the only bootlegger to purchase large quantities of unstamped cigarettes on the Poospatuck Reservation and resell them in New York City. Mari A. testified that, during her visits to the Reservation, she saw other people purchasing large quantities of cigarettes and that, depending on the store, she "usually had to wait outside while they loaded somebody else out." (Tr. 40:18-41:2.) Mari A. and other such "wholesalers" would often compare notes about the different stores, where certain brands and types of cigarettes could be purchased, and who had the best price. (Tr. 40:18-41:2, 110:15-111:7.)

## 2. Ahman Aldabeshes

One other such wholesaler was Ahman Aldabeshes. Aldabeshes testified credibly that he was in the business of purchasing cigarettes for resale on the Poospatuck Reservation from approximately the end of 2003 until his arrest in October 2006.[3] (Tr. 191:16-25.) Like Mari A., Aldabeshes would purchase cigarettes on the Reservation, transport them back to New York City, and sell them to grocery stores. (Tr. 192:1-25, 193:15-18.) He had approximately 40 or 50 customers, all of which were grocery stores located in the Bronx and Manhattan. (Tr. 193:19-24.) In 2005, Aldabeshes would purchase around 15 or 18 master cases at a time from defendant Thomasina Mack and, if he picked up the delivery early in the day, he was able to resell all of the master cases in the City on the same day. (Tr. 192:13-16, 193:1-18.) Each master case contains

---

[3] Previously, for a year in or around 1997, Aldabeshes was in the business of purchasing cigarettes in Virginia and reselling them in New York City. (Tr. 191:11-15.)

60 cartons of cigarettes. (Tr. 10:22-24.) In 2005, Aldabeshes generally paid approximately $21 or $21.50 for each carton of cigarettes. (Tr. 194:3-4.)

Aldabeshes was friends with an individual named Emad Al-Naimat, whom he referred to as "the biggest guy in the Bronx" when it came to trafficking cigarettes into the City. (Tr. 197:7-23.) Al-Naimat used to purchase approximately two vans full of cigarettes each day from defendant Shawn Morrison. (Tr. 208:7-11.) Aldabeshes testified that he did not know if Al-Naimat used to purchase cigarettes from anyone other than Shawn Morrison. (Tr. 208:12-19.)

**C. Specific Defendants**

The Court makes the following findings of fact regarding each defendant's business individually, based upon the evidence introduced at the hearing.

### 1. Monique's Smoke Shop

#### a. Background

Monique's Smoke Shop ("Monique's") opened on the Poospatuck Reservation in around 1995 or 1996. (Ex. 92 ("Watkins Dep.") 6:6-17, 10:9-11.) Defendant Jessey Watkins has helped manage Monique's, full time, since 1995. (Id. at 15:25-16:9.) Jessey Watkins's wife, defendant Ernestine Watkins, who goes by the pseudonym "Twinkle" (Id. at 27:18-22), works as a cashier at Monique's. (Id. at 11:17-21.) Defendant Wayne Harris has been a part owner of Monique's from 1998 to at least November 2007 and works there on occasions when other employees are absent from work. (Ex. 99 at 2019:23-2020:7, 2021:20-22; Watkins Dep. 12:18-13:1.) Jessey Watkins's daughter, Anitra Monique Watkins, has been an owner of Monique's since 1995 or 1996. (Watkins Dep. 10:4-5, 16:19-23.)

At least 98% of Monique's Smoke Shop's business consists of tobacco sales, and all of the cigarettes that Monique's sells are unstamped. (Watkins Dep. 17:7-23; Ex. 80, Admission

No. 4; see also Ex. 96 at 557:12-13.) Monique's purchases unstamped cigarettes from wholesalers Gutlove & Shirvint ("Gutlove") and Mauro Pennisi ("Pennisi"), as well as from a source associated with the Seneca Nation. (Watkins Dep. 17:24-18:9.) It sells cigarettes mostly to the "[g]eneral public," to customers coming from "throughout the New York metro area." (Ex. 96 at 557:22-558:5.)

### b. Bulk Sales of Unstamped Cigarettes

In the November 2007 criminal trial of defendant Rodney Morrison (the "Morrison trial"), Jessey Watkins testified that on five or six occasions he personally sold unstamped cigarettes, in quantities of up to 100 cartons at a time, off the Reservation. (Ex. 97 at 830:7-831:5, 831:21-835:2.) When Watkins made sales off the Reservation, he did not scan the cigarettes into the store's computer system. (Id. at 833:11-21.) Other Monique's employees also delivered unstamped cigarettes off the Reservation for sale, at Watkins's direction. (Id. at 847:7-11.) From approximately 2006 through November 2007, Monique's employees made deliveries of at least 150 cartons of cigarettes off the Reservation twice per month, even though Watkins knew it was illegal to take cigarettes off the Reservation for sale. (Id. at 851:18-852:22.) These off-Reservation sales took place within several blocks of the Reservation, not within New York City. (Id. at 832:10-12, 849:2-6.)

From around 2005 to 2007, Mari A. purchased cigarettes from Monique's between five and ten times. (Tr. 32:22-33:8, 35:10-12.) She did not like buying from Monique's because "they weren't friendly and they didn't ride people out." (Tr. 33:9-13.) On the occasions Mari A. did buy cigarettes from Monique's, she purchased around 300 cartons at a time, paying between $25 and $27 per carton. (Tr. 33:9-13, 35:4-9.)

Mari A. testified credibly that Monique's never put a restriction on the number of cigarettes she could buy. (Tr. 35:1-3.) This testimony is corroborated by Wayne Harris, who testified at the Morrison trial that Monique's routinely sold bulk cartons of cigarettes to customers in whatever quantity the customers wished to purchase, and that Monique's customers had purchased up to "a couple of hundred" cartons of cigarettes at a time. (Ex. 100 at 2154:9-33.) Harris further testified that on several occasions he personally delivered untaxed cigarettes off the Reservation for sale. (Id. at 2157:7-23, 2161:51-2164:35.)

On June 6, 2008, DTF investigator Byron Mars and a confidential informant known as Larry ("CI Larry") visited Monique's Smoke Shop. (Tr. 319:15-320-3; Ex. 57B.) Inside the smoke shop, CI Larry spoke to Ernestine Watkins, who identified herself as Twinkle, and told her that he and Mars wanted to buy sixty cartons of Newport cigarettes. (Tr. 320:10-21; Ex. 57B.) Mars informed Ms. Watkins that he needed a good price because he intended to resell the cigarettes for a profit in Brooklyn and the Bronx. (Tr. 320:22-321:4; Ex. 57B.) Ms. Watkins replied by stating that Mars and CI Larry could make a lot of money selling those cigarettes and acknowledged that a lot of their customers were from New York City. (Tr. 320:22-321:4; Ex. 57B.) Ms. Watkins sold Mars and CI Larry 60 cartons of unstamped Newport cigarettes at $27 per carton and packaged them in black garbage bags. (Tr. 321:17-24, 322:24-323:5; Ex. 57B.) CI Larry paid Ms. Watkins $1,620 in cash. (Ex. 57B.)

Investigator Mars and CI Larry returned to Monique's Smoke Shop on July 8, 2008. (Tr. 323:18-20; Ex. 57C.) A sales person offered to sell them 100 cartons of Newport cigarettes at about $30 per carton. (Tr. 324:3-9; Ex. 57C.) Mars and CI Larry left Monique's without making a purchase. (Tr. 324:6-9; Ex. 57C.)

### c. Continuing Sales of Unstamped Cigarettes

Monique's is engaged in a high volume business. From April 2006 until the end of 2008, Monique's purchased over 1.29 million cartons of unstamped cigarettes from wholesalers Gutlove and Pennisi. (Exs. 14A, 15A.) In addition, Monique's obtained unknown amounts of cigarettes from other sources, including an entity on the Seneca Reservation. (Watkins Dep. 17:24-18:11, 18:22-19:16, 37:20-38:1.) On its federal income tax returns, Monique's reported gross revenues of $11,117,225 in 2006 and $11,648,139 in 2007, and gross profits of $746,349 in 2006 and $394,049 in 2007. (Exs. 45, 46.)

This high volume of business has continued into 2009. Monique's purchased 47,437 cartons of unstamped cigarettes from Gutlove and Pennisi in January 2009, 36,322 cartons in February 2009, and 46,139 cartons in March 2009. (Ex. 91 at 3.) Gutlove and Pennisi each made deliveries of cigarettes to Monique's in February and March 2009 on every weekday except one.[4] (See Ex. 53.) Jessey Watkins testified at his April 29, 2009 deposition that Monique's plans to stay in business and that Monique's currently sells between 13,000 and 15,000 cartons of cigarettes per week. (Watkins Dep. 8:16-18, 19:17-19.) Given Monique's history of selling large quantities of unstamped cigarettes and its plans to continue its current business, the Court concludes that this practice is likely to continue in the future.

### d. Continuing Sales at Prices Below CMSA Minimum

Approximately 70% of Monique's cigarette sales are Newports. (Watkins Dep. 32:6-7; Ex. 53.) Jessey Watkins testified at his deposition that, as of April 29, 2009, Monique's was selling a carton of Newports for $48.50 and that Monique's sold a carton of Newports for about $40 prior to the most recent federal tax increase. (Watkins Dep. 31:19-24.) DTF Investigator Mars and CI Larry purchased Newports at Monique's for $27 a carton on June 6, 2008, and

---

[4] The records do not reflect deliveries on Thursday, February 26, or on Monday, March 2.

Monique's offered to sell them 100 cartons of Newports at approximately $30 per carton on July 8, 2008.  (Tr. 321:17-27, 322:24-323:6; Exs. 57B, 57C.)  As discussed above, the CMSA minimum price per carton of Newports was $43.28 in December 2007, $58.28 in June 2008, $65.40 in December 2008, and $66.51 as of February 12, 2009.  Monique's has sold and continues to sell Newports at prices substantially below the CMSA minimums.  In light of Monique's history of selling cigarettes at prices below the CMSA minimums and its plans to continue its current business, the Court concludes that this practice is likely to continue.

### 2. Peace Pipe Smoke Shop

#### a. Background

Peace Pipe Smoke Shop ("Peace Pipe"), a sole proprietorship owned by defendant Charlotte Morrison, opened on the Poospatuck Reservation in 1994.  (Ex. 89 ¶¶ 1, 4.)  Until August 3, 2004, Peace Pipe was managed by Charlotte Morrison's husband, Rodney Morrison.  (Ex. 89 ¶ 8; Ex. 96 at 408:15-17; Ex. 42 ¶ 5.)  After Rodney Morrison was arrested on August 3, 2004, Peace Pipe was managed by Joseph Rombola until Rombola was arrested for CCTA violations in approximately September 2007.  (Ex. 89 ¶ 9, Att. 2.)  Peace Pipe is presently managed by Lillian Garcia, a non-party to this action.  (Id. ¶ 10.)

Peace Pipe's principal business is the sale of cigarettes and other tobacco products.  (Id. ¶ 2.)  All of the cigarettes that Peace Pipe sells are unstamped.  (Id. ¶ 3.)  Since it opened in or around 1994, Peace Pipe has engaged in sales of unstamped cigarettes continuously to the present.  (Id. ¶ 4.)  Peace Pipe has sold thousands of cartons of cigarettes in thousands of transactions to numerous individual customers who reside in New York City.  (Id. ¶ 16.)

#### b. Bulk Sales of Unstamped Cigarettes

Mari A. began purchasing cigarettes from Peace Pipe Smoke Shop in 2001 or 2002. (Tr. 19:22-20:1, 20:23-21:1.) On her first visit, she purchased 30 cartons of cigarettes from defendant Rodney Morrison. (Tr. 19:22-20:1.) On her next visit, Mari A. sought to purchase 60 cartons of cigarettes. (Tr. 21:2-5.) Rodney Morrison was impressed with how quickly Mari A. came back, however, so he gave her 120 cartons "on consignment," for which Mari A. paid him at a later time. (Tr. 21:2-22:5.) In around 2003, Mari A. began purchasing 300 cartons of cigarettes on each visit. (Tr. 22:6-10.) On one occasion in around 2005, a Peace Pipe employee delivered 300 cartons of cigarettes to Mari A. in the Bronx. (Tr. 23:17-25:20.)

Mari A. testified credibly that Peace Pipe never put a restriction on the number of cigarettes she could buy in a single purchase. (Tr. 25:21-27:16.) For orders exceeding 49 cartons, Peace Pipe would divide the order onto multiple receipts so that no receipt had more than 49 cartons on it. (Tr. 25:21-26:2.)

> [T]hey would put me under different names because the receipt could only be –
> can only show 49 cartons. They said they could only sell 49 cartons a day to a
> person. So what they would do is if you ordered say five hundred cartons, you
> would get ten receipts with 49, and then one more receipt with ten. But they
> wouldn't give you the receipt. They would just lay them in the counter, so they
> could double-check the order. But you never got a receipt.

(Tr. 26:10-18.) Peace Pipe would make out Mari A.'s order under multiple names, including the pseudonym "Ms. Tiny." (Tr. 27:8-15.) Mari A. testified that Peace Pipe started this practice in around 2006 or 2007 after a manager named Joe was arrested and people at Peace Pipe "were saying that they had gotten to a lot of hot water about the cigarettes." (Tr. 27:18-25.) As discussed above, Peace Pipe manager Joseph Rombola was arrested in around September 2007.

Mari A. testified credibly that there were two ways to enter Peace Pipe Smoke Shop. (Tr. 77:24-78:4.) One way to enter Peace Pipe was through the front door. (Tr. 78:14-20.) Inside, cashiers took orders and entered them into electronic cash registers. (Tr. 84:5-18; Ex. B.) The

cashiers at the registers produced receipts via computer, which Peace Pipe normally kept rather than giving them to Mari A. (Tr. 84:19-85:2.)

Another way to enter Peace Pipe was through a gate on the left-hand side of the front entrance. (Tr. 78:5-17.) The gate led to a concealed area that was "around the side" of the store. (Tr. 85:3-5, 85:22-86:2.) To place a large order, Mari A. would drive her vehicle through the gate on the left side and down a driveway "that leads to bigger houses in the back" where there was a window for placing orders. (Tr. 83:18-84:4.) The gate was covered with a green material, so that the area behind it was not visible from the road. (Tr. 109:14-110:7.) When placing orders in the hundreds of cartons, Mari A. explained that "you don't want the police or anyone passing to see you being loaded, [so] you go in through that gate. You close that gate, and then you go up to the window." (Tr. 83:18-84:4.) Sometimes Mari A. would call in her large order ahead of time by telephone and a Peace Pipe employee would be available to open the gate for her. (Tr. 109:14-110:7.) Upon arriving, Mari A. would drive in through the gate, place her money in through the window in the back, and she would "sit in my van and wait for them to load me up." (Id.) When she placed orders in this concealed area, Peace Pipe employees would break her order down into separate orders of 49 cartons each. (Tr. 85:22-86:2.) Mari A. could see that Peace Pipe generated receipts that they used to check the orders, but she was not shown the receipts. (Tr. 86:3-9.)

On June 3, 2008, Investigator Mars and CI Larry visited Peace Pipe. (Tr. 315:2-4, 315:20-23.) Mars and Larry spoke to an employee in the store and informed her that they wanted to buy 60 cartons of Newport cigarettes. (Tr. 316:2-7.) They were referred to a supervisor named Carolina. (Id.) Mars told Carolina that he and CI Larry wanted to purchase 60 cartons of Newport cigarettes to resell in New York City. (Tr. 316:8-11.) Carolina refused to

sell Mars and Larry more than 49 cartons of cigarettes.  (Id.)  Mars suggested that Carolina split

the order, but Carolina refused, saying that she knew Mars and Larry had come in a single

vehicle and that if the police stopped them they all could get in trouble.  (Tr. 356:21-357:1.)

Mars purchased 49 cartons of unstamped Newport cigarettes from Peace Pipe at $26 per carton,

which Peace Pipe packaged for him in a black garbage bag.  (Tr. 316:12-25; Ex. 57A.)

### c.  Continuing Sales of Unstamped Cigarettes

Peace Pipe has engaged in a high volume of business in unstamped cigarettes.  In 2004,

Peace Pipe purchased over 1.9 million cartons of unstamped cigarettes from Gutlove and

Pennisi.  (Ex. 11A; Ex. 91 at 4, 16.)  Peace Pipe purchased over 2.3 million cartons in 2005, over

2 million cartons in 2006, and nearly 1.5 million cartons in 2007.  (Id.)  In 2008, Peace Pipe

purchased 726,350 cartons from Gutlove and Pennisi.  (Id.)  Although Peace Pipe's business has

declined from its peak in 2005, and still further in 2008 (the year of Rodney Morrison's

conviction), Peace Pipe continues to deal in large quantities of unstamped cigarettes.  Peace Pipe

purchased 54,416 cartons of unstamped cigarettes from Gutlove and Pennisi in January 2009,

51,204 cartons in February 2009, and 57,786 cartons in March 2009.  (Ex. 91 at 3.)  Peace Pipe

currently employs 44 people, with weekly salaries ranging from $9 an hour to $20 an hour, and

intends for the foreseeable future to remain in business.  (Ex. 89 ¶¶ 7, 18, 19.)  In light of Peace

Pipe's history of selling large quantities of unstamped cigarettes, its large payroll, and its plans to

continue its current business, the Court concludes that it is likely to continue selling large

quantities of unstamped cigarettes.

### d.  Continuing Sales at Prices Below CMSA Minimum

Peace Pipe has stipulated to the highest prices for which it sold Marlboro and Newport

cigarettes to its customers from 2007 to 2009.  (Ex. 89 ¶¶ 14-15.)  The highest prices for which

Peace Pipe sold Marlboro cigarettes to its customers was $36 per carton in 2007, $39.50 per carton from January to June 2008, $48 per carton from June to December 2008, and $52 per carton in 2009. (Ex. 89 ¶ 14.) As stated above, the CMSA minimum prices for a carton of Marlboros was $43.61 in December 2006, $44.11 in December 2007, $58.91 in June 2008, $59.41 in December 2008, $60.41 as of February 12, 2009, and $68.30 as of March 9, 2009.

The highest prices for which Peace Pipe sold Newport cigarettes to its customers was $33.50 per carton in 2007, $39.50 per carton from January to June 2008, $48 per carton from June to December 2008, and $51 per carton in 2009. (Ex. 89 ¶ 15.) As stated above, the CMSA minimum prices for a carton of Newports was $42.72 in December 2006, $43.28 in December 2007, $58.28 in June 2008, $65.40 in December 2008, $66.51 as of February 12, 2009, and $74.40 as of March 9, 2009.

On at least some occasions, Peace Pipe sold cigarettes below its stipulated prices. Mari A. testified credibly that, for her bulk purchases, Peace Pipe's prices were generally "about the same" as those at other stores. (Tr. 107:17-24.) In addition, Mars purchased 49 cartons of Newport cigarettes on June 3, 2008, for $26 per carton. (Tr. 316:2-19.)

Even at its stipulated prices, Peace Pipe has sold and continues to sell cigarettes at prices substantially below the CMSA minimums. In light of Peace Pipe's history of selling cigarettes at prices below the CMSA minimums and its plans to continue its current business, the Court concludes that this practice is likely to continue.

### 3. Red Dot and Feather Smoke Shop

#### a. Background

Red Dot and Feather Smoke Shop ("Red Dot"), currently doing business as Red Dot Smokes, is owned by defendant Raymond Hart. (Ex. 93 ("Hart Dep.") 8:16-19, 10:15-25, 19:22-

20:3; 24:8-13, 43:21-44:8.)  Hart testified at his deposition that Red Dot opened on the

Poospatuck Reservation in around October 2007, although sales records from Gutlove and

Pennisi indicate deliveries to Red Dot as early as March 2006.  (Id. at 7:20-23; Ex. 91 at 11.)

Hart currently works at Red Dot at least three to four hours a day, seven days a week, keeping up

the inventory and making sure the store pays its bills and follows the rules of the Reservation.

(Hart Dep. 6:5-9, 7:12-19.)

Approximately 96% of Red Dot's revenue is from tobacco products.  (Hart Dep. 14:22-

15:5.)  All of the cigarettes Red Dot sells are unstamped.  (Id. 12:25-13:3; Ex. 76, Admission No.

4.)  Red Dot purchases its unstamped cigarettes from Gutlove  and Pennisi.  (Hart Dep. 20:14-17,

25:14-16.)

### b.   Bulk Sales of Unstamped Cigarettes

Mari A. purchased cigarettes from Red Dot about five to ten times in 2008.  (Tr. 35:13-

21.)  She normally dealt with an individual named Kenny.  (Tr. 36:1-3.)  Red Dot used to employ

an individual named Kenny Gilkes, who was a family member of Raymond Hart's former

business partner Marcel.  (Hart Dep. 42:21-43:6.)  After Marcel was arrested in around

November 2008, Kenny left the store a few months later.  (Id. at 27:12-14, 43:7-20.)

Like Peace Pipe, Red Dot had a drive-thru window around the side of the store for their

big customers.  (Tr. 36:11-22, 37:12-20.)  Mari A. testified credibly regarding large purchases

she made at this window:

> [T]hey have a drive-thru window.  And so when you get to the end of the drive-
> thru, you could back up.  They got a cherry tree.  And you back up right there,
> under the cherry tree, and then while they finished the people that is going around
> that's where their side door is for their big customers.  So I would sit inside like
> on a milk crate.  They also didn't ring it up in the cash register.  They did it on a
> calculator.  And [they] would load me up while I just sat down and waited.

(Tr. 36:11-22.)  Red Dot never put a restriction on the amounts of cigarettes Mari A. could purchase.  (Tr. 37:9-11.)  She paid for her cigarettes in cash, and Red Dot processed her orders on a calculator without putting them into their cash register or generating a receipt.  (Tr. 36:9-10, 37:12-20.)  Mari A. purchased cigarettes at Red Dot in quantities of six hundred cartons, which were loaded into her van in black bags.  (Tr. 35:22-25, 36:11-22.)

Once she had purchased her cigarettes, Red Dot provided Mari A. with an escort off the Reservation.  Red Dot employee Kenny had a "beige older Cadillac, four doors, and he used to ride around a lot, and he would ride me out when it was time for me to leave." (Tr. 36:23-37:8.)  If Kenny was not available, a younger employee whose name Mari A. could not recall would "ride around and let [her] know whether the police was out and if it . . . was clear, then he would take [her] out."  (Id.)

Investigator Mars and CI Larry visited Red Dot on June 3, 2008.  (Tr. 308:15-17, 309:2-5.)  Upon entering the smoke shop, Mars observed several people behind the counter selling cigarettes.  (Tr. 309:8-13.)  Mars and Larry spoke with an individual who identified himself as Ken, and asked to purchase 60 cartons of Newport cigarettes.  (Tr. 308:14-17.)  Ken quoted them a price of $28 per carton.  (Tr. 309:18-310:1.)  Mars told Ken that the price was too high because he intended to resell the cigarettes in Brooklyn and in the Bronx, and Ken reduced the price to $26 per carton.  (Tr. 309:25-310:8.)  Mars and Larry purchased 60 cartons of unstamped Newport cigarettes from Ken for $26 per carton, paying in cash.  (Tr. 310:6-16.)  Ken packaged the cigarettes for Mars and Larry in black garbage bags.  (Tr. 310:17-18.)  Mars picked up a business card from Ken labeled "Red Dot & feather Smoke Shop, 115 Poospatuck Lane, Mastic NY 11950," which advertises: "Tax Free Cigarettes" and "The only drive-thru smoke shop." (Tr. 310:21-311:22; Ex. 49.)

Mars visited Red Dot again on September 3, 2008, along with DTF Investigator Romero. (Tr. 328:9-16.) Mars and Romero drove up to the drive-thru window and told a gentleman there that they wanted to purchase Newport cigarettes. (Tr. 328:23-329:2.) The salesman quoted a price of $31 per carton. (Tr. 329:3-8.) Mars told the salesman that the price was too high because he intended to resell the cigarettes in Brooklyn and the Bronx, and the salesman reduced the price to $28.50 per carton. (Tr. 329:9-12.) Mars and Romero purchased 98 cartons of Newports for $28.50 cash per carton, which Red Dot placed in a black garbage bag. (Tr. 329:15-17.) When the cigarettes were vouchered later that day, Mars discovered that they had received only 97 cartons of cigarettes. (Tr. 329:18-24; Ex. 57E.)

### c. Continuing Sales of Unstamped Cigarettes

From March to November 2006, Red Dot purchased over 121,000 cartons of unstamped cigarettes from Gutlove and Pennisi. (Ex. 91 at 11.) From January 2007 until August 2007, Red Dot did not make any purchases from Gutlove or Pennisi. (Id. at 7.) Deliveries began again in September 2007, just before the date Hart testified that Red Dot opened for business. (Id.; Hart Dep. 7:20-23.) From September to December 2007, Red Dot purchased 22,319 cartons of unstamped cigarettes from Gutlove and Pennisi. (Ex. 91 at 7.) Red Dot purchased 722,994 cartons in 2008. (Ex. 91 at 4; Ex. 18A.)

Although Red Dot's purchases of unstamped cigarettes have declined from their peak in around May 2008 (see Ex. 17A), Red Dot continues to purchase large quantities of unstamped cigarettes in 2009. Red Dot purchased 19,257 cartons from Gutlove and Pennisi in January 2009, 9,169 cartons in February 2009, and 20,580 cartons in March 2009. (Ex. 91 at 3.) Sales records indicate continuing large purchases in April 2009. (See Ex. 54.) In light of Red Dot's

history of purchasing large quantities of unstamped cigarettes and its continued purchases up through April 2009, the Court concludes that this practice is likely to continue.

### d.  Continuing Sales at Prices Below CMSA Minimum

Red Dot's biggest selling cigarettes are Newport and USA Gold.  (Hart Dep. 45:21-25.) Hart testified at his deposition that, as of April 27, 2009, Red Dot sells a carton of Newports for $48.  (Id. at 32:12-14.)  According to Hart, Red Dot was selling Newports for about $37 per carton in 2008 and during the beginning of 2009.  (Id. at 32:21-24, 33:9-15.)  Investigator Mars purchased Newports at Red Dot for $26 per carton on June 3, 2008 and for $28.50 per carton on September 3, 2008.  (Tr. 308:15-19, 309:23-310:8, 328:9-11, 329:3-14.)  As stated above, the CMSA minimum prices for a carton of Newports was $42.72 in December 2006, $43.28 in December 2007, $58.28 in June 2008, $65.40 in December 2008, $66.51 as of February 12, 2009, and $74.40 as of March 9, 2009.  Red Dot has sold and continues to sell Newports at prices substantially below the CMSA minimums.  In light of Red Dot's ongoing practice of selling cigarettes below the CMSA minimums, the Court concludes that this practice is likely to continue.

### 4.  Smoking Arrow Smoke Shop

#### a.  Background

Smoking Arrow Smoke Shop ("Smoking Arrow"), also known as Smoking Arrow Smokes, is owned by defendant Denise Paschall.  (Ex. 94 ("Paschall Dep.") 5:21-6:1, 14:23-15:1.)  The shop is located at 159 Poospatuck Lane, which is the same address as Paschall's residence, although the shop and residence are in separate buildings.  (Id. at 8:25-9:11.) Smoking Arrow opened on the Reservation in 2006 or 2007.  (Id. at 10:5-7; Tr. 157:23-158:1; Ex. 91 at 11; Ex. 7A at CG6 01425.)  From the time Smoking Arrow opened until the present,

Paschall worked in the shop "on and off" approximately two or three hours a day, two or three days a week. (Paschall Dep. 11:8-21, 13:13-15.) Paschall's daughter, Rashea Henderson, works in the shop as a cashier and runs the financial aspect of the business including "the ordering and the inventories" and paying the bills. (Id. at 11:22-12:4, 12:23-25, 13:5-17.) Henderson's boyfriend, defendant Tony Phillips, also works in the store in the same capacity as Henderson, although not as frequently as when the shop first opened. (Id. at 12:5-9, 13:16-19, 14:13-14.)

Apart from selling cigarettes, Smoking Arrow sells soda and water. (Paschall Dep. 32:16-18.) Soda and water makes up a "very little" portion of Smoking Arrow's business. (Id. at 19-24.) All of the cigarettes Smoking Arrow sells are unstamped. (Ex. 78, Admission No. 4.) Smoking Arrow purchases its unstamped cigarettes from Gutlove and Pennisi. (Paschall Dep. 18:18-19:14.)

### b. Bulk Sales of Unstamped Cigarettes

At the Morrison trial, Tony Phillips testified that he managed Smoking Arrow for one year, from about 2006 until 2007. (Ex. 101 at 2508:3-13, 2512:5-13.) Phillips testified that during this period Paschall was an "absentee owner" who "didn't care too much about the business" and charged Phillips with "basically running the business" by himself, even though Phillips was not a Native American. (Id. at 2512:5-2513:3, 2524:23-2525:7.) Phillips estimated that during the time he ran the business he sold about 10,000 cartons of cigarettes a day, generating about $140,000 of gross revenue per day, or about $1 million per week. (Id. at 2523:43-2524:11.) All of this business was done in cash. (Id. at 2526:3-5.) Phillips characterized Smoking Arrow's business during the period he managed it as "wholesale" and explained that on average he sold 10 to 20 cases of cigarettes per customer, with each case containing 60 cartons. (Id. at 2528:45-2529:23.)

Mari A. purchased cigarettes from Smoking Arrow in 2007 and 2008.  (Tr. 28:1-6.)  She would typically buy 900 cartons at a time, including nine cases of "longs" (Newport One Hundred Box) and six cases of "short" (Newport Box).  (Tr. 28:10-18.)  Sometimes Mari A. would also add "specials" to her order, which she bought "just to be nice to customers, because really, most people that did wholesale like I did really just focused on Newports."  (Tr. 28:10-29:1.)  At Smoking Arrow, Mari A. normally dealt with defendant Tony Phillips.  (Tr. 29:2-12.)  Although Mari A. understood that Denise Paschall may have been the "owner on paper, because Tony had said that you have to be a Native American or the council won't approve you," Mari A. understood Phillips to be effectively the owner.  (Tr. 29:13-25.)  Smoking Arrow never put a restriction on the number of cartons Mari A. could purchase at one time, and even sold her cigarettes on "consignment" if she did not have enough cash with her to pay for the order.  (Tr. 31:21-32:2.)  Smoking Arrow did not give her receipts.  (Tr. 32:3-10.)

Mari A. testified credibly that Smoking Arrow would escort her off the reservation. Smoking Arrow employees "had the mountain bike, and they rode the bikes out and they rode around to see if the cops were there, and then they would key you on for the next sale, and they would tell you it's safe to go."  (Tr. 31:12-20.)

On around ten occasions in late 2007 or early 2008, Smoking Arrow delivered cigarettes to Mari A. in New York City.  (Tr. 30:1-17.)  Mari A. had the cigarettes delivered instead of bringing them back herself because "the police were there," or because she arrived before the delivery truck arrived with cigarettes and she "got tired of waiting" or "didn't want to get arrested."  (Tr. 30:18-25.)  Mari A. paid fifty cents extra per carton for this delivery service, which she considered worth it because even if the delivery person was caught by the police, the shop would still have to give her the cigarettes.  (Tr. 30:18-31:4.)

Mari A. testified credibly that she sometimes had to wait outside at Smoking Arrow while other individuals placing large orders made their purchase.  (Tr. 40:21-41:5, 42:7-13.)  Smoking Arrow was "the wors[t]" in this regard "because they didn't have an enclosure.  So they would load people up right there.  They would take [the cigarettes] off the delivery truck, and put [them] right . . . into people's cars."  (Tr. 42:7-13.)

Investigator Mars and CI Larry visited Smoking Arrow on June 3, 2008.  (Tr. 311:25-312:4.)  Mars told the person behind the counter that he and Larry wanted to purchase 60 cartons of Newport cigarettes.  (Tr. 312:13-313:1.)  The salesperson told Mars that it was illegal to sell more than 49 cartons of cigarettes but offered to split the cigarettes up into two orders of 30 cartons each.  (Tr. 313:12-20.)  Mars and Larry agreed to do that, and the salesperson sold them 60 cartons of unstamped cigarettes for $26 per carton, divided into two orders of 30 cartons each, with each order packaged in a separate black plastic bag.  (Tr. 313:21-314:6; Ex. 57A.)  Mars picked up a business card from Smoking Arrow, which advertises "Tax Free Cigarettes" and "Cigarettes as Low as $16.50."  (Tr. 314:9-315:1; Ex. 51.)  The business card also advertises "SmokingArrowSmokes.com Wholesale/Retail" and "Smoking Arrows Smokes, 159 Poospatuck Lane, Mastic NY."  (Ex. 51.)

Mars returned to Smoking Arrow on August 7, 2008, with DTF Investigator Muriel.  (Tr. 324:10-325:3.)  Mars told a store clerk who later identified himself as Steve that he wanted to buy Newport cigarettes.  (Tr. 325:10-13, 327:3-9.)  Steve quoted Mars a price of $34 per carton for Newports.  (Tr. 325:19-20.)  Mars told Steve that he would buy 180 cartons, and Steve lowered the price to $28 per carton.  (Tr. 325:21-326:16; Ex. 57D.)  Mars also told Steve that he intended to sell the cigarettes in Brooklyn and the Bronx.  (Tr. 327:16-23.)  Steve sold Mars 180 cartons of unstamped Newport cigarettes for $28 per carton, composed of 90 cartons of Newport

regular cigarettes and 90 cartons of Newport 100s, for a total of $5,040. (Tr. 326:8-18.) Steve told Mars that if he purchased more cigarettes he would lower the price. (Tr. 326:24-327:2.)

Mars returned another time to Smoking Arrow on September 5, 2008, with Investigator John Romero. (Tr. 330:24-331:3; Ex. 57G.) Mars told a store clerk that he wanted to buy Parliament cigarettes and the clerk quoted Mars a price of $43 per carton. (Tr. 331:7-18.) Mars told the clerk that the price was too high because he intended to sell the cigarettes in Brooklyn and the Bronx, and the clerk told him that Philip Morris was selling them the cigarettes at too high a price. (Id.) Mars asked for Newport cigarettes and the clerk sold him 100 cartons of Newports for $27.25 per carton, for which Mars paid in cash. (Tr. 331:7-24.) The store clerk told Mars that he expected Lorillard to raise the price of Newports soon so that "you guys can't come here and take it to go and make more money." (Ex. 57G.)

### c. Continuing Sales of Unstamped Cigarettes

Smoking Arrow purchased 663,870 cartons of unstamped cigarettes from Gutlove in 2006. (Ex. 91 at 4.) In 2007, Smoking Arrow purchased almost 2.3 million cartons of unstamped cigarettes. (Id.) Business declined in 2008, with Smoking Arrow purchasing almost 1.4 million cartons. (Id.)

Smoking Arrow's high volume business has continued in 2009. The shop purchased 41,667 cartons of unstamped cigarettes from Gutlove and Pennisi in January 2009, 41,748 cartons in February 2009, and 63,160 cartons in March 2009. Paschall testified at her deposition that Smoking Arrow plans to continue in business. (Paschall Dep. 40:2-6.) In light of Smoking Arrow's history of selling large quantities of unstamped cigarettes and its plans to continue in business, the Court concludes that Smoking Arrow is likely to continue selling large quantities of unstamped cigarettes.

#### d. Continuing Sales at Prices Below CMSA Minimum

Smoking Arrow's largest selling brands are Newports and native brand cigarettes. (Paschall Dep. 20:9-10.)  According to Paschall, Smoking Arrow sold Newports for between $37 and $40 per carton as of April 30, 2009.  (Id. at 24:4-7.)  Paschall further testified at her deposition that Smoking Arrow sold Newports for "thirty-something" per carton in 2008 or the beginning of 2009.  (Id. at 24:8-12.)  Mari A. testified credibly that in 2007 and 2008 she paid between $28 and $32 per carton for Newports.  (Tr. 32:11-21.)  Investigator Mars purchased Newport cigarettes at Smoking Arrow for $26 per carton on June 3, 2008, for $28 per carton on August 7, 2008, and for $27.25 per carton on September 5, 2008.  (Tr. 326:8-16, 330:24-331:22; Ex. 57A; Ex. 57D; Ex. 57G.)  As stated above, the CMSA minimum prices for a carton of Newports was $42.72 in December 2006, $43.28 in December 2007, $58.28 in June 2008, $65.40 in December 2008, $66.51 as of February 12, 2009, and $74.40 as of March 9, 2009. Smoking Arrow has sold and continues to sell Newports at prices substantially below the CMSA minimums.  In light of Smoking Arrow's ongoing practice of selling cigarettes below the CMSA minimums, the Court concludes that this practice is likely to continue.

#### 5. TDM Discount Cigarettes

##### a. Background

TDM Discount Cigarettes ("TDM") is a sole proprietorship owned by defendant Thomasina Mack.  (Ex. 95 ("Mack Dep.") 14:1-15.)  TDM opened on the Poospatuck Reservation in January 2000.  (Id. at 12:22-13:21; see also id. at 6:4-7.)  Mack runs TDM from a storefront located at her residence.  (Id. at 13:12-21, 20:15-21:8.)

TDM's only business is selling cigarettes, and all of the cigarettes it sells are unstamped. (Id. at 33:14-16; Ex. 78, Admissions Nos. 5, 7.)  From 2000 until October 2008, TDM purchased

unstamped cigarettes from Pennisi. (Mack Dep. 33:17-22.) TDM also purchased unstamped cigarettes from Gutlove for a year in 2007. (Id. at 34:6-8.) Apart from those wholesalers, TDM purchased about 30 or 40 cartons of Native American brand cigarettes from Harry Wallace once a month, and about 90 cartons of King Mountain cigarettes from Jessey and Anitra Watkins every three months. (Id. at 35:4-36:25.)

### b. Bulk Sales of Unstamped Cigarettes

Mack testified at the Morrison trial that, as of November 2007, she ran a cash only business, selling customers cigarettes in quantities of "anywhere from five cartons to a thousand cartons." (Ex. 98 at 1075:10-16.) In 2007, she purchased over a million dollars per month of untaxed cigarettes for her business from Pennisi. (Id. at 1146:23-1148:1, 1154:6-15.) Mack testified that customers would pick the cigarettes up from her home, "and whatever they did with them afterwards was really for personal use." (Id.)

Mack also admitted to delivering cartons of untaxed cigarettes off the Reservation. (Id. at 1075:19-21.) Mack had two drivers, Anton Williams and Richard White, who delivered untaxed cigarettes for her to customers off the Reservation. (Id. at 1158:20-1159:9.) Richard White was arrested on April 20, 2005 while in possession of more than 20,000 unstamped cigarettes on Poospatuck Lane. (Ex. 58A at CNY 02117.) Anton Williams was also arrested on April 20, 2005, while in possession of more than 20,000 untaxed cigarettes, which he was seen unloading from his vehicle in Queens. (Id. at CNY 02125.) When they were arrested, White and Williams each made statements that the cigarettes in their possession came from Poospatuck Lane in Mastic, New York. (Id. at CNY 02117, 02125.)

Ahman Aldabeshes testified credibly that he purchased large quantities of unstamped cigarettes from Thomasina Mack in 2005. Aldabeshes would purchase the cigarettes from Mack

on the Reservation and transport them into New York City, where he sold them to grocery stores. (Tr. 192:7-25.) Aldabeshes purchased approximately 15 to 18 master cases on each trip to the Reservation, which he visited five or six days a week. (Tr. 193:1-14.) Each master case contains 60 cartons of cigarettes. (Tr. 10:22-24.) All of the cigarettes Aldabeshes purchased from Thomasina Mack were unstamped. (Tr. 193:25-194:1.) He paid approximately $21 or $21.50 per carton. (Tr. 194:3-4.)

When he first started purchasing cigarettes from Thomasina Mack, Aldabeshes purchased them from her house on the Poospatuck Reservation. (Tr. 194:11-18.) Later, Mack would deliver the cigarettes to Aldabeshes off the Reservation at a storage location near Exit 41 on the Long Island Expressway. (Tr. 194:19-24.) Aldabeshes would call Mack the night before, and pick the cigarettes up the next night. (Tr. 195:7-10.) Sometimes Mack delivered the cigarettes herself, and sometimes she sent one of two men, either her brother-in-law, or someone Aldabeshes understood to be her husband or boyfriend. (Tr. 195:11-196:1.) Aldabeshes would purchase 15 to 18 master cases in this fashion with each order, principally Newports and Newport 100s, and some Marlboros. (Tr. 196:3-10.)

This testimony is corroborated by Mari A., who testified credibly that she purchased unstamped cigarettes indirectly from Thomasina Mack at a 24 hour storage facility on Route 106 in Long Island. (Tr. 37:21-39:4.) Mari A. purchased cigarettes at the storage unit approximately 20 to 30 times between 2005 and 2006. (Tr. 39:9-14.) The cigarettes were delivered to the storage unit by a worker named Dee, who Mack told Mari A. was one of her employees. (Tr. 37:21-38:15.) On each visit to the storage facility, Mari A. paid around $25 per carton for 600 to 900 cartons of Newports. (Tr. 35:15-21.)

In September 2006, DTF Investigator Christopher Lannon performed surveillance on a white pickup truck and trailer registered to Thomasina Mack. (Tr. 161:16-162:5.) At approximately 8:00 or 9:00 P.M., Lannon observed the white pickup truck and trailer meet with a van, which was waiting at the Bisset Nursery in Farmingville, Long Island. (Tr. 162:2-163:12.) Material from the trailer was offloaded and placed in the van. (Tr. 162:25-163:12.) After the material was transferred, the van left in a westerly direction and the pickup truck and trailer traveled in an eastward direction. (Id.) Investigators followed the van and subsequently arrested its driver, who was found in possession of one thousand cartons of unstamped cigarettes. (Tr. 162:25-164:6.)

An investigative report prepared by Investigator Lannon indicates that, on February 17, 2006, a green pickup truck towing a white trailer registered to Thomasina Mack, was observed at a Storage USA unit located at 789 South Broadway in Hicksville, New York. (Ex. 60C at CNY 00807.) Four individuals were observed moving square objects in black plastic bags from the storage building into two vehicles. (Id. at CNY 00808.) A subsequent stop of one of the vehicles revealed multiple boxes wrapped in black plastic bags, which were found to contain approximately 1320 cartons of unstamped cigarettes. (Id.) Investigators also found two handwritten cigarettes invoices and a note. (Id.) The note stated: "Dee, Tomorrow the order will be early! I will call at 11 am to get in the mix." (Id.) The invoices indicated the price of $21.25 per carton of Newport cigarettes and $23.25 per carton of Marlboro cigarettes, with a combined total of 3,240 cartons. (Id.)

### c. Continuing Sales of Unstamped Cigarettes

TDM purchased 563,078 cartons of unstamped cigarettes from Pennisi in 2006. (Ex. 24A; Ex. 91 at 3.) In 2007, TDM purchased 822,636 cartons of unstamped cigarettes. (Ex. 24A;

Ex. 91 at 3.)  From January to September 2008, TDM purchased 453,182 cartons of unstamped cigarettes.  (Ex. 24A; Ex. 91 at 3.)  In July and August 2008, TDM received deliveries from Pennisi on every business day.  (Ex. 55.)  TDM suspended its business in October 2008 and has not since made any purchases from Gutlove or Pennisi.  (Ex. 24A; Ex. 91 at 3.)  Mack testified at her deposition that she is not currently doing business because she is pregnant, and that she is not sure if she will go back into business after she has a baby.  (Mack Dep. 18:20-19:7.)  In September 2008, however, Mack installed a larger sign on her storefront, explaining that the new sign "just directs so people have knowledge to where I was at because there were complaints that people didn't know where I was located."  (Id. at 21:9-17.)  Mack explained at her deposition that she did not know she would be going out of business in October 2008 when she installed the larger sign.  (Id. at 20-23.)

Since December 2008, Mack has purchased approximately 90 cartons every three months from Jessey Watkins or Anitra Watkins.  (Mack Dep. 75:6-12.)  Although TDM is not currently selling cigarettes, Mack purchases these cartons for her mother, who takes them off the Reservation to a thrift shop in Mastic Beach, where she sells them to senior citizens.  (Id. at 75:13-76:13.)  As of April 14, 2009, Mack maintained a stock of approximately 300 cartons of unstamped cigarettes at her store.  (Id. at 21:24-22:66.)

Although TDM and Mack currently have suspended business, the Court finds by a preponderance of the evidence that they are likely to engage in the sale of large quantities of unstamped cigarettes in the future unless enjoined by this Court.  The Court bases this conclusion on TDM and Mack's long history of selling large quantities of unstamped cigarettes, including through sales off the Reservation; the profitability of engaging in this business; and the fact that Mack recently installed a new sign to direct customers to her store.  In addition, as discussed

above, TDM and Mack continue to receive, possess, and purchase more than 10,000 unstamped cigarettes although the store is technically closed.

### d. Continuing Sales at Prices Below CMSA Minimum

Mack testified at her deposition that in October 2008 TDM sold Newport cigarettes for around $36 per carton.  (Mack Dep. 48:21-48:6.)  As discussed above, Mari A. purchased Newport cigarettes from Mack for around $25 per carton for Newports in 2005 or 2006, and Aldabeshes paid approximately $21 or $21.50 per carton of Newports in 2005.  As stated above, the CMSA minimum prices for a carton of Newports was $42.72 in December 2006, $43.28 in December 2007, $58.28 in June 2008 and $65.40 in December 2008.  For the reasons just discussed, although TDM and Mack currently have suspended business, the Court finds by a preponderance of the evidence that they are likely to engage in the sale of cigarettes at prices below the CMSA minimums in the future unless enjoined by this Court.

### D.  Injury to the City

The evidence establishes that defendants' considerable sales of unstamped cigarettes injure the City.  As discussed in detail above, the credible testimony of Mari A. and Ahman Aldabeshes establish that large quantities of untaxed cigarettes are purchased in defendants' stores and trafficked into the City where they are resold at below-market prices, without the payment of City or State taxes.  Apart from their own activity, Mari A. and Aldabeshes each testified upon personal knowledge that they knew of other individuals engaged in cigarette trafficking from the Reservation.

This testimony is corroborated by DTF Investigator Lannon.  Investigator Lannon testified credibly that, for the last nine years, he has focused his investigation on individuals transporting cartons of untaxed cigarettes off the Poospatuck Reservation.  (Tr. 177:6-11)

Lannon observed people bringing large quantities of cigarettes off the Reservation and delivering them to storage locations or bodegas within the City. (Tr. 177:12-178:16.) Lannon has participated in the arrest of approximately thirty individuals for cigarette tax evasion, some multiple times, of which approximately 98% of the arrests involved the Poospatuck Reservation. (Tr. 131:9-132:2.) Approximately 95% of the individuals Lannon has arrested in the course of this investigation have had New York City addresses. (Tr. 134:20-24.) This testimony is further corroborated by approximately 220 Suffolk County arrest reports submitted by the City, which document that numerous individuals arrested in Suffolk County for transporting or possessing unstamped cigarettes have New York City addresses. (Ex. 58.) Some of these arrestees made statements revealing their intent to resell the cigarettes in the City. (See Ex. 58 at CNY 1383 (individual arrested near Reservation while in possession of 400,000 untaxed cigarettes, stating "I picked up cigarettes and I was going to the Bronx to sell them"), CNY 1817 (individual with New York City address arrested on Poospatuck Lane, stating "I'm not going to lie, I got like 40 cartons, I got a deli in NYC"), CNY 2061 (individual with Staten Island address arrested on Eleanor Avenue in Mastic Beach, New York, stating "I've been arrested for this before. It's cheaper to buy them here—no taxes. I bring them back to people where I live").) Furthermore, a review of the arrest and conviction histories of individuals whose arrest records for cigarette trafficking appear in Exhibit 58 indicates that a number of them were arrested on separate occasions for cigarette trafficking in New York City. (See Exs. 61, 62A. 62B.) This evidence raises the inference that these individuals were engaged in cigarette trafficking between the Reservation and New York City.

Based upon all of this evidence, the Court concludes that there exists a substantial trade in unstamped cigarettes between the Poospatuck Reservation and New York City. Although it is

impossible to quantify based upon the current record, this trade likely deprives the City of significant tax revenue. In addition, as discussed below, the availability of cheap cigarettes in the City has detrimental effects on public health due to the relationship between cigarette price and smoking behavior.

### E. Irreparable Harm

The Court heard testimony from two expert witnesses concerning the harm caused to the City by the availability of cheap cigarettes. The City called Dr. Thomas Frieden, then the Commissioner of the New York City Department of Health and Mental Hygiene, who has since been appointed Director of the United States Centers for Disease Control and Prevention (CDC). Dr. Frieden testified that there is a price elasticity associated with cigarette purchasing, such that an increase in cigarette prices leads to a decline in cigarette consumption. Specifically, Dr. Frieden testified that cigarettes have a price elasticity of -0.4, which means that for every 10% increase in the price of cigarettes, there is a 4% decline in smoking. According to Dr. Frieden, approximately half of this effect consists of smokers quitting and half consists of smokers reducing their consumption of cigarettes although they continue to smoke. Based upon this price elasticity relationship, Dr. Frieden developed conclusions regarding the impact cheap cigarettes imported from the Poospatuck Reservation have on the health of City residents.

Defendants offered the testimony of Dr. W. Kip Viscusi, a professor of economics at Vanderbilt University who is an expert in the economics of risk and uncertainty. Dr. Viscusi agreed that higher cigarette taxes affect how many cigarettes people smoke, but disagreed that higher taxes cause smokers to quit. Relying in part on his own study, Dr. Viscusi testified that the price elasticity associated with cigarette purchasing is composed entirely of smokers reducing their consumption of cigarettes, but not ceasing to smoke altogether.

The Court first describes New York City's tobacco control program and the study performed by Dr. Frieden in this matter, which concluded that the availability of cheap cigarettes from the Poospatuck Reservation leads to approximately 450 premature deaths in New York City each year. The Court next evaluates the expert testimony concerning the relationship between the price of cigarettes and smoker behavior.

### 1. New York City's Tobacco Control Program

Beginning in 2002, New York City implemented a multifaceted program designed to control the use of tobacco among the City's population. (Tr. 382:9-19.) The program's several components were implemented in stages. (Id.) First, in 2002, the City increased city tobacco taxes from eight cents per pack to $1.50 per pack. (Tr. 383:7-23.) Over the next few years, the City banned smoking in public places and increased its efforts to help smokers quit through public hospitals and by distributing nicotine patches. (Tr. 383:24-384:13.) Finally, in around 2005 or 2006, the City implemented advertising campaigns to encourage smokers to quit. (Tr. 384:5-13.)

The City also implemented a series of mechanisms to evaluate its smoking cessation program. (Tr. 384:14-385:11.) For example, the Department of Health conducts an annual Community Health Survey, which surveys approximately ten thousand people each year and asks those respondents who stopped smoking to report the reasons they quit. (Tr. 388:17-389:12.) The City also conducts a "longitudinal" survey, which follows a panel of individuals over a period of time to track the progress of their smoking habit. (Tr. 385:12-19.)

### 2. Dr. Frieden's Study

Dr. Frieden conducted an evaluation of the public health impact on smokers in New York City of cigarettes purchased on the Poospatuck Reservation and imported to the City for resale.

(Tr. 397:15-18; see Ex. 56.)  The study assumed that on each weekday 15 master cases (or 900 cartons) of untaxed cigarettes were purchased on the Poospatuck Reservation and resold in New York City.  (Ex. 56; Tr. 397:19-8.)  This assumption was based on Mari A.'s testimony that she purchased approximately 900 cartons of unstamped cigarettes on the Reservation at least five days per week and resold them in the City.  (Tr. 9:25-11:6; see also Tr. 398:9-16.)  Nine hundred cartons of unstamped cigarettes equates to a total of 46 million cigarettes sold in the City in a year, or an average of 128,130 unstamped cigarettes per day.  (Ex. 56.)  The analysis further assumed that the average legal price of a pack of cigarettes in the City was $8.50 and the average bootlegged price was $5.50.  (Ex. 56; Tr. 398:17-22.)

According to Dr. Frieden, the Community Health Survey has determined that the average New York City smoker smokes 10.2 cigarettes per day, or approximately half a pack.  (Ex. 56 n.4; Tr. 405:8-406:17.)  Thus, the 128,130 unstamped cigarettes resold in the City each day would be consumed by approximately 12,560 smokers.  (Ex. 56; Tr. 405:8-406:17.)  Plugging in the participation elasticity for cigarettes, Dr. Frieden concluded that if the untaxed cigarettes trafficked to the City from the Poospatuck Reservation were fully taxed, in one year 1,370 additional New York City smokers would have quit smoking, avoiding 450 premature deaths. (Ex. 56; Tr. 397:12-398:8.)

### 3.  Relationship Between Cigarette Cost and Consumption

Both Dr. Frieden and defendants' expert Dr. Viscusi agreed that increasing the price of cigarettes, through taxation or otherwise, leads smokers to consume fewer cigarettes.  Dr. Frieden testified that there are "very extensive studies," both in the United States and in other countries that consistently find a -0.4 price elasticity for cigarettes, which means that for every ten percent increase in the price of cigarettes, there is a four percent decrease in cigarette

consumption. (Tr. 389:13-390:21.) Dr. Viscusi similarly testified that "[d]ozens of studies indicate" that "cigarette taxes decreased the total number of cigarettes people smoke," and acknowledged writing in an article that studies generally find demand elasticities for cigarettes ranging from around 0.4 to 0.1. (Tr. 740:16-741:4, 748:5-15; see also Tr. 740:1-15, 743:24-744:5.) Dr. Viscusi agreed that economically cigarettes are "normal goods," such that it is effectively a "law of nature" that increasing the price for cigarettes lowers the demand for them. (Tr. 740:10-15.)

It is undisputed based upon the evidence presented to this Court that there are health benefits to decreasing the amount one smokes, even without quitting altogether. According to Dr. Frieden, lung cancer in particular has a "dose response relationship," which means that the more cigarettes a person smokes, the higher the risk of lung cancer. (Tr. 391:18-392:6.) Conversely, "someone who smokes fewer cigarettes will have a lower risk of lung cancer than someone who smokes more cigarettes." (Id.) Defendants have not presented any medical evidence to the contrary.

### 4. Relationship Between Cost of Cigarettes and Smoking Cessation

There was conflicting evidence on whether an increase in the price of cigarettes affects not only the amount of cigarettes smoked, but also the propensity to smoke at all, or the number of smokers who quit. (See, e.g., Tr. 748:5-15 ("Where I part company with Dr. Frieden is that cigarette taxes and cigarette prices do not affect the propensity to smoke or the propensity to quit. Neither of these things are significantly affected by taxes.").) A report that Dr. Frieden apparently inferentially relied upon[5] suggests that an increase in the price of cigarettes leads to a

_____

[5] The parties dispute the extent to which Dr. Frieden relied upon an article entitled "Response to Increase in Cigarette Prices by Race/Ethnicity, Income, and Age Groups – United States, 1976-1993," published by the CDC in the Morbidity and Mortality Weekly Report (MMWR) in 1998

decline in the number of people who smoke.  (See Ex. U.)  A report authored by Dr. Viscusi contradicts that result, concluding that there is no relationship between cigarette price and smoking cessation.  (See Ex. V; Tr. 704:15-705:7.)  For the reasons discussed below, there is no need to resolve this dispute because a fact critical to the City's position is undisputed; namely, that an increase in cigarette prices leads to a decrease in the number of cigarettes people smoke.

## V.    Motion for Preliminary Injunction:  Conclusions of Law

### A.  Standard of Review

A party seeking a preliminary injunction is generally held to the burden of establishing irreparable harm and "either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships decidedly tipped in the movant's favor." Green Party v. N.Y. State Bd. of Elections, 389 F.3d 411, 418 (2d Cir. 2004).  Both parties take issue with this formulation as applied to this case.  Defendants argue that the City is held to a

---

(the "1998 MMWR") to support his conclusion that there is a relationship between cigarette price and smoking cessation.  (Ex. U.)  Dr. Frieden testified that the 1998 MMWR publication was merely "one of literally dozens, if not a hundred, articles on price elasticity that contributed to [the] accepted scientific consensus" that higher cigarette prices lead more people to quit smoking.  (Tr. 417:15-19; see also Tr. 419:11-13, 421:2-7.)  Indeed, this MMWR article is not cited anywhere in Frieden's study as submitted to the Court; instead, he relies on a different article published in MMWR from 2002, which addresses the health effects of smoking, not the correlation between cigarette price and smoking cessation.  (See Ex. 56 at n.6.)

The 1998 MMWR, however, is the only study, other than Dr. Viscusi's article, that was submitted to this Court for review.  Despite his testimony that numerous sources substantiate the relationship between cigarette price and quitting, Dr. Frieden's report cites only two sources for that proposition:  an article and a PowerPoint presentation both written by Professor Frank J. Chaloupka.  (See Ex. 56 at n.5.)  Dr. Frieden did not explain these studies' methodologies, nor were they introduced as evidence.  The Court's own review of these materials, however, indicates that Professor Chaloupka did not conduct a study of his own, but instead relied for this proposition on the 1998 MMWR, along with another study by the same author.  (See F. J. Chaloupka, et al., "Tax, Price and Cigarette Smoking:  Evidence from the Tobacco Documents and Implications for Tobacco Company Marketing Strategies," Tobacco Control 2002, at i64 & nn. 11, 12, available at http://tobaccocontrol.bmj.com/cgi/reprint/11/suppl_1/i62.)  Among the evidence presented to the Court, therefore, the 1998 MMWR is a prominent source of information on the relationship between cigarette price and smoking cessation.

higher standard of making a clear and substantial showing of a likelihood of success on the merits because it seeks alteration of the status quo.  The City argues that it is not required to show irreparable harm.

The Court turns first to defendants' claim.  The movant is required to meet a higher standard when "(i) an injunction will alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits."  Tom Doherty Assocs. v. Saban Entm't, Inc., 60 F.3d 27, 33-34 (2d Cir. 1995).  This higher standard is a "clear" or "substantial" showing of a likelihood of success on the merits.  Id.

Defendants argue that an injunction alters the status quo because it would require defendants "to drastically change the character of the stores in question, if not close them altogether."  Dunkin' Donuts Inc. v. Nat'l Donut Rests. of N.Y., Inc., 291 F. Supp. 2d 149, 150 (E.D.N.Y. 2003) (reasoning that "for [the plaintiff] to obtain a preliminary injunction against the [defendants] it must meet the higher standard. . . [because] [s]uch an injunction would alter rather than preserve the status quo").  The City for its part contends that it does not have to meet the heightened standard because the injunction sought here is prohibitive and not mandatory. The line between a prohibitive and a mandatory injunction is not always easily drawn.  See Tom Doherty Assocs. , 60 F.3d at 33-35.  The issue need not be resolved because on the record before this Court, the City meets the more demanding standard.

For the reasons set forth more expansively below in Section IV.C, the Court agrees with the City that it is not required to establish irreparable harm to prevail.

Accordingly, the standard that the Court will apply is that the City must make a clear and substantial showing: 1) of a likelihood of success on the merits of establishing a violation, and, 2) that the violations will recur.  SEC v. Unifund SAL, 910 F.2d 1028, 1037-40 (2d Cir. 1990).

**B.  Likelihood of Success on the Merits**

**1.  The CCTA**

The CCTA makes it "unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute or purchase contraband cigarettes."  18 U.S.C. § 2342(a).  Contraband cigarettes are defined as "a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found, if the State or local government requires a stamp, impression, or other indication to be placed on packages or other containers of cigarettes to evidence payment of cigarette taxes."  Id. § 2341(2).  Together, these provisions establish four elements for a CCTA violation: that a party (1) knowingly "ship, transport, receive, possess, sell, distribute or purchase" (2) more than 10,000 cigarettes (3) that do not bear tax stamps, (4) under circumstances where state or local cigarette tax law requires the cigarettes to bear such stamps.  See Golden Feather, 2009 WL 705815, at *11; Milhelm Attea, 550 F. Supp. 2d at 345-46.  Prior to March 9, 2006, the threshold for contraband cigarettes was 60,000 cigarettes.  See USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, § 121(a), 2006 HR 3199 (2006) (amending threshold quantity for "contraband cigarettes" to 10,000 from 60,000).

**a.  Applicable Tax**

This Court has already concluded that state law "requires" cigarettes sold by defendants to non-Tribe members to bear tax stamps by virtue of New York Tax Law § 471.  See Golden Feather, 2009 WL 705815, at *11; Milhelm Attea, 550 F. Supp. 2d at 345-48.  Defendants have

asked that the Court revisit this conclusion based upon a recent opinion by the New York State Supreme Court, Appellate Division, in <u>Cayuga Indian Nation of New York v. Gould</u>, ___ N.Y.S.2d ____, 2009 WL 1981848 (N.Y. App. Div. July 10, 2009).  In <u>Cayuga</u>, the Fourth Department held that § 471-e of the New York Tax Law is the "exclusive means" for taxing cigarette sales on Indian reservations to non-Indians or to Indians who are not members of the nation or tribe located on the reservation, and that § 471 does not provide an independent basis for taxation.  <u>See id.</u> at *1.  In a previous opinion, the Appellate Division held that § 471-e is not in effect because DTF has not taken steps necessary to implement the statute.  <u>See</u> <u>Day Wholesale, Inc. v. New York</u>, 51 A.D.3d 383 (N.Y. App. Div. 2008).  Accordingly, the <u>Cayuga</u> court held that there is currently no tax applicable to cigarette sales on Indian reservations, regardless of the purchaser.  Justice Peradotto dissented, arguing based upon "the plain language of the statute and its legislative history" that "section 471-e does not circumscribe the long-standing tax obligation imposed by section 471."  <u>Cayuga</u>, 2009 WL 1981848, at *8 (Peradotto, J., dissenting).  Instead, in Justice Peradotto's view, § 471-e merely "establishes a statutory mechanism for the <u>collection</u> of that tax from reservation sales to non-Indians and non-member Indians which have historically evaded the cigarette tax."  <u>Id.</u> (emphasis in original).

When addressing an uncertain issue of state law, "the job of the federal courts is carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity." <u>Phansalkar v. Andersen Weinroth & Co.</u>, 344 F.3d 184, 199 (2d Cir. 2003) (quoting <u>Travelers Ins. Co. v. 633 Third Assocs.</u>, 14 F.3d 114, 119 (2d Cir. 1994)).  In the absence of a ruling by the New York Court of Appeals, "the decisions of New York State's Appellate Division are helpful indicators" of how the Court of Appeals would rule.  <u>Michalski v. Home Depot, Inc.</u>, 225 F.3d 113, 116 (2d Cir. 2000).  Although a federal court is "not strictly bound by state intermediate

appellate courts, rulings from such courts are a basis for 'ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" DiBella v. Hopkins, 403 F.3d 102, 112 (2d Cir. 2005 (quoting West v. Am. Tel. & Tel. Co., 311 U.S. 223, 237, 61 S.Ct. 179 (1940)).

Section 471 of the New York Tax Law is entitled "Imposition of cigarette tax." Its first subsection provides, in part:

> There is hereby imposed and shall be paid a tax on all cigarettes possessed in the state by any person for sale, except that no tax shall be imposed on cigarettes sold under such circumstances that this state is without power to impose such tax or sold to the United States or sold to or by a voluntary unincorporated organization of the armed forces of the United States operating a place for the sale of goods pursuant to regulations promulgated by the appropriate executive agency of the United States, to the extent provided in such regulations and policy statements of such an agency applicable to such sales.

N.Y. Tax L. § 471(1). Section 471(1) sets the amount of such tax as follows:

> Such tax on cigarettes shall be at the rate of two dollars and seventy-five cents for each twenty cigarettes or fraction thereof, provided, however, that if a package of cigarettes contains more than twenty cigarettes, the rate of tax on the cigarettes in such package in excess of twenty shall be sixty-eight and three-quarters cents for each five cigarettes or fraction thereof.

Id. Finally, § 471(1) provides that it "shall be presumed that all cigarettes within the state are subject to tax until the contrary is established, and the burden of proof that any cigarettes are not taxable hereunder shall be upon the person in possession thereof." Id. There is no exception made in the statute for sales of cigarettes by or to Native Americans or by retailers on Indian reservations.

It is settled law that a state is without power to tax cigarettes sold to Indian tribe members for their own consumption, but has the power to tax "[o]n-reservation cigarette sales to persons other than reservation Indians." Milhelm Attea & Bros., 512 U.S. at 64, 114 S.Ct. at 2031. In recognition of this principle, this Court has held that cigarettes sold to enrolled tribe members for

their own consumption are exempt from New York State cigarette tax pursuant to the limits of state power and the express exception in § 471 that no tax is imposed "on cigarettes sold under such circumstances that this state is without power to impose such tax."  N.Y. Tax L. § 471(1); see Golden Feather, 2009 WL 705815, at *1; Milhelm Attea, 550 F. Supp. 2d at 346-49.  The terms of § 471, however, do not exempt cigarettes sold in circumstances where New York does have the power to impose a tax, which under established law includes on-reservation sales of cigarettes to non-Indians.

The Appellate Division nevertheless held that § 471 does not impose a tax on reservation sales of cigarettes to non-Indians by reading it in conjunction with a separate provision of the Tax Law, § 471-e.  Section 471-e, entitled "Taxes imposed on qualified reservations," provides, in part:

> Notwithstanding any provision of this article to the contrary qualified Indians may purchase cigarettes for such qualified Indians' own use or consumption exempt from cigarette tax on their nations' or tribes' qualified reservations.  However, such qualified Indians purchasing cigarettes off their reservations or on another nation's or tribe's reservation, and non-Indians making cigarette purchases on an Indian reservation shall not be exempt from paying the cigarette tax when purchasing cigarettes within this state.  Accordingly, all cigarettes sold on an Indian reservation to non-members of the nation or tribe or to non-Indians shall be taxed, and evidence of such tax will be by means of an affixed cigarette tax stamp.

N.Y. TAX L. § 471-e(1)(a).  The statute proceeds to establish a coupon system to ensure that qualified Indians have the opportunity to purchase cigarettes exempt from tax:

> In order to ensure an adequate quantity of cigarettes on Indian reservations which may be purchased by qualified Indians exempt from the cigarette tax, the department shall provide Indian nations and tribes within this state with Indian tax exemption coupons as set forth in this section.  A reservation cigarette seller shall be able to present such Indian tax exemption coupons to a wholesale dealer licensed pursuant to this article in order to purchase stamped cigarettes exempt from the imposition of the cigarette tax.  Qualified Indians may purchase cigarettes from a reservation cigarette seller exempt from the cigarette tax even though such cigarettes will have an affixed cigarette tax stamp.

Id. § 471-e(1)(b); see also id. § 471-e(2) (establishing procedure for distributing tax exemption coupons). Following the passage of this amended version of § 471-e, however, the New York State Department of Taxation and Finance failed to implement the coupon system set forth in the statute. In light of DTF's inaction, the Appellate Division held that the amended version of § 471-e was without effect.[6] See Day Wholesale, 51 A.D.3d at 388-89.

In Cayuga, the Appellate Division concluded that the "Legislature's express imposition of the cigarette tax in Tax Law § 471-e . . . demonstrate[s] the intention of the Legislature to overhaul the statutory scheme and, in our view, to provide a single statutory basis for taxing cigarette sales on qualified reservations." 2009 WL 1981848, at *6. According to the Appellate Division, New York State historically "has not attempted to impose taxes on reservation cigarette sales unless a specific regulatory or statutory scheme was in place to differentiate between sales to Indians and sales to non-Indians or non-member Indians." Id. The court understood the legislature to have recognized in passing § 471-e that "sovereignty considerations attendant upon imposing and collecting a state cigarette tax on reservation sales renders Tax Law § 471 alone insufficient to impose the tax," and concluded that there is currently "no statutory basis for the imposition of a cigarette tax" on a qualified Indian reservation. Id.

---

[6] In enacting the latest version of § 471-e, the legislature provided that this amended version "'shall take effect March 1, 2006, provided that any actions, rules and regulations necessary to implement the provisions of [the statute] on its effective date are authorized and directed to be completed on or before such date.'" Day Wholesale, 51 A.D.3d at 385 (quoting L 2005, ch 63, part A, § 4). The DTF, however, did not take any action or promulgate any rules or regulations necessary to implement § 471-e prior to March 1, 2006. The Appellate Division concluded that "the effective date clause expresses the Legislature's intent that the amended version of Tax Law § 471-e would become effective only in the event that 'any actions, rules and regulations necessary to implement' its provisions were complete on or before March 1, 2006." Id. at 386-87. Since DTF had not taken any such steps, the court concluded that § 471-e was without effect. Id.

This Court believes that the New York Court of Appeals would reject the majority's reasoning in Cayuga and conclude that § 471 imposes a tax on reservation sales of cigarettes to non-Tribe members.[7] As Justice Peradotto explained in her well-reasoned dissent, § 471-e creates a mechanism for the collection of cigarette taxes already imposed by § 471. Although the Cayuga majority is correct that § 471-e reflects the legislature's judgment that § 471 alone does not provide a mechanism for the collection of taxes on cigarette sales by reservation retailers, it does not follow that no such taxes were owed. As set forth below, in light of the principles the Court of Appeals generally applies in construing statutes, the plain language of both sections, and the legislative history of § 471-e, this Court concludes that the Court of Appeals is likely to reject the majority opinion in Cayuga and adopt the reasoning of the dissent.

The Court of Appeals has held "repeatedly" that "where the language of a statute is clear and unambiguous, courts must give effect to its plain meaning." Samiento v. World Yacht Inc., 883 N.E.2d 990, 10 N.Y.3d 70, 78 (N.Y. 2008) (quoting Charter Dev. Co. v. City of Buffalo, 848 N.E.2d 578, 582 (N.Y. 2006); Tall Trees Constr. Corp. v. Zoning Bd. of Appeals, 761 N.E.2d 565, 568 (N.Y. 2001)); see also, e.g., Jones v. Bill, 890 N.E.2d 884, 10 N.Y.3d 550, 554 (N.Y. 2008) ("As a general proposition, we need not look further than the unambiguous language of the statute to discern its meaning . . . ."); Majewski v. Broadalbin-Perth Cent. Sch. Dist., 696 N.E.2d 978, 980 (N.Y. 1998) ("As the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof."); Sega v. State, 456 N.E.2d 1174, 1178 (N.Y. 1983) ("Generally, a statute is to be construed according to the ordinary meaning of its words, and resort to extrinsic matter is inappropriate when the statutory language is unambiguous and the meaning

---

[7] If this Court's ruling is appealed to the Second Circuit, that court may choose to certify this question to the New York Court of Appeals. This Court has no authority to take such action.

unequivocal." (internal citations omitted)).  Section 471 is unambiguous: it imposes a tax on "all cigarettes possessed in the state by any person for sale," except for "cigarettes sold under such circumstances that this state is without power to impose such tax."  N.Y. Tax L. § 471(1) (emphasis added).  There is no dispute that the state has power to impose taxes on cigarettes sold by Indians to non-Tribe members.  Thus, those sales do not fall within the exception created by statute and are subject to tax pursuant to § 471.

This conclusion is reinforced by the well-established principle of New York law that statutes creating tax exemptions are strictly construed.  The Court of Appeals has held that "in construing a tax exemption statute, the well-settled rule is that if ambiguity or uncertainty occurs, all doubts must be resolved against the exemption."  Charter Dev. Co., 848 N.E.2d at 462 (internal quotation marks and alteration omitted) (citing People v. Brooklyn Garden Apartments, 283 N.E.2d 877, 879 (N.Y. 1940); see also City of Lackawanna v. State Bd. of Equalization & Assessment, 212 N.E.2d 42, 46 (N.Y. 1965) ("Tax exemptions are limitations of sovereignty and are strictly construed." (internal quotation marks and alteration omitted)).  According to this established rule, "[t]ax exclusions are never presumed or preferred and before petitioner may have the benefit of them, the burden rests on it to establish that the item comes within the language of the exclusion."  Mobil Oil Corp. v. Fin. Adm'r of New York, 446 N.E.2d 130, 132 (N.Y. 1983).  A "statute authorizing a tax exemption will be construed against the taxpayer unless the taxpayer identifies a provision of law plainly creating the exemption.  Thus, the taxpayer's interpretation of the statute must not simply be plausible, it must be the only reasonable construction."  Charter Dev. Co., 848 N.E.2d at 462 (internal quotation marks and citations omitted); see also F.D.I.C. v. Comm'r of Taxation & Fin., 628 N.E.2d 1330, 1332 (N.Y. 1993) ("Statutes creating tax exemptions must be construed against the taxpayer.  The taxpayer

must show that its interpretation of the statute is the only reasonable construction.  Although petitioner here puts forth an alternative interpretation of the statute, its interpretation is by no means the only reasonable construction." (internal citations and alterations omitted)).  The Cayuga decision contravenes this principle by reading in an exemption from tax not specified by statute based upon the court's understanding of some unexpressed intention of the legislature.

In carving out a tax exception by implication, the Cayuga majority further runs afoul of the established rule of construction that "where the Legislature lists exceptions in a statute, items not specifically referenced are deemed to have been intentionally excluded."  Weingarten v. Bd. of Trustees of N.Y. City Teachers' Retirement Sys., 780 N.E.2d 174, 179 (N.Y. 2002).  Under New York law, "[t]he maxim expressio unius est exclusio alterius is applied in the construction of the statutes, so that where a law expressly describes a particular act, thing or person to which it shall apply, an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded."  N.Y. STAT. LAW § 240.  The New York Court of Appeals has held that this canon of construction applies with the same force when a statute provides a list of exceptions.  See Weingarten, 780 N.E.2d at 179; Morales v. County of Nassau, 724 N.E.2d 756, 759 (N.Y. 1999) (holding that where the legislature "has provided an extensive list of exemptions" in a statute, the "standard canon of construction of expressio unius est exclusio alterius" gives rise to the inference "that the expression of these exemptions in the statute indicates an exclusion of others").  Section 471 expressly provides three exemptions from the tax imposed "on all cigarettes possessed in the state by any person for sale."  N.Y. TAX LAW § 471(1).  The statute provides that "no tax shall be imposed on cigarettes sold [1] under such circumstances that this state is without power to impose such tax or [2] sold to the United States or [3] sold to or by a voluntary unincorporated organization of the armed forces of the United

States . . . ." (Id.)  In establishing these three exceptions, the state legislature acted with an awareness of the limits on its ability to impose tax.  See James v. Fed. Reserve Bank of N.Y., 471 F. Supp. 2d 226, 237-38 (E.D.N.Y. 2007) (noting that the Supremacy Clause "immunizes the federal government and its instrumentalities against taxation or regulation by the states") (citing McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 436-37 (1819)).  The legislature's enumeration of certain exemptions from state cigarette taxation, and its omission of any exemption for sales of cigarettes on Indian reservations, means that courts should not read such an exemption into the statute by inference.

Section 471-e does not alter the tax obligation imposed pursuant to the plain language of § 471.  Contrary to the Cayuga majority's reasoning, § 471-e does not independently impose or levy a tax on cigarette sales.  When the New York State legislature imposes a tax, it normally employs specific language making its intention clear.  The operative words "there is hereby imposed," "there is hereby imposed and shall be paid" or "there is hereby levied and imposed," which normally appear in statutes imposing tax and do appear in § 471, are absent from the operative language of § 471-e.  See § 471(1) ("There is hereby imposed and shall be paid . . ."), 471-a (same), 471-b (same), 471-c (same); see also, e.g., id. §§ 282-a, 284, 301-f, 301-g, 301-i, 301-j, 424, 452, 503, 1105, 1150, 1160, 1166-a.  Another element these tax imposition statutes have in common, which § 471-e does not share, is that in imposing tax the statutes specify the amount of tax to be paid.  See, e.g., id. § 471(1) (imposing tax "at the rate of two dollars and seventy-five cents for each twenty cigarettes or fraction thereof"), 471-a (imposing cigarette use tax "at the rate of two dollars and seventy-five cents for each twenty cigarettes or fraction thereof"), 471-b (imposing tax on "tobacco products other than snuff" "at the rate of forty-six percent of the wholesale price" and on snuff "at the rate of ninety-six cents per ounce and a

proportionate rate on any fractional parts of an ounce"), 471-c (imposing use tax on "tobacco products other than snuff" "at the rate of forty-six percent of the wholesale price" and on snuff "at the rate of ninety-six cents per ounce and a proportionate rate on any fractional parts of an ounce"). Unlike §§ 471, 471-a, 471-b, and 471-c, however, § 471-e does not specify any amount of tax to be paid. Defendants conceded at oral argument, as they must, that in order to determine the amount of tax to be collected pursuant to § 471-e, one must look to the amounts specified in § 471. (See Tr. of Oral Argument, July 30, 2009 ("OA Tr."), at 35-36.) This structure further supports the conclusion that § 471 operates to impose a tax on "all cigarettes possessed in the state by any person for sale," including cigarettes sold on Indian reservations to non-tribe members, and § 471-e, which operates only by reference to the tax imposed by § 471, provides a mechanism for the collection of that tax.

To the extent Cayuga embodies the conclusion that § 471-e implicitly modified § 471 by "overhaul[ing] the statutory scheme and . . . provid[ing] a single statutory basis for taxing cigarette sales on qualified reservations," 2009 WL 1981848, at *6, this conclusion is contrary to the well-established principle of New York law that repeals or modifications of statutes are not to be implied except in exceptional cases where it is impossible to give full effect to both statutes. See N.Y. STAT. LAW § 391. ("Repeals of earlier statutes by implication are not favored and a statute is not deemed repealed by a later one unless the two are in such conflict that both cannot be given effect."); see also Iazzetti v. City of New York, 723 N.E.2d 81, 85 (N.Y. 1999) ("Implied repeal . . . is distinctly not favored in the law. The Legislature is hardly reticent to repeal statutes when it means to do so; a statute generally repeals a prior statute by implication only if the two are in such conflict that it is impossible to give some effect to both." (internal quotation marks and citations omitted)); Ball v. State, 363 N.E.2d 323, 326 (N.Y. 1977) ("The

doctrine of repeal by implication is heavily disfavored in the law and may be resorted to only in the clearest of cases."); Cimo v. State, 116 N.E.2d 290, 293 (N.Y. 1953) ("As we know, repeal by implication is not favored and will be decreed only where a clear intent appears to effect that purpose."); Naramore v. State, 32 N.E.2d 800, 802 (N.Y. 1941) ("Repeal by implication is not favored."). The New York Court of Appeals has consistently held that "unless there is clear evidence of a legislative design to repeal or modify an earlier piece of legislation . . . [the court] must, if at all possible, give full effect to both statutes." People v. Newman, 298 N.E.2d 651, 657 (N.Y. 1973); see also Consol. Edison Co. of N.Y. v. Dep't of Envtl. Conservation, 519 N.E.2d 320, 324 (N.Y. 1988) ("Con Ed.") ("Repeal or modification of legislation by implication is not favored in the law. Absent an express manifestation of intent by the Legislature—either in the statute or the legislative history—the courts should not presume that the Legislature has modified an earlier statutory grant of power to an agency"). According to this principle, "a statute is not deemed impliedly modified by a later enactment unless the two are in such conflict that both cannot be given effect. If by any fair construction, a reasonable field of operation can be found for [both] statutes, that construction should be adopted." Con Ed., 519 N.E.2d at 324-35 (internal quotation marks and citations omitted); accord Iazzetti, 723 N.E.2d at 85 ("[W]henever possible, a reviewing court should adopt a construction that permits a reasonable field of operation for each statute."); Alweis v. Evans, 505 N.E.2d 605, 607 (N.Y. 1987). In keeping with this principle, this Court presumes that if the legislature intended to extinguish a tax obligation imposed by § 471 in enacting § 471-e, it would have done so explicitly. Furthermore, there exists a simple way to give both statutes their full effect, which is more consistent with the statutes' plain meaning: rather than replacing § 471 to the extent it imposes taxes on reservation cigarette sales, § 471-e merely provides one means to collect taxes already imposed by § 471.

Defendants' apparent reading of <u>Cayuga</u>, that § 471 <u>never</u> imposed a tax on reservation cigarette sales, regardless of the purchaser, as discussed above; is inconsistent with both the plain language of § 471 and accepted canons of statutory construction. It is also inconsistent with case law of the New York Court of Appeals, which recognized that § 471 imposed a tax on reservation sales of cigarettes to non-Indians years before § 471-e was enacted. In <u>New York Association of Convenience Stores v. Urbach</u>, the Court of Appeals noted that "Articles 12-A, 20 and 28 of the Tax Law impose sales and excise taxes on cigarettes and motor fuel sold within the State" and explained that although "[p]reemptive Federal law forbids collection of these taxes on goods sold on Indian reservations to enrolled tribe members . . . when the goods are sold on the reservation to non-Indian consumers, the taxes may be collected." 699 N.E.2d 904, 906 (N.Y. 1998) (internal citations omitted).

The legislative history of § 471-e further supports the conclusion that § 471-e was meant to provide a collection mechanism for cigarette tax already imposed by § 471. In 1988, more than fifteen years before the latest version of § 471-e was enacted, DTF adopted regulations to facilitate the collection of cigarette taxes on reservation sales to non-Indians. <u>See</u> <u>Urbach</u>, 699 N.E. at 906 (citing, <u>inter alia</u>, 20 N.Y.C.R.R. §§ 336.6, 336.7, 564.2). These regulations allowed reservation retailers to purchase a limited quantity of untaxed cigarettes based upon "the 'probable demand' of tax-exempt Indian consumers." <u>Milhelm Attea & Bros.</u>, 512 U.S. at 66, 114 S.Ct. at 2032. Implementation of these regulations was suspended, however, pending the outcome of litigation challenging their validity. <u>Urbach</u>, 699 N.E. at 906. In 1994, the United States Supreme Court unanimously held that the 1988 DTF regulations were valid and not preempted by Federal law. <u>See</u> <u>Milhelm Attea & Bros.</u>, 512 U.S. at 75-76, 114 S.Ct. at 2036-37. In so holding, the Supreme Court noted that under then-prevailing New York law, non-Indians

who purchase cigarettes on reservations "must pay" tax.  Id. at 64, 114 S.Ct. at 2030-31

("Cigarette consumers in New York are subject to a state tax of 56 cents per pack.  Enrolled

tribal members who purchase cigarettes on Indian reservations are exempt from this tax, but non-

Indians making purchases on reservations must pay it.").

Following the Supreme Court's decision in Milhelm Attea & Bros., DTF did not reinstate

the regulations.  See Milhelm Attea, 550 F. Supp. 2d at 338; Urbach, 699 N.E.2d at 906-07.  On

April 28, 1998, DTF formally repealed the regulations, in part due to enforcement difficulties.

Urbach, 699 N.E.2d at 909.  In doing so, DTF recognized that "'the repeal . . . does not eliminate

the statutory liability for taxes as they relate to sales on Indian reservations to nonexempt

individuals.'"  Id. (quoting 20 NYS Register, Apr. 29, 1998, Issue 17, Book 1, at 22-24).  The

repeal of the regulations gave way to a "policy of forbearance, pursuant to which [DTF]

suspended all attempts to collect the tax on reservation sales of cigarettes."  Cayuga, 2009 WL

1981848, at *3; see also Milhelm Attea, 550 F. Supp. 2d at 337-38.  Of course, if defendants are

correct that no tax was ever imposed on reservation sales under § 471, this policy of forbearance

would have been nonsensical because there would have been no applicable tax to forbear.

After years in which DTF failed to implement regulations necessary to collect taxes on

reservation cigarette sales, the legislature enacted the first version of section 471-e.  The statute,

entitled "Taxes imposed on native American nation or tribal lands," provided:

> Where a nonnative American person purchases, for such person's own
> consumption, any cigarettes or other tobacco products on or originating from
> native American nation or tribe land recognized by the federal government and
> reservation land recognized as such by the state of New York, the commissioner
> shall promulgate rules and regulations necessary to implement the collection of
> sales, excise and use taxes on such cigarettes or other tobacco products.

See 2003 N.Y. Sess. Laws Ch. 63, Part Z, § 4 (McKinney).  The plain terms of this statute

indicate that its purpose was not to impose a new tax on reservation cigarette sales, but to require

DTF to establish regulations necessary to collect the tax already imposed by § 471. Following the enactment of § 471-e, in September 2003, DTF developed regulations to implement the collection of cigarette taxes on reservation sales. See Proposal of Indian tax enforcement provisions, available at http://www.tax.state.ny.us/rulemaker/proposals.htm#2003 (the "Proposed Regulations"). The Proposed Regulations called for the establishment of a coupon system to ensure that tribe members could purchase cigarettes exempt from tax. Id. at 6-8 ("Indian tax exemption coupons shall be provided to the recognized governing body of each Indian nation or tribe to ensure that each Indian nation or tribe can obtain cigarettes upon which the tax will not be Collected . . . ."); compare N.Y. TAX. L. § 471-e (setting forth same language). Although the Governor vetoed the bill, it was reintroduced the following year and signed into law on April 12, 2005. See 2005 N.Y. Sess. Laws Ch. 61, part K, § 2 (McKinney). The Governor's November 15, 2004 veto message noted that "[t]his bill would provide for the collection of sales and excise taxes on goods and services sold on or from Native American lands within the State of New York." (Pl.'s Br., July 21, 2009, Ex. 2 at 2.) It further explained that "[t]his bill would essentially codify draft regulations that were published last September by the Department pursuant to Chapters 62 (Part T3) and 63 (Part Z) of the Laws of 2003, which became law over my objections." (Id. (emphasis in original).) The bill, which eventually was signed into law despite the Governor's 2004 veto, became the version of § 471-e that is the subject of the current dispute.

It is clear from the legislative history that § 471-e did not impose a new tax on cigarettes sold on Indian reservations or modify existing tax obligations. Rather, § 471-e "embodies the Legislature's most recent effort to collect taxes on cigarettes sold on Indian reservations," already imposed by § 471, in the face of persistent inaction by the executive branch. Day Wholesale, 51

A.D.3d at 384 (emphasis added). When DTF failed for years to implement regulations necessary to halt large scale tax evasion taking place on Indian reservations in New York state, the legislature stepped in and codified an enforcement framework by statute. The underlying tax liability imposed by § 471 remains unchanged.

Accordingly, this Court reaffirms its conclusion that § 471 imposes an applicable tax on cigarettes sold by reservation retailers to non-tribe members, and such cigarettes are required to bear tax stamps under New York law.

### b. Defendants' Violation of the CCTA

Having reaffirmed the conclusion that cigarette sales on the Poospatuck Reservation to non-Tribe members are subject to an applicable tax, the Court now turns to the remaining elements of the CCTA. Based upon the findings set forth above, the Court concludes that each defendant has received, possessed, sold, distributed, and purchased quantities far in excess of 10,000 cigarettes, which do not bear New York tax stamps, under circumstances where such stamps are required. Furthermore, with the exception of defendants TDM Discount Cigarettes and Thomasina Mack, which currently have suspended business, each defendant continues to "receive, possess, sell, distribute [and] purchase" more than 10,000 unstamped cigarettes.

In the case of TDM and Mack, the Court finds that they are likely to engage in the sale of large quantities of unstamped cigarettes in the future unless enjoined by this Court. The Court bases this conclusion by a preponderance of the evidence on TDM and Mack's long history of selling large quantities of unstamped cigarettes, including through sales off the Reservation; the profitability of engaging in this business; and the fact that Mack recently installed a new sign to direct customers to her store. In addition, although she has suspended business, Mack continues to purchase approximately 90 cartons of unstamped cigarettes for resale off the Reservation, and

maintains a stock of more than 10,000 unstamped cigarettes at her store.  Accordingly, TDM and

Mack continue to receive, possess, and purchase more than 10,000 unstamped cigarettes.

Defendants argue that they are entitled to sell unlimited quantities of unstamped

cigarettes so long as they do not sell more than 49 cartons of unstamped cigarettes in any

particular transaction.  As described in the Court's Findings of Fact, one defendant in mid-2008

structured its sales around this threshold.  In defendants' view, only quantities of at least 50

cartons, or 10,000 cigarettes, are "contraband" under the CCTA, so that there can be no CCTA

violation without a single sale in excess of more than 49 cartons.

As an initial matter, the evidence reveals that defendants have not abided by their self-

imposed limitations in the past and are unlikely to do so in the future.  Since the threshold for

contraband cigarettes was reduced to 10,000 cigarettes, defendants have sold up to several

hundred cartons in a single transaction, sometimes dividing large orders into separate orders of

49 cartons each in order to avoid detection.  (See, e.g., Ex. 97 at 851:18-852:22 (Monique's); Tr.

25:21-27:25 (Peace Pipe); Tr. 35:13-25, 36:11-22, 37:9-11 (Red Dot); Ex. 101 at 2508:3-13,

2515:5-13, 2528:45-2529:23; Tr. 28:1-18, 31:21-32:2 (Smoking Arrow); Ex. 98 at 1075:10-16;

Tr. 161:16-164:6 (TDM).)  Investigator Mars purchased more than 49 cartons from Monique's,

Red Dot, and Smoking Arrow as recently as June and July 2008.

In any event, the Court rejects the view that defendants can sell unlimited quantities of

unstamped cigarettes so long as they avoid making any single sale in excess of 49 cartons.

Nothing in the CCTA provides that for cigarettes to be considered contraband they must be sold

in a single transaction.  Certainly each defendant sells more than 49 cartons of unstamped

cigarettes in any given day, if not in a single hour.  (See, e.g., Ex. 91 at 3, 7 (showing purchases

of tens of thousands of cartons per month by each defendant from Gutlove and Pennisi); Watkins

Dep. 8:16-18, 19:17-19 (Watkins testifying that Monique's currently sells between 13,000 and 15,000 cartons of cigarettes per week, for an average of more than 1,800 cartons each day).

As a related argument, defendants contend that they are entitled to receive, possess and purchase unlimited quantities of unstamped cigarettes because they must do so in order to sell them to other Tribe members for their own consumption, which sales are tax-exempt. This argument, like the issue of whether sales below 49 cartons are not contraband, raises the question of <u>when</u> untaxed cigarettes possessed by Indian retailers become contraband.

Section 471 of the New York Tax law places the burden on defendants to prove that any cigarettes they possess, purchase, receive, or sell are exempt from tax. It provides, in part:

> It shall be presumed that all cigarettes within the state are subject to tax until the contrary is established, and the burden of proof that any cigarettes are not taxable hereunder shall be upon the person in possession thereof.

N.Y. TAX L. § 471(1). Defendants have not presented evidence that <u>any</u> of the cigarettes they possess, purchase, receive, or sell are intended for other Tribe members for their own consumption. Accordingly, on the record in this case, all of the cigarettes defendants deal in are subject to tax. Defendants cannot defeat CCTA liability for the possession of massive quantities of untaxed cigarettes intended for resale to non-Tribe members based upon the hypothetical possibility, unsupported in the record, that some portion of those cigarettes may be sold to Tribe members for their own consumption. Such cigarettes are contraband from the moment defendants purchase, receive, or possess them in quantities greater than 10,000 cigarettes, unless defendants carry their burden of proving that any such cigarettes are not taxable. Defendants have not met that burden.

Accordingly, the Court concludes that the City has established a clear or substantial likelihood of success on the merits of its CCTA claim.

### 2. The CMSA

#### a. Applicable Tax

The CMSA, N.Y. TAX L. §§ 483-89, "prohibits the sale of cigarettes below cost when the seller intends thereby to harm competition or evade taxes." Lorillard Tobacco Co. v. Roth, 786 N.E.2d 7, 8 (N.Y. 2003). The statute makes it unlawful for

> any agent, wholesale dealer or retail dealer, with intent to injure competitors or destroy or substantially lessen competition, or with intent to avoid the collection or paying over of such taxes as may be required by law, to advertise, offer to sell, or sell cigarettes at less than the cost of such agent wholesale dealer or retail dealer, as the case may be.

N.Y. TAX L. § 484(a)(1). For retail dealers, it is also unlawful "to induce or attempt to induce, or to procure or attempt to procure the purchase of cigarettes at a price less than the cost of the agent for sales to retail dealers, if purchased from an agent, or at a price less than the cost of the wholesale dealer." Id. § 484(a)(4)(A). The statute provides that "any person injured by any violation or threatened violation" of the CMSA may bring action "to prevent, restrain or enjoin a violation, or threatened violation, of any of the provisions of this article." Id. § 484(b)(1).

As discussed above, the CMSA defines the "cost of the retail dealer" as "the basic cost of cigarettes plus the cost of doing business by the retail dealer" including operational costs and taxes. Id. § 483(b)(3)(A). The "basic cost of cigarettes," in turn, is defined as "the invoice cost of cigarettes to the agent who purchases from the manufacturer, or the replacement cost of cigarettes to the agent . . . to which shall be added the full face value of any stamps which may be required by law." Id. § 483(a)(1).

#### b. Standing under the CMSA

Defendants contend that the City lacks standing to bring a claim under the CMSA because that statute is intended to prevent unfair competition and any harm to the City suffered

in the loss of tax revenue is derivative of that unfair competition. In support of this position, they

rely on a decision of the New York Court of Appeals interpreting N.Y. Business Law § 349, a

different provision of New York law. City of New York v. Smokes-Spirits.com, ___ N.E.2d

____, 2009 WL 1585844 (N.Y. June 9, 2009) (City's alleged tax loss derivative of claims that

internet consumers were misled that cigarettes were tax free and that they need not file Jenkins

Act reports). Defendants' position is unpersuasive because it is based upon a fundamental

misreading of the provision of the CMSA that limits its coverage to unfair competition and

ignores its sanctioning of the avoidance of the collection of taxes.

To have standing, a plaintiff must demonstrate (1) an injury in fact which is concrete and

particularized; (2) a causal connection between the injury and the conduct complained of so that

the injury is fairly traceable to the challenged action of the defendant; and (3) a likelihood that

the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S.

555, 560-561 (1992) (internal citations and quotation marks omitted).

Here, the CMSA makes it unlawful both to "injure competitors or destroy or substantially

lessen competition" and "avoid the collection or paying over of such taxes as may be required by

law." N.Y. TAX L. § 484(a)(1). The CMSA further provides that "any person injured by any

violation or threatened violation" of the CMSA may bring an action "to prevent, restrain or

enjoin a violation, or threatened violation, of any of the provisions of this article," Id. §

484(b)(1).

The City claims a direct injury by virtue of the defendants' efforts to "avoid the

collection or paying over of such taxes as may be required by law." Id. § 484(a)(1). Here, the

complaint alleges that the City has suffered injury in the form of "millions of dollars in lost

cigarette tax revenues." (Compl. ¶ 63.) According to the City, "defendants' sales of cigarettes at

prices that do not include the costs of applicable tax stamps" deny the City lost tax revenue "with each and every sale of cigarettes to City residents caused by defendants' violations of the CMSA." (Id. ¶¶ 42-43.)  Unlike the City-plaintiff in Smokes-Spirits.com, the City's alleged injury is direct economic injury to itself—the City's position is not too remote from the defendants' activity, and the loss of tax revenue is not a result of injuries sustained by a third party.

### c.  Defendants' Violation of the CMSA

The Court concludes based upon the findings set forth above that each defendant has sold, and continues to sell, large quantities of cigarettes at less than the cost of the retail dealer, as that term is defined by the CMSA.  The Court further concludes that defendants' sales at less than cost were made with the intent to avoid the payment of New York State cigarette tax.  The CMSA provides that advertising, offering to sell, or selling cigarettes at less than cost "shall be prima facie evidence . . . of intent to avoid the collection or paying over of such taxes as may be required by law."  Id. § 484(a)(6).  Defendants have offered no evidence to rebut this presumption of intent.

Accordingly, the Court concludes that the City has established a clear or substantial likelihood of success on the merits of its CMSA claim.

### C.  Additional Required Showing

#### 1.  Irreparable Harm

##### a.  Not Required to be Shown

As a general matter, a showing that irreparable harm would result if an injunction is not granted is "the single most important prerequisite for the issuance of a preliminary injunction." Citibank N.A. v. Citytrust, 756 F.2d 273, 275 (2d Cir. 1985).  Irreparable harm is defined as an

injury for which a monetary award cannot be adequate compensation.  JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 79 (2d Cir. 1990).

The City argues that it need not show irreparable harm in this case because the CCTA and CMSA explicitly authorize a municipal government to seek and obtain injunctive relief. This Court has already concluded that no showing of irreparable harm is required to obtain an injunction under the CMSA, but reserved decision on whether irreparable harm must be shown to obtain a preliminary injunction under the CCTA.  See Golden Feather, 2009 WL 705815, at *9-*10.  The Court now addresses whether a showing of irreparable harm is required under the CCTA.

The CCTA specifically authorizes state and local governments to enforce the requirements of the statute through suits for injunctive relief.  The statute also provides that a "State, through its attorney general, [or] a local government, through its chief law enforcement officer (or a designee thereof), . . . , may bring an action in the United States district courts to prevent and restrain violations of this chapter by any person (or by any person controlling such person) . . . ."[8]  Id. § 2346(b)(1).

When Congress expressly authorizes the government to enforce a statute by way of an injunction, "the standards of the public interest not the requirements of private litigation measure the propriety and need for injunctive relief."  Hecht Co. v. Bowles, 321 U.S. 321, 331, 64 S.Ct. 587, 592 (1944); accord SEC v. Unifund SAL, 910 F.2d 1028, 1035-36 (2d Cir. 1990). Although the district court still must weigh equitable considerations in determining whether an injunction is appropriate, "the legislative goals are the framework within which the court

_____

[8] The CCTA further provides that, in such an action, a local government may "obtain any other appropriate relief for violations of this chapter from any person (or by any person controlling such person), including civil penalties, money damages, and injunctive or other equitable relief." 18 U.S.C. § 2346(b)(2).

67

operates in deciding whether to grant injunctive relief." United States v. Diapulse Corp. of Am., 457 F.2d 25, 28 (2d Cir. 1972) (citing Hecht, 321 U.S. 321, 64 S.Ct. 587).

A well-established outgrowth of this principle is that a government agency seeking an injunction authorized by statute need not establish irreparable injury. See CFTC v. British Am. Commodity Options Corp., 560 F.2d 135, 141 (2d Cir. 1977) ("The district court applied the now well-established rule that in actions for a statutory injunction, such as this, the agency need not prove irreparable injury or the inadequacy of other remedies as required in private injunctive suits . . . ."); SEC v. Management Dynamics, Inc., 515 F.2d 801, 808 (2d Cir. 1975) ("Unlike private actions, which are rooted wholly in the equity jurisdiction of the federal court, SEC suits for injunctions are creatures of statute. Proof of irreparable injury or the inadequacy of other remedies as in the usual suit for injunction is not required." (internal quotation marks omitted)). "The passage of the statute is, in a sense, an implied finding that violations will harm the public and ought, if necessary, be restrained." Diapulse, 457 F.2d at 28. Accordingly, "[n]o specific or immediate showing of the precise way in which violation of the law will result in public harm is required." Id.; see also United States v. Blue Ribbon Smoked Fish, Inc., 179 F. Supp. 2d 30, 49-50 (E.D.N.Y. 2001) ("Where the government is enforcing a statute designed to protect the public interest, it is not required to show irreparable harm to obtain injunctive relief. The statute's enactment constitutes Congress' implied finding that violations will harm the public and ought, if necessary, be restrained." (internal quotation marks and citations omitted)).

These principles are particularly applicable in this case, where the City seeks to enjoin activity that constitutes a federal crime. See 18 U.S.C. § 2344 (setting forth criminal penalties for knowing violation of the CCTA). Congress's determination that this conduct should be criminalized implies a judgment that violations will harm the public. This judgment is further

reflected in the legislative history of the Act, which reveals Congress's concern with the connections between cigarette trafficking and organized crime and the ensuing detrimental effects on public safety and economic welfare. See S. Rep. No. 95-962, at 6 ("Cigarette bootlegging has often been viewed as a victimless crime, but both research and testimony of witnesses forcefully refuted this notion by pointing out the violent activity associated with organized crime infiltration and take-over operations."); id. at 6 ("The truly innocent victims of the activities of organized crime in this area are the thousands of legitimate businessmen, wholesalers, retailers, drivers, packers, and sales people who have lost their jobs and businesses as a result of the takeover."); H.R. Rep. No. 95-1778, at 7 (finding that there is a "causal relationship between the flow of cigarettes into interstate commerce to be sold in violation of state laws and the rise of racketeering in the United States").

Defendants argue that the CCTA does not dispense with the need to show irreparable harm because, in their view, the statute does not set forth "statutory conditions" for injunctive relief. The term "statutory conditions" was first employed in the 1937 case of SEC v. Torr, in which the SEC sought a preliminary injunction to restrain certain alleged violations of the securities acts. 87 F.2d 446 (2d Cir. 1937). Section 20(b) of the Securities Act of 1933 and § 21(e) of the Securities Exchange Act of 1934 provide:

> Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this title (chapter), or any rule or regulation thereunder, it may . . . bring an action . . . to enjoin such acts or practices, and upon a proper showing a permanent injunction shall be granted without bond.

15 U.S.C. § 78u(e); 15 U.S.C. § 77t(b); see Mgmt. Dynamics, 515 F.2d at 807; Torr, 87 F.2d at 449. In Torr, the Second Circuit noted that because "the issuance of an injunction in cases of this nature has statutory sanction, it is of no moment that the plaintiff has failed to show threatened

irreparable injury or the like, for it would be enough if the statutory conditions for injunctive relief were made to appear."  87 F.2d at 450.  Years later, the court in <u>Management Dynamics</u> quoted <u>Torr</u> in reaffirming this principle, noting that "[t]his principle has been applied in granting both permanent injunctions and preliminary injunctions."  515 F.2d at 808.

The "statutory conditions" referred to in these cases are substantive.  They refer to the Commissioner's burden in the SEC enforcement cases to establish the violation for which an injunction is authorized.  <u>See</u> <u>Mgmt. Dynamics</u>, 515 F.2d at 807 (holding that Securities Act and Exchange Act provisions "provide for injunctive relief only when a person 'is engaged or about to engage' in the illegal acts"); <u>Torr</u>, 87 F.2d at 450 (finding that "language in this instance conditions the right [to an injunction] upon sufficient proof that 'any person is engaged or about to engage in any acts, or practices which constitute or will constitute a violation' of the statute."). The statute at issue in the SEC enforcement cases does not expressly set forth any substitute showing for the traditional equity test applied in private litigation, providing only that an injunction should issue upon an unspecified "proper showing" if a violation or threatened violation is established.  In the instant case, the "condition" for injunctive relief pursuant to the CCTA is simply that a state or local government establish a "violation[] of this chapter by any person."  <u>See</u> 18 U.S.C. § 2346(b)(1).  Since Congress has authorized the City to enforce the CCTA by restraining unlawful conduct through an injunction, this authorization implies Congress's judgment that violations harm the public, and consequently there is no further need for the City to prove any particular way in which the public is harmed.

Some district courts within the Second Circuit have declined to apply this principle in suits for injunction brought pursuant to § 7402(a) of the Internal Revenue Code.  <u>See</u> <u>United States v. Buddhu</u>, No. 3:08-CV-74, 2008 WL 2355930 (D.Conn. June 5, 2008); <u>United States v.</u>

Webb, No. 06-CV-5317, 2007 WL 397041 (E.D.N.Y. Feb. 1, 2007); United States v. Broccolo, No. 06-CV-2812, 2006 WL 3690648 (S.D.N.Y. Dec. 13, 2006).  Section 7402(a) of the Internal Revenue Code provides that the "district courts of the United States at the instance of the United States shall have such jurisdiction to make and issue in civil actions, writs and orders of injunction . . . and to render such judgments and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws."  26 U.S.C. § 7402(a).  In Broccolo, the court distinguished this provision from other statutes authorizing injunctive relief on the grounds that it is merely a "catch-all provision," which makes injunctive relief available in suits brought under the Internal Revenue Code, without specifically authorizing injunctive relief upon the establishment of any particular violation.  2006 WL 3690648, at *6.  Stated another way, the court determined that "[s]ection 7402(a) authorizes injunctive relief, but does not provide 'statutory conditions.'"  Id. at *2 (quoting Mgmt. Dynamics, 515 F.2d at 807-08).  The court therefore applied "traditional equity considerations" including the requirement that the Government establish irreparable harm.  Id. at *6.  Other district courts following Broccolo have concurred in this analysis.  See Buddhu, 2008 WL 2355930, at *3 ("Section 7402(a) authorizes injunctive relief, but does not provide 'statutory conditions.'  Accordingly, the traditional equitable considerations must be applied."); Webb, 2007 WL 397041, at *5-*6 ("[Section 7402(a)] is essentially a catch-all provision which grants district courts jurisdiction to issue injunctive relief.  However, unlike sections 7407 and 7408, section 7402(a) does not itself authorize specific injunctive relief.  Therefore, courts have applied traditional equity considerations when crafting injunctive relief pursuant to this section." (internal citation omitted)).

These cases reflect the courts' conclusions that § 7402(a), in providing for the availability of injunctive relief broadly in actions brought under the Internal Revenue Code, operates merely to make injunctive relief available in such actions and does not reflect Congress's judgment that all violations of the Internal Revenue Code irreparably harm the public. The courts in those cases were presented with other sections of the Internal Revenue Code, which authorize the issuance of injunctions upon the establishment of certain specific violations. See 26 U.S.C. §§ 7407, 7408. This Court does not read these cases to alter longstanding doctrine governing statutory injunctions by imposing a requirement that Congress phrase statutes using an "if . . . then" formulation to make plain its judgment that violations harm the public. Certainly no such formulation was at issue in Management Dynamics, or in other principal cases governing this area of law. In contrast to § 7402(a), which merely makes injunctive relief available, the CCTA expressly provides for enforcement of its provisions through an action by a State or local government for an injunction. This express grant of authority that local governments "may bring an action in the United States district courts to prevent and restrain violations of this chapter by any person," 18 U.S.C. § 2346(b)(1), reflects Congress's judgment that "violations will harm the public and ought, if necessary, be restrained." Diapulse, 457 F.2d at 28.

### b. Irreparable Harm in any event Established

Even if the City were required to prove irreparable injury, the Court concludes that it has sustained this burden. The evidence in the record establishes that defendants' sales of cigarettes in violation of the CCTA and CMSA cause a substantial number of cheap, untaxed cigarettes to be transported into the City for resale. The City further has established, and defendants do not dispute, that the availability of reduced-price cigarettes in a particular marketplace causes smokers to smoke more cigarettes. Undisputed medical testimony in the record establishes that

more smoking causes detrimental health effects, including an increased risk of lung cancer, even if there is no change in the amount of smokers who begin or quit smoking altogether.

Defendants attack Dr. Frieden's assumption that halting the flow of cheap cigarettes from the Poospatuck Reservation would cause that number of cheap cigarettes to disappear from the City's marketplace. (See Tr. 436:15-22.) Pointing to Dr. Viscusi's testimony concerning the "cross-border effect," defendants argue that, in fact, the availability of such cigarettes simply could be "replaced" by cigarettes trafficked from other nearby jurisdictions with low cigarette taxes, such as Delaware, Virginia, and New Hampshire. (See Tr. 724:17-725:12.) Although defendants have presented expert testimony regarding this cross-border effect in the abstract, however, they merely speculate that there would be a replacement effect, without offering any evidence to undercut the City's showing of irreparable injury.

Defendants do not dispute the legal proposition that causing an increased risk of lung cancer in the City, if proven, constitutes irreparable harm to the City. As discussed above, the Court finds that the City has sustained its burden of proof on this issue by a preponderance of the evidence. Accordingly, the Court concludes that irreparable harm to the City would result if an injunction is not granted.

### 2. Violations Will Likely Be Repeated

Although there is no requirement for a showing of irreparable harm, there is a requirement that there be a showing of "a reasonable likelihood that the wrong will be repeated." SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1100 (2d Cir. 1972); accord British Am., 560 F.2d at 141; Mgmt. Dynamics, 515 F.2d at 807; Diapulse, 457 F.2d at 28-29 ("The other major consideration in the trial court's exercise of discretion is the likelihood of continuing violation or recommencement of the offensive behavior, if it has ceased during the pendency of

the litigation."); <u>Blue Ribbon Smoked Fish</u>, 179 F. Supp. at 50 ("To enjoin future behavior, the government must show that defendants have violated the [statute] and that there is some reasonable likelihood that the violations may recur."). This determination "depends upon the totality of the circumstances," bearing in mind that "the commission of past illegal conduct is highly suggestive of the likelihood of future violations." <u>Mgmt. Dynamics</u>, 515 F.2d at 807. In <u>British American</u>, for example, the Second Circuit held:

> A likelihood of future violations may be inferred from past unlawful conduct. In the present case, not only did British American maintain that its activities were legitimate, but it persisted in offering commodity trading advice right up to the day of the hearing in the district court. Under these circumstances, the likelihood of future violations, if not restrained, is clear.

560 F.2d at 142.

This Court concludes based upon the evidence in the record that there has been a substantial showing that defendants' violations of the CCTA are likely to continue unless enjoined by this Court. As discussed above, defendants have a long history of selling massive quantities of untaxed cigarettes. Like the defendant in <u>British American</u>, defendants continue to "maintain that [their] activities [are] legitimate," <u>Id.</u>, even while many of them have taken steps to avoid detection by law enforcement, either by dividing up orders believed to exceed legal limits or by assisting customers in avoiding police patrols. In addition, defendants continue to purchase and sell large quantities of unstamped cigarettes during the pendency of this lawsuit. Accordingly, the Court concludes that an injunction is necessary to prevent further violations of the CCTA.

The Court further concludes based upon the evidence in the record that defendants' violations of the CMSA are likely to continue unless enjoined by this Court. As described in detail above, for years defendants consistently have sold selling cigarettes at prices below the

CMSA minimums. Indeed, defendants' principal business model is to provide customers with the opportunity to purchase cigarettes at significantly reduced prices, without paying tax. Defendants maintain that these activities are lawful. Accordingly, the Court concludes that an injunction is also necessary to prevent further violations of the CMSA.

## VI. Defendants' Application for a Stay Pending Appeal

Having concluded that a preliminary injunction should be issued, the Court further addresses defendants' request that the injunction should be stayed pending appeal. Rule 62(c) of the Federal Rules of Civil Procedure provides that when an appeal is taken from an interlocutory or final judgment granting an injunction, the court in its discretion may suspend or modify the injunction while the appeal is pending "on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62(c).

> The standard in this circuit for a stay or injunction pending appeal is (1) whether the movant will suffer irreparable injury absent a stay, (2) whether a party will suffer substantial injury if a stay is issued, (3) whether the movant has demonstrated a substantial possibility, although less than a likelihood, of success on appeal, and (4) the public interests that may be affected.[9]

LaRouche v. Kezer, 20 F.3d 68, 72 (2d Cir.1994) (internal quotation marks and citation omitted). These factors are interrelated, such that "more of one excuses less of the other." Mohammed v. Reno, 309 F.3d 95, 101 (2d Cir. 2002) (internal quotation marks omitted); see also In re World Trade Center Disaster Site Litig., 503 F.3d 167, 170 (2d Cir. 2007) (noting that "the degree to which a factor must be present varies with the strength of the other factors").

---

[9] The Second Circuit has noted that "some uncertainty has developed" regarding this standard "because of the various formulations used to describe the degree of likelihood of success that must be shown." Mohammed v. Reno, 309 F.3d 95, 100 (2d Cir. 2002) (emphasis in original). Ultimately, the Second Circuit has concluded that the "necessary level or degree of possibility of success will vary according to the court's assessment of the other stay factors." Id. at 101 (internal quotation marks and alteration omitted).

Defendants have failed to demonstrate their entitlement to a stay pursuant to Fed. R. Civ. P. 62(c). The defendants would no doubt be financially harmed by the injunction, but such harm would not be irreparable. If they were to prevail on appeal, there has been no showing that they could not resume their business activities. Moreover, the public interest would not be served by permitting the defendants to continue to engage in conduct that this Court has concluded is unlawful. Diapulse, 457 F.2d at 29 (a defendant has no vested interest in business activity found to be illegal).

In fairness to the defendants, however, the Court believes that it is appropriate to stay the preliminary injunction for a limited period of thirty days to give the defendants an adequate opportunity to file a Notice of Appeal and seek a further stay pending appeal from the United States Court of Appeals for the Second Circuit.

## VII.    Conclusion and Preliminary Injunction

For the reasons set forth above, defendants' motion for reconsideration is denied. The City's motion for a preliminary injunction is granted. Defendants Monique's Smoke Shop, Ernestine Watkins, Wayne Harris, Peace Pipe Smoke Shop, Rodney Morrison, Sr., Charlotte Morrison, Red Dot & Feather Smoke Shop, Inc., Raymond Hart, Smoking Arrow Smoke Shop, Inc., Denise Paschall, TDM Discount Cigarettes, Thomasina Mack, Jessey Watkins, and Tony D. Phillips[10] are enjoined from selling unstamped cigarettes other than to members of the Unkechauge Nation for their personal use. These defendants are further enjoined from selling

---

[10] Although defendants Jessey Watkins and Tony D. Phillips are currently in default, ample evidence introduced at the hearing establishes that these defendants have participated in the violations set forth herein. Although Watkins has indicated that he wants to make a motion to set aside the default, he has indicated that he did not answer on purpose as a tactical decision. Accordingly, both defaulting defendants are bound by the injunction.

cigarettes at prices below the CMSA minimum prices except in sales to members of the

Unkechauge Nation for their personal use.  This injunction is stayed for thirty days.

SO ORDERED.


Dated: Brooklyn, New York
       August ___, 2009

_____
Carol Bagley Amon
United States District Judge