UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
THE CITY OF NEW YORK,

          Plaintiff,

-against-

GOLDEN FEATHER SMOKE SHOP, INC., KIMO
SMOKE SHOP, INC., SMOKE AND ROLLS INC.,
SHAWN MORRISON, KIANA MORRISON, in her
individual capacity, MONIQUE'S SMOKE SHOP,
ERNESTINE WATKINS, in her individual capacity,
JESSEY WATKINS, WAYNE HARRIS, PEACE PIPE
SMOKE SHOP, RODNEY MORRISON, Sr.,
CHARLOTTE MORRISON, in her individual capacity,
RED DOT & FEATHERS SMOKE SHOP, INC.,
RAYMOND HART, in his individual capacity,
SMOKING ARROW SMOKE SHOP, DENISE
PASCHALL, in her individual capacity, TONY D.
PHILLIPS, TDM DISCOUNT CIGARETTES, and
THOMASINA MACK, in her individual capacity,

          Defendants.
-------------------------------------------------------------------x

FINDINGS OF FACT AND
CONCLUSIONS OF LAW
NOT FOR PUBLICATION

08-CV-3966 (CBA)

AMON, United States District Judge:

       The City of New York (the "City") has brought a contempt action against defendants

Jesse Watkins Jr. ("Watkins Jr." or "Watkins")[1], Rodney Morrison ("Morrison") and Wayne

Harris ("Harris"), alleging that they have violated the injunction imposed by this Court in its

August 25, 2009 Order (the "Injunction" or "Order"). City of New York v. Golden Feather

Smoke Shop, Inc., No. 08-CV-3966, 2009 WL 2612345 (E.D.N.Y. Aug. 25, 2009). In its Order,

---

[1] The Court notes that there has been confusion in the parties' papers as to the identity of defendant Jesse Watkins; the City refers to him at various points as Watkins Sr. and counsel refers to his client as Watkins Jr. The Court hereby clarifies that the defendant named as violating the Injunction is Jesse Watkins Jr., son of Jesse Watkins Sr., father of Jesse Watkins III and Anitra Watkins, and husband of Ernestine Watkins. Hereinafter, the Court will refer to this defendant as Watkins or Watkins Jr. See Decl. of Anitra Watkins, at ¶ 2 (February 4, 2010) ("Antira Watkins Decl.").

this Court enjoined defendants Monique's Smoke Shop ("Monique's"), Ernestine Watkins, Wayne Harris, Peace Pipe Smoke Shop ("Peace Pipe"), Rodney Morrison, Sr., Charlotte Morrison, Red Dot & Feather Smoke Shop, Inc., Raymond Hart, Smoking Arrow Smoke Shop, Inc., Denise Paschall, TDM Discount Cigarettes, Thomasina Mack, Jesse Watkins Jr., and Tony D. Phillips "from selling unstamped cigarettes other than to members of the Unkechauge Nation for their personal use. . . [and] from selling cigarettes at prices below the CMSA minimum prices except in sales to members of the Unkechauge Nation for their personal use." Id. at *43. The Injunction took effect on September 25, 2009 (the "effective date"). The City alleges that since that time these defendants have evaded the mandates of the Injunction. As a result of violating the Injunction, the City claims that it is entitled to damages, including tax loss and attorneys' fees for bringing the instant motion. The City acknowledges that further briefing is required prior to any determination of damages.

For the reasons stated herein, the Court finds that the named defendants have violated the Injunction and are in civil contempt.

I.      Evidentiary Submissions

Before proceeding to the merits of the City's motion, it is appropriate to review the voluminous evidentiary submissions filed in this case. As explained below, the Court will give consideration to the City's submissions on December 9, 2009, February 19, 2010, February 26, 2010, March 23, 2010, May 3, 2010, and June 14, 2010. The Court declines to grant the City's June 1, 2010 request to further supplement the record by introducing a copy of a criminal complaint against the defendant Jesse Watkins Jr. and an unsigned supporting affidavit. The Court also strikes from the record the declaration submitted by Watkins on February 4, 2010.

**a.  Submissions prior to March 4, 2010 Oral Argument**

Prior to the Oral Argument held before the Court on March 4, 2010, the City made multiple evidentiary submissions. On December 9, 2009, the City submitted a Notice of Motion and Memorandum of Law in Support of its Motion for Contempt Against Defendants Jesse Watkins, Rodney Morrison, and Wayne Harris. (Mem. of L. of Pl. City of New York in Supp. of its Mot. for Contempt Against Defs. Jesse Watkins, Rodney Morrison and Wayne Harris (December 9, 2009); Notice of Mot. for Civil Contempt (December 9, 2009).) Accompanying those filings, the City submitted a Declaration by William H. Miller, assistant corporation counsel in the office of Michael A. Cardozo, Corporation Counsel of the City of New York, with attached Exhibits. (Decl. of William H. Miller (December 9, 2010) (the "Miller Decl.").) On February 19, 2010, the City submitted a Reply Memorandum, accompanied by the Declaration of Eric Proshansky, assistant corporation counsel, with attached exhibits. (Mem. of L. of Pl. the City of New York in Further Supp. of its Mot. for Contempt Against Defs. Jesse Watkins, Rodney Morrison and Wayne Harris and in Supp. of Mot. to Strike (February 19, 2010) ("City's Reply Mem."); Decl. of Eric Proshansky (February 19, 2010) (the "Proshansky Decl.").)

On February 26, 2010, the City filed a letter to the Court submitting supplementary evidence, including bank records pertaining to Wayne Harris' alleged ownership of Princess Rainbow Smoke Shop. (Letter from Eric Proshansky to Judge Carol B. Amon (February 26, 2010) ("City's February 26, 2010 Letter").) Harris, upon request, was afforded the opportunity to respond to the City's February 19, 2010 filings as well as the supplementary evidence filed on February 26, 2010. (See Defendant Wayne Harris' Sur-Reply in Opp'n to Pl.'s Mot. for Civil Contempt (February 23, 2010); Letter from Richard Levitt, Counsel for Wayne Harris, to Judge Carol B. Amon (March 2, 2010).) All parties were heard in response to the City's submissions at Oral Argument on March 4, 2010. Despite being given the opportunity, no defendant requested

an evidentiary hearing to further test the City's proof. Rather, it was principally their position that the facts submitted by the City failed to establish a violation of the Injunction.

### b. The City's March 23, 2010 and May 3, 2010 submissions

On March 23, 2010 and May 3, 2010, the City submitted additional evidence against defendants Watkins, Harris, and Morrison. (Letter from Eric Proshansky to Judge Carol B. Amon (March 23, 2010) (the "City's March 23, 2010 Letter"); Letter from Eric Proshansky to Judge Carol B. Amon (May 3, 2010) (the "City's May 3, 2010 Letter").) Defendants Harris and Watkins Jr. objected to this evidence and requested that the Court decide the merits of the City's contempt motion solely on the evidence before it at Oral Argument. Defendants suggest that these submissions were untimely and contrary to the orderly disposition of the case. Defendants also note that the Court did not specifically request additional evidence.

Defendants are correct in arguing that the City should not be allowed to endlessly supplement its briefing. For that reason, on May 6, 2010, the Court required that the City request leave before submitting any additional evidence. However, in deciding this motion, the Court will take into account the evidence included in the City's March 23, 2010 and May 3, 2010 submissions. The Court gave the defendants the opportunity to request a hearing on the additional evidence submitted since Oral Argument. (See Minute Entry for proceedings held before Judge Carol B. Amon: Pre Motion Conference held on June 1, 2010.) The defendants specifically declined such request. (Id.; Letter from Howard R Leader, Attorney for Defendant Jesse Watkins, to Judge Carol B. Amon (June 1, 2010).) The evidence contained in the March 23, 2010 submission includes direct statements by Harris and Morrison made during recorded telephone conversations (City's March 23, 2010 Letter 1-4) and an affidavit from John O'Brien, an Excise Tax Investigator, regarding an investigation conducted after oral arguments (id.,

4

Attach. 1, at 1-2).  The Court finds such evidence both helpful and relevant.  Likewise, the May 3, 2010 submission contains bank and travel records obtained pursuant to subpoenas from March and April 2010.  (City's May 3, 2010 Letter, Ex. A-H.)  While the strength of such evidence will be discussed below, the Court again finds such evidence helpful and relevant.

### c.  The City's June 1, 2010 submission

On June 1, 2010, the City requested leave to submit additional evidence, as required by the Court's May 6, 2010 Order.  (Letter from Eric Proshansky to Judge Carol B. Amon (June 1, 2010).)  The City sought to introduce a copy of a criminal complaint filed on May 11, 2010 in the United States District Court for the District of New Jersey against Watkins Jr. and others, as well as an attached Complaint Affidavit.  (Id.)  The Complaint Affidavit is unsigned.  For it to have any evidentiary import, the information would have to be further developed at a hearing.  Since these same allegations form the basis of a pending criminal action, further exploring these allegations here would unnecessarily complicate the instant proceeding.  For that reason, the Court denies the City's request to supplement the record with these documents.

### d.  The City's June 14, 2010 submission

On June 14, 2010, the City sought leave to submit additional evidence produced by Suffolk County National Bank on June 8, 2010, including a photocopy of the defendant's driver's license and bank records with identifying information about the "authorized signer" for Smoke Warehouse.  (Letter from Eric Proshansky to Judge Carol B. Amon (June 14, 2010).)  The City argued that these records show that Jesse Watkins Jr., and not his son Jesse Watkins III, was the "authorized signer" for Smoke Warehouse.  Watkins submitted an objection to the receipt of this evidence.  (Letter from Howard R Leader, Attorney for Jesse Watkins Jr., to Judge Carol B. Amon (June 18, 2010) ("Watkins June 18, 2010 Letter").)  He argues that the evidence

is not relevant, as the account was used only to purchase, not sell cigarettes. (<u>Id.</u> at 1-2.)  Watkins also criticizes the City's "piecemeal approach to litigation." (<u>Id.</u> at 2.)[2]

The Court will, however, accept the evidence submitted by the City in its June 14, 2010 letter.  This evidence is directly responsive to a specific question from the Court on June 1, 2010 regarding the strength of earlier evidence suggesting that Smoke Warehouse checks were signed by Watkins Jr., and not his son Jesse Watkins III.  The evidence is relevant in that it shows Watkins' involvement with a shop selling unstamped cigarettes.  The Court, therefore, will give consideration to the evidence submitted on June 14, 2010.

### e.   Watkins Jr.'s February 4, 2010 Declaration struck from the record

Defendant Jesse Watkins Jr. submitted a declaration accompanying his February 5, 2010 Memorandum of Law in Opposition to Plaintiff's Motion for Civil Contempt.  (<u>See</u> Mem. of L. in Opp. to Pl.'s Mot. for Civil Contempt (February 5, 2010) ("Watkins Opp."); Decl. of Def. Jesse Watkins Jr. (February 4, 2010) (the "Watkins Decl.").)  Defendant submitted the declaration even after repeatedly declining to answer questions on topics addressed in the declaration by invoking his Fifth Amendment privilege.  (<u>See</u> Miller Decl., Ex. 10, 7-15.)  For the reasons discussed below, the Watkins Declaration will be struck from the record.  The Court will, however, consider the additional evidence attached to the Watkins Memorandum in Opposition, including the February 4, 2010 declaration by Anitra Watkins.

Where a litigant has sought to use the Fifth Amendment to abuse or obstruct the discovery process, a district court can prevent prejudice to opposing parties and adopt remedial

---

[2] In his June 18, 2010 letter Watkins also requests an evidentiary hearing and trial pursuant to Rule 83.9 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York.  (Watkins June 18, 2010 Letter 6.)  Since the letter focuses largely on the City's June 1, 2010 submission of a criminal complaint pending in the District of New Jersey, the Court construes it as a request for a hearing on the complaint allegations. As the Court has already declined to accept the City's submission of the complaint, and since Watkins already had the opportunity to request an evidenciary hearing pertaining to other post-hearing submissions and declined the opportunity, the Court sees no need for further hearings at this time.

measures or impose sanctions.  United States v. Certain Real Prop. & Premises, 55 F.3d 78, 84-85 (2d Cir. 1995).  Courts "must be especially alert to the danger that the litigant might have invoked the privilege to abuse, manipulate or gain an unfair advantage over opposing parties."  Id. at 84.  Especially where the litigant appears to be employing a "manipulative cat-and-mouse approach," a trial court may be "entitled to bar a litigant from testifying later about matters previously hidden from discovery through an invocation of the privilege."  Id. at 83-84; see also In re Inflight Newspapers, Inc., Bankruptcy No. 807-71796-reg., 2010 WL 104594, at *6-*7 (Bankr. E.D.N.Y. Jan. 6, 2010) (striking defendant's affidavit submitted after he had refused to consent to a deposition and to answer any questions as to matters which he affirmed); Bourgal v. Robco Contr. Enters., 969 F. Supp. 854, 862 (E.D.N.Y. 1997) (barring defendants, who had obstructed discovery by invoking the Fifth Amendment, from creating issues of fact by submitting affidavits in opposition to plaintiff's motion for summary judgment); United States v. Inc. Vill. of Island Park, 888 F. Supp. 419, 431 (E.D.N.Y. 1995) (refusing to consider defendants'  affidavits because of their "'eleventh hour' attempt to avoid the consequences of asserting [the Fifth Amendment] privilege by submitting affidavits in opposition to the government's summary judgment motion").

At the same time, "those who invoke the Fifth Amendment and those who oppose them – should be afforded every opportunity to litigate a civil case fully and . . . exercise of Fifth Amendment rights should not be made unnecessarily costly. . . ." Certain Real Prop. & Premises, 55 F.3d at 83.  To strike the appropriate balance, courts will consider several factors including, "the nature of the proceeding, how and when the privilege was invoked, and the potential for harm or prejudice to the opposing parties."  Bourgal, 969 F. Supp. at 861.

As stated, Watkins submitted a declaration, dated February 4, 2010, in his opposition to the City's motion for civil contempt. In his declaration, Watkins seeks to offer evidence as to matters that the City had previously tried to question him about at his deposition on November 19, 2009. (See Watkins Decl. ¶¶ 5-12, 15-21.) At his deposition in November, Watkins refused to answer questions about Smoke Warehouse's operations, its profits from the sale of unstamped cigarettes, and its employees; about payments to Mauro Pennisi Inc. ("Pennisi"), a cigarette wholesaler, after the Injunction; or about his personal or family involvement in the business and any funds he may personally have contributed to Smoke Warehouse. (See Miller Decl., Ex. 10, 7-15.) However, in his declaration, Watkins Jr. has offered testimony about the closing of Monique's, his business interest in Smoke Warehouse, and payments made to Pennisi. (See Watkins Decl. ¶¶ 5-12, 15-21.)

After submitting the declaration, Watkins continued to invoke his Fifth Amendment privilege to avoid deposition. According to the Declaration of Eric Proshansky, on February 6, 2010, the City requested that Watkins appear for a continuation of his deposition. (Proshansky Decl. ¶ 20.) On February 9 and February 12, 2010, counsel for Watkins advised the City that Watkins would again assert his Fifth Amendment privilege. (Id.) On February 16, 2010, the City submitted a list of questions to which Watkins could stipulate he would assert the privilege. (Id.) On February 19, 2010, the day the City's Reply Memorandum was due, Watkins' counsel reversed his position and informed the City that he might partially waive his assertion of the privilege without specifying what questions Watson would be willing to answer. (Id. at ¶ 21.) The City declined the offer, as tardy and inconsistent. (Id.) Watkins never formally sought to revoke his invocation of the privilege with this Court, requested a reasonable accommodation to allow partial testimony, or even addressed the City's Motion to Strike in written filings. Because

this Court concludes that attempting to proceed in this fashion creates significant prejudice to the opposing party and is an abuse of the discovery process, the Court strikes the Watkins Jr. February 4, 2010 declaration from the record.

II.    Civil Contempt

**A. Legal Standard**

"[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt." Spallone v. United States, 493 U.S. 265, 276 (1990) (quoting Shillitani v. United States, 384 U.S. 364, 370 (1966)); see also Powell v. Ward, 643 F.2d 924, 931 (2d Cir. 1981) ("A court has the inherent power to hold a party in civil contempt in order to enforce compliance with an order of the court or to compensate for losses or damages."). A party can be held in civil contempt for failure to comply with a court order if, "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." Paramedics Electromedicina Comercial, Ltda v. GE Medical Systems, 369 F.3d 645, 655 (2d Cir. 2004) (quotations omitted). The defendant's conduct need not be willful, id., and the decision to hold a party in contempt is within the discretion of the district court. U2 Home Entertainment, Inc. v. Melody Elite Enterprises, Inc., No. 08-CV-3340, 2009 WL 763428, at *4 (E.D.N.Y. 2009).

As to the first prong, the court's order must "be specific in terms" and "shall describe in reasonable detail . . . the act or acts sought to be restrained." Drywall Tapers & Pointers, Local 1974 v. Local 530 of Operative Plasterers & Cement Masons Int'l Ass'n, 889 F.2d 389, 400 (2d Cir. 1989) (quoting Int. Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n, 389 U.S. 64, 76 (1967)). With respect to the second element, the party seeking a civil contempt sanction bears

the burden of establishing the offense by clear and convincing evidence. <u>Latino Officers Ass'n City of New York, Inc. v. City of New York</u>, 558 F.3d 159, 164 (2d Cir. 2009); <u>Levin v. Tiber Holding Corp.</u>, 277 F.3d 243, 250 (2d Cir. 2002). Moreover, "[i]n the context of civil contempt, the clear and convincing standard requires a quantum of proof adequate to demonstrate a 'reasonable certainty' that a violation occurred." <u>Levin</u>, 277 F.3d at 250. Finally, regarding the third element, "reasonable diligence requires a party to develop and execute reasonable effective methods of compliance." <u>Yurman Studio, Inc. v. Castaneda</u>, Nos. 07 Civ. 1241(SAS), 07 Civ. 7862(SAS), 2009 WL 454275, at *2 (S.D.N.Y. Feb. 23, 2009) (internal citations and quotations omitted). The Second Circuit has noted that "substantial compliance" is the appropriate standard in evaluating noncompliance in a contempt case. <u>Id.</u>

### B. The Court's Order of August 25, 2009: Clear and Unambiguous

The Court's Order of August 25, 2009 enjoins all defendants "from selling unstamped cigarettes other than to members of the Unkechauge Nation for their personal use . . . [as well as] from selling cigarettes at prices below the CMSA minimum prices except in sales to members of the Unkechauge Nation for their personal use." <u>Golden Feather</u>, 2009 WL 2612345, at *43.

Of the three defendants alleged to have violated the Injunction, only Jesse Watkins claims in his written filings that this Court's Order of August 25, 2009 is unclear and ambiguous.[3] Specifically, Watkins argues that the Injunction is ambiguous as to what constitutes "selling" unstamped cigarettes and with respect to the phrase "members of the Unkechauge Nation."

As stated above, to hold a party in civil contempt of a court order, the order must be clear and unambiguous. <u>See</u> <u>Chao v. Gotham Registry, Inc.</u>, 514 F.3d 280, 291 (2d Cir. 2008);

---

[3] During oral argument on March 4, 2010, counsel for defendant Wayne Harris also suggested that the Injunction's prohibition on "selling" cigarettes was not clear to the extent that it also prohibited possession. Harris' attorney did not press this argument, however, since the Court clarified, as it does again here, that mere possession, standing alone, is not sale. (<u>See</u> Oral Argument, March 4, 2010, at 29:6-23.)

Paramedics Electromedicina, 369 F.3d at 657. To be clear and unambiguous, an injunction need only "be specific and definite enough to apprise those within its scope of the conduct that is being proscribed." N.Y. State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1352 (2d Cir. 1989) (quotations omitted). A clear and unambiguous order "leaves 'no uncertainty in the minds of those to whom it is addressed,'" King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir. 1995) (quoting Hess v. New Jersey Transit Rail Operations, Inc., 846 F.2d 114, 116 (2d Cir. 1988)), and such parties, "'must be able to ascertain from the four corners of the order precisely what acts are forbidden.'" Id. (quoting Drywall Tapers, Local 1974 v. Local 530, Operative Plasterers Int'l Ass'n, 889 F.2d 389, 395 (2d Cir.1989)).

Watkins argues that the Order is ambiguous for failing to define what constitutes "selling" unstamped cigarettes. He contends that other acts, such as "purchasing" or "possessing" unstamped cigarettes, are not equivalent to "selling" and thus are not explicit violations of the Injunction, and that if the Court wanted to enjoin this type of activity it would have explicitly said so in its Order.

The injunction is clear as to what acts are prohibited. According to Merriam Webster's online dictionary, "selling" encompasses "giv[ing] up (property) to another for something of value (as money)," "offer[ing] for sale," "caus[ing] or promot[ing] the sale of [something]," "mak[ing] or attempt[ing] to make sales," and "influenc[ing] or induc[ing] to make a purchase." See Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/sell (last visited June 23, 2010). Watkins is correct in arguing that simple possession, standing alone, does not constitute "selling," but possession is not irrelevant.

Possession of large quantities of unstamped cigarettes may constitute *evidence* that an individual *intended* to sell or was in the process of selling such cigarettes. In the criminal

context, for example, it has been found that, "a conviction for possession with intent to distribute may be supported by evidence that the defendant carried a large quantity of drugs which most likely would exceed an amount desired for personal consumption." U.S. v. Gonzalez, No. 08 Cr. 363, 2010 WL 1924703, at *9 (S.D.N.Y. 2010) (quoting United States v. Gaviria, 740 F.2d 174, 185 (2d Cir. 1984)).  What Watkins is really attacking, then, is the sufficiency of the City's evidence.  It should also be noted that Watkins never requested clarification as to what the Injunction prohibits and clearly could have done so.  See Andre Matenciot, Inc. v. David & Dash, Inc., 422 F. Supp. 1199, 1209 n.3 (S.D.N.Y 1976) (suggesting that "[a]ny such infirmity of the order should [be] immediately brought to the court's attention upon its issuance, rather than at a time subsequent to the court's deadline for compliance").  This Court finds its use of the term "selling" clear and unambiguous.

Watkins also argues that the Court did not adequately define the phrase "members of the Unkechauge Nation."  As stated, the injunctive order need only "be specific and definite enough to apprise those within its scope of the conduct that is being proscribed."  Terry, 886 F.2d. at 1352 (quotations omitted).  A "member" is defined as, "one of the individuals composing a group."  See Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/sell (last visited June 23, 2010).  The Court's Injunction self-evidently prohibits sale to any individual other than those composing the Unkechauge Nation.

While the precise contours of membership in the Unkechauge Nation may be disputed in individual cases, it was not for this Court to resolve that question in crafting the contested injunctive relief.  In general, Indian tribes define for themselves who is and who is not a member. See Poodry v. Tonawanda Band of Seneca Indians, 85 F.3d 874, 880 (2nd Cir. 1995) (noting that absent limitation by treaty or statute, tribes have power to determine questions of membership).

Defendant himself explains that the Unkechauge Nation defines membership on the basis of blood relation. See Watkins Opp. 6; see also Gristede's Foods, Inc. v. Unkechuage Nation, 660 F. Supp. 2d 442, 452-53 (E.D.N.Y. 2009) (discussing eligibility for membership in Unkechauge Nation). If Watkins had provided evidence that numerous individuals were falsely claiming membership in the Ukechauge Nation prior to purchasing cigarettes, the question might be different, but none of the parties has provided any factual submissions contending that they made specific efforts to sell unstamped cigarettes only to members of the Unkechauge Nation.

Indeed, rather than seriously attacking the clarity of the Court's definition of membership, Watkins seems instead to press the separate and distinct argument that the pure impracticability of making an *ad hoc* determination as to whether a purchaser of cigarettes is in fact a member of the Unkechauge Nation makes it *impossible* for Watkins to comply with the Court's injunction. (Watkins Opp. 2, 5-6.) To successfully assert noncompliance with a court's order because of inability or impossibility, the alleged contemnor must prove "clearly, plainly and unmistakably" that "compliance is impossible." Huber v. Marine Midland Bank, 51 F.3d 5, 10 (2d Cir. 1995); see also Nat'l Basketball Ass'n v. Design Mgmt. Consultants, Inc., 289 F. Supp. 2d 373, 377 (S.D.N.Y. 2003) ("[C]ompliance must be beyond the realm of possibility, not just difficult to achieve, before a party will be exonerated in a contempt proceeding."). Aside from self-serving, conclusory assertions that he cannot comply with the Court's Injunction, Watkins has not offered any other proof of inability to comply with the Injunction, nor has he described any efforts to do so. Watkins might, for example, have presented evidence that either he himself or employees at Smoke Warehouse actually asked customers whether they are members of the Unkechauge Nation. He did not do so. Under the present circumstances, then, Watkins has not met his burden. See Nudelman v. Siag, No. 93 CIV. 2587 (PKL), 1996 WL

13

451379, at *3 (S.D.N.Y. Aug. 9, 1996) ("If an alleged contemnor fails to offer evidence of his inability to comply with the order, he has not satisfied his burden.").

Accordingly, the Court finds Watkins' argument that the Injunction is ambiguous and unclear as well as the related argument that compliance was impossible to be unavailing.

## C. Contempt of Named Defendants

The Court finds each of the named defendants in contempt of the Injunction based on the findings of fact discussed below. Such findings of fact are based on the evidence provided by the City in its factual submissions, as well as the additional evidence provided by the named parties.

### 1. *Defendant Jesse Watkins Jr.*

The City has provided clear and convincing evidence that Watkins Jr. contrived with his family members—daughter Anitra Watkins and son Jesse Watkins III—to evade the Injunction's mandates by reviving the moribund Smoke Warehouse in order to continue in the business of selling unstamped cigarettes. The City also provides clear and convincing evidence that Watkins violated the terms of the Injunction by delivering unstamped cigarettes off the reservation.

Watkins claims that the City has offered only circumstantial evidence that he has violated the Injunction and has failed to meet its burden. Watkins contends that he has been in full compliance with the Injunction, and that in order to distance himself from the cigarette business after the Injunction went into effect, he and his daughter, Anitra Watkins, closed his prior business, Monique's Smoke Shop ("Monique's"). (Watkins Opp. 2.) Further, Watkins claims that since closing Monique's, he has "not been actively involved in the cigarette business on the Poospatuck Reservation." (Id.) As will be discussed, even though much of the evidence

provided by the City is in fact circumstantial, it has more than met its burden in showing that Watkins was a participant in the sale of cigarettes after closing Monique's.

Prior to the effective date of the Injunction, defendant Jesse Watkins Jr. had managed and operated Monique's Smoke Shop full time since 1995. See Golden Feather, 2009 WL 2612345, at *9 ("Defendant Jessey Watkins has helped manage Monique's, full time, since 1995."). In that capacity, Watkins oversaw the business, made cigarette orders, and made direct sales to customers. See Miller Decl., Ex. 17, at 11:8-16. On August 25, 2010, this Court enjoined Monique's as well as defendant Watkins in his individual capacity from selling unstamped cigarettes other than to members of the Unkechague Nation. Golden Feather, 2009 WL 2612345, at *43. The Injunction took effect on September 25, 2009. Id.

While Monique's was apparently closed following the issuance of the Injunction (see Anitra Watkins Decl. ¶ 4), the City has provided clear and convincing evidence that Watkins Jr. continued to sell unstamped cigarettes to non-members of the Unkechauge Nation. Within a week of the effective date of the Injunction, the Watkins' family reopened "Smoke Warehouse," an entity formerly in the business of selling cigarettes which had been out of operation for several years. (See Miller Decl., Ex. 18.) On or about October 2, 2009, Anitra Watkins filed a certificate of discontinuance of business with the Suffolk County Clerk's Office for Smoke Warehouse, indicating the reason for discontinuance was "gift to younger brother," Jesse Watkins III. (See William H. Miller Decl., Ex. 5.) Around that same date, Watkins III, Jesse Watkins' son, filed a business certificate with the Suffolk County Clerk's Office indicating his intent to do business as Smoke Warehouse, located at 115A Poospatuck Lane, and certifying that he is the successor in interest to Anitra Watkins in that business. (See id., Ex. 6.) In her declaration, Anitra Watkins explains that she did so, conveying her interest in the business to her

younger brother Jesse Watkins III, "on the advice of . . . my father Jesse Watkins Jr." (Anitra Watkins Decl. ¶ 6.) Neither Jesse Watkins III nor Smoke Warehouse were bound by the express terms of the Injunction. <u>Golden Feather</u>, 2009 WL 2612345, at *43.

Smoke Warehouse soon became actively involved in the cigarette market, both buying and selling unstamped cigarettes. Between October 1, 2009, and October 22, 2009, Gutlove & Shirvint Inc. ("Gutlove") and Mauro Pennisi Inc. ("Pennisi") delivered tens of thousands of cigarettes to Smoke Warehouse. (<u>See</u> Miller Decl., Ex. 7, 7A.) The Court finds that the quantity of cigarettes purchased demonstrates that the cigarettes were not intended for mere personal use, nor would they reasonably have been sold only to members of the Unkechauge Nation. On September 28, 2009, Investigator Michelle Buczak entered Smoke Warehouse and purchased a carton of Marlboro "Red" cigarettes for $50.00. (<u>Id.</u>, Ex. 4.)[4] On October 2, 2009, she returned to the smoke shop where she observed three men working, and purchased another carton of cigarettes. (<u>Id.</u>) These facts amply demonstrate that Smoke Warehouse was selling unstamped cigarettes after the effective date of the Injunction.

The City has also provided clear and convincing evidence that Watkins Jr. played a role in such sales. Around October 13, Watkins Jr. purchased a cashier's check for $45,000, made payable to Pennisi. (<u>See</u> Miller Decl., Ex. 9; Anitra Watkins Decl. ¶ 7.) In her February 4, 2010 declaration, Anitra Watkins claims that this check was merely a loan intended to "assist [Jesse Watkins III] with opening his shop." (Anitra Watkins Decl. ¶ 7.) Anitra Watkins claims that the check was made payable to Pennisi simply "to make certain that my brother used the money on inventory for his store, and not on less beneficial endeavors." (<u>Id.</u>) The check, however, was

---

[4] Watkins' argument that the City has confused Smoke Warehouse and Monique's is unavailing. The City never contends that Investigator Buczak purchased cigarettes from Monique's. It was apparently the store clerk who confused the two businesses when he mistakenly told Investigator Buczak that the store was Monique's when it was really Smoke Warehouse. (<u>See</u> Miller Decl., Ex. 4, ¶ 3.)

made payable to Pennisi, a cigarette supplier, with the admitted purpose of adding to store "inventory." (Id.) None of Watkins' submissions suggest that such inventory was sequestered pending the outcome of appeal. Reasonably, such inventory could only have been directed toward ultimate sale. Indeed, as stated, Smoke Warehouse was at the time the check was procured actively selling unstamped cigarettes.

Additionally, the evidence suggests that Watkins had managerial responsibilities at Smoke Warehouse. In its May 3, 2010 letter, the City attached records from Suffolk County National Bank. (See id., Ex. F-H.) The records were subpoenaed in April 2010, and the bank has provided an affidavit certifying that the records produced are authentic business records. (See City's May 3, 2010 Letter, Ex. H.) The records show that Jesse Watkins was an authorized signatory for Smoke Warehouse (see id., Attach. G) that he signed wire transfer requests (see id., Attach. G-1), including one signed "Jesse Watkins, DBA Monique's Smoke Shop" (id., Attach. G-1, at CNY 02313), and that he did in fact sign checks on behalf of Smoke Warehouse (id., Attach. G-2.) After the Court questioned whether there was sufficient evidence to establish that Jesse Watkins Jr. had signed these checks, the City provided additional evidence that the signatory was in fact Jesse Watkins Jr., and not his son, Jesse Watkins III. (See Minute Entry to proceedings held before Judge Carol B. Amon: Pre Motion Conference held on 6/1/2010 ("City of New York to advise the Court as to whether it is submitting additional evidence as to the signature of Defendant Jesse Watkins on bank records").) The City received further records, authenticated by a representative of Suffolk County National Bank, which show that the authorized signatory, Jesse Watkins, shared the same Social Security number as the Defendant. (See Letter from Eric Proshansky to Judge Carol B. Amon (June 14, 2010).)

More significantly, Watkins' role in managing Smoke Warehouse is confirmed by his own statement. During processing, following a December 7, 2009 arrest, discussed below, Watkins Jr. stated to DTF Revenue Crimes Specialist John Prehm that he was the manager of Smoke Warehouse. (See Miller Decl., Ex 10A, ¶ 8.) Counsel for Watkins suggests that the Court should not rely on this statement. (See Tr. of March 4, 2010 Oral Arg. 23:17-24:22.) Counsel for Watkins contends that the officer did not take notes, and that, "it wouldn't be the first time that [a] member of law enforcement either misremembered or recast a statement to assist what he believed his cause." (Id. at 24:1-5.)[5] This general observation does not serve to undermine the officer's credibility. There is no evidence contradicting the officer's account and it is in fact corroborated to some extent by the bank records already discussed (see City's May 3, 2010 Letter, Ex. F-H). The Court finds the officer's recollection credible.

Watkins was also involved in at least one off reservation sale. On December 7, 2009, in or near Shirley, New York, Watkins Jr. was arrested and found in possession of at least 30 cartons of unstamped Newport cigarettes, which were being transferred to an individual parked in a Ford Explorer. (See Miller Decl., Ex 10A; Proshansky Decl., Ex. 13, at 50:4-9.) In addition to stating that he was the manager of Smoke Warehouse, Watkins also explained to DTF Revenue Crimes Specialist John Prehm that the unstamped cigarettes in his possession were packaged in a garbage bag at Smoke Warehouse which he carried to his vehicle, and that the cigarettes were being delivered to a friend at a location off the Poospatuck Reservation. (See Miller Decl., Ex 10A, ¶¶ 4-7.)

---

[5] Counsel, however, deposed the investigator, and the Court gave counsel the opportunity to cross-examine the investigator in an evidentiary hearing, an opportunity which was declined. (See Tr. of March 4, 2010 Oral Arg. 24:12-14. When asked whether the Court could accept that the statement was made by Watkins, counsel responded that the Court could do so. (See id. at 24:15-17).

Watkins' statements at that time provide further evidence that the cigarettes in question were being sold, not delivered as a gift. Prior to the issuance of the Injunction, Watkins Jr. explained during his deposition that, as he understood the law, it was illegal to sell a customer more than 49 cartons of cigarettes at a time, but legal to sell less than that number. (See Miller Decl., Ex. 18, at 22:19-23:23.) Watkins statements during his December 7, 2009 arrest, then, imply that he was actually selling the cigarettes. According to deposition testimony by Investigator Christopher Lannon, "[Watkins Jr.] said there's only 30 cartons in the bag that he was giving to his friend in the Ford Explorer, and he basically said, 'It's less than 49. I didn't think that would be a problem.'" (Proshansky Decl., Ex. 13, at 56:18-23.) If Watkins was not selling the cigarettes, the relevance of the number 49 is not apparent. The evidence shows Watkins to have been directly involved in at least one off reservation sale.

It is against this background that we consider Watkins' invocation of his Fifth Amendment privilege during his November 19, 2009 deposition. During that deposition, Watkins was asked numerous questions regarding his ongoing sale of unstamped cigarettes and his business relationship with Smoke Warehouse after the effective date of the Injunction. (See Miller Decl., Ex 10, at 6:19-17:4.)

In a civil action, a court may draw an adverse inference against a party who invokes his Fifth Amendment privilege and refuses to answer probative questions. See Baxter v. Palmigiano, 425 U.S. 308, 318 (1976); S.E.C. v. Suman, 684 F. Supp. 2d 378, 386 (S.D.N.Y. 2010) (explaining that adverse inference proper "because the invocation of the privilege results in a disadvantage to opposing parties by keeping them from obtaining information they could otherwise get"). "[T]he invocation of the Fifth Amendment cannot be the sole basis upon which a significant penalty is leveled against the party remaining silent." Monteleone v. Leverage

Group, No. CV-08-1986(CPS)(SMG), 2008 WL 4541124, at *7 (E.D.N.Y. Oct. 7, 2008) (citing Rockwood Computer Corp. v. Morris, 94 F.R.D. 64, 67 (E.D.N.Y. 1982)); see also In re Inflight Newspapers, Inc., 2010 WL 104594, at *6-7 ("If the Court determines that an adverse inference may be drawn, the moving party must present additional evidence; it cannot rely solely on the adverse inference."). However, "an adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader." Libutti v. United States, 178 F.3d 114, 120 (2d Cir. 1999).

The Court concludes that it is appropriate to make the adverse inference that Watkins Jr. has been in violation of the Injunction by selling unstamped cigarettes at Smoke Warehouse. As discussed above, the City has provided significant evidence that Watkins Jr. was involved in the operations of Smoke Warehouse, an entity which was actively purchasing and selling substantial quantities of unstamped cigarettes shortly after the effective date of the Injunction. Watkins Jr. himself suggested transferring the business to his son, Watkins III, with the effect that the business, though not Watkins Jr. personally, was no longer bound by the Injunction. Watkins provided funds for the purchase of cigarettes. By his own admission, he was involved in management. Additionally, Watkins has conducted at least one off reservation sale, delivering to another individual cigarettes that his own statements trace back to Smoke Warehouse.

Because of the significant evidence tracing Watkins Jr. to ongoing sales, along with the presumption imposed by his refusal to answer questions directly on point, the City has demonstrated "a 'reasonable certainty' that a violation [of the Court's Injunction] occurred," Levin, 277 F.3d at 250.

Likewise, it does not appear from the record that Watkins was "reasonably diligent and energetic in attempting to comply [with the Injunction.]" Chao v. Gotham Registry, 514 F.3d

280, 291 (2d Cir. 2008). Watkins argues that he has demonstrated such diligence by closing Monique's and advising his daughter, Anitra, to give the Smoke Warehouse business to his son, Jesse Watkins III. (Watkins Opp. 8-9.) As explained, however, Watkins continued to be actively involved in the sale of cigarettes after closing Monique's. Any affirmative steps taken by Watkins to comply with the injunction, therefore, are substantially outweighed by his other activities.

Accordingly, the Court finds defendant Jesse Watkins Jr. in civil contempt.

### 2. *Defendants Wayne Harris and Rodney Morrison*

The City has provided clear and convincing evidence that Wayne Harris and Rodney Morrison continued to be involved in the sale of cigarettes after the effective date of the Injunction. Because the evidence of post-Injunction sale is informed by the defendants' pre-Injunction creation, management and operation of the Princess Rainbow Smoke Shop ("Princess Rainbow"), the Court will first review their pre-Injunction relationship before separately discussing the post-Injunction evidence submitted against each defendant.

### a) **Pre-Injunction evidence of informal partnership between Wayne Harris and Rodney Morrison**

The City provides clear and convincing evidence that defendants Wayne Harris and Rodney Morrison were engaged in an informal partnership, jointly creating and managing the Princess Rainbow Smoke Shop ("Princess Rainbow") prior to the effective date of the Injunction. Neither party disputes that defendant Harris owned and managed Princess Rainbow prior to September 25, 2010. The City's evidence, including recorded conversations between Rodney Morrison, his employees, Wayne Harris and others, as well as bank records and Peace

Pipe memoranda, demonstrate that Rodney Morrison was instrumental to the establishment and operation of the store.

Until August 2004, Rodney Morrison was the manager of Peace Pipe Smoke Shop, an entity enjoined by the Order. See Golden Feather, 2009 WL 2612345, at *21, *43. After that date, he continued to control operations at Peace Pipe. (See, e.g., Proshansky Decl., Ex. 1, at 107 (12/09/08, 1:45pm)[6] (stating that he is in "control of basically two companies"); id. at 44 (12/2/08, 1:30pm) ("I have to now run two companies.").) He retained an office (id. at 104 (12/9/08, 1:45pm) (answering, "Mr. Morrison's office")), and he directed Peace Pipe's employees (see, e.g., id. at 69-74 (12/08/08, 1:39pm). He is actually identified as the "owner" of Peace Pipe Smoke Shop in various Peace Pipe documents. (See Proshansky Decl., Ex. 4, 5.) The evidence shows that he played a similar role at Princess Rainbow.

Telephone conversations between Rodney Morrison and Wayne Harris indicate that Morrison was involved in the construction, outfitting, and staffing of Princess Rainbow. Morrison and Harris discuss details from construction of the shop (Proshansky Decl., Ex. 1, at 13 (11/4/08, 2:00pm) ("spackling"); id. at 15-16 (11/5/08, 10:17am) (putting down the carpet, "mudding upstairs," and "blacktop[ing]"); id. at 93-99 (12/9/08, 12:52pm) (decorating the store with "red pails in the front" and installing black shelves and granite black countertops)), and hiring employees (id. at 21 (12/2/08, 10:01am) (Morrison says, "I need a secretary and – and a cashier" to work at Princess Rainbow); id. at 75-83 (12/8/08, 1:49pm) (Morrison discussing with Peace Pipe staff and Harris the possibility of hiring a student to work at Princess Rainbow)), to stocking Princess Pipe with inventory (id. at 35-36 (12/2/08, 1:30pm) (Morrison discussing with Peace Pipe staff the purchase of promotional sweatshirts for his "sister company"); id. at 106-07

[6] The transcribed phone calls annexed to the Proshansky Declaration in Exhibit 1 are referenced by citing to the corresponding page number(s) of Exhibit 1, and then followed by a parenthetical indicating the date and time of the phone call.

(12/9/08, 1:45pm) (Morrison discussing the purchase of Arrow brand cigarettes and identifying Princess Rainbow as his "new company")).

In the conversations, Harris and Morrison appear to view the company as an informal partnership. On October 31, 2008, the two discuss company finances, and statements by both suggest that the enterprise was a cooperative venture:

Morrison:    What you said to me? We still got a hundred with the inventory?

Harris:    I would say that we would still have a hundred in the company, even though we gave Mike twenty-five.

Morrison:    A hundred in the company? Hundred with − with the cigarettes?

Harris:    Yeah.

Morrison:    You're − you're confusing me now. Hundred with the cigarettes or a hundred extra money?

Harris:    No, from the hundred *we started the company with*.

(Id. at 9 (10/31/08, 6:20pm) (emphasis added).)

Subsequent recorded phone conversations reveal Morrison and Harris developing their joint venture. In an October 31, 2008 conversation, Morrison discusses his strategic vision:

Morrison:    Just let it keep growing, keep buying, you know, more stuff, buying more material, buying more cigarettes to put downstairs, buying – fixing the upstairs, put the furniture upstairs, you know what I'm saying? You let it – you let – let – let it take care of itself.

Harris:    No, I understand.

Morrison:    And pay some of the loans – pay some of the loans that are out. 'Cause, even me, I paid a little bit more money than I was supposed to be paying for this company, 'cause right now I gotta put more blacktop and more this and more that, you know what I'm saying?

Harris:    Yeah.

. . .

| Morrison: | Do you know how strong it would become a year from now?  In less than – in less than November? |
|---|---|
| Harris: | Yeah. |
| Morrison: | How strong it would be?  How many employees it would be? |
| Harris: | Yeah. |
| Morrison: | How much we've grown?  How much advertising we can do? |
| Harris: | Yeah. |
| . . . | |
| Morrison: | Now we can just – All we can do is just add on to it, make bigger stuff, and keep pushing – keep pushing the company 'cause the money is there. |
| Harris: | Yeah. |

(Id. at 2-8 (10/31/08, 6:20pm).)  In his calls to Harris and other colleagues, Morrison

consistently inquires about the joint venture, and how the business is developing financially.

(Proshansky Decl., Ex. 1, at 136 (4/25/09, 6:31pm) (Morrison asks Harris, "How we doing. How

we doing financially?"); id. at 147 (8/1/09, 5:34pm) (Morrison asks "Johnny," "how's business

going over there?"); id. at 151 (8/3/09, 5:17pm) (Morrison asks Harris, "How – how the two

stores doing, brother?").)  And in another conversation, Morrison talks to employees of Peace

Pipe, his store, about assisting Harris with the promotion of unstamped cigarettes:  "I'm giving

you an opportunity to make money on a side project that me and Mr. Harris is involved in . . . .

*He's my partner*, I'm not going against him for anybody."  (Miller Decl. ¶ 22 (12/24/08)

(emphasis added).)

The City's evidence shows not only cooperation, but a substantial financial investment by

Morrison in Princess Rainbow.  The City has produced a check dated October 6, 2008 from

Peace Pipe, Morrison's company, to "Princess Rainbow" in the amount of $20,000.  The check is

signed by Charolette Morrison, Rodney Morrison's wife, and endorsed "W. Harris." (See Proshansky Decl., Ex. 2.)  A November 29, 2008 memorandum on Peace Pipe letterhead, signed by Harris, evidences a loan by Peace Pipe to Harris/Princess Rainbow: "This is to verify that Peace Pipe Smoke Shop is loaning Princess Rainbow/Wayne Harris $64,740.81." (Proshansky Decl., Ex. 3.)  A document dated November 30, 2008, indicates that the $64,740.81 was used to purchase inventory for Princess Rainbow; Peace Pipe Executive Manager Carolina Suarez writes: "On November 30, 2008, I arrived at Princess Rainbow with 3 of my staff members and the cigarettes and merchandise in the amount of $64,740.81. We restocked, organized the smoke shop as best to my ability [sic] . . . ."  (Proshansky Decl., Ex. 4.)

The City has also provided the Court with a series of Peace Pipe documents, titled "Incident Report[s]," which appear to be essentially short memoranda and which show significant financial ties between Princess Rainbow and Peace Pipe.  Two Incident Reports dated December 23, 2008 show "Wayne Harris/ Princess Rainbow" received financial assistance from Peace Pipe in purchasing 6,000 cartons of Arrow cigarettes at $7.00 per carton for a total of $42,000, but paying only $15,000 with a check, leaving $27,000 due to Peace Pipe in 30 days.[7] (Proshansky Decl., Ex. 5, 6.)  A third report on the same date indicates that Peace Pipe gave Wayne Harris/Princess Rainbow 80 Arrow t-shirts for promotional use, and 120 cartons of various Arrow cigarettes. (Proshansky Decl., Ex. 7.)  Another Incident Report dated December 29, 2008 forgives the $27,000 balance from the December 23 order, stating, "[a]t this time you do not owe Peace Pipe any money in regards to the previous Arrow order." (Proshansky Decl., Ex. 8.)  And, a few days later, on December 31, 2008, Peace Pipe Smoke Shop loaned Princess

---

[7] Interestingly, on December 9, 2008, Morrison and Harris had discussed promoting Arrow cigarettes at both stores. (Proshansky Decl., Ex. 1, at 101-02 (12/9/08, 12:52pm).)

Rainbow/Wayne Harris $50,000, due back by June 1, 2009 (Proshansky Decl., Ex. 9); the check for the loan was endorsed "Princess Rainbow/Wayne Harris" (Proshansky Decl., Ex. 10).

Demonstrating even further financial entanglement between Harris and Morrison, the recorded phone conversations suggest that Harris is making payments and distributing money on Morrison's behalf. In one conversation in April 2009, Morrison asks "John": "Did Wayne call you for the money?", and John replies, "Yeah . . . It's all taken care of." (Id. at 132) (4/25/09, 2:03pm).) Later that day, Morrison and Harris talk:

Morrison:     . . . Let me take care of a few things before I forget.

Harris:       Yeah.

Morrison:     Give him 1500 more today please. Tell him it goes −

Harris:       Yeah.

Morrison:     It goes to the same girl.

Harris:       Okay.

Morrison:     Also, you get – you send that girl $500.00.

Harris:       Yeah, I did that yesterday.

. . .

Morrison:     . . . Please call John −

Harris:       Yeah.

Morrison:     − and I give that guy fifteen more hundred.

Harris:       Uh-huh.

Morrison:     What's the amount of (unclear) send some money to people.

Harris:       Yeah. That's alright.

Morrison:     It will never be more than (unclear) thousand dollars though.

(Id. at 135, 140 (4/25/09, 6:31pm).)  One month later, Morrison discusses with Charolette

Morrison other payments with Harris:

| | |
|---|---|
| Morrison: | You gave him the money? |
| Charolette: | Yes, I gave it to him. |
| Morrison: | Did he get the money from Wayne? |
| Charolette: | Yeah, I think Raina took care of that. |

(Id. at 142 (5/24/09, 8:53pm).)

In a conversation dated August 3, 2009, Morrison again inquires about the business and

offers Harris money if he needs it:

| | |
|---|---|
| Morrison: | You need some money? |
| Harris: | No, I'd rather do it like this, man. If you were home, then obviously, yeah, but you're not home.  I'd rather wait. |
| Morrison: | You sure? |
| Harris: | Yeah. |
| Morrison: | You sure? |
| Harris: | Yeah. |
| Morrison: | I'll give you some money, if you need it. |
| Harris: | Yeah, yeah. Nah, I'd rather do it like this. |

(Id. at 152 (8/3/09, 5:17pm).)

Given the breadth of such financial entanglement, it is not surprising that Morrison

expected his investment to produce personal profit.  As early as October 31, 2008, Morrison

reveals his understanding that Princess Rainbow was a shared asset.  He explains to Harris:

| | |
|---|---|
| Morrison: | Now, if you take 50% out – if you take a dollar, I want a dollar. So, I – I can't take a dollar out the company. I don't want to take any money out, I don't need to take any money out of the company, and I was hoping you |

<div style="margin-left: 2em;">

don't need no money out there for a year, either. Just let the company just grow.

Harris:        Yeah.

</div>

(<u>Id.</u> at 2 (10/31/08, 6:20pm).)

As late as August 3, 2009, Morrison reveals that he expects an ownership interest in Princess Rainbow. Discussing Harris and Princess Rainbow with a man referred to as "Johnny," he explains:

<div style="margin-left: 2em;">

Morrison:    Yeah. I guess – I guess, we're doing excellent then.

Johnny:    I think you guys – you guys are doing excellent too you hear.

Morrison:    Yeah. Well I – you know what'll happen, he has to give me – he doesn't know it yet, but I want – I want a piece of the company also.

Johnny:    I don't blame you.

Morrison:    Of course. I mean he'll – he'll give it to me. I'm not worried about that.

Johnny:    Worry about it later.

Morrison:    Yeah. We – but we'll – we'll both come in together, no question about that.

</div>

(<u>Id.</u> at 147 (8/3/09, 5:34pm).)

The evidence demonstrates that throughout this period, Morrison believed he had substantial control over Princess Rainbow. In a conversation with Mark Weinstein, a cigarette business colleague, Morrison explicitly refers to Harris as his partner in Princess Rainbow, though it is clear he means only an informal partner:

<div style="margin-left: 2em;">

Morrison:    . . . Let's keep in mind that right now I am in control of basically two companies. Princess Rainbow is my new company also.

Mr. Weinstein:    Ok.

Morrison:    I'm not sure if – if you're familiar with Princess – Princess Rainbow. Have you met with them yet?

</div>

| Mr. Weinstein: | I have not met with them.  And – |
|---|---|
| Morrison: | Have you seen – |
| Mr. Weinstein: | I have seen it.  I know – I know the facility. |
| Morrison: | The brand new build – the brand new building? |
| Mr. Weinstein: | The brand new building, but I have not gone in there at all. |
| Morrison: | Okay, yeah, I have – that's my company also, I'm involved with that company, I should say I have a partner there, unlike the Peace Pipe, there's no partnership really. |

(Id. at 107 (12/9/08, 1:45pm).)

Morrison's control over, his financial entanglement with, and his joint management of Princess Rainbow, therefore, provides clear and convincing evidence that prior to the effective date of the injunction, Morrison and Harris were involved in an informal partnership in operating Princess Rainbow for financial gain.

### b)   Post-Injunction Evidence of Continued Operations:

When the Injunction went into effect on September 25, 2010, it caused a significant disruption in the sale of cigarettes on the Unkechauge reservation.  Numerous stores, including Morrison's Peace Pipe Smoke Shop, were forced to close their doors.  In a conversation on the date that the Injunction went into effect, September 25, 2009, Harris tells Morrison "they closed a few stores today," and that he's "worrying about the store."  (Proshansky Decl., Ex. 1, at 164, 167 (9/25/09, 10:50am).) Morrison then tells Harris "to call Peace Pipe and offer them whatever help you can . . . ." (Id. at 166.)

Yet despite the fact that both Morrison and Harris were personally covered by the Injunction's prohibition on the sale of cigarettes, Princess Rainbow stayed in operation.  (See City's March 23, 2010 Letter 1-2 (10/25/09, 3:17pm) (Wayne Harris, stating, "the doors are still

open").)  On September 28, 2009, Detective John Jacobsen went to Princess Rainbow and observed multiple individuals entering the store and leaving with cigarettes.  (Miller Decl., Ex. 13, at 2.)  On October 2, 2009, DTF Investigator Buczak went to Princess Rainbow and observed individuals purchasing cigarettes.  She purchased one carton of "Signal" brand cigarettes for $20.00, after she was told that she could not get Marlboros on the Reservation.  (Id., Ex. 4, ¶ 5.)  On March 22, 2010, Excise Tax Investigator John O'Brien observed six persons driving to Princess Rainbow from off the reservation, entering and exiting the store, and driving off the reservation.  (City's March 23, 2010 Letter, Attach. 1, at 2.)   He observed individuals exiting the store holding plastic bags that appeared to contain cartons of cigarettes, and one customer holding a carton of Seneca brand cigarettes.  (Id.)  Accordingly, the Court finds the City's evidence that Princess Rainbow continued to sell cigarettes after the effective date of the Injunction clear and convincing.  The Court therefore turns to the individual defendants' role in selling unstamped cigarettes after the effective date of the Injunction.

### c)  Wayne Harris

The City has provided clear and convincing evidence that defendant Wayne Harris through his participation in Princess Rainbow continued to sell unstamped cigarettes other than to members of the Unkechuage Nation after the effective date of the Injunction.

As discussed above, there is overwhelming evidence that before the Injunction went into effect Harris actively managed and operated the Princess Rainbow Smoke Shop.  Conversations from late 2008 reveal Harris and Morrison regularly discussing the construction and renovation of the store, the hiring of employees, and deciding how to stock inventory.  Calls in 2009 indicate Harris is operating Princess Rainbow and maintaining its inventory.  (See, e.g., Proshansky Decl., Ex. 1, at 135-41 (4/25/09, 6:31pm) (Morrison and Harris discussing the store's

financial status and inventory); <u>id.</u> at 147-49 (8/1/09, 5:34pm) (Johnny tells Morrison that "[Harris'] doing excellent").)  By the end of 2008, Morrison characterizes Harris as "the boss there." (<u>Id.</u> at 88 (12/8/08, 6:05pm).)  And by August 2009, Harris admits to running two stores:

Morrison: "I heard you – I heard you running the whole ship and everything."

. . .

Morrison: How – how the two stores doing, brother?

Harris: Our store is doing very well. The store next door, I let them feed off our store.

. . .

Morrison: . . . How you doing?

Harris: I'm doing alright. They driving me crazy around here trying to run the two stores, but it's a good feeling, though, you know. . . .

(Id. at 151, 168 (8/3/09, 5:17pm).)

Documentary evidence also supports Harris' involvement in the ownership and management of Princess Rainbow.  As mentioned above, Harris signed Incident Reports relating to Peace Pipe's loans to Princess Rainbow, which referenced Harris as the "owner" of Princess Rainbow (Proshansky Decl., Ex. 6, 7, 8, 9); and also signed and endorsed checks on behalf of Princess Rainbow (Proshansky Decl., Ex. 18).

Harris, however, does not dispute the overwhelming evidence concerning his relationship with Princess Rainbow prior to the effective date of the Injunction.  Instead, Harris claims that he "divested his interest in Princess Rainbow promptly after the issuance of the injunction," referring to a September 22, 2009 amendment to Princess Rainbow's Suffolk County Business Certificate "removing" Harris' name from the certificate.  (Def. Wayne Harris' Mem. of L. in Opp. To Pl.'s Mot. For Civil Contempt ("Harris Mem.") 1.)  Harris's contention regarding the

formal removal of his name from the Business Certificate will be addressed below. However, Harris' actions on the same day indicate he did not relinquish all control over Princess Rainbow. Harris and his mother, Debra Harris, signed revised signature cards and certified resolutions authorizing Harris to remain a signatory on all of Princess Rainbow's accounts. (See Proshansky Decl., Ex.11.) Harris appears to have used such signatory power to his benefit. The City has provided records from Bank of America as well as US Airways indicating that Harris used Princess Rainbow funds to purchase airfare to Charlotte, North Carolina. (See City's May 3, 2010 Letter, Exs. D, E.) It is not evident from these submissions whether Harris' travel was business or personal; however, it suggests that Harris continued to have a close financial relationship with Princess Rainbow.[8]

Most significantly, Harris' physical presence at Princess Rainbow after September 25, 2009 indicates that he remained involved in the shop's activities following the effective date of the Injunction. One undercover officer, Detective John Jacobsen of the Suffolk County Police Department, visited Peace Pipe on September 28, 2009; there, he observed customers purchasing cigarettes and witnessed a male working behind the counter whom he later identified as Wayne Harris. (Miller Decl., Ex. 13, ¶¶ 5, 6, 7.) Likewise, DTF Investigator Buczak visited Princess Rainbow on October 2, 2009, observed many customers making purchases, and specifically observed a male working behind the counter who had previously been identified to her in a photograph as Wayne Harris. (Id., Ex. 4, ¶ 5.)

---

[8] The City also submitted to the Court bank records produced pursuant to a subpoena from Bank of America, indicating that Harris is designated as a 50% shareholder in Princess Rainbow Smoke Shop, Inc. (See City's Feb. 26, 2010 Letter, Ex. 2, at 9.) The document is titled, "Boss-Customer Profile," and appears to list business information, such as the number of people employed by Princess Rainbow, and the year the business was established. (See id. at 7.) It is not clear on the face of the document, however, when it was created or whether the listed information is up to date. The reference to stock ownership itself appears informal, listing the 50% shareholder simply as "Wayne." The Court, therefore, does not rely on this evidence.

Reinforcing the evidence of Harris' violation of the Injunction already noted is the adverse inference created by Harris' refusal to answer questions at his deposition regarding his involvement and ownership interest in Princess Rainbow and its sales of unstamped cigarettes. (See Miller Decl., Ex. 15, 5:8-16:14.) As discussed above, an adverse inference is appropriate here where Harris has refused to answer questions in response to probative evidence offered against him.

The Court is not persuaded that removing one's name from a store's business certificate signifies the removed person's complete detachment from the store and abandonment of an interest in its business activities. Harris has not cited any case law or legal authority to support this argument. Moreover, the Court notes that Rodney Morrison's name does not appear on the business certificate for Peace Pipe Smoke Shop (see Proshansky Decl., Ex. 16), but Morrison managed and operated the store until his arrest on August 3, 2004. Golden Feather, 2009 WL 2612345, at *11 ("Until August 3, 2004, Peace Pipe was managed by Charlotte Morrison's husband, Rodney Morrison" who "was arrested on August 3, 2004.") Likewise, Jesse Watkins' name does not appear on the business certificate for Monique's Smoke Shop, (see Proshansky Decl., Ex. 17), but he also managed the store. See Golden Feather, 2009 WL 2612345, at *9 ("Defendant Jessey Watkins has helped manage Monique's, full time, since 1995.").

Nor does removing Harris' name from the business certificate show that Harris, "diligently attempted to comply in a reasonable manner [with the terms of the Injunction.]" Paramedics Electromedicina, 369 F.3d at 655 (quotations omitted). A change in face, but not in substance cannot constitute reasonable diligence.

Accordingly, based on the clear and convincing evidence provided by the City and reinforced by Harris's refusal to answer directly related questions under oath, the Court finds Wayne Harris in civil contempt of the August 25, 2009 Order.

### d)  Rodney Morrison

The Court finds Rodney Morrison in civil contempt of the Injunction.  Like Wayne Harris, Rodney Morrison's actions must be judged in light of his pre-Injunction relationship with Princess Rainbow.  As described, the City has provided clear and convincing evidence that Wayne Harris and Rodney Morrison were engaged in an informal partnership, jointly creating, managing and operating Princess Rainbow, a business actively selling unstamped cigarettes to non-members of the Unkechuage Nation prior to the effective date of the Injunction. Throughout such period, Morrison routinely offered Harris and Princess Rainbow financial assistance.  Following the effective date, therefore, it was incumbent on Morrison to sever such financial relationship and terminate his efforts to sell unstamped cigarettes through Princess Rainbow.  The City has provided clear and convincing evidence, however, that not only did Morrison fail to sever his informal partnership with Harris, but he actually took positive steps to increase sales of unstamped cigarettes at Princess Rainbow.

Understandably, the conversations between Harris and Morrison become less specific following the effective date of the Injunction;[9] however, they indicate that an informal partnership still existed between the two.  In a conversation on September 25, 2010, Harris tells Morrison "they closed a few stores today," and that he's "worrying about the store."  Morrison then tells Harris, "to call Peace Pipe and offer them whatever help you can . . . [,]" suggesting

---

[9] Morrison himself reveals an understanding that the conversations were taped and could be introduced against him. (See City's March 23, 2010 Letter 2-3 (11/25/09, 5:23pm) (Morrison states, "I don't want to talk about on the phone, 'cause you know our – our phone conversations are taped a hundred miles an hour."  Harris replies, "I know.").)

ongoing cooperation.  (Proshansky Decl., Ex. 1, at 164, 166 (9/25/09, 10:50am).)  Likewise, in a

conversation on October 25, 2009, Morrison expresses concern about the status of the store:

> Morrison:      How – how else you doing besides that?  Everything else going?
>
> Harris:        I mean everything's alright.  Not – not – you know, not bad.  I can't
>                complain.
>
> Morrison:      Well, that's it, man, you know what I'm saying?
>
> Harris:        I can't complain.  *The doors are still open, so*.
>
> Morrison:      That's the most important thing.

(City's March 23, 2010 Letter 1-2 (10/25/09, 3:17pm) (emphasis added).)  More significantly,

Morrison continued to offer Harris assistance, likely financial.  In a conversation on October 28,

2009, Morrison, discussing Harris' financial difficulties including his home mortgage, suggests

that Harris contact him if he needs help:

> Harris:        . . . .  It's just, you know, it's hard to make money down there, man.  I
>                mean, like to be making money like every week, I mean, like a steady
>                flow.
>
> Morrison:      I would think you guys doing okay.  I – I – I have no idea how you guys
>                are doing over there.  I have no clue.
>
> Harris:        We're doing alright.  We doing alright.  I mean, I'm trying to take care of
>                you know.  Trying to do things, the best, you know, I can.
>
> Morrison:      If you need my help, write me and let me know . . . .  You know, get to
>                Lillian [Garcia, Morrison's former manager at Peace Pipe], she'll get it to
>                you.  You know what I'm saying?  . . .  If you need my help, let me know.

(City's March 23, 2010 Letter 2.)

Beyond evidence suggestive of an ongoing informal partnership between the two men,

the City provides evidence that Morrison took direct actions to further cigarette sales at Princess

Rainbow.  On September 27, 2009, Morrison actually called the manager at Peace Pipe to ensure

that a letter was posted outside of Peace Pipe directing customers to Princess Rainbow.  (Miller

Decl. ¶ 23 (9/27/09) ("[I]s there a letter on the door asking them to go to Wayne's?").) The presence of this letter was verified by Detective John Jacobsen of the Suffolk County Police Department, who went to Peace Pipe on September 28, 2009 and observed the following sign posted on the front door of the shop: "Sorry for the inconvenience we are closed until further notice. You can go to Princess Rainbow they will be honoring our prices. Princess Rainbow is located on Poospatuck Lawn 2 or 3 stores after Monique's." (Miller Decl., Ex. 13, ¶ 3.)

Morrison argues that "the City's proffer falls short of establishing the clear and convincing evidence required." (Morrison Mem. 5-6.) He claims that he could not dictate the operations of Princess Rainbow, nor was he involved, directly or by proxy, in any action to sell cigarettes in contravention of the Court's Order. Moreover, he suggests, any interest he acquired in Princess Rainbow was simply "a passive interest" and cannot be the basis for a violation of the injunction. (Id. at 2.) These arguments, however, must fail.

Morrison's own words and actions contradict his assertions. Prior to the effective date of the injunction, Morrison's "passive investment" provided him with substantial control over Princess Rainbow's activities. He made staffing and construction decisions. He worked with Harris to determine business strategy. Moreover, Morrison took affirmative steps to direct sales to Princess Rainbow. As stated, on September 27, 2009, Morrison actually called Peace Pipe to ensure that its customers were being directed to Princess Rainbow, where they could purchase unstamped cigarettes at Peace Pipe's prices.

Second, Morrison argues that he did not have "a continuing claim on some portion of the profits from Princess Rainbow" (Morrison Mem. 5), and did not enter into a formal partnership or other formal agreement that he would get a predetermined share, or any share, of the profits of Princess Rainbow. While no formal agreement is substantiated, Morrison's statements indicate

that he did, in fact, look to benefit financially from the business. (See, e.g., Proshansky Decl., Ex. 1, at 136 (4/25/09, 6:31pm) (Morrison asks Harris, "How *we* doing. How *we* doing financially?") (emphasis added).) Moreover, as discussed above, there is clear evidence that that Morrison and Harris were informal partners in Princess Rainbow. (See, e.g., Miller Decl. ¶ 22 (12/24/08) (Morrison talking to Peace Pipe employees about assisting Harris with promotion of unstamped cigarettes and noting, "I'm giving you an opportunity to make money on a side project that me and Mr. Harris is involved in . . . . He's my partner, I'm not going against him for anybody."); Proshansky Decl., Ex 1, at 127 (12/24/08, 12:55pm) (Morrison tells Harris, "I'm just trying to help you and be your partner now.").)

Finally, Morrison, by stipulation, invoked his Fifth Amendment right and refused to testify about: 1) his ownership interest in the Princess Rainbow, 2) any profits he might have received from Princess Rainbow's sale of unstamped cigarettes, 3) any funds he might have contributed to the construction or renovation of Princess Rainbow, 4) any joint business venture he may have had with Wayne Harris, 5) any participation in the sales or marketing strategies employed in connection with the sale of unstamped cigarettes, and 6) any ownership interests in other establishments located on the Poospatuck Reservation presently selling unstamped cigarettes to the public. (See Miller Decl., Ex. 14.) The Court may make the adverse inference that Morrison is in fact partners with Harris and has participated in the sales of unstamped cigarettes . The Court does not solely rely on this adverse inference. The City has offered sufficient evidence to support the conclusion that Morrison has acted in violation of the Court's Injunction.

Likewise, the evidence does not show that Morrison diligently attempted to comply with the Injunction. While Peace Pipe closed shop, Morrison specifically directed customers to

Princess Rainbow.  Accordingly, the Court finds that Rodney Morrison has violated the mandates of the August 25, 2009 Order and is in civil contempt.

III.  <u>Sanctions</u>

While finding the defendants, Jesse Watkins Jr., Wayne Harris, and Rodney Morrison in contempt of this Court's August 25, 2009 injunction, the Court defers the question of sanctions and damages.  The appropriate level of sanctions and damages, including compensatory damages, costs, and attorney's fees, has not been fully briefed.  The Court, therefore, will not address the issue of sanctions or award damages at this time.

IV.  <u>Conclusion</u>

For the reasons stated, the Court finds the defendants, Jesse Watkins Jr., Wayne Harris, and Rodney Morrison in contempt of the Court's August 25, 2009 injunction.  The Court will issue a separate order setting forth a briefing schedule and scheduling a hearing to determine the appropriate amount of damages to be awarded or sanctions to be imposed.  The Clerk of the Court is directed to enter judgment in accordance with this Order.

SO ORDERED.

Dated: Brooklyn, New York
       June 25, 2010

/S Hon. Carol Bagley Amon
_____
Carol Bagley Amon
United States District Judge