UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
THE CITY OF NEW YORK,

                Plaintiff,

     - against -

GOLDEN FEATHER SMOKE SHOP, INC., KIMO
SMOKE SHOP, INC., SMOKE AND ROLLS INC.,
SHAWN MORRISON, KIANA MORRISON, in her
individual capacity, MONIQUE'S SMOKE SHOP,
ERNESTINE WATKINS, in her individual capacity,
JESSEY WATKINS, WAYNE HARRIS, PEACE PIPE
SMOKE SHOP, RODNEY MORRISON, Sr.,
CHARLOTTE MORRISON, in her individual capacity,
RED DOT & FEATHERS SMOKE SHOP, INC.,
RAYMOND HART, in his individual capacity,
SMOKING ARROW SMOKE SHOP, DENISE
PASCHALL, in her individual capacity, TONY D.
PHILLIPS, TDM DISCOUNT CIGARETTES, and
THOMASINA MACK, in her individual capacity,

                Defendants.
----------------------------------------------------------------x

NOT FOR PUBLICATION
**CORRECTED MEMORANDUM
& ORDER**[*]
08-CV-03966 (CBA) (JMA)

AMON, Chief United States District Judge.

      The City of New York ("the City") initiated this action against the above-captioned

defendants, individuals and businesses engaged in the sale of cigarettes from the Poospatuck

Indian Reservation in Mastic, New York (the "Poospatuck Reservation" or the "Reservation"),

where members of the Unkechauge Indian Nation reside.  The City contends principally that

defendants violated the Contraband Cigarette Trafficking Act ("CCTA"), 18 U.S.C. § 2341 et

seq., and the Cigarette Marketing Standards Act ("CMSA"), N.Y. Tax Law § 483 et seq., by

engaging in bulk re-sales of cigarettes on which State and City taxes have not been paid

("unstamped cigarettes") to the public, either directly or through trafficker intermediaries.

---

[*] This corrected M&O reflects a change correcting a typographical error in the Court's original M&O issued March
29, 2013 (DE #457).  At page 11, the quotation taken from NYTL § 471(2) has been updated to reflect the proper
and complete language.  No change has been made to the substance of the opinion.

Several defendants have entered into consent orders pursuant to which they will no longer engage in or benefit from transactions with unstamped cigarettes.  (See DE #138, 398, 412, 418.) Against the remaining defendants, the City seeks a permanent injunction against their purchase, receipt, possession, sale, distribution, offer and advertisement of unstamped cigarettes, damages, civil penalties and attorney's fees.  In the midst of multiple rounds of motion practice and some discovery, the Court previously preliminarily enjoined defendants' sales of unstamped cigarettes other than to members of the Unkechauge Nation for their personal use.  City of New York v. Golden Feather Smoke Shop, Inc. ("Golden Feather II"), No. 08-CV-3966, 2009 WL 2612345 (E.D.N.Y. Aug. 25, 2009).  Although it has since revisited the viability of the preliminary injunction in light of various legal developments, the Court has declined to vacate or modify it. (DE # 353).  The parties now cross-move for summary judgment.

The City argues that it is entitled to summary judgment on the requested forms of relief because: (1) based on the undisputed facts, it has succeeded on the merits of its claims and demonstrated that defendants are likely to violate the CCTA and the CMSA in the future, thus warranting an injunction permanently enjoining defendants from engaging in any transactions with unstamped cigarettes; (2) the CCTA and CMSA authorize damages awards, and there are no disputed issues of fact with regards to the City's damages calculations; (3) the CCTA authorizes civil penalties, and defendants offer no legitimate basis for precluding them here; and (4) the CMSA authorizes attorney's fees and defendants' claims that the Court should not award them here are legally flawed.

Defendants Thomasina Mack and TDM Discount Cigarettes ("TDM") (collectively the "TDM defendants"), and Rodney Morrison, Charlotte Morrison and Peace Pipe Smoke Shop ("Peace Pipe") (collectively the "Peace Pipe defendants"), contend that the City's case should be

2

dismissed with prejudice because the City cannot establish that their alleged violations of the CCTA have actually or proximately caused harm to the City, raising an issue of the City's standing. They dispute, moreover, that the City has demonstrated that there are no genuine issues of material fact warranting summary judgment in its favor; that the City's request for damages was properly pleaded; and that attorney's fees are appropriate.

Defendant Raymond Hart, the owner of Red Dot & Feathers Smoke Shop, Inc., later known as Red Dot Smokes (collectively "Red Dot"), asserts that Hart's "good faith" belief that he was not violating any tax laws or criminal statutes shields him from CCTA liability and warrants exemption from or mitigation of the amount of any penalty or tax assessment.

For the reasons below, the Court grants the City summary judgment as to defendants' liability under the CCTA and the CMSA. With respect to relief, the Court (1) grants the requested permanent injunction against defendants' "purchase, receipt, possession, sale, distribution, offer and advertisement of unstamped cigarettes—even to tribe members for personal use"; (2) awards damages as against the Peace Pipe and TDM defendants; (3) awards civil penalties as against the Red Dot defendants, the amount of which will be determined at a later hearing; and (4) awards the City attorney's fees, the amount of which will be determined in the first instance by Magistrate Judge Joan M. Azrack by report and recommendation.

## BACKGROUND

### I.  The New York Cigarette Tax Scheme and Procedural History

To provide the necessary context, the Court sets forth below the relevant procedural history of this action and the legal developments in New York's cigarette tax scheme. Because the procedural history of this case intersects with a number of these legal developments— including decisions by the New York Court of Appeals and the Second Circuit and amendments

to the New York Tax Law ("NYTL")—the Court summarizes the progress of both in tandem in roughly chronological order.  Although the Court repeats some of the aspects of its prior orders in this action, some familiarity with the legal context and history of this litigation is assumed.

### A.  Basics of New York's Cigarette Tax Scheme

1.  *The imposition of cigarette tax on Native American cigarette sales*

Article 20 of the NYTL imposes a tax on all cigarettes possessed for sale or use in New York State, except for those cigarettes that New York is "without power" to tax.  See N.Y. Tax Law ("NYTL") § 471; Dep't of Taxation & Fin. of N.Y. v. Milhelm Attea & Bros., Inc., 512 U.S. 61, 64 (1994).  Under § 471, all cigarettes are presumed taxable "until the contrary is established."  NYTL § 471(1).  The City of New York also imposes its own cigarette tax pursuant to the New York City Administrative Code § 11-1302.

The State normally collects this cigarette tax through a system of prepayments where the cost of the tax is passed down the distribution chain.  The process begins with State-licensed "stamping agents," usually wholesalers, who buy cigarettes from manufacturers and then pre-pay the State tax by purchasing tax stamps from the State and affixing them to cigarette packages as evidence of payment.  This stamping system "mandates that these agents be the only entry point for cigarettes into New York's stream of commerce."  Oneida Nation of N.Y. v. Cuomo, 645 F.3d 154, 158 (2d Cir. 2011).   The tax burden is subsequently built into the cost of the cigarettes and thereby passed on to other wholesalers or retailers, such as defendants, and ultimately to the consumer.  See NYTL § 471(2); In re N.Y. Assoc. of Convenience Stores v. Urbach, 92 N.Y.2d 204, 209 (1998).  The purpose of this system is to prevent the widespread evasion of New York cigarette taxes.  See Milhelm Attea, 512 U.S. at 75.

Due to the unique status of Native American tribes, however, federal and state governments lack authority to tax cigarettes sold to members of Native American tribes for their own consumption.  New York is thus "without power" to tax cigarettes to be consumed on the reservation by enrolled tribal members, rendering cigarettes sold for that purpose tax-exempt. Milhelm Attea, 512 U.S. at 64.  "On-reservation cigarette sales to persons other than reservation Indians, however, are legitimately subject to state taxation."  Id.  The specific mechanism for collecting taxes on cigarettes sold on qualified reservations is set forth in § 471-e of the NYTL.

On June 21, 2010, after the City commenced this action, the New York State Legislature amended NYTL §§ 471 and 471-e, focusing in large part on clarifying the cigarette tax scheme as related to Native American cigarette sales ("Tax Law Amendments" of "Amendments"). Both the pre-amendment framework and the post-amendment framework of the NYTL as applied to Native American cigarette sales are discussed below.

2.   *The CMSA and the cost of cigarettes*

Through the CMSA, NYTL § 483 et seq., New York's cigarette tax is incorporated into a set of minimum price requirements for the sale of cigarettes within the state.  The CMSA "prohibits the sale of cigarettes below cost when the seller intends thereby to harm competition or evade taxes."  Lorillard Tobacco Co. v. Roth, 99 N.Y.2d 316, 319 (2003).  Specifically, the statute makes it unlawful for

> any agent, wholesale dealer or retail dealer, with intent to injure competitors or destroy or substantially lessen competition, or with intent to avoid the collection or paying over of such taxes as may be required by law, to advertise, offer to sell, or sell cigarettes at less than the cost of such agent wholesale dealer or retail dealer, as the case may be.

NYTL § 484(a)(1).  "Cost" is defined to include several components, which incorporates the added costs at each step in the supply chain.  Most relevant to this case is the "cost of the retail dealer," which is the minimum price at which a retail dealer may sell cigarettes to a customer.

The CMSA defines the "cost of the retail dealer" as (1) the "basic cost of cigarettes," plus (2) "the cost of doing business by the retail dealer," plus (3) "the cost of doing business by the agent with respect to the sales of cigarettes to retail dealers."  Id. § 483(b)(3)(A).  The "basic cost of cigarettes," meanwhile, is defined as "the invoice cost of cigarettes to the agent who purchases from the manufacturer . . . less all trade discounts, except discounts for cash, to which shall be added the full face value of any stamps which may be required by law."  Id. § 483(a)(1). Thus, the minimum price at which a retail dealer may sell cigarettes to a customer is the sum of the "basic cost of cigarettes," which includes any applicable taxes, and two markups, one for each step in the supply chain.  Accordingly, if a retailer is required to sell stamped cigarettes but instead sells unstamped cigarettes, that practice would result in sales of cigarettes below cost in violation of the CMSA.

**B.  The Pre-Amendment New York Cigarette Tax Landscape and Early Case History**

*1.  Pre-Amendment New York Tax Law*

In its pre-amendment form, § 471—the provision of the NYTL that imposes a tax on all cigarettes possessed for sale or use in New York State, except those the State is "without power" to tax—did not specifically exempt sales of cigarettes by or to Native Americans or retailers on Native American reservations.  Meanwhile, the pre-amendment version of § 471-e, the specific mechanism for collecting taxes on cigarettes sold on qualified reservations, explicitly exempted from the cigarette tax purchases made by "qualified Indians . . . for such qualified Indians' own use or consumption . . . on their nations' or tribes' qualified reservations."  NYTL § 471-e(1)(a)

6

(amended 2010).  It also made clear, however, that all other cigarette transactions remained

subject to the cigarette tax, payment of which would be evidenced "by means of an affixed

cigarette tax stamp."  Id.

   To ensure that qualified Native Americans had the opportunity to purchase cigarettes

exempt from tax, the statute established a coupon system.  Id. § 471-e(1)(b); see also id. § 471-

e(2).  The State Department of Taxation and Finance ("DTF"), however, failed to implement this

coupon system, and instead, on March 16, 2006, issued an advisory opinion stating that it would

continue to adhere to its longstanding non-enforcement or "forbearance" policy, permitting

untaxed cigarettes to be sold to and from Native American reservation retailers.  See City of New

York v. Milhelm Attea & Bros, Inc. ("Milhelm I"), 550 F. Supp. 2d 332, 337-38 (E.D.N.Y.

2008); State of New York Comm'r of Taxation and Fin., Advisory Opinion Petition No.

M06316A (Mar. 16, 2006).  Due to the DTF's inaction, § 471-e was essentially, as the Fourth

Department held, not "presently in effect."  See Day Wholesale, Inc. v. State of New York, 51

A.D.3d 383, 388-89, 856 N.Y.S.2d 808 (N.Y. App. Div. 2008).

   *2.   The City's Complaint and the Preliminary Injunction*

   On September 29, 2008, the City commenced the instant action under the above pre-

amended version of the New York tax scheme.  Seeking injunctive relief, penalties and damages,

the City alleged that defendants violated the CCTA, which prohibits the shipping, transporting,

receiving, possessing, selling distributing or purchasing of "contraband cigarettes," i.e., 10,000

or more unstamped cigarettes found in a State or locality that requires the affixation of a stamp

as evidence of payment of cigarette taxes.  Id, 18 U.S.C. §§ 2343(a), 2341(2).  By selling

cigarettes at prices that did not include the costs of applicable tax stamps, the City also claimed

that defendants sold cigarettes at prices less than the "cost of the retail dealer" in violation of the

CMSA.  On October 28, 2008, the City moved for a preliminary injunction against all

defendants, enjoining them from selling cigarettes that are unstamped or below CMSA-minimum

prices other than to members of the Unkechauge Nation for their personal use.  (DE #30.)

While this motion was pending, a number of defendants moved to dismiss all claims

against them on the grounds of sovereign immunity by virtue of their membership in, or

relationship with, the Unkechauge Indian Nation.  (DE #51, 54.)  The Court denied this motion

on March 16, 2009, finding that as private businesses and individual business owners, defendants

could not assert the defense of sovereign immunity as either arms of the Tribe or as Tribal

government officials acting in their official capacity.  City of New York v. Golden Feather

Smoke Shop, Inc. ("Golden Feather I"), No. 08-CV-3966, 2009 WL 705815, at *7 (E.D.N.Y.

Mar. 16, 2009).  The Court further concluded that the CCTA exemption for "Indian[s] in Indian

Country," 18 U.S.C. § 2346(b)(1), was not a bar to the City's CCTA claims.  Golden Feather I,

2009 WL 705815, at *12.

On August 29, 2009, following a four day evidentiary hearing in which the defendants on

this motion participated, the Court granted the City's request for a preliminary injunction

("Preliminary Injunction Order").  Defendants had challenged the imposition of an injunction

arguing that § 471-e, held previously by the Fourth Department in Cayuga Indian Nation of N.Y.

v. Gould, 66 A.D.3d 100, 884 N.Y.S.2d 510 (N.Y. App. Div. 2009), to not be in effect, was the

exclusive means for taxing reservation cigarette sales to non-Tribe members and that § 471 did

not provide an independent basis for taxation.  This Court, however, rejected the Fourth

Department's conclusions, predicting that the New York Court of Appeals would hold that § 471

imposed an applicable tax on cigarettes sold by reservation retailers to non-Tribe members and

that such cigarettes were required to bear tax stamps under New York law.  Golden Feather II,

2009 WL 2612345, at *29.  Accordingly, the Court imposed a preliminary injunction enjoining defendants from "selling unstamped cigarettes other than to members of the Unkechauge Nation for their personal use . . . [and] from selling cigarettes at prices below the CMSA minimum prices except in sales to members of the Unkechauge Nation for their personal use."  Id. at *43. The preliminary injunction took effect on September 25, 2009.

Following an appeal of the Preliminary Injunction Order, the Second Circuit entered a decision on March 4, 2010, certifying two questions to the New York Court of Appeals:

> (1) Does N.Y. Tax Law § 471-e, either by itself or in combination with the provisions of § 471, impose a tax on cigarettes sold on Native American reservations when some or all of those cigarettes may be sold to persons other than members of the reservation's nation or tribe?

> (2) If the answer to Question 1 is "no," does N.Y. Tax Law § 471 alone impose a tax on cigarettes sold on Native American reservations when some or all of those cigarettes may be sold to persons other than members of the reservation's nation or tribe?

City of New York v. Golden Feather Smoke Shop, Inc. ("Golden Feather III"), 597 F.3d 115, 120-21, 127-28 (2d Cir. 2010).  The Court of Appeals accepted these certified questions on May 11, 2010.  City of New York v. Golden Feather Smoke Shop Inc., 14 N.Y.3d 880 (2010).

**C.  The New York Court of Appeals' Cayuga Decision**

On the same day that it accepted the certified questions, the New York Court of Appeals entered a decision in the appeal of the Fourth Department's Cayuga decision, affirming, as modified, the opinion of the Fourth Department.  Cayuga Indian Nation of N.Y. v. Gould, 14 N.Y.3d 614 (2010).  Specifically, the court addressed "whether, absent the implementation of a statutory or regulatory scheme addressing the specific tax collection issues posed by the retail sales of cigarettes on Indian reservations, Nation retailers can be prosecuted for the possession and sale of untaxed cigarettes under Tax Law § 471."  Id. at 622.  At the outset, the court stated

that "[t]here is no question that Tax Law § 471 generally imposes a sales tax on cigarettes sold in

New York," explaining that "the issue in this case is not whether sales taxes are due when non-

Indian consumers purchase cigarettes from Indian retailers—they are." Id. at 647-48.

Nevertheless, the court held, criminal enforcement of § 471 against Native American retailers

was impermissible "without implementation of an appropriate calculation and collection

methodology." Id. at 650-54

   Despite this holding, the Cayuga Court specifically distinguished federal cases—

including this Court's decision in Golden Feather I—in which § 471's stamping requirement was

enforced pursuant to the CCTA against cigarette sellers making "bulk sales" of cigarettes "to a

party that intends to resell them off the reservation." Id. at 653.  In these cases, the court

explained

> the complex calculation and collection issues raised when a state attempts to
> collect sales taxes from Indian retailers (such as determining which cigarettes
> possessed for potential sale must contain tax stamps and which need not, and
> which sales are exempt from taxation because they involve Indian consumers and
> which are not) are not present . . . .

Id.  Because "[t]he federal tax exemption applies only to on-reservation sales to Indians for their

personal use" and not to Native Americans "engag[ing] in the wholesale distribution of untaxed

cigarettes destined for off-reservation sales," the court found that "the exemption is not

implicated . . . and no special calculation or collection mechanism like the system set forth in

Tax Law § 471-e is necessary because not a single pack of cigarettes involved in such a transfer

would be tax exempt."  Id.  In such cases, the court found, enforcement of § 471's taxing and

stamping obligations would be permissible.  Id.

**D.  The Tax Law Amendments**

On June 21, 2010, less than three months after the decisions in <u>Golden Feather III</u> and

<u>Cayuga</u>, the New York State Legislature enacted Senate Bill 8285/Assembly Bill 11515, which

amended § 471 and § 471-e and became effective on September 1, 2010.  The Tax Law

Amendments added language to § 471 that specifically exempts from taxation on-reservation

cigarette sales to qualified Native Americans for personal use.  The Amendments also clarify

§ 471's applicability to on-reservation cigarette sales to non-Tribe members, adding that "[t]he

tax imposed by this section is imposed on all cigarettes sold on an Indian reservation to non-

members of the Indian nation or tribe and to non-Indians and evidence of such tax shall be by

means of an affixed cigarette tax stamp."  NYTL § 471(1).  In addition, § 471(2) now explicitly

requires "[a]ll cigarettes sold by agents and wholesalers to Indian nations or tribes or reservation

cigarette sellers located on an Indian reservation [to] bear a tax stamp."

In conjunction with the new requirement that all cigarettes sold to tribes or reservation

retailers be stamped, the amended tax law creates three systems by which reservation retailers

can still obtain tax-free cigarettes for sales to Native Americans for their own use and

consumption.  First, § 471-e creates a "coupon system" whereby the State provides tribal

governments with a number of coupons each quarter based on the probable demand, which the

tribe can hold or distribute to retailers.  Tribes or retailers can use these coupons to buy stamped

cigarettes from a stamping agent without paying the tax that the stamping agent pre-paid in

affixing the stamp.  To recoup that tax, the agent then redeems the coupon with the State.

If the tribe declines to participate in the coupon system, § 471(5) creates a "prior

approval" system pursuant to which the State calculates the probable demand for cigarettes and

allots a certain number of cartons the tribe may sell tax free each quarter.  Any Native American

retailer may then purchase stamped cigarettes from a wholesaler without paying the applicable tax.  Before consummating the sale, the wholesaler will check whether there are still available cartons allotted to the tribe, deduct the number sold to the Native American retailer from that allotment, and later obtain a refund or credit for the tax pre-paid on those cigarettes.  Section 471(6) provides a third option, whereby Native American tribes enter into voluntary tax agreements with the State, subject to legislative or court approval.

### E.  Defendants' Motion to Vacate Preliminary Injunction

On June 25, 2010, a few days after the Tax Law Amendments were enacted, the City moved the Second Circuit to recall as moot the questions it had certified to the Court of Appeals, a motion defendants did not oppose.  The Second Circuit withdrew the certified questions on August 20, 2010 and remanded the case to this Court to consider further the viability of the preliminary injunction in light of the Court of Appeals' decision in Cayuga and the Tax Law Amendments "and for such proceedings as the District Court may determine necessary."  (See DE #297.)

Following the Second Circuit's remand, defendants moved to vacate or, in the alternative, modify the Court's Preliminary Injunction Order.  Defendants argued that Cayuga undermined the Court's prior holding that § 471 requires tax stamps to be placed on the cigarettes sold on the Unkechauge reservation to individuals not members of the Unkechauge Nation.  As a result, they urged the Court to rescind the injunction, or, in the alternative, to narrow its scope to permit retail (versus bulk) sales of unstamped cigarettes to non-members of the Unkechauge Nation.

In its Order of August 16, 2011 ("Golden Feather IV"), the Court declined to either vacate or modify the Preliminary Injunction Order.  (DE #353.)  Noting that in considering the validity of prospective injunctive relief, the Court "appl[ies] the law in effect at the time it

12

renders its decision," the Court considered the validity of the preliminary injunction in light of Tax Law Amendments, which, because they came into force after Cayuga, superseded any contrary holding in that case.  Golden Feather IV, DE #353, at 12-13.  The Court determined that the Tax Law Amendments resolved any doubt that cigarettes sold by defendants to non-Indians must bear tax stamps and thus, if anything, strengthened the validity of the injunction. Nonetheless, even under the pre-amendment NYTL, the Court found, the preliminary injunction remained valid.  Indeed, the Court of Appeals in Cayuga accepted the principle advanced by this Court that § 471 standing alone imposes a tax on cigarettes sold on reservations to non-Native Americans and recognized that enforcement of § 471's stamping obligation with respect to bulk sales destined for off-reservation sales was permissible.

The Court likewise denied defendants' alternative request for modification, determining that the Tax Law Amendments eliminated the need for any carve out for retail sales of unstamped cigarettes.  The Court noted further that, even under the pre-amendment Tax Law, modification would be inappropriate because defendants' history of bulk sales and efforts to avoid detection by law enforcement demonstrated the need for an injunction that swept broadly enough to prohibit "defendants' proven and continuing efforts to sell large quantities of cigarettes destined for resale."  Golden Feather IV, DE #353, at 22.

Since the Court's August 16, 2011 Order denying defendants' motion to vacate or modify the Preliminary Injunction Order, the parties have engaged in additional discovery, and several defendants have entered into consent orders pursuant to which they will no longer engage in or benefit from transactions with unstamped cigarettes.  (See DE #138, 398, 412, 418.)

**F.  The Current Cross-Motions for Summary Judgment**

On June 4, 2012, the City filed the instant motion for summary judgment against the

Peace Pipe, TDM, and Red Dot defendants as well as defendants Denise Paschall, Tony D.

Phillips, and Smoking Arrow Smoke Shop ("Smoking Arrow").  (City Mem. at 1.)  On July 13,

2012, the City entered into a consent order with defendant Paschall.  (DE #418.)  Both Paschall

and Smoking Arrow, the business owned by Paschall, were terminated from this action as a

result.  The City has taken no action with respect to Phillips, an employee of Smoking Arrow,

and he thus remains a part of this summary judgment motion.  However, since the Court

previously granted default judgment on the issue of Phillips' direct liability under the CCTA and

CMSA, the only issue remaining as against Phillips is the appropriate monetary relief.  The City,

as directed by the Court, has discussed this issue as part of its request for relief on this motion.

(DE #382.)  The Peace Pipe and TDM defendants, meanwhile, cross-moved for summary

judgment on July 13, 2012.

On December 13, 2012, the Court heard oral argument on the parties' motions.  At the

beginning of these proceedings, the City and the TDM defendants informed the Court that they

had reached a settlement agreement in principle and would be finalizing the terms in the next few

days.  (Transcript of Oral Argument held on December 13, 2012 ("1st OA Tr.") at 3-4.)  As a

result, the TDM defendants did not participate in the proceedings.  After being notified by the

City and the TDM defendants the next day that they were not, in fact, able to reach a settlement

agreement, the Court heard supplemental oral argument on matters pertaining specifically to the

City's claims against the TDM defendants on December 27, 2012.  (See DE # 451, 452.)

### G.  The __Morrison__ and __Milhelm II__ Decisions

While these cross-motions for summary judgment have been pending, two relevant court decisions have been issued: the Second Circuit's decision in United States v. Morrison, 686 F.3d 94 (2d Cir. 2012), and this Court's decision in the related case City of New York v. Milhelm Attea & Bros., Inc. ("Milhelm II"), No. 06-CV-3620, 2012 WL 3579568 (E.D.N.Y. Aug. 17, 2012).

#### 1.  _United States v. Morrison_

In Morrison, the Second Circuit addressed a challenge to defendant Rodney Morrison's RICO conspiracy conviction predicated on violations of the CCTA and NYTL § 471.  In upholding the conviction, the Second Circuit held that § 471 was not void for vagueness and that neither Cayuga nor the DTF's forbearance policy invalidated Rodney's conviction as a result of his bulk sales of unstamped cigarettes to non-Native Americans from Peace Pipe.  As this Court likewise noted Golden Feather IV, the Second Circuit pointed out that Cayuga held that "'large-scale cigarette bootlegging,' involving 'the wholesale distribution of untaxed cigarettes destined for off-reservation sales' constituted the core conduct that Section 471 criminalized."  686 F.3d at 102 (quoting Cayuga, 14 N.Y.3d at 652-53).  In addition, the Second Circuit held that for purposes of determining whether cigarettes are "contraband" within the meaning of the CCTA, it is "what is mandated by the state statute (Section 471), and not what is enforced by the state executive" that controls.  686 F.3d at 105.  Accordingly, because there was "no question that the conduct at issue . . . was made unlawful by the terms" of § 471, "New York's decision, for political and practical reasons, to refrain from enforcing Section 471 did not grant Morrison leave to sell massive quantities of untaxed cigarettes to non-Native Americans."  Id. at 105-06.  The court also observed that CCTA enforcement was particularly appropriate in that case since

15

the CCTA was designed "as a federal statutory 'back-up' for state-level enforcement regimes" in order to "provide federal support to states struggling with circumstances precisely like those that prompted New York's forbearance," including legal barriers related to tribal sovereign immunity as well as various forms of civil unrest and tribal resistance.  Id. at 106-07.

    2.  *City of New York v. Milhelm Attea*

This Court's recent opinion in Milhelm II addressed cross-motions for summary judgment in a parallel case brought by the City against cigarette wholesalers.  The Court found two wholesalers liable for CCTA violations for shipping in excess of 10,000 unstamped cigarettes to Native American reservation retailers, including defendants in this case, for re-sale to the public.  The Court also determined that civil penalties, the amount of which would be determined after an evidentiary hearing, were appropriate but denied summary judgment as to the City's CMSA claims and request for attorney's fees where the City "had abandoned all claims for substantive judicial relief under" the CMSA.  2012 WL 3579568, at *27, *36.

Not unlike defendants' arguments here, the wholesalers made numerous claims, including (1) that the City lacked standing to pursue its claims or, at a minimum, that there remained outstanding issues of fact as to whether the City was injured by cigarettes sold by them; and (2) that they were not liable for CCTA violations because, inter alia, state law did not require them to affix stamps to the cigarettes sold to reservation retailers and they did not possess the requisite scienter.

With respect to the wholesalers' standing challenges, the Court found each of the standing requirements easily satisfied.  First, it determined that the City unquestionably suffered an injury-in-fact because the "City was deprived of tax revenue to which it was entitled the minute the [wholesalers'] cigarettes were trafficked into the City limits."  2012 WL 3579568, at

*14.  The City did not, the Court found, need to "prove that the particular transactions involving the [wholesalers'] cigarettes directly 'replaced' transactions on which City taxes would have been collected."  Id.  The Court held further that the CCTA conferred an "expansive grant of standing" under which the "entry of contraband cigarettes into the City stream of commerce" is clearly a cognizable injury.  Id. at *15.  Second, the Court determined that because the trafficking of untaxed cigarettes from the Reservation into the City was entirely dependent on the wholesalers as "the sources of the unstamped cigarettes on which the contraband market . . . relied," they were "properly considered causes of the resulting injury."  Id.  In doing so, the Court rejected the argument that the existence of an "intermediate link," i.e., the reservation retailers, broke the chain of causation between the wholesalers' actions and the City's injury.  Id. at *15-*16.  Third, the Court held that the civil penalties sought by the City would deter future violations, prevent their recurrence, and provide some compensation, thereby serving as a form of redress for standing purposes.  Id. at *17.

In granting summary judgment as to liability under the CCTA, the Court noted that the reasoning of Morrison and this Court's decision in Golden Feather II foreclosed the wholesalers' contention that under the pre-amendment version of § 471 they were not obligated to affix stamps to any of the cigarettes they sold to reservation retailer.  See id. at *20-*22.  Neither Cayuga, the DTF forbearance policy, nor any other aspects of the tax law, the Court determined, shielded the wholesalers from liability or somehow relieved them of their obligation to precollect the cigarette tax.  Id.  The Court also rejected the wholesalers' contention that in order to demonstrate the existence of a CCTA violation, the City had to prove that the wholesalers knew that the cigarettes they sold were required by law to bear stamps.  See id. at *25.

17

## II. Relevant Facts

The following facts unless otherwise noted are undisputed.

### A. Peace Pipe Smoke Shop

Peace Pipe Smoke Shop, including its affiliated Internet, telephone, and mail-order operation Smoker's Den (collectively "Peace Pipe"), was a sole proprietorship owned by defendant Charlotte Morrison located on the Poospatuck Reservation. Peace Pipe sold cigarettes and tobacco products to members of the Unkechauge Nation and the public. (City 56.1 ¶¶ 1, 2 Peace Pipe 56.1 ¶¶ 1, 3; Hearing Ex.[1] 89.) Peace Pipe was managed and operated by defendant Rodney Morrison until his arrest on August 3, 2004. (City 56.1 ¶¶ 3, 4; Peace Pipe 56.1 ¶ 4; Hearing Ex. 89.) Both Charlotte and Rodney Morrison received profits from Peace Pipe throughout its existence until it closed on or around September 25, 2009 when the preliminary injunction went into effect. (City 56.1 ¶¶ 1, 5; Peace Pipe 56.1 ¶¶ 5, 39.)

Peace Pipe sold cigarettes continuously from 1994 through September 25, 2009, but only sold cigarettes via its Smoker's Den operation from 1997 through September 25, 2009. (City 56.1 ¶¶ 6, 7, 11-12; Peace Pipe 56.1 ¶¶ 6, 7, 11-12; Hearing Ex. 89.) All of the cigarettes that Peace Pipe sold were unstamped and sold at less than the minimum prices set forth in the CMSA, irrespective of whether the sale was made to a tribe member for personal use or to a member of the public. (City 56.1 ¶¶ 6-7, 10-11, 15; Peace Pipe 56.1 ¶¶ 6-7, 10-11, 15-16.) For a period of time, Smoker's Den received orders by telephone, mail, and the Internet, and shipped unstamped cigarettes to customers via UPS and the U.S. Postal Service. (City 56.1 ¶ 8; Peace Pipe 56.1 ¶ 8.) At least some of the customers purchasing cigarettes through Smoker's Den sent payment to Peace Pipe. (City 56.1 ¶ 9; Peace Pipe 56.1 ¶ 9.)

---

[1] All citations to "Hearing Ex." are to exhibits admitted into evidence at the preliminary injunction hearing and are annexed to the June 4, 2012 Declaration of Aaron M. Bloom.

Between 2004 and 2009, Peace Pipe purchased unstamped cartons of cigarettes from wholesaler Gutlove & Shirvint, Inc. ("Gutlove") in the following amounts:

| Year | Cartons |
|------|---------|
| 2004 | 1,961,760 |
| 2005 | 2,349,876 |
| 2006 | 2,049,533 |
| 2007 | 1,495,230 |
| 2008 | 726,350 |
| 2009 | 471,577 |

(City 56.1 ¶ 13; Peace Pipe 56.1 ¶ 13.)  It sold all or nearly all of those cigarettes.  (City 56.1 ¶ 14; Peace Pipe 56.1 ¶ 14.)

###### 1.   *Sales of unstamped cigarettes to New York City residents*

Peace Pipe sold thousands of cartons of unstamped cigarettes in thousands of transaction to New York City residents.  (City 56.1 ¶ 16; Peace Pipe 56.1 ¶ 16; Hearing Ex. 89.)  Between October 12, 2007 and March 14, 2009, Peace Pipe sold directly at least 437,567 cartons of unstamped cigarettes and at least 410,789 cartons of unstamped cigarettes via Smoker's Den to purchasers with New York City addresses.  (City 56.1 ¶¶ 17-19; Peace Pipe 56.1 ¶¶ 17-18; Proshansky Decl., Exs. 9-12.)

Between August 29, 2004 and June 30, 2006, Peace Pipe sold at least 231,838 cartons of unstamped cigarettes to purchasers with New York City addresses.  (City 56.1 ¶ 22; Peace Pipe 56.1 ¶ 22; Wanderer Decl. ¶¶ 7, 9-10; Proshansky Decl., Exs. 9-10.)  During this period, Peace Pipe also sold at least 11,683 cartons of unstamped cigarettes for $260,033 in twenty-one sales to Mari A. or an individual identified in Peace Pipe's records as Mari A.  (City 56.1 ¶ 23; Peace Pipe 56.1 ¶ 23; Wanderer Decl., Ex. 1, at 26; Proshansky Decl., Exs. 9-10.)  Mari A. is a cigarette trafficker who testified at the preliminary injunction hearing that she re-sold her Reservation purchases in the City.  (City 56.1 ¶ 23.)

19

Between July 21, 1999 and August 3, 2004, Peace Pipe made sales of unstamped cigarettes totaling: at least $8,437,162.76 to customers listed in Peace Pipe's records as having phone numbers with a "212" area code; at least $40,757,306.72 to customers listed as having phone numbers with a "718" area code; at least $632,206.38 to customers listed as having phone numbers with a "646" area code; at least $791,684.14 to customers listed as having phone numbers with a "347" area code; and at least $1,558,648.11 to customers listed as having phone numbers with a "917" area code.  (City 56.1 ¶¶ 26-30; Peace Pipe 56.1 ¶¶ 25-30; Wanderer Decl., Ex. 2; Proshansky Decl., Exs. 9-10.)  During this period, Peace Pipe also made at least ninety-two sales of unstamped cigarettes totaling $497,499.60 to Mari A. or to an individual identified in Peace Pipe's records as Mari A.  (City 56.1 ¶ 34; Peace Pipe 56.1 ¶ 34; Wanderer Decl., Ex. 2; Proshansky Decl., Exs. 9-10.)

**B.  TDM Discount Cigarettes**

TDM Discount Cigarettes ("TDM") was a sole proprietorship owned and operated by defendant Thomasina Mack located on the Poospatuck Reservation.  (City 56.1 ¶ 61; TDM 56.1 Resp. ¶ 61; Mack Dep., at 14-15.)  As with the cigarettes sold by Peace Pipe, all cigarettes sold by TDM were unstamped and sold at less than the minimum prices set forth in the CMSA, irrespective of whether the sale was made to a tribe member for personal use or to a member of the public.  (City 56.1 ¶¶ 62, 65; TDM 56.1 Resp. ¶ 62; Hearing Ex. 78; Mack Dep. at 47-49.)  TDM purchased unstamped cigarettes and sold hundreds of them at a time to individual customers until it was closed on or around August 2009.  (City 56.1 ¶¶ 64, 69; TDM 56.1 Resp. ¶¶ 64, 69.)  Although she disputes it here, Mack previously admitted during the criminal trial of Rodney Morrison that she also delivered cartons of unstamped cigarettes to customers off of the

Reservation.  (City 56.1 ¶ 70; Bloom Decl., Ex. 98 ("Morrison Trial Tr."), at 1075-76, 1158-59,

1216; TDM 56.1 Resp. ¶ 70.)

Records from wholesalers Gutlove and Mauro Pennisi, Inc. ("Pennisi") show that from

2005 through 2008, TDM purchased cartons of unstamped cigarettes from Pennisi in the

following amounts:

| Year | Cartons (Gutlove & Pennisi Combined) |
|------|------|
| 2005 | 45,021 |
| 2006 | 563,078 |
| 2007 | 822,636 |
| 2008 | 453,182 |

(City 56.1 ¶ 63; Hearing Exs. 24A, 91; Proshansky Decl., Exs. 1, 4.)  Mack testified at her

deposition that she purchased cigarettes from Pennisi for several years.  (Mack Dep. at 169.)

1. *Sales of unstamped cigarettes to New York City residents*

Ahman Aldabeshes, a cigarette trafficker, testified at the preliminary injunction hearing

in this case that in 2005 through early 2006 he purchased fifteen to eighteen 60-carton cases of

unstamped cigarettes from Mack five or six days per week.  (City 56.1 ¶ 66; Bloom Decl., Ex. D

("Aldabeshes Hearing Tr.") at 192-96, 202.)  These purchases were made, he stated, first at

Mack's home and then later at an off-Reservation site in Long Island.  (Aldabeshes Hearing Tr.

at 193.)  Aldabeshes further testified, and the TDM defendants concede, that he brought the

cigarettes he bought from TDM to New York City and re-sold them to grocery stores.  (City 56.1

¶ 67; Aldabeshes Hearing Tr. at 192-93; Transcript of Oral Argument held on December 27,

2012 ("2nd OA Tr.") at 27.)  He stated that he paid approximately $21 or $21.50 per carton.

(Aldabeshes Hearing Tr. at 194.)

Mari A. testified at the preliminary injunction hearing that in 2005 and 2006, on each of

twenty or thirty occasions, she purchased unstamped cigarettes indirectly from Mack at a 24-

hour storage facility on Route 106 in Long Island.  (City 56.1 ¶ 68; Bloom Decl., Ex. B ("Mari A. Hearing Tr."), at 37-39.)  The cigarettes were delivered to the storage unit by an individual named Dee, who, Mari A. testified she was told by Mack, was one of Mack's employees.  (Id.)  On each visit to the storage facility, Mari A. stated that she paid around $25 per carton for 600 to 900 cartons of unstamped Newports.  (Mari A. Hearing Tr. at 39.)  The TDM defendants do not dispute that Mari A. re-sold cigarettes she purchased to cigarette re-sellers in the City.  (City 56.1 ¶ 71; TDM 56.1 Resp. ¶ 71; Bloom Decl., Ex. B ("Mari Hearing Tr.") at 13-19; 2nd OA Tr. at 27.)  The TDM defendants contest that the cigarettes Aldabeshes and Mari A. purchased came from TDM or Mack.  (TDM 56.1 Resp. ¶¶ 66, 68.)

### C.  Red Dot & Feathers Smoke Shop, Inc.

Red Dot and Feather Smoke Shop ("Red Dot"), later known as Red Dot Smokes, a sole proprietorship, (collectively "Red Dot"), was owned by defendant Raymond Hart.  (City 56.1 ¶ 37; Red Dot 56.1 ¶ 37; Hart. Dep. at 6, 10, 24.)  As with the cigarettes sold by Peace Pipe and TDM, all cigarettes sold by Red Dot were unstamped and sold at less than the minimum prices set forth by the CMSA, irrespective of whether the sale was made to a tribe member for personal use or to a member of the public.  (City 56.1 ¶¶ 38, 42; Red Dot 56.1 ¶¶ 38, 42; Hearing Ex. 76; see Hart Dep. at 32-33, 80; Hearing Tr. at 308-10, 328-29.)

Records from wholesalers Gutlove and Pennisi show that from 2006 through 2009, Red Dot purchased cartons of unstamped cigarettes in the following amounts:

| Year | Cartons (Gutlove & Pennisi Combined) |
|------|--------------------------------------|
| 2006 | 121,449 |
| 2007 | 22,319 |
| 2008 | 722,994 |
| 2009 | 188,413 |

(City 56.1 ¶ 39; Hearing Exs. 7. 7A, 8; Proshansky Decl., Ex. 2.)  Red Dot sold all of these

unstamped cigarettes.  (City 56.1 ¶ 40; Red Dot 56.1 ¶ 40.)  Red Dot kept no records of cigarette

purchases, sales, or pricing.  (Red Dot 56.1 ¶¶ 39, 41-42, 46.)

     1.   *Sales of unstamped cigarettes to New York City residents*

Mari A. testified at the preliminary injunction hearing that she bought unstamped

cigarettes from Red Dot on five to ten occasions in 2008, purchasing 600 cartons at a time.  (City

56.1 ¶ 43; Mari Hearing Tr. at 35-37; see also Hart Dep. at 42, 82-83.)  She also stated that Red

Dot employees escorted her off the Reservation after she purchased unstamped cigarettes from

the store, and that she brought the cigarettes she purchased from Red Dot to the Bronx where she

re-sold them to cigarettes retailers there.  (City 56.1 ¶¶ 44-45, 71; Mari A. Hearing Tr. at 13-19,

36-37.)

DTF Investigator Byron Mars also testified at the preliminary injunction hearing that on

June 3, 2008, after he stated that he was planning to re-sell cigarettes in the City, Red Dot sold

him sixty cartons of unstamped Newport cigarettes for $26 per carton, a lower price than initially

quoted.  (City 56.1 ¶ 46; Bloom Decl., Ex. F ("Mars Hearing Tr.") at 308-10.)  Mars testified

further than on September 3, 2008, again after stating that he was planning on re-selling

cigarettes in the City, Red Dot sold him more than 90 cartons of unstamped cigarettes for $28.50.

(City 56.1 ¶ 46; Mars Hearing Tr. at 327-29.)

## DISCUSSION

## I.  Standard of Review

Summary judgment is appropriate if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law.  Fed. R. Civ. P. 56(c); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 23 (1986);

Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir. 1999).  The Court's function is not to resolve

disputed issues of fact but only to determine whether there is a genuine issue to be tried.  See

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The court is required to view the evidence in the light most favorable to the non-moving

party.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  Nevertheless, the non-

moving party cannot rest on mere allegations, speculation or denials.  See Fed. R. Civ. P. 56(e);

see also Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) ("The non-moving party may not

rely on conclusory allegations of unsubstantiated speculation."); Nat'l Westminster Bank USA v.

Ross, 676 F. Supp. 48, 51 (S.D.N.Y. 1987) ("[S]peculation, conclusory allegations, and mere

denials are not enough to raise genuine issues of fact.").  "Instead, the non-movant must produce

specific facts indicating that a genuine factual issue exists."  Scotto, 145 F.3d at 114 (internal

quotation marks and citation omitted).  No genuine issue exists unless there is sufficient evidence

favoring the non-moving party for a jury to return a verdict for that party.  If the evidence is

merely colorable, or is not significantly probative, summary judgment may be granted.

Anderson, 477 U.S. at 249-50 (citations omitted).

Where, as here, a court has made findings of fact and conclusions of law in granting a

preliminary injunction, those earlier findings and conclusions are not binding in deciding a later

summary judgment motion.  See Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981) ("[T]he

findings of fact and conclusions of law made by a court granting a preliminary injunction are not

binding at trial on the merits.");  Malletier v. Dooney & Burke, Inc., 561 F. Supp. 2d 368, 382

(S.D.N.Y. 2008) (finding preliminary injunction facts and conclusions not binding in summary

judgment determination since the two stages have different standards of proof and "findings of

fact at the preliminary injunction stage are not as fully fleshed out as at the summary judgment stage" (internal quotation marks and citation omitted)).  Nevertheless, the Court may, to the extent that they were supported by admissible evidence, consider them.  See Lanvin, Inc. v. Colonia, Inc., 776 F. Supp. 125, 127 (S.D.N.Y. 1991); Malletier, 561 F. Supp. 2d at 382; cf. Fed. R. Civ. P. 65(a)(2) ("[E]vidence that is received on the [preliminary injunction] motion and that would be admissible at trial becomes a part of the trial record . . . .").  Thus, although the Court "cannot mechanically grant judgment . . . based solely on the evidence taken at the preliminary injunction hearing," it can consider whether judgment is appropriate "in light of both (1) the evidence taken at the preliminary injunction hearing, as weighed by the Court, and (2) any additional evidence presented by the parties, taken in the best possible light for the [non-moving party]."  Caviezel v. Great Neck Pub. Sch., 814 F. Supp. 2d 209, 213 (E.D.N.Y. 2011).

## II.  Standing

The TDM and Peace Pipe defendants argue that the City's case should be dismissed because the City has failed to prove an injury and therefore does not have the requisite Article III standing to maintain this action.  (TDM/Peace Pipe Mem. at 6.)  Although not stated specifically as a challenge to standing, these defendants also contend that summary judgment is inappropriate because there remain issues of fact regarding whether defendants' sales of unstamped cigarettes caused the City's claimed injury.  (Id. at 21.)  As defendants acknowledge, they previously challenged the City's standing under the CCTA as a part of their motion to dismiss, a challenge that the Court rejected.  See Golden Feather I, 2009 WL 705815, at *8 n.6 (citing Milhelm I, 550 F. Supp. 2d at 340-41).  The Court has also already dismissed a challenge to the City's standing under the CMSA.  See Golden Feather II, 2009 WL 2612345, at * 36-*37.  Since, however, standing must be established "with the manner and degree of evidence required at the successive

stages of the litigation," Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992), the TDM and

Peace Pipe defendants suggest that the City has now failed to adequately demonstrate that it has

standing for purposes of summary judgment.  (See TDM/Peace Pipe Mem. at 7, 20.)

      To establish Article III standing, a plaintiff must demonstrate (1) "an injury in fact" that

is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical";

(2) "a causal connection between the injury and the conduct complained of" such that the injury

is "fairly traceable to the challenged action of the defendant"; and (3) a non-speculative

likelihood "that the injury will be redressed by a favorable decision."  Lujan v. Defenders of

Wildlife, 504 U.S. 555, 560-61 (1992) (internal quotation marks and citations omitted); see also

Rothstein v. UBS AG, 708 F.3d 82, 91 (2d Cir. 2013).

      The Court's standing analysis focuses on the CCTA since the majority of the parties'

arguments are concentrated on the claims under that statute and the two claims are interrelated.

The standing principles discussed below, however, apply equally to the City's CMSA claims.[2]

### A.  Injury-in-fact

      "Injury in fact is a low threshold" that "need not be capable of sustaining a valid cause of

action."  Ross v. Bank of America, N.A., 524 F.3d 217, 222 (2d Cir. 2008) (internal quotation

marks and citation omitted).  The party asserting jurisdiction bears the burden of clearly

establishing the facts that demonstrate standing.  Id.  Here, the City has shown through a variety

of evidence that defendants' CCTA and CMSA violations have caused it concrete injury in the

form of lost tax revenue.  In fact, in its Preliminary Injunction Order, the Court already

recognized that the trade in unstamped cigarettes, in which defendants play an integral part,

---

[2] As discussed above, the City's CMSA claims are bound up in the issue of defendants' obligations under the stamping system (i.e., to sell stamped cigarettes at a price that includes the cost of the tax stamps) and their downstream economic effect on the City.  As a result, the City's CMSA and CCTA claims rest largely on the same theory of injury and causation, rendering the standing inquiry substantially similar under both claims as well.

"likely deprives the City of significant tax revenue."[3] <u>Golden Feather II</u>, 2009 WL 2612345, at *23.

As summarized above, the City has presented extensive evidence that unstamped cigarettes sold by these defendants were trafficked in large quantities into the City from Poospatuck Reservation for many years.  Traveling into the City via a stream of commerce existing outside the stamping system, these cigarettes entered the City without payment of City cigarette taxes.  Indeed, the Peace Pipe defendants concede that they sold "thousands of cartons of [unstamped] cigarettes . . . to New York City residents."  (Peace Pipe 56.1 ¶¶ 10, 16.)  As the City points out, however, these cigarettes were subject to a City tax upon their very entry into the City, and the City was thus deprived of tax revenue to which it was entitled the moment defendants' cigarettes were trafficked into City limits.  <u>See</u> <u>Milhelm II</u>, 2012 WL 3579568, at *14; <u>see also</u> N.Y.C. Admin. Code § 11-1302(a) ("There is hereby imposed and shall be paid a tax on 1. All cigarettes possessed in the city for sale except as hereinafter provided; 2. The use of all cigarettes in the city except as hereinafter provided."); N.Y.C. Admin. Code § 11-1301(4) (defining "use" as "[a]ny exercise of a right or power, actual or constructive, [which] shall include but is not limited to the receipt, storage, or any keeping or retention for any length of time . . . ").

Defendants' claim, therefore, that the City cannot show injury under its original "displacement theory," i.e., that particular transactions involving defendants' cigarettes directly "displaced" taxable sales which would have otherwise occurred in the City, even if true, is beside

---

[3] Defendants' attempt to cast this statement as demonstrating that the Court had previously found that the City failed to prove that such a tax loss actually occurred is a misreading.  Although it is true that the City had not at that point made a sufficient showing to quantify the amount of the alleged tax loss, the Court's statement that the trade in unstamped cigarettes "likely deprives the City of significant tax revenue" merely refers to the Court's view that the amount of this tax loss was likely (but not proven to be) significant and not, as defendants suggest, a statement suggesting that the City only likely (but not actually) suffered a tax loss.

the point.  See Milhelm II, 2012 WL 3579568, at *14.  Although the Court will address whether

the City's evidentiary presentation is sufficient to demonstrate entitlement to a particular amount

of damages below, the lost tax revenue that accrued the minute defendants' cigarettes entered the

City "is clearly an injury sufficient for Article III purposes."  Id.  In addition, "[t]he presence of

cheap, untaxed cigarettes in the City . . . contributes to higher rates of smoking, thereby

threatening the health of City residents, another cognizable injury."  Id.

      Finally, as this Court highlighted previously in a fuller discussion in Milhelm II, it is

clear from the terms of the CCTA itself that the City has a cognizable injury here.  The injury-in-

fact inquiry "'is gauged by the specific common-law, statutory or constitutional claims that a

party presents.'"  Id. at *15 (quoting Fulton v. Goord, 591 F.3d 37, 41 (2d Cir. 2009)).  As the

Second Circuit has explained, in any "'suit on a statute'. . . the plaintiff must show both that he is

within the class the statute sought to protect and that the harm done was one that the statute was

meant to prevent."  Abrahams v. Young & Rubicam, Inc., 79 F.3d 234, 237 (2d Cir. 1996); see

Lerner v. Fleet Bank, N.A., 459 F.3d 273, 284 (2d Cir. 2006).  The statute at issue here, the

CCTA, confers an "expansive grant of standing that suggests that Congress intended to recognize

a broad class of public injuries caused by the contraband cigarette market" at all stages in the

distribution chain.  Milhelm II, 2012 WL 3579568, at *15.  The CCTA, furthermore, "delegate[s]

enforcement authority to state and local governments—those whose tax revenues are most

directly harmed."  Id.  Given the City's legitimate interest in minimizing tax revenue losses, "the

CCTA makes clear that the entry of contraband cigarettes into the City's stream of commerce is

a cognizable injury."  Id.

**B. Traceability/Causation**

To ensure that the alleged injury in fact is attributable to the defendant, a plaintiff must also "demonstrate a causal nexus between the defendant's conduct and the injury." Heldman v. Sobol, 962 F.2d 148, 156 (2d Cir. 1992); see also Denney v. Deutsche Bank AG, 443 F.3d 253, 263 (2d Cir. 2006). "Such a nexus is most easily shown if there is a direct relationship between the plaintiff and the defendant with respect to the conduct at issue." Rothstein, 708 F.3d at 91. The "fairly traceable" element, however, requires only that the plaintiff "establish that, in fact, the asserted injury was the consequence of the defendants' actions." Id. (internal quotation marks and citation omitted). Thus, a plaintiff "does not lack standing simply by virtue of the indirectness of his or her injury," Heldman, 542 F.2d at 156, but can establish the requisite causal nexus by demonstrating "the existence of [an] intermediate link between the [defendants' actions] and the injury," Pacific Capital Bank, N.A. v. Connecticut, 542 F.3d 341, 350 (2d Cir. 2008) (internal quotation marks omitted). See Heldman, 542 F.2d at 156 ("[P]laintiffs' injury would satisfy the fairly traceable requirement if they had alleged all the links in the chain of causation." (discussing Allen v. Wright, 468 U.S. 737 (1984)); cf. Bennett v. Spear, 520 U.S. 154, 168-69 (1997) ("[The Government] wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation.").

At the outset, the Court notes that despite language to the contrary in their briefing papers, the Peace Pipe defendants concede that, pursuant to remote orders placed through Smoker's Den, they sold and shipped via UPS or USPS unstamped cigarettes directly to customers with New York City addresses. (Peace Pipe 56.1 ¶ 18.) Accordingly, any claim of a lack of evidence that the Peace Pipe defendants "actually or proximately caused the unstamped

cigarettes to become present in the City" is, at least in regards to the Smoker's Den shipments, simply incorrect.  (TDM/Peace Pipe Mem. at 21.)

In cases where they did not themselves ship, deliver, or otherwise transport unstamped cigarettes into the City, defendants' challenge to the sufficiency of the City's evidence of causation fares no better.  Defendants argue that the City cannot prevail on its motion for summary judgment because (1) the bootleggers, not defendant retailers, are "the possessor of the unstamped cigarettes in New York City, who would be responsible for the cigarette tax" (id. at 21); and (2) "the City cannot prove that defendants' sales of unstamped cigarettes alone caused its harm," which, at the very least, creates a triable issue of fact with respect to causation (id.. at 22).  These arguments appear to raise not just Article III and statutory standing concerns but also intertwined questions of statutory causation and liability.  Regardless of how they are construed, however, neither argument is persuasive.

1.  *Constitutional requirement*

The City has amply met its burden of demonstrating a causal nexus for purposes of constitutional standing, "a 'lesser burden' than the requirement that it show proximate cause."[4] Rothstein, 708 F.3d at 92 (quoting Lerner v. Fleet Bank, N.A., 318 F.3d 113, 122 n.8 (2d Cir. 2003)).  First, the Court notes that it has previously identified a causal connection between defendants' conduct and the City's injury in the context of issuing the preliminary injunction. Golden Feather II, 2009 WL 2612345, at *22 ("[D]efendants' considerable sales of unstamped cigarettes injure the City.").  Although defendants do not offer any new evidence that

---

[4] Accordingly, defendants' arguments concerning the City's ability to demonstrate proximate cause are not directly relevant to the Article III analysis and not specifically addressed here.  As the Second Circuit has recently made clear, "'for purposes of satisfying Article III's causation requirement, we are concerned with something less than the concept of proximate cause.'"  Rothstein, 708 F.3d at 92 (quoting Connecticut v. Am. Elec. Power Co., 582 F.3d 309, 346 (2d Cir. 2009)).

undermines that earlier conclusion, the Court nevertheless addresses defendants' concerns about the City's proof of causation as it is raised here.

Defendants' claim that the chain of causation in the City's case stops with the actions of the bootleggers improperly heightens the City's burden on standing.  As this Court held in Milhelm II, which also addressed standing at summary judgment, "that there [is] an 'intermediate link' . . . between these defendants' sales and the City's injury does not defeat the causation component of the standing inquiry."  2012 WL 3579568, at *15.  The wholesaler defendants in that case, the Court readily concluded, were "[a] cause[] of the [City's] injury" because the chain of events resulting in that injury—the same injury claimed in this case—was "entirely dependent on" the wholesalers' sales of unstamped cigarettes to reservation retailers. Id.  The City's injury was, accordingly, "fairly traceable" to the wholesalers' sale of unstamped cigarettes.  Id.; see also Heldman, 962 F.2d at 156; Bennett, 520 U.S. at 169.

Given that the defendant retailers here, the "intermediate link" in Milhelm II, are farther down the chain of causation than the wholesalers, the Court is hard-pressed to see how the City's injury is not likewise "fairly traceable" to the actions of these defendants.  In any event, the City's substantial evidentiary showing in this case demonstrates that defendants are no less integral than the wholesalers to the trafficking of contraband cigarettes into the City.  As this Court found previously, defendants' "principal business model, and the reason customers visit them from throughout the New York Metropolitan Area, is to provide customers with the opportunity to purchase cigarettes at significantly reduced prices."  Golden Feather II, 2009 WL 2612345, at *6.  In this capacity, they were the retail source of unstamped cigarettes for bootleggers (or in the case of Smoker's Den the direct source for City customers) who transported and resold the cigarettes in the City.  They served, as a result, as an indispensable

31

bridge connecting the wholesalers to the City, with the bootleggers serving as merely another "intermediate link" in the chain of causation.  That role in this series of transactions is sufficient causal nexus for constitutional standing purposes.

The Peace Pipe and Red Dot defendants make no real effort to dispute that they supplied this causal link.  Indeed, at oral argument, the Peace Pipe defendants conceded that, beyond their Smoker's Den sales to residences in the City, at least some of the unstamped cigarettes they sold ended up in City.  (1st OA Tr. at 22-23.)  The Red Dot defendants' dispute with the City's evidence, meanwhile, is based mainly on their lack of recollection or records and their "good faith" belief in the legality of their sales, neither of which is sufficient to defeat summary judgment.  (Red Dot 56.1 ¶¶ 43-46; 1st OA Tr. at 44, 46.)  Although Hart's counsel attempted at oral argument to create an issue of fact by asserting that Hart did not know Mari A. and did not "know if, in fact, [the cigarettes she bought] from his shop were brought back into the City," he conceded that his client simply did not know whether or not Mari A.'s testimony regarding her purchases of unstamped cigarettes from Red Dot was true.  (1st OA Tr. at 45.)  These general claims of ignorance do not create a genuine dispute.  (Id. at 46.)

The TDM defendants make the sole attempt, albeit a feeble one, to generate a genuine issue of material fact as to their role in the trafficking of cigarettes into the City.  They offer, however, only vague denials, conjecture, and generalized attacks on the credibility of the City's evidence and put forth, despite their burden on summary judgment, almost no facts or counter-evidence properly supported in the record.  (See TDM/Peace Pipe 56.1 ¶¶ 66-68.)  In particular, they question the testimony of Mari A. and Aldabeshes in light of evidence that they suggest casts a general shadow over these witnesses' credibility.  Although credibility issues are normally resolved by a jury based on the in-court testimony of witnesses, see Jeffreys v. City of

New York, 426 F.3d 549, 551 (2d Cir. 2005), where, as here, the non-moving party "has made a properly supported [summary judgment] motion," general attacks on a witness's credibility are not sufficient to defeat the motion.  See Crawford-El v. Britton, 523 U.S. 574, 600 (1998); see also Island Software & Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 261-62 (2d Cir. 2005) (citing Crawford-El, 523 U.S. at 600) ("Broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact."); McCullough v. Wyandanch Union Free Sch. Dist., 187 F.3d 272, 280 (2d Cir. 1999). The non-moving party in such cases must identify affirmative evidence supporting its version of events, i.e., evidence that establishes a genuine issue of material fact.  See Island Software, 413 F.3d at 261-62.

Defendants' efforts on this motion fail to generate the necessary genuine dispute.  First, as discussed above, their broad credibility attacks on Mari A. and Aldabeshes are insufficient to create a triable issue.[5]  Their claim that the necessary issue of material fact is created by the discrepancies between the testimonies of Mari A. and Aldabeshes and that of Mack likewise fails.  Indeed, close inspection of the testimony and the record establish that Mack's own testimony and other evidence in the record largely confirm the relevant testimony of Mari A. and Aldabeshes.

With respect to Mari A.'s testimony, the Court notes first that Mack's testimony that she never conducted business with Mari A. and met her on a single occasion creates only an illusory discrepancy with Mari A.'s assertion that she purchased cigarettes from Mack on numerous

---

[5] The TDM defendants claim that Mari A.'s testimony is unreliable because: (1) she has a criminal history involving drug abuse and crimes of fraud; and (2) she has received monetary compensation in return for cooperating with the DTF.  (TDM/Peace Pipe Mem. at 23-24.)  They argue in addition that Aldabeshes is not credible because: (1) he has a criminal history including felonious assault and fraud for which he lost his resident alien status; and (2) he struck a deal with City prosecutors to a sentence of time served and the forfeiture of $90,000 in exchange for his promise to act as a confidential information.  These attacks identify no facts that are in dispute and are an insufficient basis for denying summary judgment.  Indeed, the Court rejected similar generalized credibility attacks on the City's witnesses, including Mari A., as insufficient to create a genuine issue of material fact to defeat summary judgment in Milhelm II.  2012 WL 3579568, at *17.

occasions.  (Mack Dep. at 184-85.)  In fact, their testimonies are consistent: Mari A. testified that

she made purchases of 600 to 900 cartons of cigarettes from Mack not directly but rather through

an off-storage location stocked by a person called "Dee," the same name as an individual to

whom Mack testified she sold 600 cartons of unstamped cigarettes every two days over

approximately the same time period.  (Mari A. Hearing Tr. at 37-39; Mack Dep. at 53-54, 192-

93.)[6]  Independent evidence, furthermore, confirms Mari A.'s account of her off-Reservation

transactions with Mack via Dee.  A New York State DTF investigative report from February

2006, for example, recorded a DTF officer's observations of large objects in black plastic bags

being loaded into a trailer registered to Mack and another vehicle at a storage facility in

Hicksville, NY.  (Hearing Ex. 60C.)  The officer subsequently stopped the second vehicle,

pursuant to which he seized hundreds of cartons of unstamped cigarettes found in the black bags

as well as a note stating: "Dee, Tomorrow the order will be early!  I will call at 11 am to get the

mix."  (Id.)  One of the vehicle occupants had keys to a storage unit at the facility, which further

investigation revealed to have been rented by Mack's brother-in-law since July 2005.  (Id.; Mack

Dep. at 218.)

　　　　Defendants' attempt to create an issue of fact by claiming a discrepancy between

Aldabeshes's testimony and Mack's claim that she does not know Aldabeshes and has never

delivered cigarettes to a location off the Reservation is similarly misleading.  (Mack Dep. at

125.)  First, Mack did not testify that she did not know Aldabeshes but rather that she did know

an individual named "Ahmed Aldabarb."  (Mack Dep. at 125.)  Mack also admitted that she did

"not really" know the names of her customers and acknowledged that she did not, in fact, know

any of their real names.  (Id. at 53-54.)  Mack's assertion, moreover, that she never delivered

---

[6] Although Dee is referred to by Mack as a "repeat customer" and by Mari A. as Mack's worker, the distinction is
immaterial to both Mari A.'s credibility and, based on the chain of causation discussed earlier, Mack's liability.

cigarettes to an off-Reservation site is immaterial for purposes of establishing causation under the theory presented here; the relevant question is whether the large quantities of unstamped cigarettes she sold made their way via Aldabeshes into the City. Toward that end, the Court observes that despite the fact that she appears to disclaim her previous sworn testimony at the Morrison trial that she employed two drivers who delivered unstamped cigarettes off the Reservation for her using a truck she owned (Morrison Trial Tr. at 1158-59, 1075), she nevertheless concedes here that she sold these individuals large quantities of unstamped cigarettes, an admission sufficient to demonstrate the necessary causal link (Mack Dep. at 218-19).[7]

Taken together, the Court finds that these purported discrepancies in testimony do not establish a genuine issue of material fact with regard to the testimony of Mari A. and Aldabeshes linking cigarettes sold by TDM to the presence of unstamped cigarettes in the City. Based on the present record, the Court thus concludes that defendants' claimed disputes of fact with respect to causation are not genuine. Fed. R. Civ. P. 56(a); see also Crawford-El, 523 U.S. at 600.

2. *Statutory concerns*

Although the City's basis for constitutional standing is straightforward, as the Court observed in addressing similar arguments in Milhelm II, defendants' causation arguments "may be better conceived not as Article III issues, but rather as raising the statutory question of whether the CCTA extends direct liability . . . to an action between the parties in the position presented here." Milhelm II, 2012 WL 3579568, at *16. This question delves into the intertwined concepts of statutory standing and statutory causation, and thus, although resolution

---

[7] Other evidence in the record, including Mack's own testimony, buttresses Aldabeshes's account. Mack testified at the Morrison trial, for example, that customers bought unstamped cigarettes in amounts "anywhere from five cartons to a thousand cartons . . . and would come, pick them up from my home," business practices entirely consistent with Aldabeshes's description of his purchases. (Morrison Trial Tr. at 1075.)

of this issue is not purely jurisdictional and touches upon the merits of this action, the Court addresses it in a single discussion here.  See id. (citing Abrahams, 79 F.3d at 237; Lerner, 459 F.3d at 284.

Defendants contend that "because the City has failed to prove that the defendants actually and proximately caused the City's" injury, its summary judgment motion should be denied. (TDM/Peace Pipe Mem. at 20.)  In their view, to prevail on its claims, the City must "prove that Defendants' sales of unstamped cigarettes alone caused its harm," a showing it cannot make, or at the very least, has not yet made for purposes of summary judgment.  (Id. at 22.)

Putting aside the fact that defendants appear to misstate the principle of proximate cause,[8] their argument fails for the simple reason that the CCTA does not require a plaintiff to demonstrate proximate cause to maintain a valid CCTA claim.[9]  As this Court observed in Milhelm II,  "statutory liability may extend further than common law notions of proximate cause: 'conceivably, some statutes might go beyond the common law and create rights of recovery for plaintiffs who are not foreseeable and who are injured by defendants' wrongdoing. A legislature could do so if it wished.'"  2012 WL 3579568, at *16 (quoting Abrahams, 79 F.3d at 237 n.3).  In authorizing "states and municipalities to bring actions to prevent and restrain violations by 'any person,'" the CCTA by its plain terms "does not appear to require anything more" than the "fairly traceable" requirement of Article III, a requirement the City easily satisfies.  Id. at *17.

---

[8] Proximate cause does not, as defendants seem to suggest, require that the challenged conduct be sufficient on its own to cause the alleged injury.  Instead, as the Second Circuit has stated, a defendant is the proximate cause of another's injury where "his acts were a substantial factor in the sequence of responsible causation" and where the injury "was reasonably foreseeable or anticipated as a natural consequence."   Lerner, 318 F.3d at 123 (internal quotation marks omitted); see also Rothstein, 708 F.3d at 91.

[9] Defendants' reliance on Judge Hurley's causation discussion in United States v. Morrison, 685 F. Supp. 2d 339 (E.D.N.Y. 2010), is misplaced for this reason.  In that case, Judge Hurley considered whether the City was, under the "displacement theory," entitled to restitution under the actual and proximate cause standards required under the Mandatory Victims Restitution Act.  In doing so, Judge Hurley expressly distinguished the issue of civil liability under the CCTA presented here.  Id. at 346-47.

36

To the extent that defendants nevertheless question whether the City is a proper plaintiff to maintain a CCTA claim against defendants "who transacted in cigarettes that were only 'contraband' within the meaning of the CCTA because" they did not have a State (versus City) stamp affixed, that argument is also unavailing.  2012 WL 3579568, at *17.  As the Court noted in the above discussion on injury, the CCTA confers an "expansive grant of standing" that seeks to "prohibit[] actions taken with respect to contraband cigarettes at all stages of the distribution chain" and delegates broad enforcement authority to state and local governments.  Id. at *15. This comprehensive approach is designed to address specifically "the flow of contraband cigarettes between jurisdictions with differing tax obligations, and the resulting deleterious effects on state and local tax collection."  Id.  Its scope, as a result, necessarily contemplates the full length of the causal chain that injures a local taxing jurisdiction.  Cf. City of New York v. Chavez,[10] No. 11 Civ. 2691, 2012 WL 1022283, at *4 (S.D.N.Y. Mar. 26, 2012) ("[T]o establish liability, the statute does not require that the cigarettes sold, shipped, or transported be contraband at the time of the sale, shipment, or transport.  Rather, it suffices that the cigarettes become contraband as a result of the sale and shipment.").  With this in mind, the Court concludes, as it did in Milhelm II, that the CCTA authorizes the action between parties in the positions presented in this case.  Where, as here, the City can show that defendants' sales of cigarettes that did not bear State tax stamps was a necessary step in carrying unstamped cigarettes down the New York State and City streams of commerce, an action may be maintained against the CCTA violators that were integral to the existence of that unlawful market.  Id. at *17; see also Chavez, 2012 WL 1022283, at *5.

---

[10] Defendants' claim that Chavez is factually distinguishable, although obviously true, does not make that court's interpretation of the requirements of the CCTA somehow inapplicable.

## C. Redressability

Finally, to satisfy the remaining standing requirement, redressability, a plaintiff need only demonstrate the existence of a "non-speculative likelihood that the injury can be remedied by the requested relief." W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP, 549 F.3d 100, 106-07 (2d Cir. 2008).  This showing must be made with respect to "each form of relief sought." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 185 (2000).

Defendants' challenges to the City's requested relief are not aimed specifically at the ability of the relief to provide redress and will be addressed fully in the section on relief. Nevertheless, the Court notes briefly that the City has satisfied the redressability requirement. The injury suffered by the City here is fairly traceable to defendants' sales of unstamped cigarettes.  Thus, sanctions that deter future sales, prevent their recurrence and provide some measure of compensation for the City's tax loss all serve as forms of redress.  See id. at 185-86. Each of the City's forms of requested relief—a permanent injunction against selling any unstamped cigarettes, damages, and civil penalties—promote these objectives.  See id. at 185-86, 188 (remedies that encourage defendants to discontinue violations that were ongoing at the time of the complaint and that deter defendants from committing future violations can afford redress to injured plaintiffs).

In sum, the Court concludes that there are no genuinely disputed issues of material fact regarding the City's standing.  The City has offered sufficient evidence demonstrating that unstamped cigarettes sold by each defendant were trafficked into the City, thereby tangibly harming the City's tax and public health objectives.  Accordingly, the Court is satisfied that the City has met its burden on summary judgment to show that it has standing to pursue its claims against defendants.

**III.** **Liability under the CCTA and the CMSA**

   **A.  The CCTA**

   The CCTA, 18 U.S.C. § 2341 et seq., makes it "unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute or purchase contraband cigarettes."  Id. § 2342(a).  Contraband cigarettes are defined as:

> a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found, if the State or local government requires a stamp, impression, or other indication to be placed on packages or other containers of cigarettes to evidence payment of cigarette taxes . . . .

Id. § 2341(2).  These provisions together establish four elements for a CCTA violation: "that a party (1) knowingly 'ship, transport, receive, possess, sell, distribute or purchase' (2) more than 10,000 cigarettes (3) that do not bear tax stamps, (4) under circumstances where state or local cigarette tax law requires the cigarettes to bear such stamps."  Golden Feather II, 2009 WL 2612345, at *26; see also Milhelm II, 2012 WL 3579568, at *19; Milhelm I, 550 F. Supp. 2d at 345-56.).

   The CCTA's broad remedial provisions provide in relevant part that "[a] State, through its attorney general, [or] a local government, through its chief law enforcement officer . . . may bring an action in the United States district courts to prevent and restrain violations of this chapter by any person."  18 U.S.C. § 2346(b)(1).  In any such action, the plaintiff state or municipality may "also obtain any other appropriate relief for violations of this chapter from any person (or by any person controlling such person), including civil penalties, money damages, and injunctive or other equitable relief," id. § 2346(b)(2), remedies which are "in addition to any other remedies under Federal, State, local, or other law," id. § 2346(b)(3).

It is undisputed that defendants have sold and shipped vast quantities of unstamped cigarettes to bootleggers and members of the public since prior to this litigation and continuing at least until this Court issued its Preliminary Injunction Order.  (See Peace Pipe 56.1 ¶ 16; TDM 56.1 Resp. ¶¶ 64, 69; Red Dot 56.1 ¶¶ 38, 40, 42.)  Aside from continuing to maintain that they were not required under state law to sell cigarettes bearing stamps during the relevant period, the TDM and Peace Pipe defendants contend on this motion that (1) state law does not require them "to bear the incidence of cigarette excise taxes where such taxes are not pre-collected by the State"; and (2) the cigarettes sold by defendants were not required to bear the City-State joint tax stamps.  Raymond Hart, on behalf of the Red Dot defendants, suggests that his "good faith" belief that he was not violating any tax laws or criminal statutes warrants exemption from CCTA liability.

In light of the many rulings to the contrary in this case, the Milhelm action, the Second Circuit's recent decision in Morrison, and the Court of Appeals' decision in Cayuga, it is a testament to defendants' tenacity that they continue to assert that state law did not require that the cigarettes they sold be stamped.  (See, e.g., Peace Pipe 56.1 ¶¶ 6-8, 10-12; TDM 56.1 Resp. ¶¶ 65, 72; Red Dot 56.1 ¶ 73.)  Lest there be any remaining uncertainty on this point, the Court reiterates here that the prior version of § 471 constituted an "applicable" state tax that "require[d]" for purposes of the CCTA that cigarettes sold by defendants to non-Tribe members bear tax stamps.  See Golden Feather II, 2009 WL 2612345, at *26; Golden Feather I, 2009 WL 705815, at *11; Golden Feather IV, DE #353, at 13, 17; Milhelm II, 2012 WL 3579568, at *20-*23; Morrison, 686 F.3d at 106 ("New York had the power to impose that tax [on on-reservation sales to non-Native Americans] and state law mandated that the tax be paid."); Cayuga, 14 N.Y.3d at 647-48, 652-53.  The Court addresses defendants' remaining arguments below.

1.  *"Ultimate Incidence" of the Cigarette Tax*

Defendants first argue that they are entitled to summary judgment on liability because the relevant authorities place the "ultimate incidence of and liability for" both the State and the City cigarette tax "upon the consumer."  See NYTL § 471(2); N.Y. City Admin. Code § 11-1302(a)(3).  They argue further that the NYTL requires consumers to remit any unpaid sales or use taxes on retail goods purchased on reservations to the relevant taxing authority.  (TDM/Peace Pipe Mem. at 14-15.)  As a result, defendants contend that it would be "inappropriate" to hold them responsible for the ultimate consumer's failure to remit applicable taxes because any responsibilities they might have had under the NYTL (or the New York City Administrative Code) evaporated once the cigarettes passed out of their hands.

This argument misunderstands the theory of liability in the case.  First, the language that the "ultimate incidence of and liability for" the cigarette tax is "upon the consumer" does not limit other actors' responsibilities under the statute.  That language simply reflects the intent to build the cost of the cigarette tax into the price of the cigarette so that the tax cost is borne by the end consumer.  Second, insofar as this language creates, in conjunction with back-stop provisions for remittance by consumers of unpaid taxes, an independent obligation for consumers to remit any unpaid taxes to the DTF, it has no bearing on defendants' own responsibilities under the NYTL.  Defendants were supposed to sell stamped cigarettes to members of the public.  In transferring unstamped cigarettes to others downstream, thereby enabling the contraband cigarette market, defendants breached that obligation and are liable for that conduct.  See Milhelm II, 2012 WL 3579568, at *21 ("[T]hat the tax in these transaction could have been collected from the ultimate consumer does not eliminate liability for the prior parties in the distribution chain.").  As this Court stated in Milhelm II, despite the fact that "[a]ll

cigarette transactions, even outside the Native American context, are subject to the backstop 'use tax' in § 471-a," defendants have not identified any other scenario where "that provision eliminate[s] the responsibility of . . . retailers to precollect the tax [by selling] cigarettes displaying the requisite stamp." Id. Indeed, if it did, no one in the chain of distribution would need to sell stamped cigarettes, thus defeating the entire purpose of the statute. Accordingly, the Court concludes that the "ultimate incidence" of the cigarette tax does not relieve defendants of their liability for their role in the contraband cigarette market.

### 2. *Joint City-State Tax Stamp*

Defendants next argue that they have not violated the CCTA because as retailers located outside the City, they are not required to sell cigarettes bearing the joint City-State tax stamp. Whether or not this claim is true,[11] it is irrelevant here because the City's claims rely solely on defendants' sales of cigarettes that lacked the required State tax stamp—not the joint City-State tax stamp. As discussed previously, liability in this case is premised on defendants' role in injecting unstamped cigarettes into the City's stream of commerce in "evasion of the stamping schema," the reasonable and foreseeable consequence of which was to cause cigarettes on which City taxes had not been collected to be present there. Chavez, 2012 WL 1022283, at *5. As this Court held under similar circumstances in granting summary judgment against the wholesalers in Milhelm II and implicitly determined in granting the preliminary injunction in this case, such conduct constitutes a violation under the CCTA. Milhelm II, 2012 WL 3579568, at *16-*17, *27; Golden Feather II, 2009 WL 2612345; see also Chavez, 2012 WL 1022283, at *5

---

[11] In this regard, the Court notes that defendants continue to maintain that they did not sell or ship unstamped cigarettes directly into the City. At least with respect to the Peace Pipe defendants' Smoker's Den operation, this claim is nonsensical in light of their acknowledgment that they shipped cigarettes via UPS and USPS directly to City residences. For these sales at least, the Court is not convinced by defendants' suggestion that they did not have an obligation to sell only cigarettes with the joint City-State tax stamp affixed. With respect to defendants' other sales, the Court observes that defendants "simply avoided any municipal taxing obligations" by using bootleggers to carry hundreds of thousands of cigarettes the "short distance" from Poospatuck to the City. Milhelm II, 2012 WL 3579568, at *16.

("[D]efendants' CCTA liability is not tied to New York's power to tax them directly; rather, their liability hinges on whether they have injected unstamped cigarettes directly into the New York State and City streams of commerce, avoiding the stamping system.").

The Court observes, moreover, that this argument appears to be less a question about whether defendants' sales constitute a CCTA violation—indeed, defendants' cigarettes did not bear State tax stamps which they were required to have pursuant to § 471, now a well-settled violation under the CCTA— and instead one aimed at whether the City can properly pursue this claim, i.e., one in which the claimed injury did not accrue at the time of defendants' conduct but rather further down the chain of causation. As such, the argument is simply another formulation of the proximate causation argument rejected above. In that discussion, the Court noted that the CCTA's "expansive grant of standing" contemplates a wide variety of causal relationships between prospective parties, including the action between parties in the positions presented here. Accordingly, defendants' attempt to escape liability by arguing that the City must prove that defendants were required to sell cigarettes with the joint City-State tax stamp fails.

### 3. *The Red Dot defendants' "Good Faith" defense*

Hart, on behalf of the Red Dot defendants, asserts that his "good faith" belief that he was not violating any tax laws or criminal statutes warrants exemption from or mitigation of the amount of any penalty or tax assessment. (Hurwitz Decl. ¶¶ 5, 12.) To the extent that Hart is attempting to use his alleged "good faith" to escape a finding of CCTA liability, the Court notes that this argument simply has no bearing on the CCTA liability analysis.

A defendant's "good faith" belief as to his compliance with the law is irrelevant to determining whether he has violated the CCTA. Indeed, to prove that a defendant violated the CCTA, the plaintiff, or the prosecutor where the charge is criminal, does not need to show that

43

the defendant knew that the cigarettes he sold must by law bear stamps.  See Milhelm II, 2012 WL 3579568, at *25 ("[A] CCTA violation does not require proof that the defendant knew the cigarettes he possessed, distributed or sold were required by law to bear tax stamps.") (collecting cases); see also Morrison, 686 F.3d at 107-08 (affirming district court's determination that liability under CCTA does not require proof that defendant has knowledge that he was selling "contraband" cigarettes).  Only proof that "the defendant knew 'the physical nature of what he possessed,' i.e., cigarettes without stamps," is required.  Milhelm II, 2012 WL 3579568, at *25 (quoting United States v. Elshenawy, 801 F.2d 856, 859 (6th Cir. 1986)).  The case on which Hart relies for his "good faith" defense, Cheek v. United States, 498 U.S. 192 (1998), is thus inapposite.  Not only did the criminal violation in that case require that the defendant "willfully" fail to pay taxes, the case also addressed a particular concern in the criminal tax context "that an individual taxpayer unfamiliar with the nuances of the tax code might confront a felony conviction upon a nonpayment of taxes," a concern not present where the punishment faced is a "only a civil penalty."  Lefcourt v. United States, 125 F.3d 79, 83 (2d Cir. 1997).  Given that Hart concedes that he sold large quantities of unstamped cigarettes (Red Dot 56.1 ¶¶ 38, 42), the Court finds that Hart's "good faith" defense does not shield him from CCTA liability.

For the reasons stated above, and based on the uncontroverted evidence submitted by the City, the Court concludes that there are no outstanding issues of fact as to whether defendants violated the CCTA.  On the issue of CCTA liability, therefore, the Court grants summary judgment to the City.

**B.  The CMSA**

The CMSA, NYTL § 483 et seq., "prohibits the sale of cigarettes below cost when the seller intends thereby to harm competition or evade taxes."  Lorillard, 99 N.Y.2d at 319.  The

statute makes it unlawful for

> any agent, wholesale dealer or retail dealer, with intent to injure competitors or destroy or substantially lessen competition, or with intent to avoid the collection or paying over of such taxes as may be required by law, to advertise, offer to sell, or sell cigarettes at less than the cost of such agent wholesale dealer or retail dealer, as the case may be.

NYTL § 484(a)(1).  For retail dealers, it is also unlawful "to induce or attempt to induce, or to procure or attempt to procure the purchase of cigarettes at a price less than the cost of the agent for sales to retail dealers, if purchased from an agent, or at a price less than the cost of the wholesale dealer."  Id. § 484(a)(4)(A).  The statute provides that "any person injured by any violation or threatened violation" of the CMSA may bring action "to prevent, restrain or enjoin a violation, or threatened violation, of any of the provisions of this article."  Id. § 484(b)(1).

The City contends that "[t]he factual elements necessary to establish defendants' CMSA violations were established at the preliminary injunction hearing.  Because they have not been materially disputed, those facts need not be proven again on this summary judgment motion."  (City's Mem. at 21.)  Specifically, the Court at the preliminary injunction hearing considered evidence of defendants' sales prices and the CMSA minimum prices for the relevant period and, upon comparison of the two, readily concluded that "each defendant has sold . . . large quantities of cigarettes at less than the cost of the retail dealer, as that term is defined by the CMSA."  Golden Feather II, 2009 WL 2612345, at *37; see also 2009 WL 2612345, at *4-*6 (CMSA minimum prices), *13-*14 (Peace Pipe), *16 (Red Dot), *22 (TDM).  The Court also noted that under the CMSA these below cost sales are "'prima facie evidence . . . of intent to avoid the collection or paying over of such taxes as may be required by law'" and therefore establish a presumption of intent.  Id. at *37 (quoting NYTL § 484(a)(6)); see also Lorillard, 99 N.Y.2d at 324 (noting that the CMSA "establishes a presumption that sales below cost are made with the

45

proscribed intent"). Because defendants failed to rebut this presumption of intent, the Court concluded that "defendants' sales at less than cost were made with the requisite intent for establishing a CMSA violation." Id. at *37. Although the Court for purposes of granting the preliminary injunction was required to find only that the City was likely to succeed on the merits of its CMSA claims, the City's evidentiary showing and the Court's corresponding findings demonstrated that the City had, in fact, established the necessary elements of a CMSA violation.

On this motion, defendants do not offer any evidence to undermine these earlier findings. Indeed, aside from continuing to maintain that they were not required to sell cigarettes bearing tax stamps, defendants have devoted very little attention to this claim. For one, they continue to leave undisputed the fact that they sold cigarettes at less than the minimum prices set forth in the CMSA, irrespective of whether the sale was made to a tribe member for personal use or to a member of the public. (See Peace Pipe 56.1 ¶¶ 15-16; City 56.1 ¶ 65; TDM 56.1 Resp. ¶ 65; City 56.1 ¶ 42; Red Dot 56.1 ¶ 42; Hart Dep. at 80.) In addition, defendants still have not put forth any evidence cognizable here that rebuts the intent presumed from their below-cost cigarette sales.[12] Accordingly, the Court concludes that there are no outstanding issues of fact as to whether defendants violated the CMSA and thus grants summary judgment on the issue of CMSA liability to the City.

---

[12] To the extent that the Red Dot defendants attempt to create an issue of material fact with respect to intent by asserting that they "dispute that they knowingly sold unstamped cigarettes below the minimum amount" (Red Dot 56.1 ¶ 42), such unsupported self-serving assertions are insufficient for this purpose. See Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008) (noting that "to defeat a properly supported summary judgment motion, the opposing party must proffer admissible evidence" and cannot rest on mere "assertions that are conclusory . . . or based on speculation" (internal citations omitted)); Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996). The Court notes further that Hart's "good faith" claims are targeted at his liability under the CCTA, not the CMSA, and are in any event, for reasons discussed below in the section on civil penalties, without merit. (See Hurwitz Decl. ¶¶ 5, 9.)

## IV. Relief

The City requests several forms of relief under the CCTA and the CMSA, specifically: (1) a permanent injunction under the CCTA and CMSA, (2) damages against the Peace Pipe and TDM defendants under both statutes, (3) civil penalties pursuant to the CCTA against the Red Dot defendants and Tony Phillips, and (4) attorney's fees under the CMSA. The Court discusses each in turn.

### A. Permanent Injunction

The City requests that the Court enter a permanent injunction under the CCTA and the CMSA against the moving defendants' "purchase, receipt, possession, sale, distribution, offer and advertisement of unstamped cigarettes—even to tribe members for personal use." (City Mem. at 2.) Defendants, meanwhile, question the need for a permanent injunction, arguing that the Tax Law Amendments "provide the essential relief" and thus render injunctive relief moot. (TDM/Peace Pipe Reply at 13, 14; TDM/Peace Pipe Mem. at 7.)

"The requirements for a permanent injunction are 'essentially the same' as for a preliminary injunction, except that the moving party must demonstrate 'actual success' on the merits." New York Civil Liberties Union v. N.Y. City Transit Auth., 684 F.3d 286, 294 (2d Cir. 2011) (quoting Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 546 n.12 (1987)). To obtain a preliminary injunction, a party "must establish: (1) either (a) a likelihood of success on the merits of its case or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor, and (2) a likelihood of irreparable harm if the requested relief is denied." Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 152-53 (2d Cir. 2007); Golden Feather II, 2009 WL 2612345, at *25. In general, however, "'[a]n injunction is a matter of equitable discretion; it does not follow

from success on the merits as a matter of course.'" E.E.O.C. v. KarenKim, Inc., 698 F.3d 92, 100 (2d Cir. 2012) (quoting Winter v. Natural Res. Def. Council Inc., 555 U.S. 7, 32 (2008)). To convince the court that prospective injunctive relief is needed, the moving party must demonstrate "'that there exists some cognizable danger of recurrent violations.'" Id. (quoting United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953)); see also CSX Corp. v. Children's Inv. Fund Mgmt. LLP, 654 F.3d 276, 285 (2d Cir. 2011) ("The usual basis for prospective injunctive relief is not only irreparable harm . . . but also some cognizable danger of recurrent violations." (internal quotation marks and citation omitted)). Furthermore, a court may, where there is no material fact in dispute, grant a party's request for a permanent injunction on summary judgment without holding a hearing. See Beck v. Levering, 947 F.2d 639, 642 (2d Cir. 1991) (noting that evidentiary hearing required before granting permanent injunction only where a material fact is in dispute).

As the Second Circuit previously held in this action, "the City [is] not required to make a showing of irreparable harm to obtain an injunction under either the CMSA or the CCTA." Golden Feather III, 597 F.3d at 121. Moreover, in finding defendants liable for violations of the CCTA and the CMSA, the Court has determined that the City has demonstrated actual success on the merits. Accordingly, the only issue remaining is whether the City has established a danger of recurring violations. For purposes of this analysis, the Court "appl[ies] the law in effect at the time it renders the decision." Bradley v. Sch. Bd. of Richmond, 416 U.S. 696, 711 (1974); see also Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 477 F.3d 765, 766 (2d Cir. 2007) (directing district court to consider effect of amended law on prospective injunctive relief). Accordingly, the Court considers whether there is a danger of recurrent CCTA and CMSA

violations under the cigarette tax scheme as amended.[13]

       1.   *Danger of recurring violations*

Although not argued explicitly, defendants suggest that the new tax collection scheme instituted under the Tax Law Amendments eliminates any danger of recurring violations because it "preclude[s] the defendants from purchasing unstamped cigarettes from licensed wholesalers." (See DE #403; TDM/Peace Pipe Reply at 14.)  As discussed above, § 471(2) explicitly requires that "[a]ll cigarettes sold by agents and wholesalers to Indian nations or tribes or reservation cigarette sellers located on an Indian reservation must bear a tax stamp."  These agents, moreover, are meant to be "the only entry point for cigarettes into New York's stream of commerce."  Oneida Nation, 645 F.3d at 158.  As a result, reservation retailers should theoretically no longer be able to obtain unstamped cigarettes.  See Golden Feather IV, DE #353, at 21 ("[T]he recent tax law amendments make clear that all cigarettes sold on the reservation must bear the applicable tax stamps.  Under the amended tax law, therefore, all cigarettes sold on the Unkechauge reservation must bear applicable tax stamps . . . .").  Indeed, in its companion case against various cigarette wholesalers, the City withdrew its claim for injunctive relief in light of the Tax Law Amendments and the wholesalers' "voluntary cessation of all sales of unstamped cigarettes" to reservation retailers.  Milhelm II, 2012 WL 3579568, at *27.  By curtailing retailers' access to unstamped cigarettes, § 471(2) seemingly eliminates the danger that defendants will continue to sell unstamped cigarettes to anyone, whether Native American or not.

Notwithstanding this new legal obstacle to obtaining unstamped cigarettes, the City maintains that the undisputed facts demonstrate that defendants are likely to continue to violate

---

[13] The Court observes that because continuing sales of unstamped cigarettes, the CCTA violation, are essentially equivalent in this case to continuing sales of cigarettes at less than CMSA minimum prices, the CMSA violation, the analysis of the danger of recurring violations is likewise equivalent.

the CCTA and the CMSA. (City Mem. at 2.)  In addition, the City fears that the surfacing of claims that certain kinds of cigarettes remain exempt from cigarette taxes opens a window for defendants to "advance as yet another meritless legal defense for future sales of unstamped cigarettes." (City Mem. at 26.)  A permanent injunction, the City claims, is thus necessary to pre-empt these ongoing efforts to circumvent the tax scheme.

The City offers no evidence that any of the remaining defendants are currently engaging in sales of unstamped cigarettes.  In fact, the City conceded at oral argument that defendant retailers are all, as far as it is aware, currently out of business.  (1st OA Tr. at 7.)  Instead, the City argues that a danger of recurring violations is evident from (1) evidence that reservation retailers continue to be able to obtain unstamped cigarettes and have been told by the Tribal Council that, even under the Tax Law Amendments, they can still sell certain kinds of cigarettes without tax stamps; (2) the Court's findings in connection with the preliminary injunction; and (3) the Court's findings post preliminary injunction for contempt.  The Court considers each type of evidence in turn.

<u>a) Evidence of ongoing reservation sales of unstamped cigarettes</u>

To demonstrate that the Tax Law Amendments have not stemmed reservations sales of unstamped cigarettes, the City offers evidence that a number of reservation retailers (although not defendants) are engaging in present, on-going sales of unstamped cigarettes to the public, a fact that defendants do not dispute.[14]  (City 56.1 ¶ 73; Peace Pipe 56.1 ¶ 39; TDM 56.1 Resp. ¶ 73; Red Dot 56.1 ¶ 73.)  These sales of unstamped cigarettes are of so-called "native brands" i.e., cigarettes manufactured by a Native American-owned company, or at least having a Native American motif on the packaging.  (See City Mem. at 23 n.19; Proshansky Decl., Ex. 24.)

---

[14] Although defendants do not dispute that there are stores on the Reservation selling unstamped cigarettes, they continue to assert a variety of caveats in an effort to suggest that such sales are lawful, each of which the Court has dismissed as meritless in the liability discussion above.

First, settling defendant Denise Paschall, stated in her deposition that, based on advertising and customer flow, she believes that all operating retailers on the reservation, which she estimates to be approximately thirty, are continuing to sell unstamped "native brand" cigarettes to the public.  (Paschall Dep., Ex. 16 to Proshansky Decl., at 14-16.)  In her deposition, Mack corroborated Paschall's testimony, stating that she also assumed that sales of unstamped cigarettes were ongoing and that the only brands advertised for sale were "native brands." (Mack Dep., Ex. 19 to Proshansky Decl., at 159-62.)  Hart meanwhile testified that there are "maybe ten" stores on the Reservation currently selling cigarettes and that those cigarettes could be unstamped.  (Hart Dep. at 68-69.)

The City also offers evidence demonstrating the existence of a supply of unstamped "native brand" cigarettes on the Poospatuck Reservation.  This supply that derives from two sources.  First, reservation retailers appear to be obtaining unstamped cigarettes directly from other reservations.  The City points to the statement of a truck driver arrested in New York on January 23, 2012 carrying over 24,000 cartons of unstamped "native brand" cigarettes that for the prior five months, he had made weekly deliveries of cigarettes from the Winnebagoe Indian Reservation in Nebraska to the Poospatuck Reservation.  (Proshansky Decl., Ex. 22, at Ex. C thereto.)  In addition, the City produced a bill of lading for a May 2, 2012 shipment of 105 cases of cigarettes to a Poospatuck Reservation smoke shop from "Mohawk Distribution" located on the St. Regis Mohawk (Akwesasne) Reservation.  (Proshansky Decl., Ex. 23.)  The second source is the Poospatuck Reservation itself.  Deposition testimony indicates that attempts are being made to manufacture cigarettes on the Reservation and that at least one business is currently doing so.  (Paschall Dep. at 16; Mack Dep. at 164.)

In addition, to support its assertion that sales of unstamped "native brand" cigarettes will

persist despite their apparent illegality under the Tax Law Amendments, the City sets forth evidence that the Tribal Council has been attempting to establish legal cover for the practice. Paschall testified that she believes that the practice of selling unstamped "native brand" cigarettes is legal and that other store owners share this belief because the Tribal Council informed cigarette stores that they could remain open and sell Indian-brand unstamped cigarettes.  (Paschall Dep. at 14-16.)  Mack also testified to this effect in her deposition, answering in the affirmative when asked whether it "is the general opinion on the Reservation, that it's legal to sell Native brand cigarettes" and whether, if the injunction were lifted, she would be able to sell "native brand" cigarettes.  (Mack Dep. at 166-69.)  The widespread belief among reservation retailers, including defendants, that this practice is legitimate is reminiscent of defendants' contentions about the legality of their conduct under the pre-amendment Tax Law. Such assertions provided support for the Court's earlier conclusion that a preliminary injunction was necessary to prevent further violations of the CCTA.  Golden Feather II, 2009 WL 2612345, at *42.  The burgeoning justification for the continuation of sales of unstamped cigarettes under the current law is similarly disconcerting here.

 b)  Evidence that defendants are likely to engage in sales

Although the above evidence demonstrates that some reservation retailers are engaged in the sales of unstamped "native brand" cigarettes, it does not establish that defendants, all of whom are currently out of business, will also partake in the practice in the future.  To do so, the City relies mainly on (1) the Court's preliminary injunction findings, and (2) the Court's findings in the contempt proceedings following the entry of the preliminary injunction.  As the evidentiary underpinnings for those findings, the City incorporates by reference the evidence introduced during those proceedings.  (City Mem. 5-6.)

With respect to the Court's preliminary injunction findings, the City draws attention to the Court's reliance on defendants' past conduct in determining that they were likely to continue to violate the CCTA and CMSA in the future.  In making that determination, the Court noted that "'the commission of past illegal conduct is highly suggestive of the likelihood of future violations'" and highlighted defendants' "long history of selling massive quantities of untaxed cigarettes."  Golden Feather II, 2009 WL 2612345, at *41-*42 (quoting SEC v. Mgmt. Dynamics, Inc., 515 F. 2d 801, 807 (2d Cir. 1975)).  Arguing that the Court's earlier predictions remain relevant despite the fact that defendants are not currently engaged in cigarette sales, the City underscores the Court's preliminary injunction finding that even Mack, who had purportedly closed her business at the time the complaint was filed, was likely to commit future violations.  Id. at *22.  The Court based that finding in part on "TDM and Mack's long history of selling large quantities of unstamped cigarettes" and "the profitability of engaging in this business," id., both of which remain true for each of the moving defendants.

To demonstrate the accuracy of this Court's predictions about future violations, the City points out that these predictions have already been "amply borne out."  (City Mem. at 22.)  As the City notes, based on evidence that Rodney Morrison and other non-moving defendants engaged in bulk sales of unstamped cigarettes in violation of the preliminary injunction, the Court found those defendants in civil contempt.  City of New York v. Golden Feather Smoke Shop, Inc., No. 08-CV-3966, 2010 WL 2653369 (E.D.N.Y. June 25, 2010).  Given this history and the fact that defendants have not introduced any evidence that might alter the Court's original conclusion, the City argues that the Court's earlier findings that defendants are likely to continue to engage in the sale of unstamped cigarettes—even in the face of explicit directives to the contrary—remain valid and applicable here.

The City adds to these earlier findings that, at least as to Hart, there is evidence that the belief in the legitimacy of sales of unstamped "native brand" cigarettes would, particularly in light of the financial incentives, prompt future violations.  (1st OA Tr. at 41.)  Indeed, Hart stated in his deposition that if the injunction were lifted and the Tribal Council gave him permission, he would consider selling unstamped cigarettes again.  (Hart Dep.at 74, 95-96.)

Defendants for their part offer very little additional evidence here to oppose the entry of a permanent injunction.  Beyond pointing out the fact that the Tax Law Amendments went into effect after the grant of the preliminary injunction, defendants' only additions are (1) undisputed assertions that they have not, with the notable exception of Rodney Morrison, been engaged in the sales of unstamped cigarettes since the preliminary injunction went into effect, and (2) self-serving statements that they would not consider doing so in the future.  Defendants maintain that Peace Pipe Smoke Shop, TDM Discount Cigarettes, and Red Dot & Feather Smoke Shop, have all been closed since the entry of the permanent injunction.  (Peace Pipe 56.1 ¶¶ 12, 39; TDM 56.1 at 3; Hart Dep. at 66.)  Both Mack and Hart, moreover, have testified in their depositions that they have not engaged in sales of unstamped cigarettes since the preliminary injunction went into effect.  (Mack Dep. at 164; Hart Dep. at 66.)  Mack testified further that if the injunction were lifted, she would not consider selling either unstamped or "native brand" cigarettes.  (Mack Dep. at 168.)

As noted above, although the Court's earlier findings of fact and conclusions of law are not binding, the Court can nevertheless consider them, along with any additional evidence offered, in determining whether the City is entitled to summary judgment on its request for a permanent injunction.  See Caviezel, 814 F. Supp. 2d at 213; see also Camenisch, 451 U.S. at 395; Malletier, 561 F. Supp. 2d at 382; Lanvin, 776 F. Supp. at 127.

The Court notes initially that with respect to defendants' claim that the Tax Law Amendments eliminate the need for any further injunctive relief in this case that the Court has already previously determined that the preliminary injunction remains valid under and is not mooted by the new tax scheme.  See Golden Feather IV, DE #353, at 12 n.3, 13-14.  In fact, the Court concluded that, to the extent that they changed anything, the "Tax Law amendments . . . have tipped the likelihood of success on the merits decidedly in favor of the City."  Id. at 26.

With respect to defendants' current abstention from cigarette sales, that fact is, without more, insufficient to alter the Court's earlier conclusion that defendants will likely commit future CCTA and CMSA violations.  As when the Court determined that TDM's closure was insufficient to exempt TDM and Mack from the preliminary injunction, see Golden Feather II, 2009 WL 2612345, at *22, the Court re-emphasizes here the evidence introduced at the preliminary injunction hearing regarding the profitability of engaging in this business as well as defendants' history of selling large quantities of unstamped cigarettes.  See Golden Feather II, 2009 WL 2612345, at *11-*13 (Peace Pipe), *14-*16 (Red Dot), *19-*22 (TDM).  If anything, defendants' restraint in the wake of the preliminary injunction indicates the effectiveness of such an explicit directive, especially in light of the evidence of present, on-going sales of unstamped cigarettes by non-defendant retailers who are not subject to the preliminary injunction.  In conjunction with evidence of the existence of a supply of unstamped cigarettes to the Reservation and the appearance of new justifications for engaging in sales of unstamped cigarettes, the Court finds ample evidence that future CCTA and CMSA violations are likely and a permanent injunction therefore necessary.

2.  *Scope of the Injunction*

Defendants also argue that the permanent injunction that the City seeks here, which goes

beyond the scope of the preliminary injunction in enjoining all sales of unstamped cigarettes, including sales to Unkechauge Nation members for personal use, inappropriately exceeds the State's legislative intent in limiting the sovereign rights of New York Native Americans. (TDM/Peace Pipe Reply at 14.)  As the City points out, however, the preliminary injunction had a personal use carve out to reflect the law in effect at the time it was imposed.  The Tax Law Amendments, however, changed the tax scheme, requiring all cigarettes sold on reservations to bear tax stamps and setting up the coupon and "prior approval" mechanisms described earlier to independently account for the personal use exemption, see NYTL §§ 471-e, 471(5).  This scheme makes clear the State's intent to address tribal sovereignty concerns, as reflected in the personal use tax exemption, not at the point of sale, but rather through the new coupon/"prior approval" process.  There is, therefore, no longer any need for a personal use exception to an injunction prohibiting reservation sales of unstamped cigarettes.[15]  As a result, the Court finds defendants' concerns regarding the scope of the City's requested injunction without merit.

Accordingly, the Court grants the City's motion for an order permanently enjoining the moving defendants from engaging in any transactions with unstamped cigarettes.

**B. Damages**

The City seeks damages from the TDM and Peace Pipe defendants in "the amount of City tax that defendants evaded by selling unstamped cigarettes," i.e., the amount of City tax that should have been collected on cigarettes sold by defendants that became present in the City.

---

[15] Although not explicitly argued in the parties' motion papers, the City conceded at oral argument that there may exist certain situations not contemplated by the Tax Law Amendments—and thus for which there is currently no mechanism in place to handle—that would fall within the scope of the permanent injunction it requests here.  (1st OA Tr. at 16-17; 2nd OA Tr. at 41-42.)  Nevertheless, as the Court has noted in previous orders in this action, "[w]here a history of misconduct exists, courts may craft broad injunctions, even injunctions that sweep in legal activity, to prevent future violations."  Golden Feather IV, DE #353, at 20-21.  Where, as here, any allegedly legal activity covered by the proposed injunction is at best conjectural, the Court finds no reason to modify its scope, especially in light of "defendants' proven . . . efforts to sell large quantities of cigarettes destined for resale," id. at 22.

(City Mem. at 27.)  In addition to injunctive relief, the CCTA authorizes municipalities bringing

a civil action to "obtain any other appropriate relief for violations of this chapter from any person

. . ., including . . . money damages."  18 U.S.C. § 2346(b)(2).  Similarly, the CMSA allows "any

person injured by any violation" of the CMSA "to recover from the defendant the actual

damages sustained by such plaintiff."  NYTL § 484(b)(1).  The City states that it seeks the same

damages under both the CCTA and the CMSA.  (1st OA Tr. at 5.)  The City is not seeking

damages against the Red Dot defendants or Phillips, only civil penalties as discussed below.

   *1.   Special Damages*

   The TDM and Peace Pipe defendants' main legal challenge to the City's entitlement to

damages is its assertion that the City seeks special damages, which "was not properly pleaded

pursuant to Rule 9 of the Federal Rules of Civil Procedure."  (TDM/Peace Pipe Mem. at 8.)  The

theory of damages that the City has put forth on this motion, defendants contend, is a new one

and must be dismissed as not having been pleaded with the particularity sufficient to meet the

requirements of Rule 9, a failing that is "extraordinarily prejudicial to the defendants" with

respect to discovery and joinder.[16]  (Id. at 9-10.)  Defendants, however, offer no explanation for

why the damages the City seeks should be considered "special damages," and the Court rejects

this argument accordingly.

   Rule 9(g) requires that "if an item of special damages is claimed, it must be specifically

stated."  As a consequence, "failure to request items of special damages in the pleadings results

---

[16] The Court also observes that even if their claim that the City somehow improperly changed their theory of damages over the course of the litigation were true, defendants suffered no prejudice.  First, defendants should have been aware at least by the time of the preliminary injunction hearing, that the City's theory encompassed sales of unstamped cigarettes in the City.  Thus, under either theory, defendants would have been put on notice of the existence of other possible defendants, including trafficking intermediaries, who played a role in unstamped cigarettes being sold in the City.  Similarly, under either theory, the number of defendants' unstamped cigarettes that entered the City and whether there were any end consumers who remitted taxes on purchases of unstamped cigarettes are issues that would have been apparent.  Any prejudice that defendants now claim is thus based on their own failure to recognize these issues earlier and is not a basis for either dismissing the City's damages claim or denying summary judgment.

in a waiver of the right to those damages." <u>Bensen v. Am. Untramar Ltd.</u>, No. 92 Civ. 4420, 1997 WL 317343, at * 10 (S.D.N.Y. June 12, 1997).  As the modifier "special" indicates, however, not all claims for damages must satisfy this requirement.  "Special damages are 'damages that are unusual for the type of claim in question—that are not the natural damages associated with such a claim.'" <u>Mancuso v. Douglas Ellman LLC</u>, 808 F. Supp. 2d 606, 632 (E.D.N.Y. 2011) (quoting <u>Avitia v. Metro. Club of Chicago, Inc.</u>, 49 F.3d 1219 (7th Cir. 1995)); <u>Bensen</u>, 1997 WL 317343, at *10 ("'Special damages' have been described as 'those that, although resulting from the commission of the wrong, are unusual for the claim in question and not normally associated with the claim.'" (quoting 2 Jeffrey A. Parness et al., <u>Moore's Federal Practice</u> ¶ 9.08 (2d ed. 1997)).

Defendants offer no explanation for why the City's request for damages in "the amount of City tax that defendants evaded by selling unstamped cigarettes that later were present in the City," would be unusual for a claim under the CCTA or the CMSA.[17]  They simply assert that the City has not met the pleading requirements for special damages, seemingly assuming that the invocation of Rule 9 is enough to render it applicable.  The CCTA, however, is aimed, at least in part, at curbing cigarette-tax evasion and also explicitly authorizes awards of money damages to local governments injured by violations.  18 U.S.C. § 2346(b)(2).  The CMSA, similarly concerned with tax evasion, also provides that "any person injured" by a violation may recover any "actual damages sustained."  NYTL § 484(b)(1).  The Court is therefore hard-pressed to see how damages in the form of lost taxes due to evasions in violation of these statutes would be either "unusual" or "not normally associated with the claim."  As the City states, other than

---

[17] To the extent defendants seek to suggest that any "losses having pecuniary or economic value" are special damages (<u>see</u> TDM/Peace Pipe Mem. at 8-9), that suggestion is flatly incorrect.  Indeed, the cases relied on by defendant here are wholly inapposite in that they address claims for which special damages are an element, an issue not present here.  <u>See, e.g.</u>, <u>Kirby v. Wildenstein</u>, 784 F. Supp. 1112 (S.D.N.Y. 1992) (product disparagement); <u>Baez v. Jetblue Airways Corp.</u>, No. 09-CV-596, 2009 WL 2447990 (E.D.N.Y. August 3, 2009) (prima facie tort).

attorney's fees, which were properly pleaded, defendants' Rule 9 argument "is foreclosed for the obvious reason that the City does not seek 'special damages.'"   (City TDM/Peace Pipe Reply at 13 & n.10.)  Accordingly, the Court rejects defendants' unsupported attempt to use Rule 9 to bar the City's claims for damages.

The Court finds, moreover, that the City adequately pleaded its claim for damages under Rule 8.  In its complaint, the City alleged that (1) defendants sold unstamped cigarettes to traffickers and through remote transactions; (2) "the cigarettes [were] sold to the public free of associated taxes at a loss in City and State tax revenue . . . "; and (3) "[t]he City has been injured in that it is deprived of tax revenue owed in connection with each and every sale of cigarettes to City residents that are a result of Defendants' violations of the CCTA."  (Compl. ¶¶ 3, 41, 53; Compl. ¶ 63 (same allegation with respect to the CMSA).)  These allegations sufficiently state a claim for damages under either what defendants call the "displacement theory" or the City's stated theory of injury and causation here.

2.   *Sufficiency of evidence for calculating damages*

The remaining question is whether the City has put forth sufficient evidence demonstrating that it is entitled to the award of damages requested on summary judgment.[18] According to the City, § 11-1302(a) of the New York City Administrative Code imposes a City cigarette tax of $15 per carton on any cigarettes present in the City for sale or for use, an amount defendants do not dispute.  Accordingly, the City requests damages in the amount equal to the number of cartons of unstamped cigarettes sold by defendants that it can prove reached the City, multiplied by the City's $15 per carton tax.[19]  Because, as this Court discussed above, cigarettes

---

[18] The Court notes that for purposes of calculating damages, the pre-amendment version of the NYTL applies.

[19] Defendants challenge the City's entitlement to this full amount by offering a generalized attempt to distinguish various cases on which the City relies to support its damages measure here.  However, that the City cites criminal cases to support the proposition that the proper measure of damages where an entity does not comply with a tax

are subject to City tax upon their very entry into the City and the City was deprived of tax revenue to which it was entitled the moment defendants' cigarettes were trafficked into City limits, the Court agrees with the City's measure of damages.[20]

A court may grant summary judgment as to damages following a determination on liability where the defendant has had notice of and the opportunity to challenge the plaintiff's motion for damages. See United States v. O'Connor, No. 04 CV 2456, 2006 WL 1419388, at *3 (E.D.N.Y. May 18, 2006); see also Schwan-Stabilo Cosmetics GMBH & Co. v. Pacificlink Int'l Corp., 401 F.3d 28, 33 (2d Cir. 2005) (reversing award of damages on summary judgment where plaintiff did not seek damages in its motion and defendant was not on notice or given opportunity to contest damages). To defeat this motion, a defendant must meet its summary judgment burden of "establishing a genuine issue for trial on the damage award." O'Connor, 2006 WL 1419388, at *3; see West-Fair Elec. Contractors v. Aetna Cas. & Sur. Co., 78 F.3d 61, 63-64 (2d Cir. 1996) (affirming award of damages on summary judgment where defendant submitted only "conclusory statements" regarding damage amount); Gayle v. Harry's Nurses Registry, Inc., No. 07-CV-4672, 2012 WL 4174401, at *2-*3 (E.D.N.Y. Sept. 18, 2012) (holding parties to their summary judgment burdens in granting summary judgment on damages). In evaluating the evidence, the court remains obligated to view the evidence in the light most favorable to the non-movant and to "suspend judgment on credibility." Lipton v. Nature Co., 71 F.3d 464, 471 (2d

---

obligation is the amount of tax loss does not somehow invalidate the use of that measure here in a civil context. Defendants raise no reason why the measure, evaluated objectively under the circumstances of this case, would be inappropriate, nor do they offer any alternative way to measure the damages.

[20] The Peace Pipe defendants claimed during oral argument that an exemption exists for a certain quantity of cigarettes carried into the City. (1st OA Tr. at 30.) They did not, however, raise this issue in their briefing papers nor did they provide any citations to the City code or elsewhere. The City, meanwhile, disputes that there is any such exemption to the excise tax on cartons of cigarettes entering the City, only a personal exemption to the use tax. (Id. at 36.) In light of the fact that cigarettes sold or used in the City are presumed subject to the tax "until the contrary is established, and the burden of proof that a sale or use is not taxable . . . shall be upon the vendor or purchaser," N.Y.C. Admin Code § 11-1302(b)(4), the Court declines to address how any such exemption might apply here.

Cir. 1995).  Thus, an award of damages on summary judgment may not be appropriate where

resolution rests on a credibility determination.  Cf. Marni v. Adamo, 812 F. Supp. 2d, 243, 272-

73 (E.D.N.Y. 2011) (holding that issue of material fact with respect to evidence of damages

created through witness testimony required a credibility determination to resolve, thus precluding

summary judgment).  Generalized conclusory attacks on the credibility of witnesses, however,

are insufficient to defeat summary judgment.  See Crawford-El, 523 U.S. at 600.

The types of evidence relied on by the City in computing damages differ for the Peace

Pipe defendants and the TDM defendants.  Accordingly, the Court discusses the sufficiency of

the evidence as to each set of defendants separately below.

a)   Damages as to the Peace Pipe defendants

With respect to the Peace Pipe defendants, the City's calculations are based entirely on

three sets of Peace Pipe's own records: (1) sales records, produced to the City by the Peace Pipe

defendants, of sales between October 12, 2007 and March 14, 2009 (omitting April 2008)

(collectively, the "2007-2009 Sales Files"); (2) records of sales above certain quantity thresholds

from August 29, 2004 and June 30, 2006, compiled by Internal Revenue Service ("IRS") Agent

Robert Wanderer and based on records produced by Peace Pipe to the U.S. Attorney's Office for

the Eastern District ("USAO-EDNY") (collectively, the "2004-2006 Sales Spreadsheet"); and (3)

sales records seized from the Peace Pipe defendants summarizing sales, by customer account

number, between July 21, 1999 and August 3, 2004 (collectively, the "1999-2004 Sales File").

Although, as a result, many of the underlying numbers used by the City in its calculations are not

in dispute, each set of records raises slightly different concerns.  The Court thus discusses the

City's damages calculations based on each of these sets of records in turn below.

*(i)  The 2007-2009 Sales Files*

The 2007-2009 Sales Files are electronic sales records that accurately reflect Peace Pipe's sales for the period between October 12, 2007 and March 14, 2009 (omitting April 2008), including sales through its Smoker's Den operation.  (Proshansky Decl. Ex. 11; City 56.1 ¶ 17; Proshansky Decl. Exs. 9-10, Admis. 8-11; Peace Pipe 56.1 ¶ 17.)  Information contained in these files includes addresses associated with a sale.  437, 567 cartons of unstamped cigarettes are associated with sales linked to a New York City address.  (City's 56.1; ¶¶ 18-19; Proshansky Decl. Ex. 12.)  A New York City address in these files, the City contends, is strong evidence of unstamped cigarettes mailed by Peace Pipe/Smoker's Den into the City or sold to an individual who Peace Pipe knew was transporting them into the City.  Peace Pipe concedes that at least 410,789 cartons of cigarettes—the number of cartons listed as sales from a Smoker's Den cash register—were sold and shipped to purchasers with New York City addresses and does not otherwise dispute the City's determination of total City sales.  (Peace Pipe 56.1 ¶ 18.)  Based on the City's reasonable (and undisputed) inference, the 2007-2009 Sales Files reveal that Peace Pipe sold 437,567 cartons of unstamped cigarettes, taxes on which the City was deprived.  (See City's 56.1 ¶¶ 18-19; Proshansky Decl. Ex. 12.)  The Court thus finds that for this period, the City is entitled to $6,563,505 in damages, representing $15 in lost taxes for each of the 437,567 cartons of unstamped cigarettes sold to customers with New York City addresses.

*(ii) The 2004-2006 Sales Spreadsheet*

The 2004-2006 Sales Spreadsheet, produced to the City by the USAO-EDNY and compiled by IRS Agent Wanderer, is based on records produced by Peace Pipe and lists sales between August 29, 2004 and March 8, 2006 in excess of 300 cartons and sales between March 9, 2006 and June 30, 2006 in excess of 50 cartons.  (Wanderer Decl. Ex. 1; see Wanderer Decl.

¶¶ 3-10; Proshansky Decl. ¶ 16.)  In addition to detailing Peace Pipe's sales in those quantities, it includes, among other data, customer name, account number, cartons purchased, and amount paid.  (See Wanderer Decl. ¶¶ 3-10; see also Proshansky Decl. Exs. 9-10, Admis. 31-34.)

Using the information in the records produced by Peace Pipe, Agent Wanderer determined the residence of the customers in this spreadsheet by matching customer identifying information contained in the records (e.g., phone numbers, names and credit card information) with an address in the Lexis-Nexis "ACCURINT" Database.  (See Wanderer Decl. ¶¶ 7-10.)  He then noted on the spreadsheet those customers with an identifiable address in the City.  (Id.) Using only those sales matched with a customer that Agent Wanderer was able to identify as having a City address, the 2004-2006 Sales Spreadsheet constitutes persuasive evidence that Peace Pipe sold at least 231,838 cartons of unstamped cigarettes to customers with New York City addresses for this period, a number the Peace Pipe defendants concedes.  (See Proshansky Decl. Ex. 13; City 56.1 ¶ 22; Peace Pipe 56.1 ¶ 21.)  Accordingly, the Court finds that the City is entitled to damages in the amount of $3,477,570 for this period, representing $15 in lost taxes for each of the 231,838 cartons of unstamped cigarettes sold to customers with City addresses.

*(iii)The 1999-2004 Sales File*

The 1999-2004 Sales File, which was seized from Peace Pipe and produced to the City by the USAO-EDNY, contains data on Peace Pipe's sales, identified by customer name and account number, for the period between July 21, 1999 and August 3, 2004.  (Wanderer Decl. Ex. 2; see City 56.1 ¶¶ 24-25; Wanderer Decl. ¶ 11.)  This file does not include addresses but rather customer names and telephone numbers.  In addition, it provides only a given customer's total purchases in dollars, not sales, between the listed dates of each customer's first and last purchase within this period.  This period encompasses a 2002 change in the amount of City tax imposed

from $.08 per pack prior to July 2, 2002 to $1.50 per pack afterwards.  (City Mem. at 35.)

To use this data to calculate its tax loss, the City relies on a number of inferences and assumptions.  Most important to the calculations is the City's claim that the Court can infer that customers linked to City telephone numbers beginning with 917, 718, 212, 347, and 646 purchased cigarettes that were possessed or sold in the City.  To support this inference, the City matched two sample sets of phone numbers, 94 in the first set and 323 in the second, with these area codes to addresses in the Lexis-Nexis Public Records database.  In doing so, it was able to match 70 percent of the numbers sampled in the first set and 80 percent of the numbers sampled in the second set to an address.  One hundred percent of those numbers found in the database (417 total numbers) were associated with a City address.  (See Jacobson Aff. ¶¶ 2-5; Jacobson Supp. Aff. ¶¶ 3-7.)  Although the Peace Pipe defendants do not dispute the total sales in dollars made to customers linked to telephone numbers with these area codes, they dispute that these area codes are an accurate proxy for purchases of cigarettes that were possessed or sold in the City.  (Peace Pipe 56.1 ¶¶ 25-30.)  The City performed two additional operations on this data subset so that it would reflect an approximation of its tax loss:

First, the City attempted to eliminate all pre-July 2, 2002 sales to reflect the much lower City tax rate on cigarettes imposed prior to that date.  To do so, the City excluded all customers whose purchases occurred entirely before July 2, 2002.  For those customers whose first purchase preceded July 2, 2002, the City statistically removed the pre-July 2, 2002 purchases by prorating the total value of these customers' purchases by the ratio between the time span of their post-July 2, 2002 purchases and the entire span of their purchase, a method not disputed by Peace Pipe.  (See Proshansky Decl. Ex. 15.)  Applying this proration to the data in the sales file, the total value of Peace Pipe's post-July 2, 2002 sales of unstamped cigarettes is $15,663,293.95,

64

an amount defendants do not dispute.  (Proshansky Decl. Ex. 15 at 96; Peace Pipe 56.1 ¶ 31.)

Second, to convert this dollar amount of sales into cartons, the City uses a price per carton of $25, the average price at which Peace Pipe sold a carton of cigarettes during this period.[21]  (See City 56.1 ¶ 35; Peace Pipe ¶ 35.)  Excluding pre-July 2, 2002 purchases based on the above method, the number of cartons represented by the $15,663,293.95 in sales at a rate of $25 per carton is 626,532.  The City claims these calculations entitle it to $9,397,980 in lost taxes for this period, representing $15 in lost taxes for each of these 626,532 cartons.

Despite the Peace Pipe defendants' failure to adequately support their concern with the reliability of using telephone numbers as a proxy for possession or resale in the City, the Court harbors its own doubts as to the propriety of doing so.  The area codes 646 and 347, for example, are not infrequently assigned to cellphones, and there is no indication that the telephone numbers in the City's samples are representative of the full data set.  Given that the City has not adequately established that the numbers for which no address has been identified are associated with a City address, the Court declines to grant the City summary judgment on the damages based on the 1999-2004 Sales File.

In sum, the Court grants partial summary judgment on the City's claims for damages as against the Peace Pipe defendants as follows:

<u>Damages calculated from the 2007-2009 Sales Files:</u>   $6,563,505

<u>Damages calculated from the 2004-2006 Sales Spreadsheet:</u>   $3,477,570

<u>Damages calculated from the 1999-2004 Sales File:</u>   $0

**Total:**  **$10,041,075**

---

[21] The Peace Pipe defendants concede that the average price of Peace Pipe cigarettes "was not more than $25" but make the odd assertion here that "it is deceptive and misleading to use 'average prices' when many of the cartons were sold for more than $25 per carton."  (Peace Pipe 56.1 ¶ 35.)  It is not clear exactly what this statement seeks to dispute given the definition of the word "average."

b)  <u>Damages as to the TDM defendants</u>

With respect to the TDM defendants, the City's calculations are based largely on the approximate quantities and frequency of purchases that traffickers Aldabeshes and Mari A. testified that they made from Mack.  Because there is no genuine dispute that Aldabeshes and Mari A. resold cigarettes that they purchased from Poospatuck retailers in the City, the only question is whether the City has adequately established the quantities of cigarettes sold by Mack to these traffickers.  (<u>See</u> TDM 56.1 Resp. ¶ 71; 2d OA Tr. at 27.)

Aldabeshes testified to purchasing approximately fifteen to eighteen 60-carton cases five or six days a week in 2005 until early 2006 from Mack, first at Mack's house and later at a storage location.  (Aldabeshes Hearing Tr. at 192-96; 202.)  From these approximations, the City conservatively estimates that for at least one month (from 2005 through early 2006), Aldabeshes trafficked to the City at least fifteen 60-carton cases, five days per week, or a minimum of 18,000 cartons of unstamped cigarettes.  At $15 in lost taxes for each of these 18,000 cartons, the City argues that it is entitled to $270,000 in lost taxes.

Mari A., meanwhile, testified that she purchased and resold 600 to 900 cartons of unstamped cigarettes on twenty or thirty occasions from 2005 to 2006 from a Long Island facility linked to Mack.  (Mari A. Hearing Tr. at 37-39.)  From these approximations, the City estimates that at minimum Mari A. purchased and resold in the City 12,000 cartons of unstamped cigarettes.  At $15 in lost taxes for each of these 12,000 cartons, the City argues it is entitled to $180,000 in lost taxes.

The TDM defendants' challenge to the appropriateness of summary judgment based on this testimony due to concerns about the credibility of Aldabeshes and Mari A. was previously discussed and dismissed above in the section on causation.  <u>Cf.</u> <u>O'Connor</u>, 2006 WL 1419388, at

*3 (noting defendants carry same summary judgment burden in challenging summary judgment on damage award).  The Court notes, furthermore, that the City's approximations are reasonable in light of the conservative nature of the estimates[22] and the fact that more accurate calculations are not possible because of defendants' failure to keep comprehensive business records. Accordingly, the Court grants summary judgment on the City's claims for damages as against the TDM defendants as follows:

> Damages calculated from Aldabeshes's Testimony:   $270,000
>
> Damages calculated from Mari A.'s Testimony:   $180,000
>
> **Total:   $450,000**

### C.  Civil Penalties

Because the Red Dot defendants and Phillips[23] "largely frustrated the City's ability to calculate damages" due to their poor record-keeping, the City seeks instead an award of civil penalties under the CCTA against them.  (City Mem. at 41.)  In addition to injunctive relief and damages, the CCTA authorizes municipalities bringing a civil action to "obtain any other appropriate relief for violations of this chapter from any person . . . , including civil penalties." 18 U.S.C. § 2346(b)(2).

Civil penalties can serve "as a rough form of 'liquidated damages'" for the public harms caused by the defendant's conduct.  United States v. Ursery, 518 U.S. 267, 283–84 (1996).  They are also, however, designed in some measure "to punish culpable individuals," and not "simply to extract compensation or restore the status quo."  Tull v. United States, 481 U.S. 412, 422

---

[22] As the City points out, these estimates are especially conservative when viewed in light of TDM's purchases of unstamped cigarettes from wholesaler Pennisi, who Mack admitted was not her only source of unstamped cigarettes. For just the years 2005 and 2006, Pennisi's records indicate that TDM purchased 608,099 cartons of unstamped cigarettes.  (City 56.1 ¶ 63.)  For this same period, the City seeks damages based on only 30,000 cartons.

[23] In its initial motion, the City requested civil penalties against defendants Paschall, Smoking Arrow and Phillips as well as against the Red Dot defendants.  (City Mem. at 41, 49.)  Although Paschall and Smoking Arrow are no longer a part of this motion, the City has not withdrawn its claim against defaulting defendant Philips.

(1987); see Johnson v. S.E.C., 87 F.3d 484, 492 (D.C. Cir. 1996) ("'[T]he ordinary, contemporary, common meaning' of the word 'penalty,' [is] a sanction imposed by the government for unlawful or proscribed conduct which goes beyond remedying the damage caused to the harmed party."). Civil penalties also serve the purposes of "encourag[ing] defendants to discontinue current violations and deter[ring] them from committing future ones." Friends of the Earth, 528 U.S. at 186; see also Hudson v. United States, 522 U.S. 93, 102 (1997) ("[A]ll civil penalties have some deterrent effect."); S.E.C. v. Haligiannis, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007) ("Civil penalties are designed to punish the individual violator and deter future violations . . . ."). Given the culpability of the Red Dot defendants and Phillips under the CCTA, the Court finds civil penalties an appropriate form of relief against them, particularly in light of their role in making reasonable damages calculations difficult, if not impossible.

The CCTA, however, "does not specify a penalty amount for violations of its core prohibition on transacting in contraband cigarettes." See Milhelm II, 2012 WL 3579568, at *27. Nor does there appear to be any legislative history to the 2006 amendments to the CCTA that sheds light on this omission. Id. Nevertheless, for the reasons discussed more thoroughly in Milhelm II, the Court resolves this omission by using as guidance the penalty provisions of the Prevent All Cigarette Trafficking ("PACT") Act of 2010, 15 U.S.C. § 375 et. seq., a statute with similar enforcement provisions and motivated by similar concerns. Milhelm II, 2012 WL 3579568, at *31-*32. The PACT Act's penalty amounts are as follows:

> (1) In general. Except as provided in paragraph (3), whoever violates this Act shall be subject to a civil penalty in an amount not to exceed – (A) in the case of a delivery seller, the greater of —
>
>> (i) $ 5,000 in the case of the first violation, or $ 10,000 for any other violation; or

(ii) for any violation, 2 percent of the gross sales of cigarettes or
smokeless tobacco of the delivery seller during the 1-year period ending
on the date of the violation.

15 U.S.C. § 377(b).

Because defendants are liable for an enormous number of individual CCTA violations,
the City concedes that § 377(b)(1)(A)(i) would suggest an excessive penalty amount if the per
violation measure were used.  Accordingly, the City argues, as it did in Milhelm II, that the
Court should impose a penalty of up to 2% of each defendant's gross sales of unstamped
cigarettes for the year preceding a chosen violation date.  The City proposes using as the
violation date April 2009, or another date shortly after this Court issued its decision in Golden
Feather I on March 16, 2009.  As of this date, the City points out, all of the defendants in this
case were on notice that they were not protected by sovereign immunity and that their sales of
unstamped cigarettes violated both federal and state law.  (City Red Dot Reply at 6.)

As it concluded in Milhelm II, this Court "believes that using the PACT Act calculations
as a starting point for an award of civil penalties is appropriate and would not violate due
process."  2012 WL 3579568, at *33.  The Court will, moreover, inform its determination of a
civil penalty up to these amounts using "traditional factors, including the good or bad faith of the
defendants, the injury to the public, and the defendants' ability to pay" taking into account their
gross and net profits from their business of selling unstamped cigarettes.  Id.

1.   *Civil penalties as against the Red Dot defendants*

As mentioned above in the discussion on liability, Hart asserts that his "good faith" belief
that he was not violating any tax laws or criminal statutes warrants exemption from or mitigation
of the amount of any civil penalty.  (Hurwitz Decl. ¶¶ 5, 12.)  The City argues, however, that the
traditional factors for determining a discretionary civil penalty militate in favor of the maximum

69

civil penalty under the framework discussed above because: (1) in continuing to engage in massive sales of unstamped cigarettes after Golden Feather I, Hart showed clear culpability despite his assertions of "good faith"; (2) Hart's conduct contributed to substantial public harm in the form of tax losses caused to the City and State and detrimental smoking-related health effects; (3) the Red Dot defendants failure to keep records obscures their profits from the conduct at issue, but if Peace Pipe's profits are any indication, Red Dot's profits can be assumed to have been sizable; and (4) Red Dot has offered no evidence that it cannot afford to pay a substantial penalty.  (City Mem. at 52.).

The Court is deeply skeptical of Hart's claim that his "good faith" belief warrants mitigation of the amount of civil penalties imposed.  Specifically, the Court observes that for the time period for which penalties are sought by the City, the record contradicts Hart's assertion of "good faith," which stems from a mistaken understanding about tribal sovereignty.  The City's request for penalties is calculated based on Hart's violation of the CCTA in the period following this Court's decision in Golden Feather I, in which the Court held that tribal sovereign immunity did not cover any of the defendants in this case and that "the CCTA exemption for 'Indian[s] in Indian Country' is not a bar to the City's CCTA claims."  2009 WL 705815, at *7, *12.  In light of this decision, Hart was on notice that, at the very least, his conduct could constitute a violation and that by continuing to engage in sales of unstamped cigarettes he risked liability for CCTA violations and associated fines or penalties.  Nevertheless, the Court believes that, in keeping in line with the process afforded the defendants in Milhelm II, the Red Dot defendants should have the opportunity to be heard on the appropriate civil penalty amount based on the standards summarized above and described more fully in Milhelm II.

70

2. *Civil penalties as against Tony Phillips*

As directed by the Court, the City has submitted as part of this motion, its requested monetary relief as against Phillips in the form of civil penalties.  The City, however, lumps together the civil penalties requested for Paschall, Smoking Arrow and Phillips, without apportioning what amount, if any, is attributable to Phillips.  (See City Mem. at 49-50.) Although it is not clear in light of the consent order entered into with Paschall whether the City is pursuing its claim for monetary relief against Phillips, to the extent that it is, the Court notes that the briefing provided here is insufficient for purposes of determining that amount as against Phillips only.  The Court accordingly directs the City to clarify whether it is still seeking monetary relief against Phillips, and if so, to submit further damages briefing that identifies the amounts the City is seeking against Phillips only.

**D.  Attorneys' Fees**

The City argues that under the CMSA, it is entitled to an award of reasonable attorney's fees.  The TDM and Peace Pipe defendants disagree, contending that attorney's fees are not appropriate here because: (1) an award of "attorney's fees" under the CMSA requires proof of actual damages; and (2) such an award is against public policy.  They argue further that even if the Court were to find a fee award appropriate, the amount cannot be decided on a motion for summary judgment because New York law requires a hearing to determine whether a request for fees is reasonable, which, they assert, the City's request is not.  The Court discusses each of these arguments in turn.

1. *The City is entitled to attorney's fees*

The CMSA provides for an award of "reasonable attorney's fees" in an action where a

violation of the statute has been established.[24]  Specifically, the CMSA relief provisions state

that:

1. An action may be maintained in the supreme court to prevent, restrain or
enjoin a violation, or threatened violation, of any of the provisions of this
article. Such an action may be instituted by any person injured by any
violation or threatened violation of this article, or by the tax commission.  If in
such action a violation or threatened violation of this article shall be
established, the court shall enjoin and restrain, or otherwise prohibit, such
violation or threatened violation.  In such action it shall not be necessary that
actual damages to the plaintiff be alleged or proved, but where alleged and
proved, the plaintiff in said action, in addition to such injunctive relief and
costs of suit, including reasonable attorney's fees, shall be entitled to recover
from the defendant the actual damages sustained by such plaintiff.

2. In the event that no injunctive relief is sought or required, any person injured
by a violation of this article may maintain an action for damages and costs of
suit in the supreme court as provided for in the civil practice law and rules.

NYTL § 484(b).

a) Proof of actual damages

The TDM and Peace Pipe defendants argue that the language of the CMSA limits

an award of "attorney's fees" to actions where the plaintiff has alleged and proved "actual

damages."  This argument is not only inapplicable to them, but also an incorrect reading

of the statute.  First, the Court determined in the damages discussion above that the City

has in fact proven actual damages against the TDM and Peace Pipe defendants.  In

addition, as this Court concluded in Milhelm II, "based on the most natural reading of the

statutory language . . .attorney's fees [are] awardable in an action seeking either

injunctive relief or damages under the CMSA."  2012 WL 3579568, at *36.  Here, the

City sought and won injunctive relief against all remaining defendants under both the

CCTA and CMSA, rendering any requirement of proof of "actual damages" simply

---

[24] In light of this statutory authorization of attorney's fees, defendants' arguments regarding the so-called American
Rule are inapposite.

irrelevant.  Accordingly, because the City has established that the all of the defendants on this motion have violated the CMSA, the statute authorizes the City's request for some amount of attorney's fees for its efforts in this action.

b)  <u>An award of fees to the City is not against public policy</u>

The TDM and Peace Pipe defendants also suggest, without citing any authority, that the Court decline to entertain the City's request for attorney's fees because the City's status as a government entity somehow renders an award of fees "unreasonable."  The CMSA, however, authorizes an award of attorney's fees to a "plaintiff" that establishes a violation, making no distinction between a private plaintiff and a government plaintiff, and defendants point to nothing in the legislative history or elsewhere indicating any intent to have government plaintiffs treated differently for purposes of relief.  The Court notes further that courts have found the City entitled to attorney's fees under other statutes that likewise do not specify any limitations on the type of plaintiff entitled to fees.  <u>See</u> <u>City of New York v. Venkataram</u>, No. 06 Civ. 6578, 2009 WL 1938984, at *7 (E.D.N.Y. July 7, 2009) (stating that City was entitled to attorney's fees under the RICO statute which allows an award of such fees to "[a]ny person injured" by a RICO violation).  The Court thus finds that the City's status as a government entity does not preclude an award of attorney's fees to which it is otherwise entitled.

2.  <em><u>Reasonableness of the City's fee request</u></em>

In light of the Court's determination that an award of attorney's fees is appropriate, the TDM and Peace Pipe defendants request an evidentiary hearing to determine the amount of reasonable attorney's fees.  The Court refers this matter to Magistrate Judge Joan M. Azrack to conduct a hearing, if necessary, and issue a report and recommendation regarding the appropriate amount of attorney's fees to which the City is entitled.

## CONCLUSION

For the reasons stated, the Court concludes the following:  As to defendant Phillips, the City is directed to clarify whether it is still seeking monetary relief against him, and if so, to submit further damages briefing that identifies the amounts the City is seeking against Phillips only.  As to the Peace Pipe, TDM, and Red Dot defendants, the Court finds that the City is entitled to summary judgment on (1) defendants' liability under the CCTA and the CMSA, and (2) its requested permanent injunction against defendants' "purchase, receipt, possession, sale, distribution, offer and advertisement of unstamped cigarettes—even to tribe members for personal use."  In addition, the Court awards to the City (1) damages in the amount of $10,041,075 as against the Peace Pipe defendants and $450,000 as against the TDM defendants; (2) civil penalties as against the Red Dot defendants, the amount of which will be determined at a later hearing; and (3) attorney's fees, the amount of which will be determined in the first instance by Magistrate Judge Azrack by report and recommendation.

The Court further directs the City to confer with the Red Dot defendants regarding any additional discovery to be exchanged, and the parties' anticipated presentations at the civil penalties hearing.  Within thirty (30) days of this Order, the parties should submit a joint pre-hearing order that contains the witness testimony and exhibits that each party anticipates introducing at the hearing, as well as any objections to opponents' proffered evidence.  At that time, the Court will set a date for the hearing and/or a pre-hearing conference.

Defendants' cross-motion for summary judgment is denied.

SO ORDERED.

Dated: Brooklyn, New York
       June    20, 2013

                              _____/s/_____
                              Carol Bagley Amon
                              Chief United States District Judge