FILED IN CLERK'S OFFICE U.S. DISTRICT COURT E.D.N.Y. ★ OCT 1 - 2013 ★ BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
THE CITY OF NEW YORK,

          Plaintiff,

  - against -

GOLDEN FEATHER SMOKE SHOP, INC., KIMO
SMOKE SHOP, INC., SMOKE AND ROLLS INC.,
SHAWN MORRISON, KIANA MORRISON, in her
individual capacity, MONIQUE'S SMOKE SHOP,
ERNESTINE WATKINS, in her individual capacity,
JESSEY WATKINS, WAYNE HARRIS, PEACE PIPE
SMOKE SHOP, RODNEY MORRISON, Sr.,
CHARLOTTE MORRISON, in her individual capacity,
RED DOT & FEATHERS SMOKE SHOP, INC.,
RAYMOND HART, in his individual capacity,
SMOKING ARROW SMOKE SHOP, DENISE
PASCHALL, in her individual capacity, TONY D.
PHILLIPS, TDM DISCOUNT CIGARETTES, and
THOMASINA MACK, in her individual capacity,

          Defendants.
------------------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
08-CV-03966 (CBA) (JMA)

AMON, Chief United States District Judge.

      The City of New York ("the City") initiated this action against the above-captioned defendants, individuals and businesses engaged in the sale of cigarettes from the Poospatuck Indian Reservation in Mastic, New York (the "Poospatuck Reservation"), where members of the Unkechauge Indian Nation reside. The City contended principally that the defendants violated the Contraband Cigarette Trafficking Act ("CCTA"), 18 U.S.C. § 2341 et seq., and the Cigarette Marketing Standards Act ("CMSA"), N.Y. Tax Law § 483 et seq., by engaging in bulk re-sales of cigarettes on which State and City taxes had not been paid ("unstamped cigarettes") to the public, either directly or through trafficker intermediaries. On December 30, 2011, the Court granted the City's motion for a default judgment as to the direct CCTA and CMSA liability of



defendant Tony D. Phillips, an employee and the main operator of the Smoking Arrow Smoke Shop ("Smoking Arrow") located on the Poospatuck Reservation. (DE #382.) In a subsequent Memorandum and Order, the Court further determined that, "[g]iven the culpability of . . . Phillips under the CCTA, . . . civil penalties [are] an appropriate form of relief against [him]." (DE #468.) Currently before the Court is the City's request for an award of civil penalties against Phillips in the amount of $591,330.48. (DE #461, #465.)

## BACKGROUND

The Court assumes the parties' familiarity with the history of this litigation and incorporates by reference the legal background and statement of facts set forth in this Court's Memorandum and Order issued originally on March 29, 2013 and corrected on June 20, 2013. (DE #457; DE #468.)

## DISCUSSION

The CCTA authorizes municipalities bringing a civil action to "obtain any other appropriate relief for violations of this chapter from any person . . . , including civil penalties." 18 U.S.C. § 2346(b)(2). The CCTA, however, "'does not specify a penalty amount for violations of its core prohibition on transacting in contraband cigarettes,'" and there is no legislative history "that sheds light on this omission." See City of New York v. Golden Feather Smoke Shop, Inc. ("Golden Feather II"), No. 08-CV-03966, 2013 WL 3187049, at *38 (E.D.N.Y. June 20, 2013) (quoting City of New York v. Milhelm Attea & Bros., Inc., No. 06-CV3620, 2012 WL 3579568, at *27 (E.D.N.Y. Aug. 17, 2012)). Thus, for reasons discussed more thoroughly in the Court's earlier decisions in this case and in the parallel proceedings against cigarette wholesalers, to inform its award of a discretionary civil penalty here, the Court will use as guidance the penalty provisions of the Prevent All Cigarette Trafficking ("PACT") Act of 2010, 15 U.S.C. § 375 et.

seq., a statute with similar enforcement provisions and motivated by similar concerns. See Golden Feather II, 2013 WL 3187049, at *38; Milhelm Attea, 2012 WL 3579568, at *31-*32. Specifically, as stated previously, the Court will use PACT Act calculations as a starting point and will "inform its determination of a civility penalty up to these amounts" by considering "'traditional factors, including the good or bad faith of the defendant[], the injury to the public, and the defendant['s] ability to pay," taking into account the defendant's profits from engaging in the sales of unstamped cigarettes. See Golden Feather II, 2013 WL 3187049, at *38; Milhelm Attea, 2012 WL 3579568, at *33. With this framework in mind, the Court turns to the specific circumstances that inform the penalty award against Phillips.

## I. The PACT Act Starting Point

The PACT Act's penalty provision sets forth two alternative measures for determining a penalty amount: (1) a per violation measure comprised of "$ 5,000 in the case of the first violation, or $ 10,000 for any other violation"; and (2) "for any violation, 2 percent of the gross sales of cigarettes . . . of the delivery seller during the 1-year period ending on the date of the violation." 15 U.S.C. § 377(b)(1)(A). The evidence in this case indicates that Phillips engaged in an enormous number of individual CCTA violations. As a result, the imposition of the PACT Act's per violation penalty measure here would set as the starting point for this penalties discussion an unduly high amount. Thus, the Court agrees with the City that it would be more appropriate under the circumstances of this case to use the alternative measure. Accordingly, the Court will impose a penalty against Phillips of up to 2% of Smoking Arrow's gross sales of unstamped cigarettes for the year preceding a chosen violation date.[1]

In choosing the violation date, the Court recognizes the suitability of a date that is after

---

[1] Although the relevant PACT Act penalty provision provides that the penalty award is "the greater of" the two alternative measures, 15 U.S.C. § 377(b)(1)(A), the Court sees no reason to follow that instruction here where the City has not sought the higher penalty award.

3

March 16, 2009 and accepts the City's proposed violation date of April 1, 2009. On March 16, 2009, the Court issued its Order denying the defendants' motion to dismiss this action on the grounds of sovereign immunity and allowing the City's CCTA claims to proceed, concluding both that "state law 'requires' cigarettes sold by defendants to members of the broader public to bear tax stamps" and that the CCTA exemption for "Indian[s] in Indian County," 18 U.S.C. § 2346(b)(1), was not a bar to the City's claims. City of New York v. Golden Feather Smoke Shop, Inc., No. 08-CV-3966, 2009 WL 705815, at *7, *11-*12 (E.D.N.Y. Mar. 16, 2009). Although it was not a final judgment or an injunction, the March 16, 2009 Order put the defendants, including Phillips, on notice that they were not protected by sovereign immunity and that any sales of unstamped cigarettes to the public violated both state and federal law. Using a date post-dating this Order therefore bars any suggestion by Phillips that he was simply unaware of the possible illegality of his conduct and that his good faith belief in the legality of his cigarette sales completely shields him from an award of civil penalties against him.

The Court thus uses as its penalty starting point, 2% of the gross sales of Smoking Arrow for the year preceding April 1, 2009. Because Smoking Arrow did not provide any sales records in this case, its gross sales are conservatively estimated using a variety of other documents.

First, the number of cartons of unstamped cigarettes Smoking Arrow purchased at wholesale during this period serves as a proxy for the number of cartons of unstamped cigarettes sold during this period. These wholesale purchases are recorded in the required monthly wholesaler reports—"Resident Agent Cigarette Tax Reports," (Form CG-6s")—of Gutlove & Shirvint, Inc. and Mauro Pennisi, Inc., which lists the number of cigarettes sold by these wholesalers to individual stores on Indian reservations. According to these reports, Smoking Arrow purchased 1,137,174 cartons of unstamped cigarettes from April 1, 2008 through March

4

31, 2009. (DE #425, Proshansky Decl., Ex. 6.)

Second, the price at which Smoking Arrow sold cigarettes to undercover New York Department of Taxation and Finance ("DTF") investigators serves as the average price at which these cartons of cigarettes were sold. DTF investigators made three purchases at Smoking Arrow between April 1, 2008 and March 31, 2009—on June 3, 2008, August 7, 2008 and September 5, 2008—at $26.00 per carton, $28.00 per carton and $27.25 per carton respectively. See City of New York v. Golden Feather Smoke Shop, Inc. ("Golden Feather I"), No. 08-CV-3966, 2009 WL 2612345, at *18 (E.D.N.Y. Aug. 25, 2009). Using the most conservative of these prices, i.e., $26.00,[2] gross sales for Smoking Arrow in the year preceding April 1, 2009 equals $29,566,524.00 ($1,137,174 x $26.00). The starting point for this civil penalty discussion is thus in turn 2% of this gross sales amount or $591,330.48.

## II. Analysis of Other Relevant Factors

As an initial matter, the Court notes that the City had originally sought its requested $591,330.48 penalty amount jointly and severally against defendants Phillips, Smoking Arrow and Denise Paschall, the owner of Smoking Arrow. See Golden Feather II, 2013 WL 3187049, at *39. The City stated that it was seeking civil penalties against these defendants because they "ha[d] largely frustrated the City's ability to calculate damages." (DE #424-1, at 41.) In doing so, the City suggested that its main motivation in pursuing civil penalties is to recoup actual damages that it could not otherwise prove. The City subsequently settled with Paschall and Smoking Arrow for $10,000 and dismissed its claims against them pursuant to a consent order dated July 11, 2012. (DE #418; DE #460.) The City now seeks to impose on Phillips alone the full $591,330.48 in civil penalties. According to the City, Phillips's managerial involvement in

---

[2] The City points out that using an average price of $26.00 is generous in light of evidence in the record indicating that Smoking Arrow sold cartons at much higher prices—from $28.00 to $40.00—during this period. See Golden Feather I, 2009 WL 2612345, at *19.

5

the sales of unstamped cigarettes at Smoking Arrow, his bad faith, the substantial public harm resulting from his cigarette sales and the profits undoubtedly generated by this business warrants the full penalty amount of $591,330.48. Although these factors do largely support the City's request for the maximum award, the Court's analysis nevertheless indicates that a slightly smaller award is more appropriate.

### A. Phillips's Role at Smoking Arrow

The Court turns first to the effect, if any, of the settlement and consent order entered into between the City and Paschall on the penalty amount sought against Phillips alone. Although civil penalties also serve punitive purposes that are distinct from compensation for harms suffered, insofar as civil penalties are meant to serve as—and the City seeks—a form of "liquidated damages," it is not clear whether and to what extent set-off principles from the damages context should apply here, i.e., whether the penalty award against Phillips should be set-off at least in part by the City's settlement with Paschall and Smoking Arrow.

Federal common law permits a set-off where a jointly liable co-defendant has settled, but the law also "contains no rigid rule against overcompensation." McDemott v. AmClyde, 511 U.S. 202, 208, 209 (1994). Interpreting the interplay of these two concepts differently in the context of a defaulting defendant, some courts in this Circuit have held that a defaulting defendant "may not invoke the benefits of the set-off rule" since it is the defendant's burden to establish the extent to which a recovery against it would be duplicative of the plaintiff's recovery from a settling defendant. Chloe v. Zarafshan, No. 06-cv-03140, 2009 WL 2956827, at *7 (S.D.N.Y. Sept. 15, 2009); see also RLI Ins. Co. v. King Sha Group, 598 F. Supp. 2d 438, 446-47 (S.D.N.Y. 2009) (holding that under New York law, a defaulting defendant is not entitled to a set-off based on a co-defendant's settlement). This Court, however, among others, has not

6

adopted such a bright-line rule and has given a defaulting defendant the benefit of a settlement set-off where warranted based on the circumstances of the case. See, e.g., State Farm Mut. Auto. Ins. Co. v. Kalika, No. 04-CV-4631, 2007 WL 4326920, at *9 (E.D.N.Y. Dec. 7, 2007) (reducing default judgment based on settlement by other co-defendants); Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Kun Fung USA Trading Co. Inc., No. 07-CV-2568, 2012 WL 1414872, at *9 (E.D.N.Y. Jan 20, 2012), adopted on May 7, 2012 (noting courts may award set-offs to defaulting defendants and finding circumstances in that case warranted set-off); cf. State Farm Mut. Auto Ins. Co. v. Grafman, No. 04-CV-2609, 2013 WL 1910852, at *3 (E.D.N.Y. May 8, 2013) (although defaulting defendant was not entitled to a set-off, observing that other courts have granted set-offs to defaulting defendants in distinguishable circumstances). Given that the award here is ultimately a penalty and not damages, the Court declines to formally extend a strict application of set-off rules to this case. Nevertheless, even though the City settled with Paschall and Smoking Arrow for $10,000 only, in light of this settlement and the City's use of the penalty provision primarily as a substitute for damages, the Court finds the concept of set-off instructive here and thus considers Phillips's role at Smoking Arrow during the period in question.

Irrespective of whether the penalty award is viewed as proportional to the size of his role in causing harm to the City or as due punishment for that role, the City argues that because Phillips was "the driving force behind Smoking Arrow," it is appropriate for him to bear the full weight of the penalty amount. (DE #465.) Phillips testified that Paschall was an "absentee owner" who "didn't care too much about the business" and that for approximately one year—from about 2006 until 2007—Phillips was "basically running the business" by himself. Golden Feather I, 2009 WL 2612345, at *16-*17. After 2007, and through the period on which the penalty award is based, Phillips was no longer "running" Smoking Arrow and his role at the shop

7

was somewhat diminished. (Id. at *16; DE #433-4, Paschall Dep. at 9-13.) However, the testimony of Paschall and Mari A, a cigarette trafficker intermediary, indicates that he continued to operate and manage the business "on and off" and remained in charge of sales, purchasing inventory and allocating profits. (DE #433-4, Paschall Dep. at 9-13; DE #434-2, Mari A. Dep. at 28-29.) Taken together, the evidence indicates that Phillips's role at Smoking Arrow during the period at issue supports his bearing the vast majority, but not necessarily the full amount, of the civil penalty award.

### B. Phillips's Good Faith/Bad Faith

The City also argues that Phillips's sales of unstamped cigarettes were entirely in bad faith, culpability that weighs heavily in favor of awarding the maximum penalty award. The City establishes this bad faith in several ways. First, the City states that Phillips was aware that his sales of unstamped cigarettes could be illegal as early as September 2007, when federal government attorneys and investigators told him that they believed that his conduct was illegal. (DE #465, Ex. A., Phillips Testimony at 2522.) Nevertheless, he continued to help operate and manage the sales of unstamped cigarettes at Smoking Arrow through September 2009, when the shop closed. (DE #433-4, Paschall Dep. at 9-13.) Second, the City contends that "Phillips's continuous involvement in Smoking Arrow's operations strongly suggests that he would have been aware of this Court's [March 16, 2009 Order]," which would have again put him on notice that his conduct violated federal and state law. (DE #465.) Third, the City points to Mari A's testimony that "under Phillips's management, Smoking Arrow's employees assisted traffickers in avoiding police detection" as further evidence that Phillips was aware that such sales were illegal. (Id.) The Court agrees that, taken together, these facts belie any possibility that Phillips was simply unaware of the possible illegality of his conduct.

8

However, as this Court previously stated in the parallel wholesaler proceedings, "a penalty award in this case should take some account of the fact that state tax authorities actively acquiesced in the defendant['s] business model for years, despite actual knowledge that large amounts of untaxed cigarettes were being sold and distributed to non-Native American as a result of the forbearance regime." Milhelm Attea, 2012 WL 3579568, at *33. Although the forbearance policy does not negate Phillips's awareness that his conduct did not comport with the actual requirements of the law, the Court recognizes that its existence injected some uncertainty into the practical state of the law in New York. As a result, the Court believes the penalty award should be adjusted downward slightly to account for the forbearance regime.

### C. Injury to the Public

The City also argues that the substantial harm to the public caused by Phillips's conduct is undeniable and militates strongly in favor of a substantial penalty. For one, the sale and trafficking of unstamped cigarettes from Smoking Arrow resulted in significant losses in tax revenues to the City and State. Based on the City's estimates, Smoking Arrow's sales of the 1,137,174 cartons of unstamped cigarettes that it purchased during the one-year period that forms the basis of the penalty award correlate with a loss of more than $29 million in State tax revenue alone. (DE #465.) In addition, this Court previously determined that these sales of unstamped cigarettes caused harm to the public by contributing to detrimental smoking-related health effects. See Golden Feather I, 2009 WL 2612345, at *41. Accordingly, the Court agrees that this factor supports a significant penalty award against Phillips.

### D. Phillips's Ability to Pay

Turning to Phillips's ability to pay, in never appearing in this action, Phillips has failed to put forth any evidence regarding his financial circumstances or ability to pay a substantial

9

penalty award. The City, however, has put forth evidence approximating Phillips's profits from his business of selling unstamped cigarettes, a factor that the Court, in noting the appropriateness of a civil penalties award against Phillips, stated that it would take into account in determining Phillips's ability to pay. See Golden Feather II, 2013 WL 3187049, at *38. This measure suggests that Phillips's profits from engaging in the sales of unstamped cigarettes were significant. For example, based on the volume of cigarettes purchased by Smoking Arrow in the one-year period preceding April 1, 2009 and using the conservative price of $26.00 per carton, the City estimates that Smoking Arrow had gross sales of approximately $29,566,524.00 ($1,137,174 x $26.00). That Smoking Arrow's unstamped cigarette business was extraordinarily lucrative is also reflected in Phillips's own estimates that Smoking Arrow sold approximately 10,000 cartons of unstamped cigarettes per day and grossed approximately $1 million per week. (DE #435-21, Phillips Testimony at 2523-54.) The record also makes clear that Phillips shared in Smoking Arrow's profits and was, in fact, in charge of allocating the profits. (DE #433-4, Paschall Dep. at 9-13.) Based on these gross profits and with no evidence to the contrary, the Court assumes that Phillips has the ability to pay the maximum penalty requested here and that no modification to the penalty amount is warranted based on this factor.

### E. Need for Deterrence

Finally, the Court believes that the penalty award here should take into account the degree to which there is still a need for the penalty to serve as a strong deterrent for future illicit cigarette sales. See Milhelm Attea, 2012 WL 3579568, at *33. Recent legal developments, specifically the Tax Law Amendments and the Court's recent Order permanently enjoining certain defendants, including Phillips, from engaging in any transactions with unstamped cigarettes (DE #468), have substantially reduced the need for the penalty to serve as a substantial

10

deterrent. As discussed in the Court's Order granting the permanent injunction, under the Tax Law Amendments, reservation retailers should theoretically no longer be able to obtain unstamped cigarettes. See Golden Feather II, 2013 WL 3579568, at *27. To the extent that some unstamped cigarettes are still able to circumvent the new stamping regime, the permanent injunction bars Phillips from engaging in any transactions with those cigarettes. As a result, the need to impose a substantial penalty award for its deterrent effect is lessened.

## CONCLUSION

Considering all these factors together, the Court concludes that a substantial penalty award against Phillips is warranted but that the maximum penalty amount requested by the City should be moderated somewhat to take into account the existence of the forbearance policy, the reduced need for a deterrent effect, the City's settlement with Paschall and Smoking Arrow and Phillips's slightly diminished role at Smoking Arrow during the time period on which the penalty award is based. Accordingly, the Court awards the City $475,000 in civil penalties against defaulting defendant Tony D. Phillips. The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

Dated: Brooklyn, New York
September 30, 2013

s/Carol Bagley Amon
Carol Bagley Amon
Chief United States District Judge